UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ACADIA HEALTHCARE COMPANY, INC., JOEY A, JACOBS, BRENT TURNER and DAVID DUCKWORTH,<br><br>Defendants. | Civil Action No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff St. Clair County Employees' Retirement System ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of securities analysts' reports, media reports, regulatory filings and reports, U.S. Securities and Exchange Commission ("SEC") filings by Acadia Healthcare Company, Inc. ("Acadia" or the "Company"), as well as press releases and other public statements issued by the Company. Plaintiff believes that, after a reasonable opportunity for discovery, substantial additional evidentiary support will exist for the allegations set forth herein.

## INTRODUCTION

1. This is a securities class action brought on behalf of all purchasers of Acadia publicly traded securities between February 23, 2017 and October 24, 2017, inclusive (the "Class Period"), asserting claims under the Securities Exchange Act of 1934 ("1934 Act").

2. Acadia is a for-profit healthcare company focused on operating inpatient psychiatric facilities, residential treatment centers, group homes, substance abuse facilities, and facilities providing outpatient behavioral healthcare services in the United States, the United Kingdom ("U.K.") and Puerto Rico. Acadia has two operating segments, U.S. Facilities, with more than 200 behavioral healthcare facilities and approximately 8,900 beds in 39 states and Puerto Rico, and U.K. Facilities, with over 375 behavioral healthcare facilities and also approximately 8,900 beds in the U.K.

3. Prior to and during the Class Period, defendants made materially false and misleading statements and omissions regarding Acadia's business and operations. Specifically, defendants falsely stated that the quality of Acadia's U.K. operations gave it a "competitive strength" that would drive future growth and profitability. In addition, defendants caused Acadia to issue false and misleading guidance regarding the Company's actual and projected fiscal 2017 revenue, earnings before interest, taxes, depreciation and amortization ("EBITDA") and earnings per share ("EPS").

1479387_1

Defendants' false and misleading statements caused Acadia's stock to trade at artificially inflated prices during the Class Period. While Acadia's stock price was artificially inflated by defendants' misconduct, Acadia's Chief Executive Officer ("CEO") and President were able to offload ***706,000 shares of Acadia stock***, or more than half the total number of shares they beneficially owned, for proceeds of over ***$35 million***.

4.     On October 24, 2017, Acadia issued a release announcing its financial results for the third quarter of 2017. Contrary to defendants' representations, the Company revealed a drastic shortfall in EBITDA for its U.K. operations, purportedly resulting from "lower census and higher operating costs." In addition, Acadia lowered its financial guidance for 2017, including lowering its EPS guidance by as much as $0.24 per share.

5.     As a result of these revelations, which began to disclose the relevant truth that had previously been concealed from the market, Acadia's stock price plummeted 26%, closing at under $33 per share on October 25, 2017, from a closing price of $44.12 per share on October 24, 2017, causing hundreds of millions of dollars in harm to Acadia shareholders.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and §27 of the 1934 Act.

7.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b). A substantial amount of the acts and omissions giving rise to the claims at issue occurred in this District. Acadia's corporate headquarters are located in this District and defendants are subject to personal jurisdiction in this District.

8.     In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ.

## PARTIES

9.     Plaintiff St. Clair County Employees' Retirement System purchased Acadia publicly traded securities during the Class Period and has been damaged thereby, as set forth in the accompanying certification incorporated herein by reference.

10.     Defendant Acadia is one of largest publicly traded behavioral healthcare companies in the country. Acadia stock trades under the ticker symbol "ACHC" on the NASDAQ, an efficient market, and did so during the entirety of Class Period. Acadia's corporate headquarters are located in Franklin, Tennessee. As of July 31, 2018, Acadia had over 88 million shares of common stock outstanding.

11.     Defendant Joey A. Jacobs ("Jacobs") is, and was at all relevant times, Chairman of the Acadia Board of Directors and its CEO.

12.     Defendant Brent Turner ("Turner") is, and was at all relevant times, Acadia's President.

13.     Defendant David Duckworth ("Duckworth") is, and was at all relevant times, Acadia's Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO") and Controller.

14.     The defendants referenced above in ¶¶11-13 are also referred to herein as the "Individual Defendants" and are liable under §§10(b) and 20(a) of the 1934 Act for Acadia's false and misleading Class Period statements.

15.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Acadia, were privy to confidential, proprietary information concerning Acadia, its finances, operations, financial condition, and present and future business prospects. The Individual

- 3 -

Defendants also had access to material adverse non-public information concerning Acadia, as discussed in detail below. Because of their positions with the Company, the Individual Defendants had access to non-public information about its finances, business, markets, products, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

16. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Acadia's business.

17. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

18. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was, and is, registered with the NASDAQ and governed by the federal

1479387_1

securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Acadia's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Acadia stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Acadia securities.  The scheme: (a) deceived the investing public regarding Acadia's business, operations and management, and the intrinsic value of Acadia securities; and (b) caused plaintiff and members of the Class (defined below) to purchase Acadia securities at artificially inflated prices.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

20.     Throughout the Class Period, defendants inflated the trading price of Acadia securities by issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, set forth below, not false and misleading.

21.     On February 23, 2017, Acadia issued a release entitled "Acadia Healthcare Reports Fourth Quarter GAAP EPS of $0.48 and Adjusted EPS of $0.59; Establishes Financial Guidance for 2017."  In the release, Acadia announced its financial results for the fourth quarter of 2016:

> Revenue for the quarter increased 41.9% to $702.9 million from $495.3 million for the fourth quarter of 2015.  Net income from continuing operations attributable to Acadia stockholders was $41.8 million, up 21.1% from $34.5 million for the fourth quarter of 2015.  With a 22.1% increase in weighted average diluted shares outstanding, primarily due to the issuance of common stock in January and February 2016, related to the acquisition of Priory Group, net income from continuing operations attributable to Acadia stockholders per diluted share decreased 2.0% to $0.48 for the fourth quarter of 2016 from $0.49 for the fourth quarter of 2015.

- 5 -

22.     The February 23, 2017 release discussed the state of the Company's U.K. operations, including remarks from Jacobs:

> "The Priory acquisition drove the majority of our revenue growth for 2016, as we gained nearly 6,200 net additional beds in the U.K. due to the combined effect of the acquisition and the subsequent facility sale. These beds represented a majority of the 71.7%, or over 7,100 bed, increase in total beds at the end of 2016 from the end of 2015 . . . ."

> . . . Same facility revenue in the U.K. grew 4.2%, on a 4.7% increase in patient days offset by a 0.5% decrease in revenue per patient day. Management believes that same facility results in the U.K. reflected disruption throughout the fourth quarter resulting from the focus, time and effort required to complete the divestiture in late November and to begin the integration of Priory's operations into Acadia.

23.     The February 23, 2017 release included Acadia's "financial guidance for 2017 and the first quarter of 2017," as follows:

- Revenue for 2017 in a range of $2.85 billion to $2.9 billion;

- Adjusted EBITDA for 2017 in a range of $625 million to $640 million;

- Adjusted earnings per diluted share for 2017 in a range $2.40 to $2.50; and

- Adjusted earnings per diluted share for the first quarter of 2017 in a range of $0.45 to $0.47.

24.     On February 24, 2017, Acadia filed with the SEC its annual report on Form 10-K for the year ended December 31, 2016. The 2016 Form 10-K was signed by defendants Jacobs and Duckworth. The 2016 Form 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") signed by defendants Jacobs and Duckworth, who certified that they had reviewed the Form 10-K and that it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of Acadia, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

1479387_1

25.     The 2016 Form 10-K repeated the Company's fiscal 2016 financial results reported in the February 23, 2017, release, as well as the Company's statements regarding Acadia's U.K. operations, as set forth above.

26.     The 2016 Form 10-K discussed the "[f]avorable industry and legislative trends" that Acadia believed were one of its "competitive strengths," specifically including its U.K. operations:

> The mental health hospitals market in the U.K. was estimated at £15.9 billion for 2014/2015. As a result of government budget constraints and an increased focus on quality, the independent mental health hospitals market has witnessed significant expansion in the last decade, making it one of the fastest growing sectors in the U.K. healthcare industry. Demand for independent sector beds has grown significantly as a result of the National Health Service (the "NHS") reducing its bed capacity and increasing hospitalization rates. Independent sector demand is expected to further increase in light of additional bed closures and reduction in community capacity by the NHS.

27.     In the 2016 Form 10-K, defendants characterized Acadia as "the leading independent provider of mental health services in the U.K." Defendants also discussed the emphasis that the U.K. Department of Health put on quality of care:

> The U.K. Department of Health recently identified priorities for essential change in mental health that include, among other things, funding providers based on the quality of their service rather than volume of patients, allocating funds to support specialized housing for people with mental health problems and adopting a new rating system and inspection process to improve the quality of care. Increasing political focus on the provision of mental health services in the U.K. and increasing support for the rights of mental health patients are expected to lead to further increases in the size of the mental health market in the U.K. In addition, rising demand for mental health services in the U.K. coupled with a constrained mental healthcare funding environment are increasing pressure to improve operational efficiency and refer patients to single provider programs with care pathways that more appropriately reflect each patient's specific mental health needs. As a result of these pressures and an increased focus on quality, the independent mental health market has witnessed significant expansion in the last decade, making it one of the fastest growing sectors in the U.K. healthcare industry.

28.     On April 25, 2017, Acadia issued a release entitled "Acadia Healthcare Reports First Quarter GAAP EPS of $0.40 and Adjusted EPS of $0.46; Affirms Financial Guidance for 2017." In the release, Acadia announced its financial results for the first quarter of 2017:

Revenue for the quarter was $679.2 million, an increase of 10.1% from $616.8 million for the first quarter of 2016. Net income attributable to Acadia stockholders increased 36.1% to $35.0 million for the first quarter of 2017 from $25.7 million for the first quarter of 2016. Net income attributable to Acadia stockholders per diluted share increased 29.0% to $0.40 for the first quarter of 2017 from $0.31 for the first quarter of 2016, on a 4.2% increase in weighted average diluted shares outstanding.

29.     The April 25, 2017 release discussed the state of the Company's U.K. operations, including remarks from Jacobs:

"Our revenue growth primarily resulted from the acquisition of Priory Group on February 16, 2016, which added approximately 6,200 beds, net of the divestiture, to our operations in the United Kingdom."

\*      \*      \*

Same facility revenues increased 2.6% for the U.K. facilities, with a 0.1% increase in patient days and a 2.4% increase in revenue per patient day. Total same facility EBITDA margin declined to 25.2% for the first quarter of 2017 from 25.6% for the first quarter of 2016. Acadia's consolidated adjusted EBITDA was $136.4 million for the first quarter of 2017, up 4.1% from $131.0 million for the first quarter of 2016.

30.     The April 25, 2017 release "affirmed [Acadia's] previously established financial guidance for 2017," as follows:

- Revenue for 2017 in a range of $2.85 billion to $2.9 billion;

- Adjusted EBITDA for 2017 in a range of $625 million to $640 million; and

- Adjusted earnings per diluted share for 2017 in a range $2.40 to $2.50.

31.     On April 26, 2017, Acadia filed with the SEC its quarterly report on Form 10-Q for the three months ended March 31, 2017 (the "1Q17 Form 10-Q"). The 1Q17 Form 10-Q was signed by defendant Duckworth and contained Sarbanes-Oxley certifications signed by defendants Jacobs and Duckworth, which certified that they had reviewed the 1Q17 Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of Acadia, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

- 8 -

32.     The 1Q17 Form 10-Q repeated the first quarter 2017 financial results reported in the April 25, 2017 press release.  The 1Q17 Form 10-Q also repeated the Company's statements regarding Acadia's U.K. operations that were reported in the April 25, 2017 press release.

33.     On June 9, 2017, Acadia filed with the SEC a Form S-3 registration statement and prospectus using a "shelf" registration, or continuous offering process.  Under the shelf registration, Acadia securities could be sold in various future prospectus supplements in one or more offerings.  The prospectus supplements would form part of the registration statement for each offering.  The Form S-3 stated in pertinent part:

### INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The SEC allows us to "incorporate by reference" information into this prospectus, which means that we can disclose important information to you by referring you to another document filed separately with the SEC.  The information incorporated by reference into this prospectus is deemed to be part of this prospectus, except for any information superseded by information contained directly in this prospectus or contained in another document filed with the SEC in the future which itself is incorporated into this prospectus.

We are incorporating by reference the following documents, which we have previously filed with the SEC:

(1) our Annual Report on Form 10-K for the fiscal year ended December 31, 2016;

(2) our Quarterly Report on Form 10-Q for the three months ended March 31, 2017;

(3) our Current Reports on Form 8-K filed May 10, 2017 and May 25, 2017;

(4) the information specifically incorporated by reference into our Annual Report on Form 10-K for the fiscal year ended December 31, 2016 from our Definitive Proxy Statement on Schedule 14A filed with the SEC on April 13, 2017; and

(5) a description of our capital stock as set forth in our Registration Statement on Form 8-A, filed on October 31, 2011.

- 9 -

34.     On July 27, 2017, Acadia issued a release entitled "Acadia Healthcare Reports Second Quarter GAAP EPS of $0.57 and Adjusted EPS of $0.66." In the release, Acadia announced its financial results for the second quarter of 2017:

> Revenue for the quarter was $715.9 million, a decline of 5.4% from $756.5 million for the second quarter of 2016. Net income attributable to Acadia stockholders was $49.6 million, or $0.57 per diluted share, for the second quarter of 2017 compared with $56.4 million, or $0.65 per diluted share, for the second quarter of 2016.

35.     In addition, the July 27, 2017 release discussed the state of the Company's U.K. operations, including remarks from Jacobs: "'U.K. same facility revenues increased 4.0%, on growth of 2.8% and 1.1% in patient days and revenue per patient day, respectively.'"

36.     Finally, the July 27, 2017 release narrowed the Company's previously established guidance as follows:

- Revenue for 2017 in a range of $2.85 billion to $2.87 billion;

- Adjusted EBITDA for 2017 in a range of $628 million to $635 million; and

- Adjusted earnings per diluted share for 2017 in a range $2.42 to $2.47.

37.     On July 28, 2017, Acadia filed with the SEC its quarterly report on Form 10-Q for the three months ended June 30, 2017 (the "2Q17 Form 10-Q"). The 2Q17 Form 10-Q was signed by defendant Duckworth and contained Sarbanes-Oxley certifications signed by defendants Jacobs and Duckworth, which provided that the undersigned had reviewed the 2Q17 Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of Acadia, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

38.     The 2Q17 Form 10-Q repeated the second quarter 2017 financial results reported in the July 27, 2017 press release. The 2Q17 Form 10-Q also repeated the Company's statements regarding Acadia's U.K. operations that were reported in the July 27, 2017 press release.

39.    On or about August 18, 2017, Acadia filed with the SEC a prospectus supplement (which formed part of the registration statement), pursuant to which defendants Jacobs and Turner sold ***706,000 shares of Acadia stock*** (over half the total number of shares they beneficially owned), for proceeds of over ***$35 million*** – shares that were subsequently sold to the public. The prospectus supplement incorporated by reference Acadia's previously reported financial results.

40.    The statements referenced above in ¶¶21-39 were each materially false and misleading when made because they misrepresented and failed to disclose that: (a) the quality of Acadia's U.K. operations did not give the Company a "competitive strength" that would drive future growth and profitability; and (b) defendants had no reasonable basis to believe and did not in fact believe their positive statements about the Company's business and financial prospects during the Class Period, including their guidance issued and reaffirmed throughout the Class Period.

41.    On October 24, 2017, Acadia issued a release entitled "Acadia Healthcare Reports Third Quarter Financial Results; Produces U.S. Same Facility Revenue Growth of 6.3%; Revises 2017 Financial Guidance." In the release, the Company disclosed, for the first time, that its struggling U.K. operations had missed the forecasts that defendants had stated to investors would be met throughout the year:

> "The third quarter financial results for our operations in the United Kingdom reflected a lower census and higher operating costs than anticipated. After experiencing expected seasonal softness in census for the month of August, the typical rebound in census in the month of September was significantly weaker than anticipated. In addition, due to further tightening in the labor market primarily for nurses and other clinical staff, we incurred higher agency labor expense than planned. . . . U.K. same facility EBITDA margin was 21.4% for the quarter compared with 22.6% for the third quarter last year. Total facility EBITDA margin in the U.K. declined 170 basis points to 19.3% for the third quarter of 2017."

42.    The October 24, 2017 release also stated that Acadia was reducing its recently reaffirmed fiscal 2017 guidance. Adjusted earnings per diluted share for 2017 were reduced to $2.23 to $2.25 per diluted share from $2.42 to $2.47 per diluted share. Adjusted EBITDA was reduced to

a range of $600 million to $605 million from a range of $628 million to $635 million. Finally, revenue for 2017 was reduced to $2.82 billion to $2.83 billion from a range of $2.85 billion to $2.87 billion.

43.    As a direct result of this news, Acadia stock lost **26% of its value**, falling from a closing price of $44.12 per share on October 24, 2017 to a closing price of $32.68 per share on October 25, 2017.

## ADDITIONAL SCIENTER ALLEGATIONS

44.    The Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading. The Individual Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Acadia, their control over and/or receipt and/or modification of Acadia's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

45.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least the reckless disregard, of personnel at the highest levels of the Company, including the Individual Defendants.

46.    The Individual Defendants, because of their positions with Acadia, controlled the contents of the Company's public statements during the Class Period. Each defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or

- 12 -

shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause

them to be corrected. Because of their positions and access to material non-public information, these

defendants knew or recklessly disregarded that the adverse facts specified herein had not been

disclosed to and were being concealed from the public and that the positive representations that were

being made were false and misleading. As a result, each of these defendants is responsible for the

accuracy of Acadia's corporate statements and is therefore responsible and liable for the

representations contained therein.

## LOSS CAUSATION/ECONOMIC LOSS

47.     During the Class Period, the Individual Defendants engaged in a scheme to deceive

the market and a course of conduct that artificially inflated the prices of Acadia securities and

operated as a fraud or deceit on Class Period purchasers of Acadia securities, including by failing to

disclose and misrepresenting the adverse facts detailed herein. When defendants' prior

misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the

prices of Acadia securities declined as the prior artificial inflation came out of the Company's stock

price.

48.     As a result of their purchases of Acadia securities during the Class Period, plaintiff

and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

The Individual Defendants' false and misleading statements had the intended effect and caused

Acadia securities to trade at artificially inflated levels throughout the Class Period, with Acadia stock

trading as high as $53 per share on July 28, 2017.

49.     By failing to disclose to investors the adverse facts detailed herein, the Individual

Defendants presented a misleading picture of Acadia's business and prospects. When the truth about

the Company was revealed to the market, the price of Acadia stock declined, removing the inflation

from the stock price, and causing economic loss to investors who purchased Acadia securities during the Class Period.

50.     The decline in the price of Acadia securities was a direct result of the nature and extent of the Individual Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Acadia securities negate any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to the Individual Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of the Individual Defendants' fraudulent scheme to artificially inflate the prices of Acadia securities and the subsequent significant decline in the value of Acadia securities when the Individual Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

51.     At all relevant times, the market for Acadia securities was an efficient market for the following reasons, among others:

(a)     Acadia stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)     As a regulated issuer, Acadia filed periodic public reports with the SEC and the NASDAQ;

(c)     Acadia regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- 14 -

(d)  Acadia was followed by securities analysts employed by major brokerage firms, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

52.  As a result of the foregoing, the market for Acadia securities promptly digested current information regarding Acadia from all publicly available sources and reflected such information in the prices of the securities.  Under these circumstances, all purchasers of Acadia securities during the Class Period suffered similar injury through their purchase of Acadia securities at artificially inflated prices, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

53.  Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Acadia publicly traded securities during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

54.  The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Acadia stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Acadia or its transfer agent and may be notified of the pendency of this action electronically, or by mail, using the form of notice similar to that customarily used in securities class actions.

55. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

56. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

57. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Acadia;

(c) whether the prices of Acadia securities were artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

58. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5
Against All Defendants**

59. Plaintiff incorporates ¶¶1-58 by reference.

1479387_1

60.     During the Class Period, defendants disseminated or approved the false statements specified above in ¶¶21-39, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Acadia securities during the Class Period.

62.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Acadia securities and suffered losses when the relevant truth was disclosed. Plaintiff and the Class would not have purchased Acadia securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

63.     Plaintiff incorporates ¶¶1-62 by reference.

64.     The Individual Defendants acted as controlling persons of Acadia within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Acadia securities, the Individual Defendants had the power and authority to cause Acadia to engage

- 17 -

in the wrongful conduct complained of herein. By reason of such conduct, these defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  October 1, 2018                              ROBBINS GELLER RUDMAN
                                                                          & DOWD LLP
                                                                     JERRY E. MARTIN, #20193
                                                                     CHRISTOPHER M. WOOD #254908


                                                                          *s/ Christopher M. Wood*
                                                                     CHRISTOPHER M. WOOD

                                                                     414 Union Street, Suite 900
                                                                     Nashville, TN  37219
                                                                     Telephone:  615/244-2203
                                                                     615/252-3798 (fax)
                                                                     jmartin@rgrdlaw.com
                                                                     cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID C. WALTON
DANIELLE S. MYERS
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
davew@rgrdlaw.com
danim@rgrdlaw.com

VANOVERBEKE, MICHAUD &
   TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff

# CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Teamsters Local 210 Affiliated Pension Trust Fund v. Neustar, Inc., et al.*, No. 1:17-cv-01145 (E.D. Va.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

ACADIA

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _1st_ day of _October_, 2018.

ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM

By: _Deborah L. Martin_

Its: _____

- 2 -

ACADIA

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 04/05/2017 | 1,800 | $44.12 |
| 07/25/2017 | 61 | $51.29 |
| 09/15/2017 | 136 | $46.78 |