UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>ACADIA HEALTHCARE COMPANY, INC., et al., )<br><br>Defendants. ) | Civil Action No. 3:18-cv-00988<br><br><u>CLASS ACTION</u><br><br>U.S. District Court Judge Eli J. Richardson<br>Magistrate Judge Alistair E. Newbern<br><br>CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    JURISDICTION AND VENUE ........................................................................5

III.   PARTIES ..........................................................................................................5

IV.   BACKGROUND TO DEFENDANTS' FRAUDULENT STATEMENTS AND
      COURSE OF CONDUCT ................................................................................8

      A.     While Defendants Claimed Acadia's Growth Was Driven by Quality Care,
             It Ran Poor-Quality Facilities, Which Led to Disastrous Consequences for
             Patients ............................................................................................12

            1.     Acadia Ran Understaffed, Unsafe and Low-Quality Healthcare
                   Facilities ..............................................................................15

            2.     Understaffing at Acadia's Facilities Led to Numerous Horrific
                   Instances of Physical and Sexual Abuse ....................................18

            3.     Understaffing and Substandard Care at Acadia Facilities Led to
                   Multiple Patient Deaths..............................................................23

      B.     After Significantly Expanding the Company's Operations and Touting
              Expected Revenue Growth in the U.K., Defendants Sold Tens of Millions
              of Dollars of Acadia Stock Before Admitting the Underperformance of Its
              U.K. Facilities ................................................................................25

            1.     Acadia Acquires Its First U.K. Facilities in 2014 and Significantly
                   Expands Its U.K. Presence in 2016............................................25

            2.     Acadia's Priory Facilities Receive Negative U.K. Media Attention
                   in 2017 from Failed Inspections and Multiple Inquests into Patient
                   Deaths ....................................................................................28

            3.     Defendants Overstate the Expected Performance of Acadia's U.K.
                   Operations, Then Sell Tens of Millions of Dollars in Stock Prior to
                   Announcing a Major Q3 2017 Earnings Miss ...........................29

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
      AND OMISSIONS ........................................................................................31

      A.     False and Misleading Statements and Omissions Regarding Acadia's U.S.
              Operations ........................................................................................32

1. Defendants Made Misrepresentations and Omissions Regarding the Quality of Care Offered at Acadia's Facilities ...........................................32

2. Defendants Made Misrepresentations and Omissions Regarding Staffing Levels at Acadia's Facilities .......................................................42

3. Defendants Made Misrepresentations and Omissions Regarding Acadia's Regulatory Compliance ...............................................................54

B. False and Misleading Statements and Omissions Regarding Acadia's U.K. Operations ..................................................................................................59

VI. LOSS CAUSATION/ECONOMIC LOSS ........................................................71

VII. ADDITIONAL SCIENTER ALLEGATIONS ...................................................76

A. Massive Insider Sales Provide Strong Indicia of Scienter .....................76

1. Jacobs' Class Period Sales and Insider Trading ........................76

2. Turner's Class Period Sales and Insider Trading......................77

3. Duckworth's Class Period Sales and Insider Trading................79

4. Waud's Class Period Sales and Insider Trading .......................80

B. Defendants Closely Monitored Patient Admissions, Staffing Levels and Other Quality Control Metrics ................................................................82

C. Acadia's Incentive Compensation Systems Encouraged Poor Quality Care.........84

D. Acadia's CEO and President Were Fired or Resigned with No Notice Following the Alleged Corrective Disclosures ......................................85

E. Acadia Recommended Against a Shareholder Resolution Calling for Greater Transparency Regarding Patient Safety...................................86

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE ................................87

IX. CLASS ACTION ALLEGATIONS ..................................................................89

COUNT I .........................................................................................................................90

COUNT II ........................................................................................................................92

PRAYER FOR RELIEF ..................................................................................................93

JURY DEMAND ......................................................................................................................94

1546233_1

# I. INTRODUCTION

1. This is a securities class action on behalf of purchasers of Acadia Healthcare Company, Inc. ("Acadia" or the "Company") securities between April 30, 2014 and November 15, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act").

2. Acadia is a for-profit healthcare company focused on operating inpatient psychiatric facilities, residential treatment centers, group homes, substance abuse facilities, and facilities providing outpatient behavioral healthcare services in the United States, the United Kingdom ("U.K.") and Puerto Rico. Acadia has two operating segments, U.S. Facilities, with more than 200 behavioral healthcare facilities and approximately 9,300 beds in 40 states and Puerto Rico, and U.K. Facilities, with over 370 behavioral healthcare facilities and approximately 8,800 beds in the U.K.

3. Throughout and prior to the Class Period, defendants engaged in a scheme to defraud and made numerous materially false and misleading statements and omissions to investors regarding Acadia's business and operations, including by falsely stating that: (i) offering quality care was of fundamental importance to Acadia's business model, and that its facilities provided high-quality care that would drive Acadia's success; (ii) Acadia adequately staffed its facilities to ensure its ability to provide appropriate care to patients; (iii) Acadia's facilities were in compliance with relevant regulatory requirements; and (iv) Acadia's U.K. operations would achieve substantial revenue and earnings growth in the face of nursing shortages and negative media reports about the Company's operations. The truth was very different from what defendants led investors to believe.

4. First, Acadia did not provide quality care. Instead, defendants prioritized profits over patient care and safety. Acadia's Treatment Placement Specialists reportedly placed patients in facilities with the goal of maximizing their commissions and Acadia's profits, not because those facilities were in the best interest of the patients. Sexual assault and suicide occurred at Acadia

1546233_1

facilities with troubling frequency, and Acadia's corporate policies required employees to conduct investigations internally, rather than immediately contact police.  Contrary to defendants' statements that they achieved growth through improving the quality of care offered at its facilities, Acadia achieved growth by slashing costs to extract higher profits from the facilities it operated at the expense of patient care and safety, as well as the Company's reputation and long-term viability.

5.      Second, Acadia understaffed its facilities and hired unqualified staff in order to cut costs to the detriment of patient care.  Acadia hospitals were fined for being so understaffed that they failed to maintain a safe work environment.  In other instances, facilities would pass audits by inflating staff levels during inspections and then immediately cut staff after the audit was complete. Understaffing and a failure to monitor patients were cited in government reports and lawsuits as contributing to suicides and sexual assaults. Employee pleas for higher staffing levels went unheeded.

6.      Third, while defendants repeatedly assured investors that the massive acquisition of the U.K.'s largest behavioral health company, the Priory Group ("Priory"), would allow Acadia to realize record profits and earnings in FY 2017, defendants had no reasonable basis to believe, and did not actually believe, that such results would materialize.  While defendants blamed staffing costs and lower census results for their massive Q3 2017 earnings miss, they admittedly knew about rising agency staffing costs throughout 2017 and monitored their patient admission trends on a daily basis. Particularly in light of negative media reports regarding Priory facilities in 2017, defendants had no reasonable basis to believe, and did not actually believe, in the census figures underpinning their projections.

7.      Defendants knew or were reckless in not knowing that their Class Period statements concerning quality of care, staffing and Acadia's U.K. operations were misleading when made. While the price of Acadia securities was artificially inflated by the fraud alleged herein, the

1546233_1

Individual Defendants (defined below), as well as Reeve B. Waud ("Waud"), one of Acadia's founders, realized hundreds of millions of dollars in insider trading proceeds by dumping the majority of their Acadia shares. Indeed, defendant Joey A. Jacobs' largest-ever sale of Acadia stock – over $25 million worth – came just prior to the first corrective disclosure of the alleged fraud. On this same date, August 22, 2017, Waud sold almost $50 million of Acadia stock. In addition to their large and suspiciously timed insider sales, the Individual Defendants' incentive compensation structure – which expressly carved out of consideration expenses related to poor quality care, such as legal settlement costs and non-recurring items – incentivized short-term profit over patient care. Moreover, the Individual Defendants admitted that they personally and actively managed patient admissions and staffing, the two issues at the heart of the alleged fraud. The rampant patient care and staffing problems, and defendants' knowledge thereof, are corroborated by former Acadia employees who tell a similar story of patient neglect and a never-ending focus on short-term profits over quality care, all of which contradict defendants' Class Period statements to investors.

8. When defendants could no longer sustain their fraud, but not before unloading nearly all of their Acadia stock, the true state of affairs at Acadia and its facilities began to be revealed. First, on October 24, 2017, Acadia issued a release entitled "Acadia Healthcare Reports Third Quarter Financial Results." The release stated that Acadia badly missed its Q3 2017 revenue and earnings targets, and was substantially reducing its guidance for the remainder of the year. On this news, the price of Acadia securities declined from a close of $44.12 per share on October 24, 2017, to an intraday low of $30.91 per share on October 25, 2017, a decline of 30%.

9. On October 11, 2018, Aurelius Value published a report and released a video documenting systematic instances of patient abuse and neglect at dozens of Acadia facilities, caused primarily by understaffing.

1546233_1

10.     The report included an analysis of Centers for Medicare & Medicaid Services ("CMS")[1] inspection reports from 2013 to 2018 for 31 of the 40 acute inpatient U.S. hospitals that were listed on Acadia's website.  The analysis found that federal inspectors uncovered staffing deficiencies at over 90% of these 31 Acadia hospitals, including repeated violations for not having enough nurses or qualified practitioners on hand.  Of the 28 hospitals that had staffing deficiencies, 89% were also cited by inspectors for deficiencies related to patient safety or care, including violations involving patient deaths, suicides, elopements (escapes), improper or erroneous administration of medications, improper use of restraints, and physical or sexual assaults.  Inspectors also found managerial deficiencies at 87% of the 31 facilities, which included failures to report incidents to law enforcement or even investigate patient abuse allegations, and failures to provide proper oversight or follow or establish appropriate patient safety protocols.  On this news, the price of Acadia securities declined from a close of $36.55 per share on October 10, 2018, to an intraday low of $32.37 per share on October 12, 2018, a decline of more than 11%.

11.     On November 16, 2018, *Seeking Alpha* published an article entitled, "Acadia Healthcare: Very Scary Findings From A 14-Month Investigation."  The article described Acadia's rapid growth, but attributed Acadia's recent revenue and margin increases to cost-cutting and "reducing the quality of care."  The article highlighted severe problems at seven of Acadia's facilities – facilities also mentioned in the Aurelius Value report – as "consistent with declining quality of care," and reported that according to an industry expert, "'due to the number of suicides at some of their facilities, Acadia's ability to accept certain patients has been restricted by state-level governments.'"  On this news, the price of Acadia securities declined from a close of $37.86 per share on November 15, 2018, to an intraday low of $28.02 per share on November 16, 2018 – a decline of 26%.

---

[1]     CMS is a federal agency within the U.S. Department of Health and Human Services.

1546233_1

12.     These declines in the price of Acadia securities caused hundreds of millions of dollars in losses to Acadia investors, who suffered damages when the truth began to be revealed. Plaintiffs seek to recover these losses on behalf of the investors who purchased or otherwise acquired Acadia securities during the Class Period.

## II.     JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and §27 of the 1934 Act.

14.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b). A substantial amount of the acts and omissions giving rise to the claims at issue occurred in this District. Acadia's corporate headquarters are located in this District and defendants are subject to personal jurisdiction in this District.

15.     In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ.

## III.     PARTIES

16.     Lead Plaintiff Chicago Laborers' Pension Fund is a multi-employer defined benefit pension plan with approximately $3.2 billion of assets. The Chicago Laborers' Pension Fund purchased Acadia publicly traded securities during the Class Period and has been damaged thereby, as set forth in its certification attached hereto.

17.     Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund ("NY Hotel Trades Pension Fund") is a multi-employer pension plan with approximately $1.7 billion of assets. The NY Hotel Trades Pension Fund purchased Acadia publicly

- 5 -

traded securities during the Class Period and has been damaged thereby, as set forth in its certification attached hereto.

18. Defendant Acadia is one of the largest publicly traded behavioral healthcare companies in the country. Acadia stock trades under the ticker symbol "ACHC" on the NASDAQ, an efficient market, and did so during the entirety of the Class Period. Acadia's corporate headquarters are located in Franklin, Tennessee. As of March 1, 2019, Acadia had over 88 million shares of common stock outstanding.

19. Defendant Joey A. Jacobs ("Jacobs") was Chairman of Acadia's Board of Directors (the "Board") and its Chief Executive Officer ("CEO") during the Class Period. Prior to joining Acadia in February 2011, Jacobs co-founded Psychiatric Solutions, Inc. ("PSI") and served as Chairman, President and CEO of PSI from April 1997 to November 2010. On Sunday, December 16, 2018, with no advance warning, Jacobs was fired by Acadia's Board.

20. Defendant Brent Turner ("Turner") was at all relevant times, Acadia's President. Prior to joining Acadia in February 2011, Turner served as the Executive Vice President of Finance and Administration of PSI from August 2005 to November 2010, and as the Vice President, Treasurer and Investor Relations of PSI from February 2003 to August 2005. On March 25, 2019, Acadia announced that Turner had left the Company the week prior without naming a replacement.

21. Defendant David Duckworth ("Duckworth") joined Acadia as Controller in April 2011 and became Chief Accounting Officer in January 2012 and Chief Financial Officer ("CFO") in July 2012.

22. The defendants referenced above in ¶¶19-21 are also referred to herein as the "Individual Defendants" and are liable under §§10(b) and 20(a) of the 1934 Act for Acadia's false and misleading Class Period statements.

1546233_1

23.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Acadia, were privy to confidential, proprietary information concerning Acadia, its finances, operations, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Acadia, as discussed in detail below. Because of their positions with the Company, the Individual Defendants had access to non-public information about its finances, business, markets, products, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Acadia's business.

25.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or

cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

26.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was, and is, registered with the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Acadia's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Acadia stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Acadia securities. The scheme: (a) deceived the investing public regarding Acadia's business, operations and management, and the intrinsic value of Acadia securities; and (b) caused plaintiffs and members of the Class (defined below) to purchase Acadia securities at artificially inflated prices.

## IV.     BACKGROUND TO DEFENDANTS' FRAUDULENT STATEMENTS AND COURSE OF CONDUCT

28.     Formed in 2005, Acadia Healthcare is a multinational provider of behavioral healthcare services. As of December 31, 2018, Acadia operated a network of 583 healthcare facilities with approximately 18,100 beds in 40 states, the U.K. and Puerto Rico. In the United States, Acadia's revenue is primarily funded through Medicaid and commercial sources. In the U.K., Acadia's revenue is primarily funded through the National Health Service ("NHS") and other publicly funded sources.

29.     Acadia's facilities treat individuals at all stages of their lives – from young children to adults and the elderly. Its facilities are categorized into seven groups: (1) inpatient treatment; (2) residential treatment; (3) child and adolescent treatment; (4) drug and alcohol addiction detoxification; (5) partial hospitalization treatment programs; (6) intensive outpatient programs; and (7) medication-assisted treatment.

30.     Acadia was founded by Waud and his company Waud Capital Partners. From 2005 to 2010, Waud acquired or opened six behavioral healthcare facilities. Thereafter, on March 16, 2011, Acadia announced that Jacobs would be joining the Company as its CEO.

31.     Just two months later, on May 25, 2011, Acadia issued a press release detailing its plan to buy Pioneer Behavioral Health ("PBH") of Peabody, Massachusetts. At the time, PBH had five inpatient facilities with approximately 270 beds in four states. The successful merger of the two companies would ultimately be the result of a reverse merger whereby PBH, a public company, would be acquired by Acadia, a private company. The reverse merger allowed Acadia to bypass the lengthy and expensive process of a conventional initial public offering and go public relatively quickly. Acadia's Form S-4 filed with the SEC on July 13, 2011 affirmed that Acadia intended to apply for listing of its securities to be issued in the merger on the NASDAQ and at the same time Jacobs would become the Chairman and CEO of the combined company. Additionally, the merger and shake-up of PBH allowed Jacobs to bring with him a crew of colleagues who had worked under him at his previous company, PSI, including Turner, Ron Fincher, Jack Polson and Christopher Howard.

32.     Prior to joining Acadia, Jacobs was CEO of PSI, which he co-founded in 1997. PSI, like Acadia, was in the business of providing behavioral healthcare. Starting with just five facilities, Jacobs began a roll-up strategy at PSI using the same techniques alleged herein. From 2003 to 2008, PSI grew to 95 facilities. At the same time, profits surged from $5 million to $76 million. By the

mid-2000s, PSI filled more beds than any other chain and treated an estimated 8,800 patients a day. However, as detailed below, Jacobs' secret growth strategies included understaffing facilities, which resulted in poor patient care and tumultuous environments filled with patient violence, sexual abuse and death.

33. On November 23, 2008, the *Los Angeles Times* ("*LA Times*") exposed PSI's "well-honed business formula" of cutting staff, filling beds and increasing profits. The *LA Times* emphasized that "poor patient supervision, understaffing and inadequate worker training have led to instances of chaos and brutality." The egregious pattern of abuse and neglect reported by the *LA Times* included PSI hospitals cited for patient deaths, a 19-year-old patient raped twice by a fellow patient, and endless federal and state citations. Compared to other hospitals, PSI's hospitals had fewer registered nurses than other private psychiatric facilities and had about one-third fewer staffers per bed. Chad Thompson, a previous employee of a PSI facility, stated that PSI's growth strategy was not a "'client-centered approach. It's a money-centered approach.'"

34. On July 17, 2008, the *Chicago Tribune* characterized PSI facilities as hospitals where "violence festered in silence." In addition to the cruelty reported by the *LA Times*, the *Chicago Tribune*'s investigation demonstrated that "[a]dministrators at west suburban Riveredge Hospital and government authorities failed to share basic information as the savage violence left some youth worse off than when they arrived." The article then goes on to detail patient rapes that were never documented, failure by staff to maintain one-on-one observation on patients after several incidents of sexual assault, "hospital administrators shoo[ing] away police," and improper sedation of children with powerful psychotropic drugs.

35. With millions of taxpayer dollars being poured into behavioral health care, and claims of malpractice and neglect, the media spotlight on PSI caught the attention of several U.S. congressmen, including former member Ronnie Shows. While speaking about fraud in the mental

health and substance abuse sector, Congressman Shows in 2017 stated that a government analysis determined Medicare fraud costs the American taxpayer over $50 billion a year and that when it comes to healthcare fraud, "mental health and drug treatment programs are some of the worst actors." He then added: "One company with a problematic record [is] Psychiatric Solutions, Inc. . . . ." Also in 2017, former U.S. Congressman Bart Stupak, writing in *The Hill*, identified PSI as "an example of one bad actor that put profit ahead of care and was surely a questionable recipient of taxpayer funds."

36. In 2010, the U.S. Department of Justice ("DOJ") also opened an investigation into PSI. According to reports from the SEC, the DOJ was probing executive pay and demanded PSI's records related to executive salaries, stock sales, stock options and option exercises. A story published by the *Tennessean* emphasized that the DOJ's inquiry was triggered by the timing of PSI's compensation committee award to PSI's top brass, including Jacobs, of tens of millions in options and restricted stock grants while secretly engaging in conversations to sell the company.

37. All in all, PSI's senior executives, the majority of whom followed Jacobs to Acadia, granted themselves massive stock options and payouts before acknowledging they were putting PSI on the auction block. The compensation packages resulting from their acquisition totaled more than $200 million.

38. With the DOJ investigation, probes by major newspapers, and an enticing and sizable compensation package dependent on the sale of PSI, the stage was set for Jacobs to jump ship. In May 2010, Jacobs did just that when Universal Health Services ("UHS") acquired PSI for $3.1 billion. The sale of PSI came one week before it was revealed in a filing with the SEC that the company had been subpoenaed by the DOJ.

39. When UHS absorbed PSI, it inherited a host of issues and problems. As detailed by PSI in its Form 10-Q for the quarterly period ended September 30, 2010, in October of 2010, PSI

received a subpoena from the DOJ requesting certain documents regarding one of its inpatient facilities in Philadelphia, Pennsylvania.

40.     In addition, PSI was a party to *seven* putative class action complaints related to the merger.  The lawsuits alleged, among other things, that PSI's directors put their personal interests ahead of their stockholders' interests and that PSI's directors breached their fiduciary duties in connection with the proposed merger by failing to maximize stockholder value.  Further, certain of the lawsuits asserted that various individual defendants would receive improper change-of-control payments and merger consideration in connection with equity awards.

41.     Having escaped the mounting investigations against PSI, and transferred liability to UHS (certain of the investigations regarding former PSI facilities remain ongoing to this day), Jacobs joined Acadia, bringing with him numerous members of PSI's management team.  Jacobs repeated the PSI formula at Acadia, taking out debt, buying up facilities, firing staff, and generating huge profits for himself and his team, all while assuring investors that "quality" and "doing the right thing" would "absolutely [be] the first priority of [the] company."  In fact, nothing could have been further from the truth.

**A.     While Defendants Claimed Acadia's Growth Was Driven by Quality Care, It Ran Poor-Quality Facilities, Which Led to Disastrous Consequences for Patients**

42.     Acadia's revenue is primarily derived from services rendered to patients for inpatient psychiatric and substance abuse care, outpatient psychiatric care and adolescent residential treatment.  Patients are referred to Acadia by other health care providers, therapists and doctors.  Consequently, with a business model heavily dependent on referrals to fill beds, Acadia had to convince the public that its facilities stationed across the nation were the preeminent centers to seek treatment.

43.     Acadia consistently emphasized purportedly high-quality patient care in its Forms 10-K, 10-Q and 8-K filed throughout the Class Period.  For example, in its "Overview" section, Acadia stated:

> Our business strategy is to acquire and develop inpatient behavioral healthcare facilities and improve our operating results within our inpatient facilities and our other behavioral healthcare operations.  ***We strive to improve the operating results of our facilities by providing high quality services***, expanding referral networks and marketing initiatives while meeting the increased demand for behavioral healthcare services through expansion of our current locations as well as developing new services within existing locations.

44.     Additionally, when describing its strategy of "[o]pportunistically pursu[ing] acquisitions,"  Acadia's Forms 10-K describe the Company as having "established a national platform for becoming the ***leading dedicated provider of high quality behavioral healthcare services in the U.S.***"

45.     In the middle of the Class Period, at a JP Morgan Healthcare Conference, Acadia described itself as a "consolidator of space" and not a "roll-up" company, as its main focus was "acquiring and growing with M&A" while "immediately ***improving and enhancing*** the operations that [it] acquired."  Toward the end of the Class Period, Acadia repeatedly emphasized that the Company was "committed to providing the communities we serve with ***high-quality, cost-effective behavioral healthcare services***, while growing our business, increasing profitability and creating long-term value for our stockholders."  In response to several shareholder proposals asking the Company to prepare a report on environmental, social and governance ("ESG") risks and opportunities, including patient and worker safety, defendants claimed that one of the "core elements" of Acadia's business strategy was "***creating behavioral health centers where people receive individualized and quality care that enables them to regain hope in a supportive, caring environment***."  In addition, Acadia stressed that it was able to "leverage" its management team's expertise to "identify and integrate acquisitions based on a disciplined acquisition strategy ***that***

- 13 -

*focuses on quality of service*." Even now, Acadia's website claims that Acadia's mission is to "create a *world-class organization that sets the standard of excellence* in the treatment of specialty behavioral health and addiction disorders" and that Acadia should be "synonymous with *excellent care, phenomenal customer service and an unparalleled commitment to our patients, staff, physicians, and community*."

46. Furthermore, throughout the Class Period, defendants repetitively assured investors that "[m]anagement believes that we are in substantial compliance with all applicable laws and regulations and is not aware of any material pending or threatened investigations involving allegations of wrongdoing."

47. As described above, defendants consistently represented that Acadia facilities were providing high-quality care to all of its patients and as a result the Company was well-positioned to continue to acquire new operations and fill beds through its referral system. However, in stark contrast to defendants' public statements, Acadia's tactics of acquiring facilities and then rapidly cutting staff was generating alarming incidents of abuse, neglect, and on several occasions, death.

48. Such practices are consistent with an account of a former Acadia Director, who oversaw several Acadia facilities in the Midwest during the Class Period and confirmed that Acadia prioritized profits over patient care. The Director described chaotic conditions in certain Acadia facilities, including: (i) failure to report adverse patient incidents to local authorities, and staff being advised to keep problems in-house; (ii) manipulating state audits of patient charts to ensure the best charts were being audited; (iii) providing treatment to patients who had not undergone an initial evaluation; (iv) billing and collecting for reimbursements on procedures that a physician had not approved; and (v) a patient death due to improper medical care.

49. Aware of these pervasive issues, Acadia has sought to destroy evidence of its misconduct through draconian document destruction policies. Several former Acadia employees

- 14 -

reported that during the Class Period, the Company instituted a policy whereby employee e-mails were automatically deleted after 30 days unless employees took affirmative steps to preserve them.

### 1. Acadia Ran Understaffed, Unsafe and Low-Quality Healthcare Facilities

50. From the beginning of the Class Period and even before, Acadia's facilities were fraught with a myriad of care and quality issues. Explicitly, staff cuts that left fewer employees available to monitor patients permitted unsupervised patients to act out on suicidal tendencies, facilitated patients to elope from the facilities, and allowed patients and staff to physically and/or sexually abuse other patients. These and other incidents were cited by state and federal agencies and resulted in Acadia facilities being fined, having their patient admissions put on hold, or being placed in "Immediate Jeopardy" – the most serious facility deficiency that represents a situation in which "entity noncompliance has placed the health and safety of recipients in its care at risk for serious injury, serious harm, serious impairment or death."

51. In 2017 alone, one particularly deficient facility, Harbor Oaks Hospital in New Baltimore, Michigan had several reports of sexual and physical abuse, including a 15-year-old autistic boy with no communication skills found with "claw marks" on his back, bruises, and open flesh on his thighs. Staff at Harbor Oaks stated that they begged for help from their managers only to be ignored or told to "zip it" and keep "quiet." Additionally, a behavioral health associate stated: "[Families] can't go home and trust us that their loved one will be okay and bad things won't happen to them. *We have so many patients and not enough staff*."

52. There are both federal and state laws that regulate and establish quantitative and qualitative staffing requirements for hospitals and treatment centers. For example, CMS regulations, which govern all Acadia facilities that accept Medicare or Medicaid, require hospitals to "have adequate numbers of licensed registered nurses, licensed practical (vocational) nurses, and other personnel to provide nursing care to all patients *as needed*. There must be supervisory and staff

- 15 -

personnel for each department or nursing unit to **_ensure, when needed_**, the **_immediate availability_** of a registered nurse for bedside care of any patient."

53.     Staffing in treatment centers like Acadia's, which provide a wide range of mental and behavioral health treatment services, requires various levels of accountability from its staff. In addition to numerical minimums, where a fixed ratio of patients to staff is set, staffing must also take into account the needs or "acuity" of the patient population. Acuity-based staffing measures the intensity of nursing care required by a patient and thus regulates the number of nurses on a shift according to the patients' needs and not according to raw patient numbers. For example, a large number of Acadia's patients required one-on-one observation levels, which mandated that the patient be in sight of the staff member at all times. In other situations, patients were set on observation levels that required a staff member to check on their well-being every five minutes. Both of these situations required increased staff based on acuity level.

54.     Despite CMS regulations and state specific patient-to-staff ratios, Acadia facilities were repeatedly cited for inadequate staffing that jeopardized patient and staff safety and undermined quality of care. For example, in 2016, Oasis Behavioral Health Hospital was cited for being so understaffed that it posed a risk to patient safety, with staff to patient ratios reaching 1:19.

55.     Indeed, defendants' policy of cutting staff to the bone resulted in pervasive and systemic issues of inadequate staffing ratios across Acadia's facilities. On October 14, 2015, Longleaf Hospital in Alexandria, Louisiana was found to have a major staff deficiency. The facility was placed in "Immediate Jeopardy" on October 8, 2015, when it was discovered that nurses failed to assure that line-of-sight visual observation was maintained on patients in need of such observation, there was no nurse available on a unit, and the facility "failed to ensure the hospital had a system for determining the types and numbers of nursing personnel and staff necessary to provide nursing care for all areas of the hospital as evidenced by having no policy developed for the staffing

- 16 -

ratio of [staff] to patients." In some instances, this lack of policy resulted in one mental health technician being assigned to the observation of 10 to 11 patients who were ordered to be on line-of-sight observation and one mental health technician assigned to observe 17 patients during their outdoor break who were ordered to be on line-of-sight observation. Staff admitted that they were "aware" of the "'broken system'" of the hospital and that the hospital had "'painted themselves in a corner for having too many patients on line of sight.'" Further, the staff indicated that "since the current owners [Acadia] acquired the hospital" they have grown and increased by 24 beds. However, they were not aware if the staff was also increased to accommodate growth.

56.     On January 13, 2016, Acadia Montana Treatment Center located in Butte, Montana was cited by a state inspection report for not providing a safe environment for staff or patients. The report emphasized that the facility had 132 patient assaults and 38 incidents of residents causing property damage over a 13-week review period.

57.     On July 26, 2016, Pacific Grove Hospital located in Riverside, California had patient to staff ratios of 3:21. Inadequate staffing was a prevalent problem at Pacific Grove – a state inspection report issued the next year on April 28, 2017 again identified understaffing as an issue, highlighting that patient ratios were 4:29 or 3:24 over the review period.

58.     Harbor Oaks Hospital located in New Baltimore, Michigan was so understaffed that it was fined $13,500 by the Occupational Safety and Health Administration for not providing a safe work environment. A former behavioral health technician stated that the Company "would rather have more money than to make sure their staff was safe." Patient-to-staff ratio at Harbor Oaks during the review period was at one point 5:32. Harbor Oaks did not seek to resolve the inadequate staffing issue, but instead, media investigations discovered that staff would inflate staffing levels when watchdogs were on site and then cut nearly half of its staff right after the facility passed its inspection.

- 17 -

59.     In 2018, Cedar Crest Hospital and Residential Treatment Center located in Belton, Texas also failed to maintain appropriate staffing levels. Staff numbers were so low that employees "begged" management for additional help at the facility. One staff member detailed that in order to watch so many patients at one time, if a patient had to go to the bathroom, the patient was asked to "'keep the [bathroom] door cracked a little bit'" or told to "'talk loudly or sing'" so that staff knew they were ok. Another staff member stated: "'There's no staff. It's not safe . . . . We're always short staffed. It's stressful.'" The lack of staff at Cedar Crest forced interns to substitute for staff coverage or required interns to run therapy sessions. One staff member even emphasized that "'[t]he CEO knows what is going on in this hospital. He knows we are understaffed. I've told him our staff are burnt out to the hilt and they are super stretched.'" Additionally, staff admitted that they were told to clock out for breaks they never took, instructed to fix charts for things that were never done or were incomplete, and that staff had informed doctors that due to understaffing, line-of-sight orders could not be done.

60.     Given the severely understaffed nature of Acadia's facilities, it is no surprise that Acadia's treatment centers created dangerous unmonitored environments that led to numerous instances of patient abuse and multiple patient suicides.

### 2. Understaffing at Acadia's Facilities Led to Numerous Horrific Instances of Physical and Sexual Abuse

61.     Defendants consistently reassured the investing public and analysts that their facilities were appropriately staffed and that they were not suffering from any labor shortages compared to its competitors. The truth was that defendants were actively cutting staff in its facilities, causing shocking incidents of abuse.

62.     Acadia has owned and operated Timberline Knolls, LLC ("Timberline") since 2012. Timberline is an inpatient facility located on 43 acres outside of Chicago in Lemont, Illinois and was acquired at a cost of $75.6 million. The facility includes a state-approved school for adolescents and

- 18 -

24-hour, 7-days-per-week medical care. Timberline is a female-only program and the treatment center purportedly helps patients suffering from eating disorders, drug and alcohol addiction, mood and anxiety disorders, and co-occurring disorders.

63.     In 2018, several former patients of Timberline came forward and stated that they had been sexually abused by Mike Jacksa, a therapist at the facility. The shocking accounts of sexual abuse detailed in Lemont Police Department investigations reports include: inappropriate comments, verbal abuse, inappropriate touching, forced oral sex, and the rape of multiple women during one-on-one counseling sessions. Some of the women recounted being taken out of the main lodge at Timberline and having counseling sessions in a small, locked luggage room, for which Jacksa had a key. Another woman admitted that she would give herself friction burns so that she would be placed on "constant observation" by staff and could avoid her counseling sessions with Jacksa. The separate incidents all occurred between December 2017 and June 2018. None of the women gave consent to Jacksa.

64.     During the seven months that Jacksa terrorized women seeking refuge at Timberline, staff at Timberline were told more than once about his behavior. Shockingly, however, Timberline did not contact the police upon learning of Jacksa's inappropriate actions. Instead, Jacksa was twice suspended and twice reinstated before Timberline informed the authorities. When questioned by the Lemont Police Department why staff at Timberline waited until August 7, 2018 to call police when administrators were alerted to Jacksa's inappropriate behaviors on July 16, 2018, Timberline staff stated that they could only conduct "*in-house*" investigations pursuant to a corporate policy that staff "have to contact corporate with these matters and *corporate tells them to investigate and investigate more before they are allowed to call police*." The investigating officer advised Timberline's CEO that "this has happened before at [Timberline] and that delayed reporting can greatly affect the outcome of a criminal investigation. [The CEO] stated she understood but was bound by [Acadia's]

- 19 -

instructions and policies." Jacksa now faces 62 felony counts of criminal sexual assault and criminal sexual abuse, as well as one misdemeanor battery charge.

65.     Acadia has owned and operated Park Royal Hospital in Fort Myers, Florida since 2012. The facility was acquired for $10.6 million and provides care to adults and seniors on both an inpatient and outpatient basis. The services the hospital purportedly provides includes treating adult and geriatric patients for depression, anxiety and mood disorders, memory issues, post-traumatic stress disorders, and co-occurring mental health and substance abuse issues. Admissions to the facility are made 24 hours a day, 7 days a week.

66.     In July 2013, three women stated that they had been sexually assaulted by Benjamin Bland, a staff member at the facility. One patient said she was sexually assaulted in her bathroom, the second said Bland forced her to touch his genitals in a closet, and the third said Bland entered her room and forced himself on her. Following these reports, eight additional women came forward alleging that they too had been abused by Bland.

67.     Police investigations into the matter revealed a string of defects by the facility. For example, Bland claimed to be a licensed certified nursing assistant who worked as a home health aide for a Fort Myers client with bipolar disorder. However, Bland was never employed as a home health aide and Park Royal never contacted his reference. In addition, the facility never contacted Bland's previous employer, Dollar Tree, Inc. If they had, they would have learned that Bland was fired for theft and accused of sexual harassment. Additionally, Bland had two prior arrests – battery in 2009, where Bland admitted to choking his girlfriend, and theft in 2007. Depositions filed in a lawsuit against the hospital reveal further missteps taken by Park Royal including the former human relations director lying about screening Bland and the hospital's *internal investigator* accused of losing or lying about a key piece of video evidence.

68.     The alarming accounts of repetitive sexual and physical abuse at Timberline and Park Royal were not two single occurrences carried out by two bad actors.  Instead, defendants' inadequate staff-to-patient ratios and lack of supervision made it possible for sexual and physical abuse to occur rampantly across Acadia's treatment centers.

69.     Before the Class Period, in 2012, Oasis Behavioral Health located in Chandler, Arizona had an undisclosed number of youths removed by Child Protective Services.  Oasis had a history of reports that alleged that youths were involved in sexual and physical misconduct.  In 2009 to 2012 alone, the facility had at least nine instances in which staff members were alleged to have been engaged in sexual misconduct with patients.  The patients at Oasis range from 11 to 17 years of age.

70.     In 2014, a patient was forced to participate in a sexual act against his will by his roommate at the Detroit Behavioral Institute, another Acadia facility.  The lawsuit against the facility states that youth residents were left alone in their rooms "unsupervised, unmonitored and without any form of adult oversight."  As a direct result, the facility allowed adult and/or mature residents to room with minor patients unsupervised and monitors failed to perform periodic checks on the patients.

71.     In 2013, a patient was abused by a staff member at the Ten Lakes Center located in Dennison, Ohio.  The incident occurred on May 20, 2013, however, an investigation was not initiated until May 29, 2013.  The facility's failure to intervene allowed the staff member to work an additional three days following the abuse.

72.     In 2016, a patient was raped by another patient at Valley Behavioral Health System in Barling, Arkansas.  Due to "inadequate security and inadequate nursing personnel" a minor female patient was pulled into a minor male patient's room and assaulted.  The lawsuit filed against the facility alleges that Valley Behavioral did not send a nurse or personnel to check on the female

patient and that, following the assault, told the victim that making up a story about rape could damage the facility and nurses.

73.     In 2016, Acadia Montana Treatment Center located in Butte, Montana was cited for several deficiencies by the state.  The report revealed incidents of residents reporting that staff was watching pornography while on the premises, residents being pushed to the floor and attacked by staff, 128 patient assaults, and 26 incidents of residents causing property damage.  The report noted that youth felt unsafe at the facility due to physical assaults by peers and lack of staff supervision.

74.     In 2017, a 20-year-old patient at Harbor Oaks Hospital was assaulted on his first day at the facility by his roommate.  This same patient was later sexually assaulted by a different roommate  while sedated.  This assault occurred despite assurances by staff to the patient's mother that frequent checks would be made to ensure the patient's safety and comfort.

75.     Between 2014 and 2015, a patient was repeatedly sexually assaulted by another resident at Rolling Hills Hospital, located in Ada, Oklahoma.  According to a lawsuit filed in 2017 against the facility, Acadia had knowledge of the sexual assaults as well as other assaults against patients, but failed to report them to the police.  After an investigation, all children under the supervision of the Oklahoma Department of Human Services were removed from the home in July 2015.

76.     Just recently, in March 2019, multiple lawsuits were filed against Acadia's Desert Hills facility located in Albuquerque, New Mexico leading to its permanent closure.  The lawsuits claim that during the Class Period, around the same time the state began investigating the facility in 2017, children were abused at the facility, young girls were beaten up, sex between staff and teen patients occurred, and sex between patients themselves, some known to be HIV positive.  All of these incidents of abuse and neglect were linked to "a problem of  understaffing, a problem taking often times children they have no business in taking."  The New Mexico Children, Youth & Families

- 22 -

Department stated: "Everyone agrees this is no longer the safe, appropriate place for kids." The facility's website clearly states that "Desert Hills Hospital is no longer accepting patients and will be closing 4/1/19."

### 3. Understaffing and Substandard Care at Acadia Facilities Led to Multiple Patient Deaths

77.     During the Class Period, defendants repeatedly touted that they were improving and bringing value to their new acquisitions. In reality, Acadia's facilities were so understaffed that they created toxic and unsupervised environments that permitted vulnerable patients to act out on suicidal tendencies.

78.     Park Royal Hospital, the facility that was already plagued by incidences of sexual assault and rape as discussed above, was placed in "Immediate Jeopardy" in 2014 after a patient committed suicide. The patient was initially admitted into the facility and placed on 15-minute checks. However, at 9:00, 9:15 and 9:30, no checks were made on the patient. Instead, hospital video shows the patient walking down the hallway carrying a patient gown into his bedroom. The patient hanged himself with the patient gown.

79.     In 2012, Acadia acquired Red River Hospital located in Wichita Falls, Texas. In October 2014, Red River's Medicare funding was terminated after being cited for numerous deficiencies that led to a patient's death. The report stated that deficient practices "[c]reated an Immediate Jeopardy situation resulting in the death of patient No. 6, and the likelihood of serious harm, injury, impairment, or death to all patients receiving care at this hospital."

80.     In 2016, a patient who was under mandatory five-minute checks was found hanging in her bedroom at Sonora Behavioral Health Hospital located in Tucson, Arizona. Sonora was acquired by Acadia in 2012 and provides treatment services for children, adolescents, and adults recovering from behavioral health conditions and chemical dependency issues. The patient was admitted to the hospital suffering from impaired judgment, uncontrolled risk taking, and a high risk

- 23 -

of self-harm.  Upon admittance, the patient was on Observation Level Q15, which required checks on her well-being every 15 minutes.  Less than four hours after being admitted, the patient's observation level was changed to five-minute checks.  The next morning, between 7:50 a.m. and 8:50 a.m., no checks were made on the patient by a staff member.  Instead, the only nurse assigned to the unit left to get coffee.  The patient was found unresponsive and pulseless, hanging from the doorframe of her bathroom door.

81.     Seven Hills, which is located in Henderson, Nevada, was acquired by Acadia in 2011 and cares for adolescents and adults suffering from mental health issues, alcoholism and drug abuse. In 2015, a patient checked herself into Seven Hills for alcohol addiction and abuse.  As part of her treatment, the patient was prescribed a combination of morphine, triazapam and temazapam.  Just six days after voluntarily checking herself in, the patient was found dead in her room.  The wrongful death lawsuit against Seven Hills alleges that the facility failed to conduct timely patient checks and that its breaches of the appropriate standard of care served as the actual and proximate cause of her death.

82.     In July 2016, Sierra Tucson, a facility that treats mental health disorders, substance abuse, trauma/post-traumatic stress disorder and eating disorders, was fined for failing to care for its most seriously ill psychiatric patients.  The state investigation demonstrated that five Sierra Tucson patients had died since 2011 – three of them by suicide.  One of the patients who committed suicide in 2015 was admitted into Sierra Tucson seeking help and treatment for depression and debilitating neuropathy pain.  On the day of his death, the patient was assigned to one-on-one observation. Despite the high supervision level assigned to the patient, the patient missed all five of his morning appointments, but staff failed to look for him.  The patient took his own life that same day.

83.     Ascent Children's Health Services Facility located in West Memphis, Arkansas was acquired by Acadia in 2011.  In June 2017, a five-year-old boy died after being left inside a hot van

with a disabled safety alarm.  According to authorities, temperatures inside of the van could have reached as high as 141 degrees.  Staff had misrepresented on documents that the young boy had been taken inside.  Just a year later, in September 2018, Ascent said it would close three of its facilities located in Arkadelphia, North Little Rock and West Memphis.  Less than a month later, Ascent said it would close its remaining seven sites as well.

84.    In 2018, a young woman committed suicide while under the purported supervision of staff at Timberline, a facility already plagued by incidents of sexual abuse, as detailed above.  The patient left Timberline during her intake interview and committed suicide in a nearby hotel shortly thereafter.  Timberline staff failed to call the police until five hours after the patient left the center, according to a DuPage County 911 recording.  The lawsuit filed by the patient's family alleges that Timberline failed to properly secure the premises, failed to properly monitor the premises through use of video surveillance, allowed her to elope (escape) the facility, and was otherwise careless and negligent.

85.    Throughout the Class Period, defendants touted their commitment to "improv[ing] operating results" in Acadia's facilities and "providing high quality services."  On numerous occasions, Jacobs assured investors that Acadia's facilities were "appropriately staffed."  As detailed above, defendants' public statements were belied by pervasive, systemic, and egregious abuse and neglect occurring throughout Acadia's facilities.

**B.    After Significantly Expanding the Company's Operations and Touting Expected Revenue Growth in the U.K., Defendants Sold Tens of Millions of Dollars of Acadia Stock Before Admitting the Underperformance of Its U.K. Facilities**

**1.    Acadia Acquires Its First U.K. Facilities in 2014 and Significantly Expands Its U.K. Presence in 2016**

86.    By March 2014, after three years of management's acquisition-driven growth strategy, Acadia had grown to 52 facilities with 4,200 beds across the United States.  Nevertheless,

the Company continued to publicly state that it would pursue acquisitions in the M&A market, and in 2014 Acadia branched out overseas.

87.     In July 2014, Acadia completed its acquisition of U.K.-based Partnerships in Care ("PiC") for approximately $662 million in cash.  At the time, PiC was the second-largest independent provider of inpatient behavioral healthcare services in the U.K., with 23 inpatient psychiatric facilities and over 1,200 beds.

88.     The PiC acquisition was Acadia's first entry into a foreign market, but the Company would waste no time increasing its U.K. presence.  In the year following the PiC acquisition, Acadia completed 6 additional acquisitions in the U.K. for 22 facilities with over 500 beds.  By the end of Q2 2015, the Company was operating 45 facilities with over 1,800 beds in the U.K.

89.     All the while, defendants claimed that Acadia had plenty of room to grow in the U.K.'s $22 billion behavioral health market.  In its Forms 10-K for fiscal years 2015 through 2017, the Company consistently described the "[f]avorable industry and legislative trends" in the U.K. as one of Acadia's "competitive strengths":

> As a result of government budget constraints and an ***increased focus on quality***, the independent mental health hospitals market has witnessed significant expansion in the last decade, making it one of the fastest growing sectors in the U.K. healthcare industry.  Demand for independent sector beds has grown significantly as a result of the National Health Service (the "NHS") reducing its bed capacity and increasing hospitalization rates.  Independent sector demand is expected to further increase in light of additional bed closures and reduction in community capacity by the NHS.

90.     Acadia's Forms 10-K also discussed the U.K. Department of Health's emphasis on quality of care a driver of industry growth:

> The U.K. Department of Health recently identified priorities for essential change in mental health that include, among other things, ***funding providers based on the quality of their service rather than volume of patients***, allocating funds to support specialized housing for people with mental health problems and adopting a new rating system and inspection process to improve the quality of care.  Increasing political focus on the provision of mental health services in the U.K. and increasing support for the rights of mental health patients are expected to lead to further increases in the size of the mental health market in the U.K.  In addition, rising

- 26 -

demand for mental health services in the U.K. coupled with a constrained mental healthcare funding environment are increasing pressure to improve operational efficiency and refer patients to single provider programs with care pathways that more appropriately reflect each patient's specific mental health needs. As a result of these pressures and an increased focus on quality, the independent mental health market has witnessed significant expansion in the last decade, making it one of the fastest growing sectors in the U.K. healthcare industry.

91.     In February 2016, Acadia completed its acquisition of U.K.-based Priory for approximately $2.2 billion in cash and stock consideration. At the time, Priory was the largest independent provider of behavioral healthcare services in the U.K., with 327 facilities and approximately 7,100 beds. Following the acquisition of Priory, Acadia had 381 inpatient facilities with approximately 9,300 beds in the U.K. Defendants also announced that the Company would achieve $20 million in cost-cutting "synergies" from the integration of Priory once the U.K.'s Competition and Markets Authority ("CMA") fully approved the merger.

92.     In July 2016, Acadia announced that the CMA had finished its initial Phase 1 merger review, and had decided to conduct a more-detailed Phase 2 investigation into the Priory acquisition. In order to resolve the CMA's competitive concerns with the transaction, Acadia undertook to sell 21 of its existing U.K. facilities and 1 de novo facility for approximately $390 million in cash consideration. In November 2016, the CMA approved of this divestiture and did not refer the Priory transaction for a further Phase 2 investigation.

93.     As of December 31, 2016, following the completion of the Priory acquisition and CMA-approved divestiture, Acadia maintained 365 inpatient behavioral healthcare facilities with approximately 8,600 beds in the U.K. At the same time, Acadia maintained only 208 behavioral healthcare facilities and approximately 8,500 beds in the United States. Hence, by the start of 2017, the Company's overall economic performance was heavily skewed to the performance of its U.K. facilities.

2.      **Acadia's Priory Facilities Receive Negative U.K. Media Attention in 2017 from Failed Inspections and Multiple Inquests into Patient Deaths**

94.     In the first half of 2017, at the same time that the Company was becoming ever-more dependent on the performance of its U.K. facilities, those same Priory facilities were receiving ever-increasing scrutiny from U.K.-based media on their poor safety and quality of care.

95.     For instance, on January 22, 2017, *The Times* published an article entitled "Deaths spark care fears at Priory hospitals," which reported:

> Coroners have issued five formal notices over the past five years highlighting care failures after deaths of patients in the care of the Priory Group's hospitals.
>
> Among the recurring problems highlighted in the coroners' "prevention of future death notices" are a failure adequately to monitor patients at risk of self-harm, failures in training and inadequate record keeping.
>
> ***They are the latest in a series of incidents that has raised concerns about the welfare of patients, both private and NHS, at Priory hospitals***.

96.     On March 14, 2017, the independent regulator Care Quality Commission ("CQC") published a quality report on the Priory Hospital Roehampton – Priory's flagship hospital and namesake – finding the safety of the hospital's services to be "Inadequate." Numerous media outlets immediately reported on this story, including *The Guardian*, *BBC News* and *The Times*. As described by *The Times* in an article published the following day entitled "Priory hospital criticised as unsafe after suicides":

> One of Britain's leading mental health providers has been criticised by regulators for "inadequate" safety at its flagship hospital.
>
> The Priory in Roehampton, southwest London, has been under scrutiny since a series of patient suicides and self-harming incidents last year.
>
> Concerns were raised by the Care Quality Commission (CQC) about unsafe staffing levels and bosses have received an official warning notice.

97.     On May 2, 2017, *BBC News* reported on the results of another public inquest[2] in an article entitled "Priory's care plan for anorexic teen . . . 'inadequate.'"  The article reported: "The jury returned a conclusion of suicide but found the care plan when Ms. McManus was discharged was inadequate and there was not enough communication with the family about her suicide risk."

98.     Several other inquests into patient deaths at Priory facilities revealed similar failures in care, as reported in March and July 2017.  And in an August 21, 2017 "report to prevent future deaths" made pursuant to the U.K.'s Coroners and Justice Act of 2009, another coroner similarly reported an inquest jury's findings that a patient's death was "contributed to by neglect" due to Priory staffing and policy failures.

### 3.     Defendants Overstate the Expected Performance of Acadia's U.K. Operations, Then Sell Tens of Millions of Dollars in Stock Prior to Announcing a Major Q3 2017 Earnings Miss

99.     Despite ongoing scrutiny from media and regulators in the U.K. – where the NHS prioritizes "funding providers based on the quality of their service" – defendants repeatedly told investors throughout 2017 that the Company's weakening U.K. metrics would improve to meet the Company's 2017 financial guidance.

100.    Defendants first issued their FY 2017 financial guidance in a February 23, 2017 release, as follows:

- Revenue for 2017 in a range of $2.85 billion to $2.9 billion;

- Adjusted EBITDA for 2017 in a range of $625 million to $640 million; [and]

- Adjusted earnings per diluted share for 2017 in a range $2.40 to $2.50.

101.    In the same release, defendants disclosed that for Q4 2016 the Company's same facility revenue in the U.K. grew 4.2%, but that they believed these U.K. results were out of the

---

[2]    An "inquest" in the U.K. is an official fact-finding inquiry into the circumstances surrounding an unusual or unexplained death.  These public proceedings are carried out by a coroner before a jury and allow for the presentation of evidence and witnesses.

1546233_1

ordinary due to "disruption throughout the fourth quarter resulting from the focus, time and effort required to complete the divestiture in late November and to begin the integration of Priory's operations into Acadia."

102. On the earnings call the next day, defendants stressed that Acadia expected higher revenue numbers from the U.K. facilities, and that "as the census recovers, and as we are able to move forward with the integration and put the new management structure in place we will see both the census rebound and the growth rebound, as well as the margin improvement in the UK."

103. On April 25, 2017, upon releasing the Company's Q1 2017 earnings results, defendants announced that same facility revenue growth for U.K. facilities had slowed to 2.6%. Nevertheless, the Company affirmed its previously established financial guidance for FY 2017.

104. On the earnings call the next day, defendants continued to assure investors that despite the softer U.K. numbers, the Company would hit its guidance and "over the course of the year, as the integration is completed that we should see the growth pick up in the U.K."

105. On July 27, 2017, upon releasing the Company's Q2 2017 earnings results, defendants announced that same facility revenues at U.K. facilities had increased 4.0%. Defendants also narrowed their previously established financial guidance for FY 2017:

| FY 2017 Guidance | Narrowed From (February 23, 2017) | To (July 27, 2017) |
|---|---|---|
| Revenue | $2.85 billion to $2.9 billion | $2.85 billion to $2.87 billion |
| Adjusted EBITDA | $625 million to $640 million | $629 million to $635 million |
| Adjusted earnings per diluted share | $2.40 to $2.50 | $2.42 to $2.47 |

106. On the earnings call the next day, defendants repeatedly denied that there was anything to read into the narrowing of the guidance and continued to stress that the Company would see "incremental improvements through the U.K. over the balance of the year."

- 30 -

107. In August 2017, Acadia conducted a follow-on offering where the Individual Defendants and Acadia insiders sold over $100 million in stock – with Jacobs and Turner collecting more than $35 million while cutting their holdings by more than half.

108. Only after the Individual Defendants were able to collect tens of millions of dollars in insider sales did the true effect of Acadia's underperforming U.K. facilities come to light. On October 24, 2017, upon releasing the Company's Q3 2017 earnings results, defendants announced that same facility revenue growth for U.K. facilities had slowed to 3.8%. Shocking investors, defendants also announced that it was officially lowering its FY 2017 financial guidance:

| FY 2017 Guidance | Lowered From (July 27, 2017) | To (October 24, 2017) |
|---|---|---|
| Revenue | $2.85 billion to $2.87 billion | $2.82 billion to $2.83 billion |
| Adjusted EBITDA | $629 million to $635 million | $600 million to $605 million |
| Adjusted earnings per diluted share | $2.42 to $2.47 | $2.23 to $2.25 |

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

109. During the Class Period, defendants materially misled investors, thereby inflating the price of Acadia securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements not false and misleading.

110. First, defendants misled investors about Acadia's U.S. operations, and specifically the quality of care, staffing levels and regulatory compliance at its facilities. Second, defendants misled investors about the performance, and expected future performance, of Acadia's U.K. operations, which repeatedly failed to meet the financial targets defendants assured investors they would meet.

A.     **False and Misleading Statements and Omissions Regarding Acadia's U.S. Operations**

1.     **Defendants Made Misrepresentations and Omissions Regarding the Quality of Care Offered at Acadia's Facilities**

111.    Throughout the Class Period, defendants repeatedly emphasized that offering quality care was fundamental to Acadia's success, and that its facilities provided high-quality care that would drive Acadia's future success.  In reality, however, Acadia prioritized bed growth and cost cuts at its facilities over quality patient care, resulting in rampant adverse patient events throughout the Class Period.

112.    Acadia consistently touted its "high-quality services" as a key factor in improving its operating results in its Forms 10-K, signed by Jacobs and Duckworth, and in its Forms 10-Q, signed by Duckworth:

> Our business strategy is to acquire and develop inpatient behavioral healthcare facilities and improve our operating results within our inpatient facilities and our other behavioral healthcare operations.  ***We strive to improve the operating results of our facilities by providing high quality services***, expanding referral networks and marketing initiatives while meeting the increased demand for behavioral healthcare services through expansion of our current locations as well as developing new services within existing locations.[3]

113.    Throughout the Class Period, Acadia also stressed in its Forms 10-K that the Company's growth strategy based on strategic acquisitions emphasized quality of service:

> Management believes our focus on behavioral healthcare and history of completing acquisitions provides us with a strategic advantage in sourcing, evaluating and closing acquisitions.  We leverage our management team's expertise

---

[3]   This statement was included in the Company's Forms 10-K for: FY 2014, filed on February 27, 2015; FY 2015, filed on February 26, 2016; FY 2016, filed on February 24, 2017; and FY 2017, filed on February 27, 2018.  This statement was also included in the Company's Forms 10-Q for: Q1 2014, filed on April 30, 2014; Q2 2014, filed on July 30, 2014; Q3 2014, filed on October 30, 2014; Q1 2015, filed on April 29, 2015; Q2 2015, filed on August 5, 2015; Q3 2015, filed on November 4, 2015; Q1 2016, filed on April 29, 2016; Q2 2016, filed on July 29, 2016; Q3 2016, filed on November 2, 2016; Q1 2017, filed on April 26, 2017; Q2 2017, filed on July 28, 2017; Q3 2017, filed on October 25, 2017; Q1 2018, filed on May 3, 2018; Q2 2018, filed on July 31, 2018; and Q3 2018, filed on November 6, 2018.

to identify and integrate acquisitions based on a ***disciplined acquisition strategy that focuses on quality of service***, return on investment and strategic benefits. We also have a comprehensive post-acquisition strategic plan to facilitate the integration of acquired facilities that includes improving facility operations, retaining and recruiting psychiatrists and other healthcare professionals and expanding the breadth of services offered by the facilities.[4]

114. The Forms 10-K and Forms 10-Q referenced at ¶¶112-113, *supra*, contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") signed by Jacobs and Duckworth, who certified that they had reviewed the Forms 10-K and Forms 10-Q and that they contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of Acadia, were accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting. Jacobs and Duckworth also attested that they had designed disclosure controls to ensure that material information relating to Acadia was made known to them.

115. On July 30, 2014, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q3 2014 financial results. On the earnings call, Jacobs claimed that the Company's strong same facility performance for the quarter "reflect[ed] [a] growing demand for high-quality inpatient behavioral healthcare."

116. On October 30, 2014, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q3 2014 financial results. Jacobs ended the earnings call by assuring investors that the Company prioritized the quality of its behavior health services: "Thank you all very, very much and always ***keep quality, doing the right thing, that is absolutely the first priority of this company*** is doing that. So once again, see you at the end of the fourth quarter."

---

[4]   This statement was included in the Company's Forms 10-K for: FY 2013, filed on February 21, 2014; FY 2014, filed on February 27, 2015; FY 2015, filed on February 26, 2016; FY 2016, filed on February 24, 2017; and FY 2017, filed on February 27, 2018.

117.    On November 11, 2014, Jacobs, Turner and Duckworth presented to investors, analysts and market participants at the Stephens Fall Investment Conference on behalf of Acadia. In discussing the risks Acadia faced from its recently announced acquisition of CRC Health Group, Inc. ("CRC"), Duckworth emphasized that preventing patient incidents was a top priority:

> *As with [the] whole Company, you know, we want to deliver good, quality care and not have any bad incidents*. So that is always the greatest risk to us is a bad incident occurring. *We try everything we can to keep that from happening, but knowing our industry that happens*.

118.    On May 12, 2015, Jacobs and Turner gave a presentation to investors, analysts and market participants at the Bank of America Merrill Lynch Health Care Conference on behalf of Acadia. In his prepared remarks, Jacobs touted Acadia's organizational structure and quality control as a secret to the Company's success:

> This is our secret to success, these green boxes, these division structures. The accountability, responsibility, the freedom we give those division presidents and those local CEOs of our company, putting in that our clinical departments, *our oversight of the quality, just absolutely is the secret to our success*. Absolutely the secret to our success.

119.    On June 2, 2015, Jacobs and Turner gave a presentation to investors, analysts and market participants at the Jefferies Global Healthcare Conference on behalf of Acadia. When questioned about the Company's successful history in increasing profit margins at its facilities, Turner insisted that the Company's efforts for increased profitability did not come at any expense of the quality of care:

> [Brian Tanquilut – Jefferies Analyst:] Last question for me. So as we think about margins, I mean you guys have done a great job pushing margins higher on a same store basis. So is that something that we think should keep going? How should we think about your margins? Or is it something that has a cap or a regulator internally?
>
> [Turner:] I think the margins are going to settle in around 27%, give or take 100 basis points. And now that our same store base is getting so large and more – and the UK were PiC will drop in the third quarter into the same store, I think our margin's going to be in that 27% range. And that's where it should be. *I think it's*

*where it's going to be with us providing great quality care at the local level*. So that's what I see on margins.

120.    On September 9, 2015, Jacobs and Turner presented to investors, analysts and market participants at the Wells Fargo Healthcare Conference on behalf of Acadia. In response to a question regarding Acadia's efforts to minimize adverse patient events, Jacobs reiterated that patient care was the Company's first priority:

> [Audience Member:]  Generally speaking or broadly, how do you try to minimize adverse patient event at your facilities?

> [Jacobs:]  Well, *we have a robust clinical risk management department at the corporate office*, but this is the primary responsibility of the CEO, his medical staff, or their medical staff, and our employees at the local level; that is their job, take care of the patient.  And we can provide corporate resources to assist you in that and can do benchmarking and trending and point out areas for improvement, but at the end of the day, it's the responsibility of the CEO of that facility to make sure the quality of care is there.  *And throughout the Company, our CEOs (inaudible) on the side of good patient care is that take care of our patients first*.

121.    On April 8, 2016, Acadia filed a Definitive Proxy Statement on Schedule 14A with the SEC, which included a stockholder proposal from Calvert Investment Management, Inc. ("Calvert") requesting that the Company prepare a sustainability report describing the Company's ESG risks and opportunities, including patient and worker safety.  In opposing the proposal, Acadia's Board claimed the Company "conduct[s] [its] business in compliance with applicable law including environmental, health and safety regulations, and we work hard to be an exceptional employer, a good neighbor and a good citizen."  Instead, the Board suggested it would be best to focus resources on the "core elements" of the Company's business strategy, which included:

- creating a world-class organization that *sets the standard of excellence in the treatment of specialty behavioral health and addiction disorders*;

- creating behavioral health centers where *people receive individualized and quality care that enables them to regain hope in a supportive, caring environment*;

1546233_1

- offering an enviable internal culture and environment that encourages and supports both professional and personal growth that our employees are proud of; and

- developing partnerships with physicians, professionals, and payers within the communities we serve through the ***delivery of high quality specialty behavioral health services at affordable costs while always putting the patient first***.[5]

122. On June 9, 2016, Jacobs and Turner presented to investors, analysts and market participants at the Jefferies Healthcare Conference on behalf of Acadia. In his introductory remarks, Jacobs once again stressed the importance of quality care for the patients admitted to Acadia's facilities:

As you've seen from our first-quarter results, our organic same-store growth was industry-leading if you're in the hospital sector, and we're very proud of what Ron Fincher and his team have done and what we are doing out in the field. So the Company is in, we think, a great position and doing well. It is hard work. We do take care of a lot of patients, and ***that is our number one goal is taking care of the patients, making sure they are receiving the quality care that they need***, and we very much want to do that. I know our employees are dedicated to that, and our Company is improving the lives we touch. So there's a lot of people we touch when we touch a family's life.

123. On February 22, 2017, Jacobs and Turner presented to investors, analysts and market participants at the RBC Capital Markets Healthcare Conference on behalf of Acadia. In response to an audience question concerning efficacy of care, Jacobs insisted that the Company's quality and compliance compartment tracked the efficacy of the care provided to Acadia patients:

[Audience Member:] Thanks. One of those questions raised in the negative headlines I think talked about efficacy of care. And do you guys track efficacy and do you think the industry should track efficacy? Are people actually getting cured when they come in versus (inaudible)?

[Jacobs:] We can do a better job. Now, unfortunately, the psychiatric industry has been discriminated for years. And when the federal government gave

---

[5] These exact statements were repeated the following year in Acadia's April 13, 2017 Definitive Proxy Statement, in opposition to Calvert's renewed stockholder proposal for an ESG sustainability report.

out all this money for to – for med/surg hospitals to improve their computer systems, we got nothing.

So if we had gotten some money and was able to invest in our computer systems, we would be able to track that better. We are investing in that, but it is more manual than it is computerized. And we have a department headed up by Scott Schwieger that our quality and compliance department that does nothing but look at this.

And so some parts of our business are easier to follow up and to see about the cure. Obviously if somebody represents themselves, the first one didn't work.

124.    On May 16, 2017, Jacobs and Turner presented to investors, analysts and market participants at the Bank of America Merrill Lynch Healthcare Conference on behalf of Acadia. When questioned about ongoing concerns of labor shortages in the behavioral healthcare space, Jacobs assured that Acadia maintained adequately staffed facilities to provide quality care amid Acadia's expansionist growth strategy:

[Kevin Fishbeck – BofA Merrill Lynch Analyst:] I guess, obviously, one of the hot button issues for this sector has been the question of labor shortages. And can you just talk about what you're seeing there, whether it's been, I guess, either an issue from a margin perspective or whether it's been an issue from – a gating issue from a growth perspective for you guys?

[Jacobs:] *We've been very fortunate in that our shortages occur in very unique locations, very isolated locations*. Actually, on the bus tour, the question was asked from a crowd about psychiatrists, and they have plenty; and then also asked about nurses, and they have plenty. And so we expect our facilities to be in communities that have nursing teaching programs, to have the nurses coming through our facilities learning about psych patients, that if there's psychiatrist medical schools there, you'll see us joint-venturing with medical schools. We already have one with Einstein. We'll be having one with the University of Miami, whether we'll have one with the Ochsner group in Louisiana. So we've been able to find psychiatrists. We have a robust recruitment department, and we saw some of this pressure probably 4 to 5 years ago and began ramping that up, so *we can meet the needs to continue to grow. And based upon our growth numbers, we're meeting the needs and providing good quality care*.

125.    On May 24, 2017, Jacobs and Turner presented to investors, analysts and market participants at the UBS Global Healthcare Conference on behalf of Acadia. In his prepared remarks, Turner again stressed the importance of Acadia's quality assurance practices:

- 37 -

In addition to the just oversight of our facilities from an operational and financial standpoint, we have overlay of our clinical services, headed up by our Vice President of Clinical Services. And these individuals are highly trained in the behavioral health field and help assess our facilities and make sure all the quality and assurances are being adhered to, little checks and balances. We have similar quality insurance (sic) [assurance] personnel at the facility level. *But we want to also make sure from a corporate level, we are ensuring that we're delivering good patient care in our facilities.*

126. On June 8, 2017, Jacobs and Turner presented to investors, analysts and market participants at the Jefferies Healthcare Conference on behalf of Acadia. In response to an analyst question regarding the Company's efforts to maintain appropriate staffing levels, Turner stressed that Acadia secures the necessary mental health staff to support the Company's expected growth:

[Brian Tanquilut – Jefferies Analyst:] Brent, just to follow on to that, what's your thought on staffing, your ability to staff these new beds as you're adding? And how are you – where's the confidence coming from that you can keep staffing at sort of a 6% to 7% organic growth rate?

[Turner:] Well, as Joey mentioned, we've been at this since 2011 with Acadia, and we've shown very strong organic growth throughout those 6 straight years. When you're showing that in our business, the requirement as you add these patients is that there would be appropriate – the staffing is going to incrementally add with those – that addition of patients. So our confidence is much like in how we're confident about the volume coming. *We work hard to capture the volume, we work hard to recruit the staff, the nurses, the mental health techs, the physicians, whatever we need to cover that additional unit, we're working on that in advance*, at both at the local hospital level as well as our (technical difficulty) designed to source employees. But I think ultimately, the best thing about our confidence in getting the employees is we have the right culture and we have the right sort of morale at our company. I think we're a good place to work, a great place to work. And so if someone is desiring to care for the patient population that we care for, and it's the mental health – people with mental health needs, then they're going to find Acadia's facilities. *And they know at the end of the day, we're doing nothing but trying to make sure we're improving the lives of those patients that are in our care. And that's what we believe in, and that's how we have the confidence that we're going to be able to continue to access the labor to support our growth.*

127. On June 9, 2017, Acadia filed with the SEC a Form S-3ASR registration statement and prospectus, signed by Jacobs and Duckworth, using a "shelf" registration. Under the shelf registration, Acadia securities could be sold in various future prospectus supplements, which would form part of the registration statement for each offering. The Form S-3ASR incorporated by

- 38 -

reference the statements in the FY 2016 Form 10-K and Q1 2017 Form 10-Q alleged herein at

¶¶112-113, *supra*, to be false and misleading, and stated in pertinent part:

INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The SEC allows us to "incorporate by reference" information into this prospectus, which means that we can disclose important information to you by referring you to another document filed separately with the SEC. The information incorporated by reference into this prospectus is deemed to be part of this prospectus, except for any information superseded by information contained directly in this prospectus or contained in another document filed with the SEC in the future which itself is incorporated into this prospectus.

We are incorporating by reference the following documents, which we have previously filed with the SEC:

(1)    our Annual Report on Form 10-K for the fiscal year ended December 31, 2016;

(2)    our Quarterly Report on Form 10-Q for the three months ended March 31, 2017;

(3)    our Current Reports on Form 8-K filed May 10, 2017 and May 25, 2017;

(4)    the information specifically incorporated by reference into our Annual Report on Form 10-K for the fiscal year ended December 31, 2016 from our Definitive Proxy Statement on Schedule 14A filed with the SEC on April 13, 2017; and

(5)    a description of our capital stock as set forth in our Registration Statement on Form 8-A, filed on October 31, 2011.

128.    On August 18, 2017, Acadia filed with the SEC a Form 424B7 prospectus supplement to the June 9, 2017 prospectus for a follow-on offering of more than 2.8 million shares of Acadia common stock. The August 18, 2017 prospectus supplement incorporated by reference the same documents as the June 9, 2017 prospectus, *i.e.*, the FY 2016 Form 10-K and Q1 2017 Form 10-Q alleged herein at ¶¶112-113, *supra*, to be false and misleading.

129.    The statements set forth in ¶¶112-128, *supra*, were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

1546233_1

(a)     Acadia did not "strive to improve the operating results of [its] facilities by providing high quality services," but instead focused on a growth strategy driven by bed expansion, and cost cutting – at the expense of adequately staffing and servicing the Company's existing facilities (*see* §IV.A., *supra*);

(b)     Despite claiming that the quality of patient care was "the first priority of th[e] company" and the "number one goal [was] taking care of the patients," defendants designed, implemented and approved compensation structures that incentivized employees and executives to prioritize profit margins over patient care.  As detailed by former employees, Acadia maintained a weighted compensation system whereby Treatment Placement Specialists received higher commissions for placing patients at facilities that were more profitable for Acadia, regardless of patient need.  *See* ¶220, *infra*.  Similarly, facility executive bonuses were dependent on whether the facility met the budget set by Acadia during the prior year.  If a facility was behind on the budget set by Acadia, facilities would be directed to cut costs, including by firing staff, in order to make their budget, further jeopardizing patient care (*see* ¶221 *infra*);

(c)     Defendants did not recruit, hire or maintain sufficient staff to "meet[] the needs and provid[e] good quality care" for its ever-expanding facilities.  Rather, in order to meet management's budget requirements, Acadia's facilities were staffed at levels far below those necessary to provide "high quality" services.  Numerous Acadia facilities were found to have improper and inadequate staffing ratios by state and federal investigators, with some facilities cited as having 1 mental health technician assigned to observe 17 patients or staffing ratios of 3:21 or 5:32.  *See* ¶¶51, 54-59, *supra*.  An October 2018 analysis conducted by Aurelius Value on CMS inspection reports from 2013 to 2018 for 31 of the 40 acute inpatient U.S. hospitals listed on Acadia's website found staffing deficiencies at 28 of the 31 Acadia hospitals, including repeated violations for not having enough nurses or qualified practitioners on hand (*see* ¶¶185-186, *infra*);

(d)     As a result of systemic understaffing, Acadia facilities were not, in fact, providing "high" or "great" quality care.  Instead, lack of staff and supervision resulted in unsafe environments where adverse patient events were rampant, with numerous incidents of patient physical abuse, sexual abuse and suicide.  *See* §IV.A.2., A.3., *supra*.  Indeed, of the 28 acute inpatient hospitals that had CMS inspection reports detailing staffing deficiencies, 89% were cited by inspectors for having deficiencies related to patient safety or care, including violations involving patient deaths, suicides, elopements (escapes), improper or erroneous administration of medications, improper use of restraints, and physical or sexual assaults.  *See* ¶186, *infra*.  As described by one behavioral health associate at an Acadia facility: "[Families] can't go home and trust us that their loved one will be okay and bad things won't happen to them.  We have so many patients and not enough staff" (*see* ¶51, *supra*);

(e)     Defendants did not maintain adequate corporate oversight or protocols to prevent or report adverse patient events.  Instead, as corroborated by former Acadia employees, defendants instituted policies that prohibited facilities from calling the police after reports of sexual or physical abuse and demanded "in-house" investigations of abuse prior to notifying the authorities.  *See* ¶¶48, 64, *supra*.  These procedures actively hindered police investigations and concealed reporting of adverse events to the proper authorities.  According to CMS reports, inspectors also found managerial deficiencies at 27 of the 31 facilities, including failures to report incidents to law enforcement or even investigate patient abuse allegations, and failures to provide proper oversight or follow or establish appropriate patient safety protocols (*see* ¶186, *infra*);

(f)     As reported in a November 2018 *Seeking Alpha* article, problems with Acadia's facilities were "consistent with declining quality of care," with an industry expert stating that "'due to the number of suicides at some of their facilities, Acadia's ability to accept certain patients has been restricted by state-level governments.'"  *See* ¶190, *infra*.  The report also stated

- 41 -

that while most of Acadia's business came from referrals, an industry expert stated that "Acadia has developed an industry-wide reputation for not providing quality care, cutting costs, and cannibalizing their own programs in order to raise profits. As a result, reputable clinicians are willing to refer to Acadia less and less"; and

(g)     As a result of the foregoing, the Sarbanes-Oxley Certifications signed by Jacobs and Duckworth for the consolidated Forms 10-K and 10-Q containing the statements in ¶¶112-113, *supra*, were also false and misleading, as the relevant reports did in fact contain "untrue statement[s] of a material fact or omit[ted] to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report."

## 2.     Defendants Made Misrepresentations and Omissions Regarding Staffing Levels at Acadia's Facilities

130.     Throughout the Class Period, defendants repeatedly stated that Acadia adequately staffed its facilities to ensure they were able to provide appropriate quality care to patients. In fact, in order to reduce costs, Acadia routinely failed to appropriately staff its facilities, causing disastrous consequences.

131.     On November 4, 2015, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q3 2015 financial results. On the earnings call, Jacobs repeatedly assured analysts that, unlike its competitors, Acadia was not at all affected by the labor pressures facing the behavioral health industry:

> [Gary Lieberman – Wells Fargo Analyst:] Maybe on some of the other labor that you saw. A number of other acute care operators have discussed pressure on contract labor. Are you see anything there either in your facilities or in the broader markets that you could share with us?

> [Jacobs:] Gary, it's isolated here in the country for us. You know there might be one city or two cities as far as the labor market might be a little bit tighter, but that has not been a – once again, that is not a top three priority on our list. However, in the UK finding nurses is more of a challenge. They have plenty of

- 42 -

physicians but have less nurses, so we would like to take their physicians over here and take some of our nurses over there and we would be in great shape. But the UK has a little tougher time for nurses, but here in the United States we may have an isolated market or two where that might be an issue, but it's nothing that makes it to the top three of our list.

* * *

[Ana Gupte – Leerink Analyst:] Okay. Thanks. The final question just on the salaries ratio, is there any plan to increase staffing per patient or anything that might cause pressure going forward or should we expect this to remain largely flattish?

[Jacobs:] We expect it to remain flattish. We believe our hospital – our facilities are appropriately staffed today, and so we expect this to be flat for next year.

132. On May 10, 2016, Jacobs and Turner presented to investors, analysts and market participants at the Bank of America Merrill Lynch Health Care Conference on behalf of Acadia. Jacobs again stressed that Acadia maintained sufficient staffing levels to keep up with its patient growth:

[Kevin Fischbeck – BofA Merrill Lynch Analyst:] And do you think that – well, I guess do you see a shortage of psychiatrists? I guess one of your competitors highlighted that as an issue. And if you were to get this type of volume come through the system, would that put a point of pressure – would that be a gating factor to treating the patients?

[Jacobs:] I don't see the psychiatrists being a gating factor; it may end up being an isolated case, but as you all are really aware of the Acadia story, *for 5 years now we put up 8%-plus patient day growth. And we've been able to do that year-over-year and have the clinical staff, whether it's nurses or med techs or psychiatrists, in place to meet that need.*

* * *

[Kevin Fischbeck – BofA Merrill Lynch Analyst:] We mentioned a little bit (inaudible) question up here (inaudible) set that up. We mentioned a little bit that on the psychiatrist side, you're not really seeing labor shortage. *Any labor pressure on the wait – on the kind of nurse or staff side*?

[Jacobs:] *No, not really. We're able to find the staff to meet the needs*. Our budget has a 2% to 3% merit wage increase in it for our employees and we've been able to live with that. And then our CEOs and our HR departments have done a good job finding the appropriate staff.

- 43 -

There might be an isolated facility where there might be a temporary shortage at one time, but nothing that really is corporate-wide or even statewide. It would be an individual facility, so we've been very fortunate in being able to attract the employees that we need for our facility.

We have 37,000 of them approximately today and probably 36,000 of them, as Brent mentioned earlier, do patient care or support the patient care at the local level. And inside the company, our slogan is improving the lives we touch, because we know we improve the lives of the patient. But many times, it's many more members of that family, we improve their lives too. So that's what we stay focused on.

133.    On May 24, 2016, Jacobs and Turner presented to investors, analysts and market participants at the UBS Global Healthcare Conference on behalf of Acadia. Again, Jacobs reiterated Acadia's ability to sufficiently staff its facilities:

[A.J. Rice – UBS Analyst:] I'll ask a question and then we'll see, we might just go to the breakout. But one of the things we're hearing from your closest peer, one of the hospital companies, is that there seems to be some tightness of psychiatrists, tightness of maybe even clinicians and the nurses in the psychiatric business. I know you've added bed capacity because you needed to add. If you've got this IMD opportunity on top of already sort of strong growth, are you going to be able to handle the incremental volume or are you seeing any of that capacity? How would you put – what would you say about the tightness of clinician supply up there?

[Jacobs:] Oh sure, I forgot I was [mic'd]. We might see that in a specific market but overall we're able to find the clinicians whether they're psychiatrists or psychiatric nurses to staff our facilities. Most recently, as I mentioned, I was visiting a hospital that just added 80 beds over the last two years and they've been able to find enough psychiatrists and nurses to take care of those 80 beds. So we might have an individual facility that might be having some issues but we started investing more robustly in our recruitment efforts probably over two years ago. So, we've been able to find and retain the nurses and the psychiatrists that we need.

134.    On June 9, 2016, Jacobs and Turner presented to investors, analysts and market participants at the Jefferies Healthcare Conference on behalf of Acadia, where Jacobs made similar statements on Acadia's staffing efforts:

[Brian Tanquilut – Jefferies Analyst:] Joey, one of the things that we have heard is – we are hearing some constraints on the clinician front in terms of hiring and capacity. So, as you are growing your beds, what do you see in terms of the challenges or the ability to bring in whether it is a psychiatrist or psychologist or nurses?

- 44 -

[Jacobs:] Okay. We, probably two years ago, invested heavily into our internal recruitment department at the corporate office, primarily focused on psychiatrists, *and we have been very efficient and very fortunate in being able to always be able to find the psychiatrist that we need to make sure we can handle the growth in our bed build.* So psychiatrists to us, sure, we might have a single facility that might have an issue, but overall for the Company, this has not been an issue.

135. On July 29, 2016, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q2 2016 financial results. On the earnings call, Jacobs was again questioned by multiple analysts about Acadia's staffing in light of the industry-wide shortage of behavioral health professionals:

[Brian Tanquilut – Jefferies Analyst:] Joey, what about clinician supply, just to match the build-out?

[Jacobs:] As I mentioned on previous conference calls, we several years ago started beefing up our recruitment department, and that has paid dividends for us in today's environment, in that *we're able to find the clinicians we need, and that has not been an issue to us growing.*

\*          \*          \*

[Kevin Fischbeck – BofA Merrill Lynch Analyst:] Okay, great, thanks. I guess I just want to go back to the psychiatrist shortage question, which we've heard a couple more hospitals seeing that. Is it your view that, in your markets, that the market for psychiatrists is pretty consistent with where it's been the last few years, or are you seeing somewhat of a shortage, it's just that the investments you made are allowing you to manage through it?

[Jacobs:] *Our investment is allowing us to address the needs of our facilities.* We've got a top notch recruitment department, and working with our division Presidents and local CEOs, we're able to meet their needs, find the psychiatrists, get them signed up, get them relocated to the facilities where we need them. We're working closer and closer with residency programs on new graduates, stuff like that. So we're managing our way through this, Kevin. We identified this as a basic business strategy that we needed to do probably three years ago, and then put the resources behind that.

\*          \*          \*

[Paula Torch – Avondale Analyst:] Great. Thank you. I have a couple of questions. I just wanted to follow up on the labor and psychiatrists, and maybe the capacity constraints. Winder, given that hospitals and some of your other competitors are having your capacity constraints, and you're adding 800 beds this year, and maybe potential to do a similar amount next year, do you think that gives you an opportunity to take share from your competitors, or even just the hospitals

that have behavioral beds within them, given that you are able to be hiring these psychiatrists and clinicians? It seems like there are a lot of other companies having problems with this?

[Jacobs:] We just executed our strategy, Paula, and if it ends up taking market share from somebody, or just being there ready for the beds and the clinicians when those patients are looking for care, either way, we're glad to be there. It will be a combination of both of those. *So we're very pleased that consistently in the history of Acadia, that we've been able to build the appropriate number of beds each year, and find the clinicians to staff those beds, and to meet the needs of these local communities*.

136. On September 7, 2016, Turner presented to investors, analysts and market participants at the Robert W. Baird Global Healthcare Conference on behalf of Acadia, where he acknowledged the link between Acadia's volume growth and need for labor:

[Whit Mayo – Robert W. Baird Analyst:] Maybe shifting down the P&L to some of your expenses. There's been a lot of chatter in the marketplace just about the shortage of psychiatrists. And I know you have had a strategy in place for a number of years to address this and stay out in front. Can you maybe just talk about what you're seeing in terms of wage pressure for nurses and also for psychiatrists?

[Turner:] We're not seeing a lot of – again, we live within 2% to 3% merit-based increases. I'm not seeing anything come through that says we got to raise to the level of wages across the board in these markets.

We are very focused on staying close to that, because *we are dependent on that labor to grow our volumes*. We may just be in good markets or it may be some benefits – it's probably also some benefit of our corporate initiatives that we've had in place the last few years just to really support the facilities in their recruiting efforts, both from the physician as well as some of the key positions in nursing and mental health techs and that sort of thing.

137. On November 2, 2016, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q3 2016 financial results. In discussing the factors for the lower-than-expected earnings, Jacobs expressly disclaimed the effect of any staffing issues on Acadia's growth rate in his prepared remarks:

The second factor was same-facility revenue growth in the US of 6.5%, which increased compared to 5.9% for the third quarter last year, but which was below our expectations for the quarter. *The softness in our same-facility volumes in the third quarter was affected by a handful of our facilities and was not the result of any material labor shortages. While we have a few markets that have labor*

*challenges, this is not materially affecting our growth rate*. In the US, through the nine months of 2016, we've recruited 125 psychiatrists to our facilities, which is similar to the total number recruited for all of 2015. ***These numbers clearly demonstrate that Acadia has the ability to recruit psychiatrists where needed***. Thus far in the fourth quarter, US same-facility patient days grew 6.7% in October, 50 basis points better than our experience for the third quarter.

138.     In response to questions from analysts, Jacobs admitted that certain Acadia facilities

suffered from labor shortages, but again downplayed the significance of the staffing issues:

[Ana Gupte – Leerink Analyst:]  Yes.  Hi.  Thanks for taking my question. Good morning.  On the staffing shortages again, you've been saying that you haven't seen them and I think you gave a number on how many psychiatrists you recruited, but your peer – the pure-play peer and also the acute guys are talking about it. There's broad commentary in the country about mental health professionals being in short supply.  Is there likely to be any wage pressure?  There is a little bit of a pickup sequentially in your salaries line.  And as you're recruiting, are you having to see any wage pressure on that that might be a bit of an offset?

[Jacobs:]  We have, in our budget, a 2% to 3% merit increase of our employees next year and we think they're going to be able to attract the personnel to their facilities that they need to make sure we have the appropriate staffing in our facilities.

***So as I mentioned earlier, there are some isolated markets where we would – we could have a shortage of a mental health tech or social workers or something like that, but there is nothing companywide***.  And then the reason we gave the physician numbers were – gave you the physician numbers were, we gave you those numbers because we're doing well.  The recruitment team is doing an outstanding job in finding physicians for our facilities.

***So we've been able to work through that***.  This is the only thing we do is behavioral health.  And those are the companies that you mentioned, they're also focused on med/surg operations too.  ***So we've been able to find the employees for our facilities***.

139.     On February 22, 2017, Jacobs and Turner presented to investors, analysts and market

participants at the RBC Capital Markets Healthcare Conference on behalf of Acadia.  In response to

an analyst question, Turner reiterated that the nationwide staffing shortages would not bar continued

Acadia growth:

[Frank Morgan – RBC Analyst:]  So if we get this extra volume, obviously there's been a lot of discussions around labor and capacity, capacity being labor capacity, not physical capacity.  But what is your thoughts on that current state.  Can

you – do you have the labor capacity to handle the volume if we do get incremental volume?

[Turner:] I think – you know, as you have seen from our historical numbers, we have been able to grow our organic revenues very healthy numbers, upper-to-mid-single digits. When you do that in an inpatient setting, you have to have an incremental staffing. ***Caring for more patients means you must bring on more staff to do that***.

So again, we look at the history, we look at the trends going forward. We are in a full employment market. The economy is doing well. But we are only focused on behavioral health, and we've got a lot of resources and efforts designated. Our internal recruiting, corporate recruitings, supporting our facilities. We've just got – everybody in the Company knows when these next 20 beds are coming on in a certain market, so it's not a surprise when those beds come online that we are expecting to have more labor needs there.

So whether we are in the right markets, whether we have the right execution, or a combination of those things, we do not see a barrier to our growth based on labor. Do we have a couple of markets that are more challenging than others? Absolutely. But we also have hundreds of facilities. So one or two markets aren't changing our trends just on the labor component.

140.    On February 24, 2017, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q4 2016 and FY 2016 financial results. On the earnings call, Jacobs acknowledged the increased difficulties the Company was facing in the labor market, but again insisted that the Company would see increased profit margins in 2017 despite any staffing pressures:

[Brian Tanquilut – Jefferies Analyst:] I appreciate that color, Joey. Follow-up for me, margins were strong in Q4. So how should we think about the margin progression for this year? Number one, just as we think about the synergies flowing through. And then number two, the de novos improving. And then lastly, how do you tie that into kind of like staffing, because there were obviously concerns that it is getting harder to staff in the behavioral space. So how should we read into your margin performance as it relates to your ability to staff all these facilities?

[Jacobs:] My expectation is that we will have margin improvement this year. Whether that is 25 basis points to 50 basis points to 100 basis points, the expectation is that we will have margin improvement. So far, ***Ron Fincher and his recruitment team have been able to find the necessary staff so that we are confident that when we build the 967 beds that we are able to staff those beds and that that won't be an issue to keep us from hitting our [due] numbers***.

*I guess the only other comment I would say since the last call we have had, is that the labor market is a little tighter, but once again, we have been able to recruit and find the staff to work through that.* Once again, blocking and tackling our recruitment department, doing what it needs to do, hitting its target, I think we signed three physicians this week. So, if we can keep doing that, and so we should be okay there.

141.    On March 7, 2017, Jacobs and Turner presented to investors, analysts and market participants at the Raymond James Institutional Investors Conference on behalf of Acadia. At the conference, Jacobs reiterated that the Company had sufficient staffing to meet patient needs:

[John Ransom – Raymond James Analyst:]  Right.  I think you guys have done a nice job laying out your psychiatrist recruiting program.  What I think is maybe a little less understood is, it looks to me at least like a 15-year boom in behavioral health, high occupancy rates, a lot of spending, that we should be at the cycle where there's pressure on labor at below the psychiatrist level, maybe starting with the nurse level, going down to the tech level.

Do you think that over time the industry is going to have to make a step change in terms of compensation to keep running this hot in terms of demand?  It sounds like an old fashioned problem from the 70s where you're talking about capacity bottlenecks and demand for labor.  So how do you think that will change?  How has it changed?  And do you think the industry is going to have to start paying people like, say, drug counselors more than $45,000 a year and having to compete more to get the higher nurses?

[Jacobs:]  *Obviously, the most important person to us is the psychiatrist. And a psychiatrist can take care of about 20 patients a day*.  So, you know – and that's one of the reasons we're affiliating with the joint ventures in the academic centers, is that their teaching programs help feed all the acute facilities, whether it's the psychiatrists, the nurse, the mental health tech that we use inside our system.

I do not see salary adjustments below the psychiatrist, across the board salary adjustments occurring because of the tightness in the market.  Fortunately for this market and fortunately for our company, during the life of the caregiver, they're going to migrate to what they like to do best or a calling.  And there are a lot of people, and enough so far, want to be in the mental health area, that they want to serve their community this type of care.  *So so far today we have enough of those individuals to meet the needs*.

Now, Butte, Montana, will always need all of the above, because it's in Butte, Montana.  Anybody here from Butte, Montana?  (Inaudible) talk about Butte, Montana.  So I've been there.  Got out of town.  I'm sorry; I shouldn't say that since this is taped.

- 49 -

*But, anyway, so there's isolated pressure, but it's more isolated pressure. And we have a way of working through that through our recruitment department.* And we do not see wholesale salary adjustments to maintain our individuals or to pay our drug counselors $45,000.

142.     On April 26, 2017, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q1 2017 financial results.  On the earnings call, Jacobs again stressed that Acadia sufficiently staffed its facilities to meet patient demand:

[Albert J. Rice – UBS Analyst:]  Okay.  And then just maybe a follow-up on the labor side, any update on what you're seeing in terms of availability of both clinicians and psychiatrist?  And how's that pipeline look?  And what are you seeing there?

[Jacobs:]  *Here in the U.S., we're doing an excellent job on attracting physicians and the technical individuals that we will need for our facilities to meet our patient's demand*.  The real shortage is over in the U.K. where there is a nursing shortage over there.  But we have a plan there to be more efficient there and to use less agencies expense there.  So the U.S., we're doing fine and working through any labor issues or shortage of labor issues in any market.  And then the U.K., we're working on a strategy on how do we attract more nurses, make it the place to work for in the U.K.

143.     On July 28, 2017, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q2 2017 financial results.  On the earnings call, Jacobs issued similar statements regarding Acadia's ability to staff its growing number of facilities:

[Albert J. Rice – UBS Analyst:]  Okay, okay.  Obviously, not as much for you, but to some degree, there's been discussion around the industry about the tightness of labor supply and finding both psychiatrists and nurses.  Any update on your thinking?  What are you seeing in terms of turnover rates, vacant job postings and so forth and wage updates and so forth?

[Jacobs:]  We still have – as we've mentioned for the past couple of years, we have some isolated markets where it's a little tougher to find the nurses or the psychiatrists.  But we've got a great team in recruitment.  *And we have provided additional resources this year into that department, and we'll see them – those resources be very fruitful.  So the labor market is tight, but we've been able, Ron and his team and the recruitment department that reports to Ron, have been able to find the personnel that we need to continue to put up 6% same-store patient day growth here in the U.S.*  So I think we can continue to do that and find the people. Their – on the salary wage pressures, it's in the 2% to 3% is what we're seeing for wage increases.  And so – but we want to be competitive in all our markets with – we compete with the med/surg hospitals and other health care providers.  So we think

- 50 -

we're in a good position and have been able to work through it for these past several years.

144.    On September 6, 2017, Jacobs and Turner presented to investors, analysts and market participants at the Robert W. Baird Global Healthcare Conference on behalf of Acadia.  At the conference, Jacobs was asked to provide an update on the labor and staffing challenges Acadia was facing:

> [Benjamin Whitman Mayo – Robert W. Baird Analyst:]  Maybe shifting gears to labor and clinical staff shortages.  This has gotten some attention in the marketplace in the past year.  How would you describe the challenges of finding psychiatrists to cover your hospitals, finding the appropriate nurses.  You guys seem to manage through it pretty well over time.  This is all you do.  You have a lot of resources from a recruiting standpoint, so just any update on labor churn.

> [Jacobs:]  *Sure.  We started about 5 years ago creating a dedicated unit just to find psychiatrists for our facilities, and that has been money well spent.  And we're continuing to add resources there.  We have been able to find an appropriate amount of psychiatrists to grow the company.  And when you're putting up 6% same-store growth on patient days, you're going to need physicians and nurses*.  Now on the physician side, that's another reason why we're doing the joint venture opportunities with the universities is that we would be able to get first access to the graduates coming out of those programs, so we can introduce them to Acadia.  And quite frankly, if you remember the map here in the U.S., we have opportunities from coast to coast for physicians.  So we have a great team there, and they're doing a good job for us.  Now on the nurses side, that's more of a local issue.  Our CEO and HR Director are responsible for recruiting and finding the nurses at the local level.  The market is tighter.  When you're running unemployment at 4.3%, 4.4% for the whole country, that means there are tightness in some markets.  Some of our markets are very oscillated, so it's tougher there to have that nurse or find that nurse to live in that location.  *But we've been able to do that and have been very creative in finding ways to not only recruit nurses but psychiatrists*.  So we continue to add resources to that and try to think out of the box on that.  And for example, we've kicked around the idea of starting our own staffing company, more so for the U.K. than the U.S.  The nursing shortages is much more acute in the U.K.  They have plenty of physicians.  But the nurses, they do not have.  So we're looking at other ways of finding and keeping employees for our company.  And so it's an ongoing process.  But as you mentioned, Whit, *we've been able to manage through it*.

145.    On May 2, 2018, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q1 2018 financial results.  On the earnings call, Jacobs reiterated that the tight U.S. labor market would not impede Acadia's growth plan:

[Frank Morgan – RBC Analyst:]  And part 2 would just be – just maybe talk about labor in the U.S.  We still hear a lot of questions and concerns about the labor markets, particularly with behavioral health care in the U.S.  What you're seeing and your thoughts on the outlook there.

[Jacobs:]  ***And then, in the U.S., the labor market is tight as everybody knows, but it's not keeping us from building our facilities and finding the staff to open our beds and to grow our beds***.  So there is pressure there, but our teams here in the U.S. are doing a great job of managing through that.  But there are isolated markets where it's tougher than other ones, but we're working through that here in the U.S.  And I feel good about where we're at today and the beds that we're building and that we'll be able to get them open.

146.    On May 16, 2018, Jacobs and Turner presented to investors, analysts and market participants at the Bank of America Merrill Lynch Health Care Conference on behalf of Acadia, where Turner was questioned about the difference in labor challenges between Acadia's U.S. and U.K. business operations:

[Kevin Marx Fischbeck – BofA Merrill Lynch Analyst:]  And I guess, maybe moving back to the U.S.  It's really interesting how, I guess, in the U.K. you've had a harder – you've been hit harder by the labor side and UHS wasn't.  And then in the U.S., UHS was being hit harder by the labor side than you were.  I mean, how do you think about the labor rates?  And is that a gating factor at all to kind of how you think about growth?

[Turner:]  Well, I think it's important to note, both in the U.S. and U.K., we're not in the same markets as UHS, right?  And then quite frankly, in the U.K., some of their service lines, they're not as deep in the service lines that we are.  So it's hard to even compare what they're having and what we're having.  ***We've been very fortunate in the U.S. to have, with the exception of maybe a few markets, to really have been able to not just maintain our staffing, right?  We're increasing staffing because of the volume increases, the bed additions, and we've been able to do that within our 2% to 3% merit increases.  So I was speaking with a group earlier in a meeting, and we're having to work harder to do that.  We've got to expand our corporate recruiting for talent in the field.  It's a much bigger department than it used to be and it's much more dedicated and concentrated***.  But they are helping our facilities recruit and our benefit plans from our HR departments are competitive.  And so we just have to kind of continue to be a preferred employer, be a good place for these people to work because they have a commitment to behavioral health.  And so if we're going to be a market leader, we're going to continue to hopefully be a preferred employer in those markets.  But having said that, it's full employment data across the country.  So it's not easy, but we're making it work.

- 52 -

147.    On July 31, 2018, Acadia held a conference call with Jacobs, Turner and Duckworth

to discuss the Company's Q2 2018 financial results.   On the earnings call, Jacobs once again

represented that Acadia was able to recruit sufficient staff for its facilities:

> [Albert J. Rice – Credit Suisse Analyst:]  Okay.  And on – my follow-up on
> the labor cost, you were up about 80 basis points.  Professional fees was well
> contained, so maybe there wasn't much contract labor.  I think that's more on that
> line.  But can you just drill down a little bit more?  Is this still mostly U.K.?  Or are
> you seeing pressure in the U.S. as well?  And what are you attributing it?  Is it
> Brexit?  Is it NHS moves or just the underlying market trend?

> [Jacobs:] Okay.  ***Overall, the U.S. market is tight, but we're able to find the
> personnel to open up our beds and staff our facilities.  So – but it is tight here in
> the U.S.***  In the U.K., that is where there is more of the acute shortage, and it's all
> around immigration and allowing workers to enter the U.K.  And Brexit, as you
> know, put many obstacles in place, but the NHS and the government both are
> working towards freeing that up.  And right now, you can recruit nurses from the
> Commonwealth countries and bring them into the U.K., and we're working on that as
> we speak.  The acute part of the labor shortage for the company is in the U.K.  But
> here in the U.S., when you have labor market, when you have unemployment under
> 4%, there are certain labor markets that are tight.

148.    The statements set forth in ¶¶131-147, *supra*, were materially false and misleading or

omitted material information necessary to make them not misleading for the following reasons that

were unbeknownst to investors:

(a)     Contrary to defendants' consistent downplaying that any staffing issues were

limited to "isolated markets" and that "there is nothing companywide," the majority of Acadia's

acute inpatient facilities were not "appropriately staffed."  Indeed, an October 2018 analysis of CMS

inspection reports from 2013 to 2018 for 31 of the 40 acute inpatient U.S. hospitals listed on

Acadia's website found staffing deficiencies at 28 of the 31 Acadia hospitals, including repeated

violations for not having enough nurses or qualified practitioners on hand (*see* ¶¶185-186, *infra*);

(b)     Defendants did not recruit, hire or maintain sufficient staff to "handle the

growth in [the Company's] bed build" of its facilities.  Numerous Acadia facilities were found to

have improper and inadequate staffing ratios by state and federal investigators, with some facilities

- 53 -

cited as having 1 mental health technician assigned to observe 17 patients or staffing ratios of 3:21 or 5:32. *See* ¶¶51, 54-59, *supra*. As described by one behavioral health associate at an Acadia facility in 2017: "We have so many patients and not enough staff" (*see* ¶51, *supra*); and

(c)     As a result of systemic understaffing, Acadia's staffing levels did not "meet the needs" of its patients or local communities. Lack of staff and supervision allowed for unsafe environments where adverse patient events were rampant, with numerous accounts of patients suffering physical abuse, sexual abuse and suicide. *See* §IV.A.2., A.3., *supra*. Indeed, of the 28 acute inpatient hospitals that had CMS inspection reports detailing staffing deficiencies, 25 were also cited by inspectors for having deficiencies related to patient safety or care, including violations involving patient deaths, suicides, elopements (escapes), improper or erroneous administration of medications, improper use of restraints, and physical or sexual assaults. *See* ¶186, *infra*.

### 3.     Defendants Made Misrepresentations and Omissions Regarding Acadia's Regulatory Compliance

149.     Throughout the Class Period, defendants repeatedly stated that Acadia was at least in substantial compliance with the myriad of state and federal regulatory requirements. In reality, however, Acadia's facilities were in regular violation of CMS and state regulations regarding patient-to-staff ratios and other measures of patient safety or care.

150.     Throughout the Class Period, Acadia consistently assured investors that it was in "substantial compliance" with all regulatory requirements in its Forms 10-K, signed by Jacobs and Duckworth:

> The healthcare industry is subject to numerous laws, regulations and rules including, among others, those related to government healthcare program participation requirements, various licensure and accreditation standards, reimbursement for patient services, health information privacy and security rules, and government healthcare program fraud and abuse provisions. Providers that are found to have violated any of these laws and regulations may be excluded from participating in government healthcare programs, subjected to loss or limitation of licenses to operate, subjected to significant fines or penalties and/or required to repay amounts received from the government for previously billed patient services. ***Management***

- 54 -

*believes we are in substantial compliance with all applicable laws and regulations
and is not aware of any material pending or threatened investigations involving
allegations of wrongdoing*.[6]

151.    The Forms 10-K referenced at ¶150, *supra*, contained certifications pursuant to
Sarbanes-Oxley signed by Jacobs and Duckworth, who certified that they had reviewed the Forms
10-K and that they contained no materially untrue statements or omissions, fairly represented in all
material respects the financial condition of Acadia, were accurate in all material respects, and
disclosed any material changes to the Company's internal control over financial reporting. Jacobs
and Duckworth also attested that they had designed disclosure controls to ensure that material
information relating to Acadia was made known to them.

152.    On May 24, 2017, Jacobs and Turner gave a presentation to investors, analysts and
market participants at the UBS Global Healthcare Conference on behalf of Acadia. In response to
analyst questioning around negative publicity facing Acadia's competitor UHS, Jacobs denied that
any allegations of questionable business practices in the behavioral health space were affecting
Acadia:

> [Albert J. Rice – UBS Analyst:]  So there's been some adverse publicity in
> this space, not – hasn't been targeted at you guys at all, and that's good.  But has that
> had any impact in the marketplace as best you can determine?  Has it affected your
> business in anyway, either driving volume your way or making people cautious about
> sending people in your direction?
>
> [Jacobs:]  No.  We hate that our – no, it hasn't.  We did terrific same-store
> growth in the first quarter.  So this information that is out there now about our
> competitor has been out there for a while, and it has had no impact on us and – so far,
> and we don't see it having an impact on us.  It might have diverted their attention
> away from acquisitions or that sort of thing, where we haven't seen them very – we
> haven't seen a lot of activity from the competitor during the past couple of years on
> acquisitions.  So Steve Davidson and our team does a great job of finding and
> sourcing and making the acquisition.  So no impact, maybe a slight positive.

---

6    This statement was included in the Company's Forms 10-K for: FY 2014, filed on February 27,
2015; FY 2015, filed on February 26, 2016; FY 2016, filed on February 24, 2017; and FY 2017,
filed on February 27, 2018.

153. On June 9, 2017, Acadia filed with the SEC a Form S-3ASR registration statement and prospectus, signed by Jacobs and Duckworth. The Form S-3ASR incorporated by reference the statement in the FY 2016 Form 10-K alleged herein at ¶150, *supra*, to be false and misleading.

154. On July 28, 2017, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q2 2017 financial results. On the earnings call, Jacobs again claimed that Acadia had not fallen to the same pressures of its competitor UHS:

> [Ana Gupte – Leerink Analyst:] The question I have is you have a peer, and we only have the two of you to really observe, has had some regulatory coding issues, has had clinical staffing issues – is now also speaking about a length of stay pressure from payers and the mix shifting to Medicaid and the like. And it's somewhat corroborated by some of the inner channel checks we've done, at least the last one. But you're not seeing it, which is really great, and you had a good quarter. Is this really that the pressures don't exist? Or is there something about being a best-in-class in-patient operator, [and you know], can you talk about what that might be that makes you able to avert that better?

> [Jacobs:] Well, Ana, yes, we had a terrific quarter. Second quarter was terrific. But you can look at the year-to-date numbers, and they're terrific. We – obviously, I think, our team is better than other people, other companies. Obviously, I think that. We cheerlead that. I think a factor that you can't quantify is – and Ron and all the senior management, we have a – very much a different culture inside Acadia. And we try to have a lot of fun, and we try to work hard, and we try to hit our expectations, and we happen to be in markets where we can do that. So – and the length of stay, it may go down for us. But so far, we don't see that and we haven't really seen it in the past. When acute patient days – length of stay is 9.5 days, and if you go back to the industry studies, this has been since the mid-'90s. Average length of stay for adults has been in the 9 to 10 days. And we are right in the middle of that for the second quarter. So – and it could be just the composition of our programs and our beds and our markets. And – but more importantly, my hats off to our operations team. Ron and that group are unbelievable.

155. On August 18, 2017, Acadia filed with the SEC a Form 424B7 prospectus supplement to the June 9, 2017 prospectus for a follow-on offering of more than 2.8 million shares of Acadia common stock. The August 18, 2017 prospectus supplement incorporated by reference the same documents as the June 9, 2017 prospectus, *i.e.*, including the FY 2016 Form 10-K alleged herein at ¶150, *supra*, to be false and misleading.

- 56 -

156.     On November 6, 2018, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q3 2018 financial results.  On the earnings call, Jacobs avoided discussing the regulatory issues that had been revealed by Aurelius Value the month before:

> [Albert J. William Rice – Credit Suisse Analyst:]  Maybe 2 questions, if I could.  First of all, there's also been some reporting – particularly mainly in the financial press this quarter about regulatory issues that maybe the company's been facing.  And I wanted to give you a chance to give any comments you'd like to give about that and then also to ask you in the aftermath because it didn't seem to get picked up in the popular press.  I would think there hasn't been any change in your interaction with regulators, but just to ask whether that is indeed the case.

> [Jacobs:]  Sure, A.J.  Referring to the statement I've made in previous earnings calls concerning regulatory issues at a few of our facilities, I'm pleased to announce that all of those have been resolved and that those facilities do not have admission holds as of this time.  As you know, A.J., we're a large company with a large number of facilities.  So at any time – and at any time, we can have an inspection go bad or an incident occur or an investigation be instigated.  So – but I'm pleased to report that for the ones we've been talking about this year, those facilities have their admission holds removed and have their license and are building back their census.

157.     The statements set forth in ¶¶150-156, *supra*, were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)     Contrary to the claim that Acadia's facilities were in "substantial compliance" with applicable federal, state, local, and independent review body regulations and requirements:

(i)     Acadia facilities were staffed below levels necessary to assure proper treatment of patients in a safe and secure therapeutic environment, or to monitor patients at risk for harming themselves and others.  As revealed by Aurelius Value's October 2018 analysis, available CMS inspection reports from 2013 to 2018 for 31 of the 40 acute inpatient U.S. hospitals listed on Acadia's website found staffing deficiencies at 28 of the 31 Acadia hospitals, including repeated violations for not having enough nurses or qualified practitioners on hand.  *See* ¶¶185-186, *infra*.  Of the 28 acute inpatient hospitals that had CMS inspection reports detailing staffing deficiencies, 25

- 57 -

were also cited by inspectors for having deficiencies related to patient safety or care, including violations involving patient deaths, suicides, elopements (escapes), improper or erroneous administration of medications, improper use of restraints, and physical or sexual assaults (*see* ¶186, *infra*).

(ii)     Acadia's internal policies resulted in consistent failures to promptly report or accurately document incidents of actual or potential harm to patients, and actively delayed or concealed reporting of a significant number of events.  CMS inspections found managerial deficiencies at 27 of the 31 facilities, including failures to report incidents to law enforcement or even investigate patient abuse allegations, and failures to provide proper oversight or follow or establish appropriate patient safety protocols (*see* ¶186, *infra*); and

(iii)     Acadia was in violation of other state and local regulatory requirements and standards pertaining to staffing levels and patient treatment, the condition of facilities, and medical record-keeping practices;

(b)     While defendants touted that they had not succumbed to the questionable business practices that had been reported of Acadia's primary competitor UHS and that there was "a different culture at Acadia," an October 2018 analysis by Aurelius Value found that Acadia's hospitals were objectively worse than UHS.  Aurelius Value compared the results of 70 CMS inspection reports of Acadia facilities from 2015-2017 to 153 CMS inspection reports for 58 different UHS behavioral hospitals over the same time period.  The Aurelius Value analysis concluded that Acadia facilities averaged 4.8 violations per inspection, 60% higher than the 3 violations per inspection averaged by the UHS facilities.  *See* ¶187, *infra*.  Its review also found that Acadia facilities received double the violations per inspection involving patient safety or care deficiencies, and four times the number of violations for staffing problems;

(c)     Defendants claimed that Acadia had avoided the negative publicity surrounding the for-profit behavioral healthcare space.  But as reported in a November 2018 *Seeking Alpha* article, at least one industry expert reported that "'due to the number of suicides at some of their facilities, Acadia's ability to accept certain patients has been restricted by state-level governments," and that "Acadia has developed an industry-wide reputation for not providing quality care, cutting costs, and cannibalizing their own programs in order to raise profits.  As a result, reputable clinicians are willing to refer to Acadia less and less"; and

(d)     As a result of the foregoing, the Sarbanes-Oxley Certifications signed by Jacobs and Duckworth for the consolidated Forms 10-K containing the statements in ¶150, *supra*, were also false and misleading, as the relevant reports did in fact contain "untrue statement[s] of a material fact or omit[ted] to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report."

## B.     False and Misleading Statements and Omissions Regarding Acadia's U.K. Operations

158.    Acadia established its financial guidance for FY 2017 in February 2017, and throughout the year defendants reaffirmed that the Company's U.K. operations would grow at a profitable rate consistent with the guidance.  In reality, however, the Company's weakened patient admissions and increased labor costs in its U.K. operations did not support its publicly touted financial guidance – a fact that was ultimately revealed in October 2017, only two months after defendants pocketed tens of millions of dollars in insider stock sales.

159.    On February 23, 2017, Acadia issued a press release filed with the SEC on Form 8-K entitled "Acadia Healthcare Reports Fourth Quarter GAAP EPS of $0.48 and Adjusted EPS of $0.59; Establishes Financial Guidance for 2017."  In the press release, Acadia included its "financial guidance for 2017 and the first quarter of 2017," as follows:

- Revenue for 2017 in a range of $2.85 billion to $2.9 billion;

- Adjusted EBITDA for 2017 in a range of $625 million to $640 million;

- Adjusted earnings per diluted share for 2017 in a range $2.40 to $2.50; and

- Adjusted earnings per diluted share for the first quarter of 2017 in a range of $0.45 to $0.47.

160.    On February 24, 2017, Acadia released its Q4 2016 financial statements and its 2016 Annual Report on Form 10-K, which was signed by Jacobs and Duckworth.  The 2016 Form 10-K discussed the "[f]avorable industry and legislative trends" that Acadia believed were one of its "competitive strengths," specifically including its U.K. operations:

> The mental health hospitals market in the U.K. was estimated at £15.9 billion for 2014/2015.  ***As a result of government budget constraints and an increased focus on quality, the independent mental health hospitals market has witnessed significant expansion in the last decade, making it one of the fastest growing sectors in the U.K. healthcare industry***.  Demand for independent sector beds has grown significantly as a result of the National Health Service (the "NHS") reducing its bed capacity and increasing hospitalization rates.  Independent sector demand is expected to further increase in light of additional bed closures and reduction in community capacity by the NHS.

161.    The 2016 Form 10-K referenced at ¶160, *supra*, contained certifications pursuant to Sarbanes-Oxley signed by Jacobs and Duckworth, who certified that they had reviewed the Form 10-K and that it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of Acadia, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.  Jacobs and Duckworth also attested that they had designed disclosure controls to ensure that material information relating to Acadia was made known to them.

162.    The Company also held an earnings call on February 24, 2017, with Jacobs, Duckworth and Turner all participating on the call.  In his prepared remarks, Duckworth reiterated the FY 2017 financial guidance disclosed in the February 23, 2017 press release:

Turning to our financial guidance for 2017, and as announced in yesterday afternoon's news release, our 2017 financial guidance includes the following: Revenue in a range of $2.85 billion to $2.9 billion, adjusted EBITDA in a range of $625 million to $640 million, and adjusted diluted EPS in a range of $2.40 to $2.50.

163.    In response to an analyst question regarding the performance of Acadia's U.K. operations going into 2017, Turner claimed that the Company had turned a corner following its divestiture of certain Priory facilities:

[Whit Mayo – Robert W. Baird Analyst:]  Hey, thanks.  Just wanted to see if there's any more color you can provide on the UK performance in the quarter, obviously there was a lot going on, a lot of distraction with the divestitures, et cetera. So just wanted to see if there is anything you can share to put into context, how we should look at the performance, and maybe if you could just comment on sort of the cadence of the expected synergies that 2017 plays out?

[Turner:]  Sure, Whit, this is Brent.  Again, the facts are mid, two-thirds through the fourth quarter was when we closed the divestiture transaction, but there was a tremendous amount of focus by the leadership in the UK on both separately-run companies over there to help make that happen.  Multitasking, call it what you want, there was a lot of distraction, and it weighed on the operation.

*Now that is behind us.  We have gotten the roughly half of the synergies are out of the run rate, because of the removal of the redundancy, management team going over to the new company, and now we are, the UK is focused, integrating and getting back on track*.

But it does not happen overnight.  Remember, the benefit we get in the UK is a very healthy and long length of stay.  But the admissions activity is much more slower than you see in the US.  So, we are on a path.  *I just think people should expect the UK to improve rateably each quarter throughout 2017*.

164.    Duckworth similarly claimed that the Company's U.K. operations would see improvement in its growth and margin numbers, despite the challenges posed by a weakened census and increased labor costs:

[Ralph Giacobbe – Citigroup Analyst:]  Thanks.  Good morning.

I guess first, I wanted to ask about the same-store EBITDA margin down in the UK. Was there certain costs that maybe wouldn't repeat, and more related to some of the distraction that you talked about that you can help us reconcile, plus, obviously, (inaudible) capture, to give you visibility on the improvement there?

[Duckworth:]  Yes.  The main thing, obviously, in the UK they were down somewhat on a census perspective route.  *What we also saw, just on the cost*

- 61 -

*affecting the margins is just around the labor costs and the labor management costs in the UK, just with the census*.

There would be a focus on managing your labor, and with some of the distraction that did not happen to where we thought it would. ***And I think that is where we will see as the census recovers, and as we are able to move forward with the integration and put the new management structure in place we will see both the census rebound and the growth rebound, as well as the margin improvement in the UK***.

165. On March 7, 2017, Jacobs and Turner presented to investors, analysts and market participants at the Raymond James 38th Annual Institutional Investors Conference on behalf of Acadia. At the conference, Turner reiterated that the U.K. business would generate strong EBITDA growth numbers:

[John Ransom – Raymond James Analyst:] Okay. So when you look at your growth rate – I think you said on your call about 35% a year EBITDA is now coming out of the UK pro forma. What's the difference in the growth rate? I know the UK has some real growth pieces to it, but what's the difference between the organic growth rate in the UK versus the US? And what's the – I think we understand the US model of organic growth of new beds, but how does that play out in the UK, particularly in light of government pricing that's probably not going to grow a heck of a lot?

[Turner:] Sure. I think if you're just starting off in the US, obviously we continue to see top-line organic growth in the 6% to 8% range. It's important to sort of move off of that and know that it should drive higher EBITDA growth, because of the leverage effect we get off of that incremental revenue

Going over to the UK – and before I go, 90% of that top line is volume and the 10% is going to be price. You go to the UK, it's really not that much different in terms of the drivers. It's going to be much more heavily weighted to volume. But because of the mix of business in our portfolio over there – it's not all healthcare. We do have some children and adolescent services and some adult care and homes.

***So I think the expectation should be centered around 5%, with some still leverage on that 5%, giving potentially a double digit, but certain a strong single digit EBITDA growth if you were just to sort of track them side by side***.

166. In response to an audience question, Jacobs also acknowledged that "[t]he UK has a nurse issue. So we focus on nurses over there. ***For a year we've focused on nurses***."

1546233_1

167. On April 25, 2017, Acadia issued a press release filed with the SEC on Form 8-K entitled "Acadia Healthcare Reports First Quarter GAAP EPS of $0.40 and Adjusted EPS of $0.46; Affirms Financial Guidance for 2017."

168. Despite reporting smaller same facility revenue growth and decreased EBITDA margin, the April 25, 2017 release "affirmed [Acadia's] previously established financial guidance for 2017," as initially disclosed in the February 23, 2017 press release:

- Revenue for 2017 in a range of $2.85 billion to $2.9 billion;

- Adjusted EBITDA for 2017 in a range of $625 million to $640 million; and

- Adjusted earnings per diluted share for 2017 in a range $2.40 to $2.50.

169. On April 26, 2017, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q1 2017 financial results. In his prepared remarks, Jacobs announced that the Company had achieved the majority of its cost-cutting "synergies" from the integration of Priory:

> Acadia's revenue growth for the quarter was primarily driven by the addition of a net 6,200 beds through the Priory acquisition halfway through the first quarter last year. We initiated full integration of Priory into Acadia after the U.K. facility divestiture in November 2016. By the end of the first quarter of 2017, we had achieved about $16 million of the expected $20 million of cost synergies from the transaction, and we expect to recognize all the cost synergies by the fourth quarter of this year

170. Duckworth also reiterated the FY 2017 financial guidance that was initially disclosed in the February 23, 2017 press release and affirmed in the April 25, 2017 press release:

> Turning to our financial guidance and as announced in yesterday afternoon's news release, we are affirming our 2017 financial guidance, which includes revenue in the range of $2.85 billion to $2.9 billion; adjusted EBITDA in the range of $625 million to $640 million; and adjusted diluted EPS in the range of $2.40 to $2.50.

171. In response to numerous analyst questions concerning the weaker volume growth in Acadia's U.K. facilities, Jacobs and Duckworth continued to claim that U.K. growth would pick up to meet the Company's guidance numbers, and that nursing shortages were not affecting Acadia's financial performance:

- 63 -

[Unidentified Analyst:] Top line in the quarter, a little bit softer. I guess did you see anything as the quarter progressed? Maybe talk about any issues in the U.K. – specifically aside from distraction after Priory. And I guess just help frame your comforting and confidence in revenue and EBITDA guidance ramp as we sort of move through the year?

[Jacobs:] *Well, obviously, by reaffirming the guidance in our press release and now on the call, we're comfortable with our total year guidance. And as – if you follow the history of the industry and of this company, usually, our softest quarter is the first quarter and then we begin to have a ramp-up in the quarter starting in the second quarter. So I think for the last 3 quarters each, we need about $0.66 to hit the guidance, and I think that's very doable and we're working very hard to make that happen*.

\* \* \*

[Frank G. Morgan – RBC Analyst:] And just the last question, on a relative base, the weaker volume growth in the U.K., I know you talked about a shortage of nurses there, do you attribute it to that? Or is there any other issue that you would call out for that weaker relative performance?

[Jacobs:] *Not so much the nurses*. We can use agency nurses to take care of the patients, and that's more of a common practice over there than it is here in the U.S. I think the British government is a little bit more cautious, and more cautious meaning that NHS is more cautious. So I think there's a little – this Brexit thing, I think they're just looking and watching and seeing and see how they feel good and see what happens to their economy. And so – which is okay, for us. *We have plenty of opportunity. We have plenty of beds we can fill. And we will – I think, you will see us – maybe our private mix will probably grow some. I think it's about 5% of our patient days now over there, and patient – private mix could grow*.

\* \* \*

[Ann K. Hynes – Mizuho Analyst:] Okay, that's helpful. And just one last thing about the U.K., because I know with the divestitures, can you describe the assets that you were left with? Because I know there's the slower growth, I think you said on the last quarter conference call, maybe the same-store growth profile is more like 4% to 5% because there are more adult services. So can you just maybe reiterate if I'm correct way that, that we're all in line with the same-store growth over in the U.K.? And secondly, obviously, Q1, we expect – should we expect a ramp up in same-store growth in the U.K. How we're thinking about it within guidance?

[Duckworth:] Ann, this is David. And just starting what the company looks like now in the U.K., you are right. The divestiture was within our healthcare division. So we did see the education, adult care and the elderly care division become a little bit more significant to the total. *We should see strong growth across all of those divisions*, but we do have healthcare, education and adult that are growing a little bit faster than the elderly care division. So that is the mix change that we should see. *But after the divestiture healthcare, education and adult care*

*continue to be our strongest division. And we do think that over the course of the year, as the integration is completed that we should see the growth pickup in the U.K.*

172.    On May 3, 2017, Jacobs and Turner presented to investors, analysts and market participants at the Deutsche Bank Health Care Conference on behalf of Acadia. At the conference, Turner assured investors that the financial performance of Acadia's U.K. operations would turn around and strengthen as the year went on:

> [Christian Douglas Rigg – Deutsche Bank Analyst:] Right. I guess along the same lines but just purely *specific to you guys in the U.K., the patient day is also a little soft but very strong admissions. It seems like based on the length of stay there that things should start to strengthen as you move through the year*, but could you just give us some color around that?

> [Turner:] *Sure, and your observation's absolutely correct*. Anytime that you have admissions at a higher rate than your patient days and length of stay is very long, that bodes well for future growth, because *those double-digit admissions coming in, in the first quarter are going to be there really, for the most part, throughout the full year of 2017. Again, I think the highlight – the headline is that U.K. has been busy for our team. It's been very active*. Yes, November 30 came and went with the divestiture and that's great, but that's a big operation. We're just $900 million in U.K. revenues. It just takes a little time. *So we see incremental progress in terms of our expectations over there, and the supply-demand imbalance, the NHS relying more on the independent sector, all those trends, the NHS highlighting that behavioral health is 1 of 3 key pillars of their focus going forward over the next 5 years, all that positions us, we believe, very well to have enhancements to our operations going forward*.

173.    On July 27, 2017, Acadia issued a press release entitled "Acadia Healthcare Reports Second Quarter GAAP EPS of $0.57 and Adjusted EPS of $0.66." In the release, Acadia announced that it was narrowing the Company's previously announced FY 2017 financial guidance as follows:

- Revenue for 2017 in a range of $2.85 billion to $2.87 billion;

- Adjusted EBITDA for 2017 in a range of $628 million to $635 million; and

- Adjusted earnings per diluted share for 2017 in a range $2.42 to $2.47.

174.    On July 28, 2017, Acadia held a conference call with Jacobs, Turner and Duckworth to discuss the Company's Q2 2017 financial results. On the earnings call, Duckworth repeated the

- 65 -

adjustment to the FY 2017 financial guidance disclosed on the July 27, 2017 press release in his

prepared remarks:

> Turning to our financial guidance. And as announced in yesterday afternoon's news release, we adjusted our 2017 financial guidance within the previously established range, including: revenue in the range of $2.85 billion to $2.87 billion; adjusted EBITDA in the range of $628 million to $635 million; and adjusted diluted EPS in the range of $2.42 to $2.47. This guidance assumes an exchange rate of $1.25 per British pound sterling and a tax rate of approximately 25%. Our financial guidance does not include the impact from any future acquisitions and transaction-related expenses.

175. When questioned by an analyst on the call, Jacobs denied that the narrowed guidance

had any implications for the results for the remainder of 2017:

> [Brian Gil Tanquilut – Jefferies Analyst:] Brent or Joey, just first question for me. *You narrowed the guidance ranges, and I think that the – there has been a lot of question overnight for investors on whether there's anything to read into the revenue guidance midpoint being slightly below the previous midpoint*. Is there anything you guys would be able to provide in terms of color and how you are thinking about the revenue guidance adjustment?

> [Jacobs:] Brian, great question. *No, there's not. That at the beginning of the year, we set ranges, as we always do and in the middle of the year, we just tighten them up a little bit, and that's all we did here was tighten them up a little bit. There's nothing other than just – we're just narrowing the ranges from the beginning of the year. And as you saw in our second quarter results, we're doing terrific, and we expect that to continue for the last 6 months*.

> \*       \*       \*

> [Tanquilut:] Joey or Brent, *just as we think about the cadence for the back end – where guidance is and how you're thinking about the distribution between the next 2 quarters*, without giving quarterly guidance, are there any things you would call out, other than startup costs for the hospitals being spread out evenly or pro rata between the 2 quarters? *Anything that we should be thinking about*?

> [Jacobs:] *No, Brian. I think you should just, again, we tightened the reins just to reflect that we're halfway through the year. And I think you take the balance and split it in half, and you're going to be pretty close for the third and fourth quarter*.

- 66 -

176.    When questioned by another analyst for an update on the results of the U.K. operations, both Turner and Jacobs maintained that the Company's U.K. operations would see continued improvement for the remainder of the year:

> [Benjamin Whitman Mayo – Robert W. Baird Analyst:] Okay. And my next question, Brent, *any just update on the U.K. operations, how they're trending versus your expectation*? I'm just really more curious now, after the election, any change with the NHS or staffing changes? Just – we've seen some hiccups from some other nonbehavioral providers. I'm not sure this applies to you, but just any general observations on the current environment over there would be helpful.

> [Turner:] I think, as you see from our second quarter numbers, the U.K. improved for us in the second quarter over the first quarter. *And our expectations are consistent there with what we said is that we're going to get incremental improvements through the U.K. over the balance of the year*. We don't expect that market to be exactly in line with the attractive metrics of the U.S., but it's not far off. And we are not seeing just massive issues around some of the election issues. I mean, the behavioral health needs in the U.K. are not going away. And so ultimately we believe, short term and long term, our facilities and our operations are well positioned to meet the needs over there. And we see good funding streams for that, again, both in the short and the long term.

> [Jacobs:] And Whit, I'll just add that the new team we put together, *that Ron Fincher and David Duckworth put together in December – both of those guys just got back from the U.K., and we're very pleased with where we are there and the team we've got assembled there*. So – it will follow – it will be a little bit slower growth than what the U.S. is because of – the metrics here are so strong. *And we're very pleased with our investment in the U.K. and we expect them to continue, just at a little slower pace*.

177.    On September 7, 2017, Jacobs and Turner presented to investors, analysts and market participants at the Wells Fargo Healthcare Conference on behalf of Acadia. When questioned about volume and payor rate trends in the U.K., Jacobs acknowledged that defendants were aware of the increased nursing costs and modest rate increases the Company was facing, but continued to paint a rosy picture of its expected U.K. performance:

> [Daniels:] Can you talk about the volume trends and the reimbursement environment in the U.K.? And then specific, the impact of Brexit on the facilities over there, the performance?

> [Jacobs:] Sure. I'll step up to take this one. We either don't know there's a clock up here, and that counts down 30 to 30 minutes. And I spoke the first 14, and I

- 67 -

turned it over to Brent. You notice every 2 minutes he looks for me to take it back over, but he hasn't got his 14 minutes in yet, but I'll step up and do this one. U.K., first, we'll talk about Brexit. Brexit really was an immigration issue. And unfortunately, what it is, is it's created a shortage of workers in the U.K. that now the Europeans cannot migrate over and have the jobs that they used to have before Brexit. *So that's impacted us because in the U.K., there's plenty of physicians, but there's a need for nurses. So we have to use agency nurses more there than we do in the U.S.* because of Brexit. Reimbursement-wise, the NHS, all the money really is at the NHS, but there's low-cost health care trusts throughout the country. And they will give the money to these local health care trusts and then you will negotiate with (inaudible). So – and with the NHS at the global level. *So this past year, I think we ended up with like a 1.6% rate increase if you take all the trusts and the NHS together*, and that process occurs like it would here in the U.S. on negotiations since April 1 for the U.K. *So that's how rates are done there. They're growing a little slower than the U.S., and we knew that they would*, but we also see – well, we think we see into the future. We also see in the future that there's a possibility that if the NHS, which we believe they will do, accelerates the closing of their beds, it will drive more patients to us. So there's going to be some years where I think they can do as good as the U.S. on patient bed growth or maybe even better on patient bed growth. So we very much like the assets we have in the U.K., and we – the management team that we've put together there is terrific. And so we're very fortunate in what we have there and very excited about the future. But it is, for the next 2 years, will be slower growth. But then I think it has the potential to grow as fast or even faster than the U.S. ones.

178. The statements set forth in ¶¶159-177, *supra*, were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)     Defendants had no reasonable basis to believe and did not, in fact, believe that Acadia would meet its FY 2017 financial guidance that they provided in the February 23, 2017 press release and discussed on the February 24, 2017 conference call in connection with the Company's Q4 2016 earnings:

(i)     At the time of issuing this guidance, defendants' major acquisitions in the U.K. had made the Company's financial performance increasingly dependent on the results of its U.K. facilities;

(ii)     The U.K.'s NHS admittedly focused on "funding providers based on the quality of their service rather than volume of patients," and by January 2017 U.K. media had

- 68 -

begun profiling multiple "care failures after deaths of patients" in a "series of incidents that has raised concerns about the welfare of patients, both private and NHS, at Priory hospitals" (*see* ¶95, *supra*);

(iii)    At the time of issuing the FY 2017 guidance, the Company had reported disappointing same facility growth of 4.2% for its U.K. facilities in Q4 2016;

(iv)    Defendants admittedly "look[ed] at the census report every day" to monitor historical and future patient admission trends and to forecast staffing needs. *See* §VII.B., *infra*. At the time of issuing the FY 2017 guidance, the Company was aware that "in the UK they were down somewhat on a census perspective route" that the major costs affecting U.K. financial performance were "around the labor costs and the labor management costs in the UK" (*see* ¶164, *supra*); and

(v)    In light of these factors, there was no basis to believe, and defendants did not in fact believe, that the Company would "see both the census rebound and the growth rebound, as well as the margin improvement in the UK" or that "people should expect the UK to improve rateably each quarter throughout 2017" so as to support the Company's FY 2017 financial guidance.

(b)    Defendants had no reasonable basis to believe and did not, in fact, believe that Acadia would meet its previously provided FY 2017 financial guidance that was affirmed in the April 25, 2017 press release and April 26, 2017 conference call regarding the Company's Q1 2017 earnings:

(i)    By April 2017, Acadia's U.K. facilities had received even more negative media attention, with major news outlets picking up on the story that the independent regulator CQC had found the safety of defendants' flagship U.K. hospital to be "Inadequate" (*see* ¶96, *supra*);

- 69 -

(ii)     At the time of reaffirming the FY 2017 guidance, the Company's U.K. performance had already failed to improve on the Company's disappointing Q4 2016 results, as same facility revenue growth dropped from 4.2% in Q4 2016 to 2.6% in Q1 2017;

(iii)    Defendants admittedly "look[ed] at the census report every day" to monitor historical and future patient admission trends and to forecast staffing needs. *See* §VII.B., *infra*. At the time of reaffirming the FY 2017 guidance, the Company was aware that patient day metrics continued to be "soft" (*see* ¶172, *supra*);

(iv)    Despite defendants' claim that the "weaker volume growth" and "weaker relative performance" in the U.K. was "[n]ot so much the nurses" (*see* ¶171, *supra*), defendants were already aware that the major costs affecting U.K. financial performance were "around the labor costs and the labor management costs" (*see* ¶164, *supra*); and

(v)     In light of these factors, there was no basis to believe, and defendants did not in fact believe, "over the course of the year, as the integration is completed that we should see the growth pickup in the U.K." so as to support the Company's FY 2017 financial guidance.

(c)     Defendants had no reasonable basis to believe and did not, in fact, believe Acadia would meet the "narrowed" FY 2017 financial guidance that they provided in the July 27, 2017 press release and discussed on the July 28, 2017 conference call in connection with the Company's Q2 2017 earnings:

(i)     At the time of "narrowing" the FY 2017 guidance, the Company's U.K. performance had already failed to improve from the Company's disappointing Q4 2016 results, as U.K. same facility revenue growth went from 4.2% in Q4 2016 to 2.6% in Q1 2017 to 4.0% in Q2 2017;

(ii)    Defendants admittedly "look[ed] at the census report every day" to monitor historical and future patient admission trends and to forecast staffing needs. *See* §VII.B.,

*infra*. At the time of narrowing the FY 2017 guidance, the Company was aware that patient day metrics continued to be "soft," and that the major costs affecting U.K. financial performance were "around the labor costs and the labor management costs" (*see* ¶¶164, 172, *supra*);

(iii)    Despite defendants' denials that there was "anything to read into the revenue guidance midpoint being slightly below the previous midpoint" (*see* ¶175, *supra*), defendants had already filed a Form S-3ASR registration statement and were contemplating a secondary offering where they would unload tens of millions of dollars of Acadia stock – which would occur just weeks later; and

(iv)    In light of these factors, there was no basis to believe, and defendants did not in fact believe, that the Company was "going to get incremental improvements through the U.K. over the balance of the year" so as to support the Company's FY 2017 financial guidance.

(d)    As a result of the foregoing, the Sarbanes-Oxley Certifications signed by Jacobs and Duckworth for the Form 10-K containing the statements in ¶160, *supra*, were also false and misleading, as the report did in fact contain "untrue statement[s] of a material fact or omit[ted] to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report."

## VI.    LOSS CAUSATION/ECONOMIC LOSS

179.    During the Class Period, as detailed herein, defendants made false and misleading statements and/or omitted material information concerning Acadia's business fundamentals and financial prospects and engaged in a scheme to deceive the market. By artificially inflating, maintaining and manipulating the price of Acadia securities, defendants deceived plaintiffs and the Class (defined below) and caused them losses when the truth was revealed. When defendants' prior misrepresentations and fraudulent conduct began to leak out and became apparent to the market, it

caused the price of Acadia securities to fall precipitously as the prior artificial inflation came out of the stock price.  As a result of their purchases of Acadia securities during the Class Period, plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

180.    On October 24, 2017, Acadia issued a release entitled "Acadia Healthcare Reports Third Quarter Financial Results."  The release stated that "Revenue for the quarter was $716.7 million, a 2.4% decrease from $734.7 million for the third quarter of 2016."  The release quoted Jacobs, stating:

> "The third quarter financial results for our operations in the United Kingdom reflected a lower census and higher operating costs than anticipated.  After experiencing expected seasonal softness in census for the month of August, the typical rebound in census in the month of September was significantly weaker than anticipated.  In addition, due to further tightening in the labor market primarily for nurses and other clinical staff, we incurred higher agency labor expense than planned."

181.    In addition, the release stated that Acadia was lowering its FY 2017 financial guidance.

182.    That same day, Stephens published an analyst report entitled: "ACHC Initial View: 3Q17 Results."  The report stated that "a miss and FY17 guide down following management selling shares in August at ~$50 will likely not sit well with investors.  The quarter miss/guide down appear largely driven by lackluster results in the UK, particularly on labor costs."

183.    On October 25, 2017, RBC Capital Markets published an analyst report entitled: "3Q17 miss on UK census and labor headwinds; guidance lowered."  The report stated that "Acadia's shock UK results (90% of the shortfall) came as a surprise, driving a 26% sell-off. . . . Given yesterday's results, skepticism is high and many investors question the merits behind the problematic (so far) UK entry."  That same day, Deutsche Bank published an analyst report entitled:

"Downgrade to Hold – UK Weakness Prompts More Cautious Stance." The report announced that Deutsche Bank was downgrading Acadia stock to Hold from Buy, stating:

> Our fundamental call is that visibility into the company's UK business is extremely low with both labor pressure accelerating and admissions growth slowing. . . . [T]he U.K. business appears to be getting worse, not better. . . . [W]e find it difficult to recommend buying Acadia until we see some evidence that the U.K. business is indeed stabilizing.

184.    On this news, the price of Acadia securities declined from a close of $44.12 per share on October 24, 2017, to an intraday low of $30.91 per share on October 25, 2017, a decline of 30%.

185.    On October 11, 2018, Aurelius Value published a report and released a video documenting systematic instances of patient abuse and neglect at dozens of Acadia facilities, caused primarily by understaffing.

186.    The report included an analysis of CMS inspection reports from 2013 to 2018 for 31 of the 40 acute inpatient U.S. hospitals listed on Acadia's website,[7] documenting that federal inspectors uncovered staffing deficiencies at 28 of the 31 Acadia hospitals, including repeated violations for not having enough nurses or qualified practitioners on hand. Of the 28 hospitals that had staffing deficiencies, 25 were also cited by inspectors for having deficiencies related to patient safety or care, including violations involving patient deaths, suicides, elopements (escapes), improper or erroneous administration of medications, improper use of restraints, and physical or sexual assaults. Inspectors also found managerial deficiencies at 27 of the 31 facilities, which included failures to report incidents to law enforcement or even investigate patient abuse allegations, and failures to provide proper oversight or follow or establish appropriate patient safety protocols.

187.    Aurelius Value also conducted an analysis which found that Acadia's hospitals were objectively worse than its closest competitor, UHS. Aurelius Value compared the results of 70 CMS

---

[7]    Acadia's acute inpatient facilities accounted for 40%-43% of the Company's U.S. revenue throughout the Class Period.

inspection reports of Acadia facilities from 2015-2017 to 153 CMS inspection reports for 58 different UHS behavioral hospitals over the same time period. The Aurelius Value analysis concluded that Acadia facilities averaged 4.8 violations per inspection, 60% higher than the 3 violations per inspection averaged by the UHS facilities. Its review also found that Acadia facilities received double the violations per inspection involving patient safety or care deficiencies, and four times the number of violations for staffing problems.

188.    That same day, Cantor Fitzgerald published an analyst report discussing the Aurelius Value revelations entitled: "Story Alleging Numerous Patient Issues Hits ACHC; Assessment of It Could Take Time." The Cantor Fitzgerald report noted that the Aurelius Value analysis "references a number of CMS records and related research, [which] could take [Acadia] some time to refute." Cantor Fitzgerald also noted that the Aurelius Value analysis was at odds with Acadia's purported prior behavior, including that these were new revelations.

189.    On this news, the price of Acadia securities declined from a close of $36.55 per share on October 10, 2018, to an intraday low of $32.37 per share on October 12, 2018, a decline of over 11%.

190.    On November 16, 2018, *Seeking Alpha* published an article entitled: "Acadia Healthcare: Very Scary Findings From A 14-Month Investigation." The article described Acadia's rapid growth, but attributed Acadia's recent revenue and margin increases to cost-cutting and "reducing the quality of care." The article highlighted severe problems at seven of Acadia's facilities – facilities also mentioned in the Aurelius Value report – as "consistent with declining quality of care," and reported that, according to an industry expert, "'due to the number of suicides at some of their facilities, Acadia's ability to accept certain patients has been restricted by state-level governments.'" The report also stated that while most of Acadia's business came from referrals, an industry expert stated that "Acadia has developed an industry-wide reputation for not providing

quality care, cutting costs, and cannibalizing their own programs in order to raise profits. As a result, reputable clinicians are willing to refer to Acadia less and less." In addition, the article discussed how Acadia's insiders had sold almost all of their Acadia stock since August 2015, and suggested the Company may have to write down its goodwill in light of the problems with its Priory facilities.

191. That same day, the *Motley Fool* published an article entitled: "Here's Why Acadia Healthcare Company Inc. Is Plummeting." The article stated that "[s]hares of Acadia . . . dropped 19% as of 12:05 p.m. EST on Friday. The decline appears to be linked to the release of [the *Seeking Alpha* report]. . . . The crux of the short-seller's argument is that Acadia is engaged in a number of questionable business practices and that its books do not look as good as they appear."

192. On this news, the price of Acadia securities declined from a close of $37.86 per share on November 15, 2018, to an intraday low of $28.02 per share on November 16, 2018 – a decline of 26%.

193. The decline in the price of Acadia securities after the corrective disclosures came to light was a direct result of the revelation of the nature and extent of defendants' fraudulent misrepresentations to investors and the market. The timing and magnitude of the price declines in Acadia securities compared to the market and its peers negate any inference that the loss suffered by plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiffs and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Acadia securities and the subsequent significant decline in the value of Acadia securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VII.  ADDITIONAL SCIENTER ALLEGATIONS

194.    Defendants had actual knowledge of, and/or were at least reckless with respect to the quality of care, staffing and regulatory issues in the Company's U.K. operations alleged above in §V., which rendered their Class Period statements and omissions materially false and misleading.

### A.    Massive Insider Sales Provide Strong Indicia of Scienter

195.    Defendants' scienter is evidenced by the massive insider sales and trading of Acadia stock during the Class Period, which was suspicious in both timing and amount, permitting the Individual Defendants and Acadia insiders to accumulate more than *$600 million* total in ill-gotten gains before the alleged fraud was disclosed.

### 1.    Jacobs' Class Period Sales and Insider Trading

196.    During the period preceding the Class Period,[8] Jacobs sold 323,893 Acadia shares for proceeds of $7,187,526, which accounted for 23.24% of Jacobs' outstanding shares during that period.  During the Class Period, Jacobs sold 797,967 Acadia shares for proceeds of $45,137,991, which accounted for 60.17% of Jacobs' outstanding shares during the Class Period.  In other words, Jacobs sold *2.5 times more* stock during the Class Period than he did in the period preceding the Class Period.

197.    Jacobs' sales were also suspicious in timing.  As depicted in the graphic below, one of Jacobs' large Class Period sales – $7.4 million – was made on August 14, 2015, when the stock price traded near its Class Period high due to inflation caused by defendants' false and misleading statements alleged herein.  *See* ¶¶112-119, 150, *supra*.  Jacobs' other Class Period sales also occurred shortly before precipitous declines in Acadia's stock price, when the stock price was inflated by misrepresentations and omissions.  Critically, Jacobs made his largest Class Period sale –

---

[8]    For Jacobs, Turner, Duckworth and Waud, plaintiffs compared each individual's Class Period trades against their trades following Acadia's reverse merger to April 29, 2014.

$25.3 million, or 57% of his total Class Period sales – on August 22, 2017, just weeks before Acadia's first partial disclosure of the fraud alleged herein on October 25, 2017.



198.    Conspicuously, Jacobs did not sell any shares after the first partial corrective disclosures, when artificial inflation began to exit Acadia's stock price, until he was fired from the Company.

### 2.    Turner's Class Period Sales and Insider Trading

199.    During the period preceding the Class Period, Turner sold 99,833 Acadia shares for proceeds of $2,365,880, which accounted for 26.59% of Turner's outstanding shares during that period.  During the Class Period, Turner sold 294,545 Acadia shares for proceeds of $15,886,703, which accounted for 73.32% of Turner's outstanding shares during the Class Period.  In other words, Turner sold *2.3 times more* stock during the Class Period than he did in the period preceding the Class Period.

200.    Turner's sales were also suspicious in timing.  As depicted in the graphic below, like Jacobs, Turner also sold a substantial portion of his shares in August 2015, when the stock price traded near its Class Period high due to inflation caused by defendants' false and misleading statements alleged herein.  *See* ¶¶112-119, 150, *supra*.  Turner's other Class Period sales also occurred shortly before precipitous declines in Acadia's stock price, when the stock price was inflated by misrepresentations and omissions.  Like Jacobs, Turner made his largest Class Period sale – $10.5 million, or 66% of his total Class Period sales – on August 22, 2017, just weeks before Acadia's first partial disclosure of the fraud alleged herein on October 25, 2017.



201.    Like Jacobs, Turner did not sell any shares after the first partial corrective disclosures, when artificial inflation began to exit Acadia's stock price.

1546233_1

### 3. Duckworth's Class Period Sales and Insider Trading

202.    During the period preceding the Class Period, Duckworth sold 11,540 Acadia shares for proceeds of $477,622, which accounted for 25.46% of Duckworth's outstanding shares during that period.  During the Class Period, Duckworth sold 64,203 Acadia shares for proceeds of $4,412,452, which accounted for 59.89% of Duckworth's outstanding shares during the Class Period.  In other words, Duckworth sold *5.5 times more* stock during the Class Period than he did in the period preceding the Class Period.

203.    Duckworth's sales were also suspicious in timing.  As depicted in the graphic below, Duckworth made his largest Class Period trade – $2.6 million, or 60% of his Class Period sales – in August 2015, at the same time Waud, Jacobs and Turner executed large trades to take advantage of the near-Class Period high stock price.  Duckworth's other Class Period sales also occurred shortly before precipitous declines in Acadia's stock price, when the stock price was inflated by misrepresentations and omissions.

1546233_1



Acadia Healthcare Company - Duckworth

204. Like Jacobs and Turner, Duckworth did not sell any shares after the first partial corrective disclosures, when artificial inflation began to exit Acadia's stock price.

### 4. Waud's Class Period Sales and Insider Trading

205. Reeve Waud, the Founder and Managing Partner of Waud Capital Partners ("WCP," together with Reeve Waud, "Waud"), currently serves as Chairman of Acadia, and has served on its Board since 2005. Waud founded Acadia and continues to hold a significant investment in Acadia.

206. As a founder of Acadia and a member of Acadia's Board, Waud was privy to confidential, proprietary information concerning Acadia, its finances, operations, financial condition, and present and future business prospects. Waud also had access to material adverse non-public information concerning Acadia, including at the time of his securities transactions listed below.

207. During the period preceding the Class Period, Waud sold 3,262,873 Acadia shares for proceeds of $70,478,057, which accounted for 18.3% of Waud's outstanding shares during that

period. During the Class Period, Waud sold 10,438,846 Acadia shares for proceeds of $559,623,048, which accounted for 92.9% of Waud's outstanding shares during the Class Period. In other words, Waud sold *3.1 times more* stock during the Class Period than he did in the period preceding the Class Period.

208. Waud's sales were also suspicious in timing. As depicted in the graphic below, Waud's largest Class Period sale – more than $193 million – occurred on August 14, 2015 when the stock price traded near its Class Period high due to inflation caused by defendants' false and misleading statements alleged herein. *See* ¶¶112-119, 150, *supra*. Waud's other Class Period sales also occurred shortly before precipitous declines in Acadia's stock price, when the stock price was inflated by misrepresentations and omissions.



209. Tellingly, of Waud's nearly $560 million in Class Period insider sales, $544 million – or *97%* – was sold before artificial inflation began to leak out of the stock as a result of the first

partial corrective disclosure on October 25, 2017. Waud's sale of almost all of his Acadia stock shortly before the first partial corrective disclosure strongly supports an inference that defendants knew Acadia's stock price was artificially inflated by fraud, which would soon be revealed to the public.

**B.** **Defendants Closely Monitored Patient Admissions, Staffing Levels and Other Quality Control Metrics**

210. Throughout the Class Period, defendants had direct knowledge of internal metrics tracking patient levels, staffing levels and other measures of the quality of care.

211. Throughout the Class Period, defendants maintained a census that tracked the total number of patients at Acadia facilities. As Jacobs explained at the Raymond James Institutional Investors Conference on March 8, 2016, Acadia's census was a critical metric used by defendants to collect revenue, and as such, it was reviewed on a daily basis to identify trends for corrective action:

> We get paid per diems, so we're – *it's pretty easy to see how you're trending when you look at the census report every day and you see what that looks like. You can make – you can take action to help oversee things*. So, we've got a great team of operators and financial folks in the divisions.

212. On the October 25, 2017 earnings call, Jacobs confirmed again that the Company has "*a pretty good handle on how the census is trending on a daily basis*."

213. Jacobs reiterated this fact once again on the July 31, 2018 earnings call: "*We look at the census every day*."

214. Defendants also relied on the number and trends of patients and open beds to determine current and future staffing levels at Acadia facilities. Turner admitted as such at the RBC Capital Markets Healthcare Conference held on February 22, 2017:

> [Frank Morgan – Analyst:] So if we get this extra volume, obviously there's been a lot of discussions around labor and capacity, capacity being labor capacity, not physical capacity. But what is your thoughts on that current state. Can you – do you have the labor capacity to handle the volume if we do get incremental volume?

[Turner:] I think – you know, as you have seen from our historical numbers, we have been able to grow our organic revenues very healthy numbers, upper to mid-single digits. When you do that in an inpatient setting, you have to have an incremental staffing. *Caring for more patients means you must bring on more staff to do that*.

*So again, we look at the history, we look at the trends going forward*. We are in a full employment market. The economy is doing well. But we are only focused on behavioral health, and *we've got a lot of resources and efforts designated. Our internal recruiting, corporate recruitings, supporting our facilities. We've just got – everybody in the Company knows when these next 20 beds are coming on in a certain market, so it's not a surprise when those beds come online that we are expecting to have more labor needs there*.

215. Defendants also represented throughout the Class Period that they designated significant resources to identifying, tracking and reporting separate metrics related to quality of care. For instance, at the September 9, 2015 Wells Fargo Healthcare Conference, Jacobs explained that the Company maintained a "robust" clinical risk management department in its corporate office to assist its local divisions in minimizing adverse patient events:

[Unidentified Audience Member:] Generally speaking or broadly, how do you try to minimize adverse patient event at your facilities?

[Jacobs:] Well, *we have a robust clinical risk management department at the corporate office*, but this is the primary responsibility of the CEO, his medical staff, or their medical staff, and our employees at the local level; that is their job, take care of the patient. *And we can provide corporate resources to assist you in that and can do benchmarking and trending and point out areas for improvement*, but at the end of the day, it's the responsibility of the CEO of that facility to make sure the quality of care is there.

216. Similarly, at the February 22, 2017 RBC Capital Markets Healthcare Conference, Jacobs represented that the Company's quality and compliance department did nothing but track efficacy of care:

[Unidentified Audience Member:] Thanks. One of those questions raised in the negative headlines I think talked about efficacy of care. And do you guys track efficacy and do you think the industry should track efficacy? Are people actually getting cured when they come in versus (inaudible)?

[Jacobs:] We can do a better job. Now, unfortunately, the psychiatric industry has been discriminated for years. And when the federal government gave

out all this money for to – for med/surg hospitals to improve their computer systems, we got nothing.

So if we had gotten some money and was able to invest in our computer systems, we would be able to track that better. We are investing in that, but it is more manual than it is computerized. *And we have a department headed up by Scott Schwieger that our quality and compliance department that does nothing but look at this*.

217. Lastly, the Company was required to regularly report certain quality assurance metrics to CMS in order to collect full Medicare and Medicaid payments. As Turner explained at the September 6, 2017 Robert W. Baird Global Healthcare Conference:

[Benjamin Whitman Mayo – Robert W. Baird Analyst:] And one of the, I guess, obvious – I don't want to say flaws, maybe the shortcomings of the industry is there's no standardized outcomes or quality measurements that are out there. How does – when you guys talk about value-based care and behavioral treatment and how they come together, I mean, what are you guys discussing in the boardroom?

[Turner:] Well, first, there are some measurements. CMS requires – I think there's about a 7 core measure that get reported. I think we can all debate or agree that they're not the best measurements, but they are required measurements. And – but right now, we're – our industry is in a pay per reporting mode. Because CMS will penalize you 2% of your net revenues from them if you don't report your stats. And so we've been reporting now for over 2 years those stats.

218. Defendants therefore had direct knowledge of, and access to, contemporaneous data of the Company's understaffing and quality of care issues at the time they issued their false and misleading statements alleged herein.

## C. Acadia's Incentive Compensation Systems Encouraged Poor Quality Care

219. From top to bottom, defendants designed, implemented, and approved compensation structures that incentivized employees and executives to prioritize short-term profits above patient care, leading to the egregious patient care issues alleged herein.

220. First, a former Treatment Placement Specialist ("TPS") who worked for Acadia during the Class Period reported that Acadia paid commissions to its employees for placing patients into facilities. Acadia maintained a weighted compensation system whereby TPS representatives

received higher commissions for placing patients at facilities that were more profitable for Acadia, regardless of patient need. Predictably, the TPS representative reported that TPS representatives would place patients in facilities in order to maximize their own commissions and Acadia's profits, rather than referring the patient to the facility most appropriate for their needs, if any.

221. Second, a former Business Office Director who worked for Acadia during the Class Period reported that Acadia compensated its facility executives, including facility CEOs and CFOs, in large part through bonuses. Whether or not a facility executive received a bonus would depend on whether the facility met the budget set by Acadia during the prior year. If a facility was behind on the budget set by Acadia, facilities would be directed to cut costs, including by firing staff, in order to make their budget, further jeopardizing patient care.

222. Third, while Acadia repeatedly stated that they were "committed to providing quality patient care at our facilities," the quality of patient care was ***not*** a metric utilized in determining bonuses for the Individual Defendants, which made up the vast majority of their compensation. Instead, the Individual Defendants' bonuses were set solely with reference to Acadia's adjusted EPS, adjusted EDITBA and revenue, and Acadia intentionally factored out costs associated with poor quality care, such as legal settlement costs and non-recurring items, in calculating the Individual Defendants' entitlement to bonuses, creating a substantial risk that the Individual Defendants would sacrifice patient care to achieve short-term unsustainable results which allowed them to receive lucrative incentive compensation awards.

### D. Acadia's CEO and President Were Fired or Resigned with No Notice Following the Alleged Corrective Disclosures

223. On Sunday, December 16, 2018, just one month after publication of the *Seeking Alpha* report (*see* ¶190, *supra*), and without any advance notice, Jacobs was summarily fired from his position as CEO by Acadia's Board, and removed as the Board's Chairman. Jacobs was fired in

spite of the fact that just six weeks earlier, on November 6, 2018, Acadia reiterated that it depended on its "chief executive officer," and that the loss of his services could harm its business.

224.    Jacobs' involuntary termination was not typical for Acadia, which did not regularly fire its senior executives on Sundays without advance notice to shareholders.

225.    The bloodletting continued on March 19, 2019, when Turner left his position as President – a departure that was not disclosed to investors for almost a week – without Acadia even naming a replacement to fill his position, and despite the fact that the role of President is expressly enumerated in the Company's bylaws.

226.    Turner's termination was also unusual because on March 21, 2019, Acadia's Board solicited shareholder approval for Turner's 2019 multi-million dollar compensation package, despite the fact that Turner was no longer even an Acadia executive as of March 19, 2019.

**E.    Acadia Recommended Against a Shareholder Resolution Calling for Greater Transparency Regarding Patient Safety**

227.    Included in the Company's 2016 and 2017 proxy statements were shareholder proposals that would have required Acadia to prepare a sustainability report including information regarding patient and worker safety and security, among other topics.  The proposal specifically noted that "[p]atient safety, product marketing and quality of care, and quality of staff work life," were areas of concern.

228.    Acadia's Board, which included Jacobs, lobbied shareholders to reject the proposal, assuring shareholders that they "conduct our business in compliance with applicable law" and that "a report of the type being requested" was unnecessary.  The Board further stated that preparing such a report would distract from "core elements of our business strategy," including:

- creating a world-class organization that sets the standard of excellence in the treatment of specialty behavioral health and addiction disorders;

- creating behavioral health centers where people receive individualized and quality care that enables them to regain hope in a supportive, caring environment;

- offering an enviable internal culture and environment that encourages and supports both professional and personal growth that our employees are proud of; and

- developing partnerships with physicians, professionals, and payers within the communities we serve through the delivery of high quality specialty behavioral health services at affordable costs while always putting the patient first.

229.  Jacobs' and Acadia's refusal to endorse the preparation of a sustainability report, which would have included increased information and reporting on the exact issues upon which a portion of their fraudulent conduct was based, and their willingness to further mislead investors in efforts to persuade shareholders to vote against the proposal, is still further evidence of scienter.

## VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE

230.  Because of defendants' pervasive Class Period omissions, a class-wide presumption of reliance is appropriate pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

231.  Plaintiffs' claims for securities fraud are also asserted, in part, under the fraud-on-the-market theory of reliance. The market price of Acadia securities, including common stock regularly traded on the NASDAQ, was artificially inflated by the false and misleading statements and omissions complained of herein.  Defendants' false statements and omissions inflated the price of Acadia securities both before and during the Class Period.

232.  The Class Period inflation in the price of Acadia securities was eliminated when the financial conditions, business risks and other information concealed by defendants' fraud was revealed to the market. The information did not reach the market all at once but leaked out through several partial disclosures, each of which partially corrected the market price of Acadia securities.

233.  At all relevant times, the market for Acadia securities was an efficient market for the following reasons, among others:

(a)       Acadia securities met the requirements for listing, and were listed and actively traded, on the NASDAQ, a highly efficient and automated market;

(b)       During the Class Period, a high volume of Acadia securities traded on the NASDAQ;

(c)       As a regulated issuer, Acadia filed periodic public reports with the SEC and NASDAQ;

(d)       Acadia regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other Internet sites, and other wide-ranging public disclosures, such as conference calls, communications with the financial press and other similar reporting services;

(e)       During the Class Period, Acadia was followed by securities analysts employed by major brokerage firms.  Analysts employed by these and other firms regularly wrote reports based on the publicly available information disseminated by defendants about Acadia. These reports were distributed to the sales force and certain customers of their respective brokerage firms; and

(f)       Acadia had substantial institutional ownership during the Class Period.  Each of these institutions regularly analyzed and reported on the publicly available information about Acadia and its operations.

234.    Through the foregoing mechanisms, the information publicly disseminated by defendants about Acadia and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace, such that, as a result of their transactions in Acadia stock, the information disseminated by defendants, including the false and misleading statements described above, became incorporated into and were reflected by the market price of Acadia publicly traded securities.

1546233_1

235.    Under these circumstances, all purchasers of Acadia securities during the Class Period suffered similar injury through their purchase of Acadia securities at artificially inflated prices and their subsequent decline in value, and a presumption of reliance applies.

## IX.    CLASS ACTION ALLEGATIONS

236.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased or otherwise acquired Acadia securities during the Class Period and were harmed thereby (the "Class").  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

237.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Acadia shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiffs at this time, plaintiffs believe that there are thousands of members in the proposed Class, if not more.  Record owners and other members of the Class may be identified from records maintained by Acadia, its transfer agent or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

238.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

239.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

1546233_1

240.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Acadia;

(c)     whether the price of Acadia securities was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

241.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### (Against All Defendants)

242.     Plaintiffs incorporate ¶¶1-241 by reference.

243.     During the Class Period, defendants disseminated or approved the statements as specified above in ¶¶112-128, 131-147, 150-156 and 159-177, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 90 -

244.     Defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Acadia securities during the Class Period.

245.     Defendants, individually and together, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Acadia's business, operations and financial condition as specified herein.

246.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

247.     As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of Acadia securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Acadia securities was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which Acadia securities traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants (but not disclosed in defendants' public statements during the Class Period), plaintiffs and the other Class members purchased or otherwise acquired Acadia securities during the Class Period at artificially high prices and were damaged thereby.

248.     Plaintiffs and the Class, in reliance on the integrity of the market, paid artificially

inflated prices for Acadia securities, and suffered losses when the relevant truth was revealed.

Plaintiffs and the Class would not have purchased Acadia securities at the prices they paid, or at all,

if they had been aware that the market prices had been artificially and falsely inflated by these

defendants' misleading statements.

249.     As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and

the other Class members suffered damages in connection with their Class Period transactions in

Acadia securities.

250.     By reason of the foregoing, defendants named in this Count have violated §10(b) of

the 1934 Act and SEC Rule 10b-5.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### (Against the Individual Defendants)

251.     Plaintiffs incorporate ¶¶1-250 by reference.

252.     Defendants were controlling persons of Acadia within the meaning of §20(a) of the

1934 Act.  By virtue of their high-level positions as officers and/or directors of Acadia, their

ownership and contractual rights, participation in and awareness of the Company's operations, and

intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the

investing public, these defendants had the power to influence and control and did influence and

control, directly or indirectly, the decision-making of the Company, including the content and

dissemination of the allegedly false and misleading statements.

253.     In particular, each of these defendants had direct or supervisory responsibility over

the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions and business practices giving rise to the securities

violations as alleged in Count I, and exercised that power.

1546233_1

254.    As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases and acquisitions of Acadia securities during the Class Period when the relevant truth was revealed.

255.    By reason of the foregoing, the defendants named in this Count violated §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment as follows:

A.    Determining that this action is a proper class action and certifying plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Class Counsel;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: April 1, 2019

ROBBINS GELLER RUDMAN & DOWD LLP
JERRY E. MARTIN, #20193
CHRISTOPHER M. WOOD, #032977


s/ CHRISTOPHER M. WOOD
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
jmartin@rgrdlaw.com
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS
DARRYL J. ALVARADO
J. MARCO JANOSKI GRAY
TING H. LIU
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dalvarado@rgrdlaw.com
jgray@rgrdlaw.com
tliu@rgrdlaw.com

Lead Counsel for Plaintiffs

- 94 -

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on April 1, 2019, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

                                    s/ CHRISTOPHER M. WOOD
                                    CHRISTOPHER M. WOOD

                                    ROBBINS GELLER RUDMAN & DOWD LLP
                                    414 Union Street, Suite 900
                                    Nashville, TN  37219
                                    Telephone:  800/449-4900
                                    615/252-3798 (fax)
                                    E-mail:  cwood@rgrdlaw.com

**Mailing Information for a Case 3:18-cv-00988 St. Clair County Employees' Retirement System v. Acadia Healthcare Company, Inc. et al**

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **AMALGAMATED BANK, TRUSTEE**
  PKNASHLAW@AOL.COM

- **BOSTON RETIREMENT SYSTEM**
  PKNASHLAW@AOL.COM

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Lisa R. Bugni**
  lbugni@kslaw.com

- **Thomas H. Burt**
  burt@whafh.com

- **Regina M. Calcaterra**
  calcaterra@whafh.com

- **Jessica Perry Corley**
  jpcorley@kslaw.com

- **Patrick Donovan**
  donovan@whafh.com

- **Matthew M. Guiney**
  guiney@whafh.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,eseaborn@barrettjohnston.com,nchanin@barrettjohnston.com,jmartin@rgrdlaw.com,ggilbert@barrettjohnston.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,dgibby@rwjplc.com

- **Thomas C. Michaud**
  tmichaud@vmtlaw.com

- **Danielle S. Myers**
  danim@rgrdlaw.com

- **PLYMOUTH COUNTY RETIREMENT ASSOC**
  PKNASHLAW@AOL.COM

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **David C. Walton**
  davew@csgrr.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,slevins@rgrdlaw.com,9101599420@filings.docketbird.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com,ehyatt@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)