UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | | |
|---|---|---|
| ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 3:18-cv-00988 |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | District Judge William L. Campbell, Jr. |
| vs. | ) ) | Magistrate Judge Alistair E. Newbern |
| | ) | |
| ACADIA HEALTHCARE COMPANY, INC., et al., | ) ) ) | PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| Defendants. | ) ) ) | |
| | ) | |

**TABLE OF CONTENTS**

Page

I.     SUMMARY OF THE ALLEGED FRAUD ........................................................1

II.    LEGAL STANDARDS .............................................................................4

III.   ARGUMENT ..........................................................................................5

       A.    Plaintiffs' Scheme Liability Claims Are Unchallenged............................5

       B.    Plaintiffs Allege Actionable Misstatements and Omissions ...................5

             1.    Defendants' Statements Regarding Staffing Levels and Quality of
                   Care at Acadia's U.S. Facilities Were Materially Misleading....................6

             2.    Defendants' Statements of Compliance with Applicable Standards
                   at U.S. Facilities Were Materially Misleading...........................................10

             3.    Defendants' Statements Regarding the Financial Performance of
                   Acadia's U.K. Facilities Were Materially Misleading..............................12

       C.    Plaintiffs Plead a Strong Inference of Scienter ...................................15

             1.    Defendants' Intimate Involvement in the Fraud Establishes Their
                   Contemporaneous Knowledge of Acadia's Widespread Quality of
                   Care Problems ...............................................................................15

             2.    The Fraud Concerned Acadia's Core Operations .....................................17

             3.    Suspicious Insider Trading Further Demonstrates a Strong
                   Inference of Scienter.......................................................................17

             4.    Acadia's Compensation System Incentivized Personal Gain over
                   Patient Care...................................................................................21

             5.    The Suspicious Terminations of Jacobs and Turner Further
                   Buttress a Finding of Scienter..................................................................22

             6.    Defendants Personally Lobbied Against a Proposal that Would
                   Have Provided Greater Transparency .........................................................23

             7.    Defendants Instituted a Policy Preventing Facilities from
                   Reporting Adverse Patient Incidents to Authorities .................................23

             8.    A Holistic View of Plaintiffs' Allegations Supports a Strong
                   Inference of Scienter that Is at Least as Compelling as Any
                   Opposing Inference .......................................................................24

4842-4551-1325.v1

D.     Plaintiffs Adequately Allege Liability Under §20(a)............................................24

IV.    THE COURT SHOULD STRIKE DEFENDANTS' REFERENCE TO EXTRANEOUS INFORMATION .......................................................................................25

V.    CONCLUSION...............................................................................................................25

4842-4551-1325.v1

Case 3:18-cv-00988   Document 47   Filed 07/30/19   Page 3 of 35 PageID #: 1538

# TABLE OF AUTHORITIES

**Page**

## CASES

*Albert Fadem Tr. v. Am. Elec. Power Co., Inc.*,
    334 F. Supp. 2d 985 (S.D. Ohio 2004) ...................................................................22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................................4

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................................4

*Campbell v. Lexmark Int'l Inc.*,
    234 F. Supp. 2d 680 (E.D. Ky. 2002) .......................................................................19

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) .............................................................................. *passim*

*Dougherty v. Esperion Therapeutics, Inc.*,
    905 F.3d 971 (6th Cir. 2018) .....................................................................................14

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)......................................................................................................6

*Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*,
    964 F. Supp. 2d 875 (N.D. Ohio 2013)......................................................................22

*Frank v. Dana Corp.*,
    646 F.3d 954 (6th Cir. 2011) .............................................................................15, 24

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
    No. 3:09-00882, 2011 WL 1335803
    (M.D. Tenn. Mar. 31, 2011)....................................................................5, 9, 10, 24

*Grae v. Corr. Corp. of Am.*,
    No. 3:16-cv-2267, 2017 WL 6442145
    (M.D. Tenn. Dec. 18, 2017)................................................................................ *passim*

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) ........................................................................6, 14, 17

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
    958 F. Supp. 2d 1065 (D. Minn. 2013).....................................................................14

*In re AFC Enters., Inc. Sec. Litig.*,
    348 F. Supp. 2d 1363 (N.D. Ga. 2004)......................................................................21

4842-4551-1325.v1

*In re Am. Serv. Grp., Inc.*,
  No. 3:06-0323, 2009 WL 1348163
  (M.D. Tenn. Mar. 31, 2009)................................................................................22

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015)....................................................................11

*In re Cardinal Health Inc. Sec. Litigs.*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006) ................................................................25

*In re Comshare Inc. Sec. Litig.*,
  183 F.3d 542 (6th Cir. 1999) ..............................................................................15

*In re Dell Inc. Sec. Litig.*,
  591 F. Supp. 2d 877 (W.D. Tex. 2008)................................................................20

*In re First Merchs. Acceptance Corp. Sec. Litig.*,
  No. 97 C 2715, 1998 WL 781118
  (N.D. Ill. Nov. 4, 1998)......................................................................................16

*In re FirstEnergy Corp. Sec. Litig.*,
  316 F. Supp. 2d 581 (N.D. Ohio 2004) ...............................................................25

*In re Huffy Corp. Sec. Litig.*,
  577 F. Supp. 2d 968 (S.D. Ohio 2008) ................................................................22

*In re Huntington Bancshares Inc. Sec. Litig.*,
  674 F. Supp. 2d 951 (S.D. Ohio 2009) ...........................................................21, 22

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
  910 F. Supp. 2d 561 (S.D.N.Y. 2012)..................................................................16

*In re MGM Mirage Sec. Litig.*,
  No. 2:09-cv-01558-GMN-VCF,
  2013 WL 5435832 (D. Nev. Sept. 26, 2013) .......................................................14

*In re Prison Realty Sec. Litig.*,
  117 F. Supp. 2d 681 (M.D. Tenn. 2000)..............................................................15

*In re Sirrom Capital Corp. Sec. Litig.*,
  84 F. Supp. 2d 933 (M.D. Tenn. 1999)................................................................25

*In re UnumProvident Corp. Sec. Litig.*,
  396 F. Supp. 2d 858 (E.D. Tenn. 2005)...............................................................25

*Ind. State Dist. Council of Laborers & HOD Carriers*
*Pension & Welfare Fund v. Omnicare, Inc.*,
    583 F.3d 935 (6th Cir. 2009) ............................................................................9

*Katz v. Image Innovations Holdings, Inc.*,
    542 F. Supp. 2d 269 (S.D.N.Y. 2008)..........................................................17, 23

*Kuhn v. Washtenaw Cty.*,
    709 F.3d 612 (6th Cir. 2013) ............................................................................5

*Kyrstek v. Ruby Tuesday, Inc.*,
    No. 3:14-cv-01119, 2016 WL 1274447
    (M.D. Tenn. Mar. 31, 2016)..............................................................................15

*Lorenzo v. SEC*,
    __ U.S. __, 139 S. Ct. 1094 (2019).....................................................................5

*Matrixx Initiatives v. Siracusano*,
    563 U.S. 27 (2011).........................................................................................11

*Morse v. McWhorter*,
    290 F.3d 795 (6th Cir. 2002) ..........................................................................25

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    830 F.3d 376 (6th Cir. 2016) ............................................................................4

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    __ U.S. __, 135 S. Ct. 1318 (2015)..........................................................10, 11, 12

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ..........................................................................16

*SEC v. SeeThruEquity, LLC*,
    No. 18 Civ. 10374(LLS), 2019 WL 1998027
    (S.D.N.Y. Apr. 26, 2019)...................................................................................5

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) .......................................................................20, 21

*Teachers' Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ...........................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................4, 15, 21, 24

4842-4551-1325.v1

*Think Village-Kiwi, LLC v. Adobe Sys., Inc.*,
No. C 08-04166SI, 2009 WL 3837270
(N.D. Cal. Nov. 16, 2009) .................................................................................................6

*Villella v. Chem. & Mining Co. of Chile Inc.*,
No. 15 Civ. 2106(ER), 2017 WL 1169629
(S.D.N.Y. Mar. 28, 2017) ...............................................................................................11

*Weiner v. Klais & Co., Inc.*,
108 F.3d 86 (6th Cir. 1997) ............................................................................................25

*Weiner v. Tivity Health, Inc.*,
365 F. Supp. 3d 900 (M.D. Tenn. 2019) .....................................................................14, 19

*Williams v. Duke Energy Int'l, Inc.*,
681 F.3d 788 (6th Cir. 2012) ............................................................................................5

*Willis v. Big Lots, Inc.*,
No. 2:12-cv-604, 2016 WL 8199124
(S.D. Ohio Jan. 21, 2016) ..........................................................................................17, 22

*Winslow v. BancorpSouth, Inc.*,
No. 3:10-00463, 2011 WL 7090820
(M.D. Tenn. Apr. 26, 2011) ........................................................................................10, 15

*Zwick Partners, LP v. Quorum Health Corp.*,
No. 3:16-cv-2475, 2018 WL 2933406
(M.D. Tenn. Apr. 19, 2018) ....................................................................................9, 10, 11

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§78u-4(b)(1) ....................................................................................................................5
§78u-4(b)(2)(A) ...............................................................................................................5

Federal Rules of Civil Procedure
Rule 9(b) ..........................................................................................................................4
Rule 12(b)(6) ....................................................................................................................4
Rule 12(f)(1) ...................................................................................................................25
Rule 15(a)(2) ...................................................................................................................25

# I.    SUMMARY OF THE ALLEGED FRAUD

This is a securities class action on behalf of purchasers of Acadia Healthcare Company, Inc. ("Acadia" or the "Company") securities between April 30, 2014 and November 15, 2018, inclusive (the "Class Period"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). Acadia is a for-profit healthcare company that operates inpatient psychiatric facilities, residential treatment centers, and other facilities providing outpatient behavioral healthcare services in the United States ("U.S."), the United Kingdom ("U.K.") and Puerto Rico. ¶¶2, 28. Plaintiffs[1] seek damages caused by Defendants' scheme to defraud and mislead investors concerning patient care, staffing levels, legal compliance and U.K. operations – issues that were critical to the Company's business model and growth strategy.

*First*, Defendants represented that Acadia adequately staffed its facilities and complied with applicable laws and regulations, stating in no uncertain terms that their "facilities [we]re appropriately staffed" and that Acadia was continually able to "find the personnel to open up [its] beds and staff [its] facilities." ¶¶130-157. At the same time, Defendants also represented that Acadia provided high-quality services and that quality of care was "absolutely the first priority." ¶¶111-129. It was quality care, Defendants repeatedly emphasized, that drove new patients to Acadia facilities, created the demand necessary to grow its existing facilities, and was key to improving the performance and operations at the facilities Acadia acquired to fuel its growth. ¶¶42-45, 112-113. Nothing could have been further from the truth.

---

[1]    "Plaintiffs" collectively refers to Chicago Laborers' Pension Fund and New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund. "Defendants" collectively refers to Acadia, Joey A. Jacobs ("Jacobs"), Brent Turner ("Turner") and David Duckworth ("Duckworth"). (Duckworth, Jacobs and Turner are collectively the "Individual Defendants.") Paragraph references ("¶_" or "¶¶__") are to the Consolidated Complaint for Violations of the Federal Securities Laws ("Complaint") (ECF No. 39). References to "MTD at _" are to pages of Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Consolidated Complaint (ECF No. 41). Emphasis is added and citations are omitted throughout unless otherwise indicated.

- 1 -

In reality, Acadia ran facilities rife with violence, sexual assault, and counter-therapeutic policies and practices. ¶¶61-84. Although Defendants represented that they achieved growth through improving the quality of care and adequately staffing their facilities, Acadia achieved growth by inadequately staffing facilities and slashing costs to extract higher profits at the expense of patient care and safety, as well as the Company's reputation and long-term viability. ¶¶47-60, 185-186.

**Second**, Defendants falsely represented that Acadia's $2.2 billion acquisition of The Priory Group, the U.K.'s largest chain of behavioral health centers, would contribute to positive financial growth. ¶¶91-108. Indeed, despite ongoing scrutiny from analysts, the media and regulators, Defendants repeatedly assured investors throughout 2017 that Acadia was on track to meet its financial targets and that the Company would experience "margin improvement in the UK." ¶¶158-178. In fact, Acadia was not on track to meets its U.K. financial targets because of weakened patient census and increased labor costs plaguing its U.K. operations – problems that Defendants concealed. ¶¶180-183.

Defendants' fraud was revealed through a series of partial disclosures. The first occurred on October 24, 2017, when Acadia revealed that deteriorating performance in the U.K. had caused the Company to miss its 3Q17 revenue and earnings targets and substantially reduce its guidance for the remainder of the year. ¶¶8, 180-181. News of this "came as a surprise" and "shock[ed]" Acadia's shareholders, causing Acadia's stock price to plummet 30%. ¶¶8, 183-184.

Then, on October 11, 2018, Aurelius Value published a report and released a video documenting systemic patient abuse and neglect at dozens of Acadia facilities caused primarily by understaffing. ¶¶9, 185. The report included an analysis of Centers for Medicare and Medicaid Services ("CMS") inspection reports from 2013 to 2018 for 31 of the 40 acute inpatient U.S. hospitals listed on Acadia's website. ¶10. The analysis found that federal inspectors uncovered staffing deficiencies at over **90%** of these 31 Acadia hospitals, including repeated violations for insufficient

4842-4551-1325.v1

nurses or qualified practitioners on hand. *Id.* Of these 28 hospitals with staffing deficiencies, *89%* of those facilities were also cited by inspectors for patient care and safety deficiencies. *Id.* Following this news, Acadia's stock price declined by more than 11%. ¶¶10, 189.

Finally, on November 16, 2018, *Seeking Alpha* published an article entitled, "Acadia Healthcare: Very Scary Findings From A 14-Month Investigation," which revealed that the Company's rapid growth, as well as its revenue and margin increases, were attributed to cost-cutting and "reducing the quality of care." ¶¶11, 190. The article highlighted severe problems at seven of Acadia's facilities (facilities that were also featured in the October 2018 Aurelius Value report) and reported that, "due to the number of suicides at some of their facilities, Acadia's ability to accept certain patients has been restricted by state-level governments." *Id.* On this news, Acadia's stock price declined by 26%. ¶¶11, 192.

None of this came as a shock to Defendants, who had actual knowledge of, or recklessly disregarded, their scheme and the falsity of their Class Period misrepresentations. Having committed an almost identical fraud at their previous company, Psychiatric Solutions, Inc. ("PSI"), Defendants had intimate knowledge of patient admissions, staffing levels and quality control issues and monitored those metrics on a "daily basis." ¶¶6, 211-212. Before the misconduct was revealed, moreover, the Individual Defendants and one of Acadia's founders unloaded more than *$600 million* in Acadia stock while its price was inflated by fraud. ¶¶196-209. From top to bottom, Defendants installed compensation structures designed solely to reward short-term profit at the expense of patient care. ¶¶219-222. Shortly after Defendants' fraud was revealed, Acadia's CEO and President were abruptly fired or resigned with no notice under highly unusual circumstances. ¶¶223-226.

Defendants provide no credible basis for dismissal, and Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint ("Motion") (ECF No. 40) should be denied. First, because Defendants do not challenge Plaintiffs' scheme liability claims, those claims must proceed. *Infra*,

§III.A. Second, Defendants' puffery challenge is baseless, as Acadia's failure to adequately staff its facilities and provide quality care is objectively determinable. *Infra*, §III.B.1. Third, questions of materiality and "truth-on-market" are not resolvable on the pleadings as a matter of law, and Defendants' statements of regulatory compliance are more than mere opinion. *Infra*, §§III.B.1., III.B.2. Fourth, none of the alleged statements are "forward looking" but, even if they were, Acadia's risk warnings were not meaningful. *Infra*, §III.B.3. Finally, the inference of scienter is cogent, strong and more plausible than any opposing inference. *Infra*, §III.C.

Accepting the Complaint's allegations as true and construing them in the light most favorable to Plaintiffs, they are more than sufficient to state viable claims for securities fraud. Defendants' Motion should be denied.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) requires a court to "consider the complaint in its entirety," "accept all factual allegations . . . as true" and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). A complaint "does not need detailed factual allegations" but need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A securities fraud complaint must satisfy the additional pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383 (6th Cir. 2016). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "'Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the

fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.'" *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012). The PSLRA requires a plaintiff to specify the alleged false statements, identify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. §78u-4(b)(1), (2)(A). "'Where a complaint alleges "a complex and far-reaching fraudulent scheme,"'" the scheme must be pleaded with particularity and the complaint must "'"provide examples of specific" fraudulent conduct that are "representative samples" of the scheme.'" *Grae v. Corr. Corp. of Am.*, No. 3:16-cv-2267, 2017 WL 6442145, at *12 (M.D. Tenn. Dec. 18, 2017) ("*CCA*").

## III.    ARGUMENT

### A.    Plaintiffs' Scheme Liability Claims Are Unchallenged

The Complaint alleges Defendants engaged in a course of conduct that operated as a fraud on investors, otherwise known as "scheme liability." ¶¶3, 27, 179, 193, 244; *Lorenzo v. SEC*, ___ U.S. ___, 139 S. Ct. 1094 (2019); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2011 WL 1335803, at *45 (M.D. Tenn. Mar. 31, 2011) ("The securities laws reach misleading conduct as well as misleading statements . . . ."). Here, the Complaint "alleges that the defendants' entire business model, beyond any misstatements or omissions, [wa]s deceptive." *SEC v. SeeThruEquity, LLC*, No. 18 Civ. 10374(LLS), 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019). Because Defendants do not seek dismissal of Plaintiffs' scheme claims, any challenge to such claims is waived. *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("arguments not raised in a party's opening brief . . . are waived").

### B.    Plaintiffs Allege Actionable Misstatements and Omissions

The Exchange Act also prohibits "the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not

- 5 -

misleading.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). Corporate actors must

"'provide complete and non-misleading information with respect to the subjects on which [they]

undertake[] to speak.'" *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560-61 (6th Cir. 2001). "[A] company

may choose silence or speech elaborated by the factual basis as then known – but it may not choose

half-truths." *Id.* Assessing falsity requires an analysis of the alleged false statements *and* the context

in which they were made.[2] *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672

(6th Cir. 2005).[3]

## 1. Defendants' Statements Regarding Staffing Levels and Quality of Care at Acadia's U.S. Facilities Were Materially Misleading

Acadia's periodic reports represented that its core business strategy involved acquiring and

integrating behavioral healthcare facilities "based on a disciplined acquisition strategy that focuses on

quality of service, return on investment and strategic benefits" and that Acadia would improve

operating results by providing "high-quality services." ¶¶112-113. This refrain was repeated at

investor conferences, where Defendants pronounced that "quality . . . is absolutely the first priority of

th[e] [C]ompany," ¶116, and that Acadia could maintain its profit margins while "providing great

quality care at the local level." ¶119; *see also* ¶121 ("core element[]" of business strategy was "the

delivery of high quality specialty behavioral health services at affordable costs while always putting

the patient first"); ¶122 ("[The] number one goal is taking care of the patients, making sure they are

receiving the quality care that they need.").

---

[2]    In practice, where, as here, the "allegedly false statements are numerous, [but] are offered . . . in service of a single, central theory of liability," a finding that falsity has been alleged with particularity does not require a statement-by-statement enumeration by the Court. *CCA*, 2017 WL 6442145, at *13.

[3]    Defendants attached a five-page exhibit listing self-selected portions of the alleged misstatements alongside the claimed "corresponding basis for dismissal." *See* MTD, Ex. 4. Not only is this exhibit flawed in its selective quotation of the misstatements set forth in the Complaint, but it should also be disregarded as an improper attempt to exceed the 25-page limit. *See, e.g.*, *Think Village-Kiwi, LLC v. Adobe Sys., Inc.*, No. C 08-04166SI, 2009 WL 3837270, at *7 (N.D. Cal. Nov. 16, 2009) (striking attorney-prepared chart as improper argument in excess of page limit).

Moreover, after telling the market that the Company was "dependent on [nurse and psychiatric] labor to grow [its] volumes," ¶136, Defendants claimed they were "meeting the [staffing] needs" to keep up with the Company's aggressive bed-growth strategy while "providing good quality care" and that the Company was continually able to "access the labor to support [its] growth." ¶¶124, 126. Defendants shrugged off questions regarding clinician supply and increased labor pressures, assuring that their "facilities [we]re appropriately staffed" and that Acadia was able to "find the personnel to open up [its] beds and staff [its] facilities." *See* ¶¶131-147. Any potential staffing issues, Defendants contended, were limited to "very isolated locations." ¶124. Thus, Defendants assured investors that there was "nothing companywide" to be concerned about regarding staffing levels. *See* ¶¶124, 134, 138, 141, 146.

In fact, Acadia's facilities were routinely understaffed, ¶¶50-60, in violation of state and federal law, ¶¶52-53 – resulting in alarming incidents of patient abuse, neglect and, on several occasions, death. *See* ¶¶61-85. An October 2018 analysis of CMS inspection reports concerning 31 of Acadia's 40 acute inpatient U.S. hospitals revealed staffing deficiencies at 28 of the 31 Acadia hospitals, including repeated violations for insufficient numbers of nurses or qualified practitioners. ¶186. Underscoring the direct link between staffing levels and quality of patient care, *89%* of the 28 hospitals cited for staffing deficiencies were also cited for deficiencies related to patient safety or care – including violations involving patient deaths, suicides, elopements (escapes), improper or erroneous administration of medications, improper use of restraints, and physical or sexual assaults. *Id*. Inspectors also found managerial deficiencies at *87%* of the 31 facilities for which CMS reports were available, including failures to report incidents to law enforcement and failures to provide proper oversight or follow established appropriate patient safety protocols. *Id*.

Despite the stark differences between Defendants' statements and reality, Defendants argue their statements are nonactionable because: (1) they constituted puffery; or (2) the facts alleged to be

- 7 -

misleading had been publicly disclosed.  MTD at 12-13; MTD, Ex. 4.  Both arguments fail.

"***Puffery***."  Defendants' statements regarding staffing levels and quality of care are objectively verifiable and "pegged" to concrete standards, as well as state and federal laws governing patient care and staffing requirements at Acadia facilities.  *CCA*, 2017 WL 6442145, at *14.  For example, both federal and state laws prescribe objective, quantitative staffing requirements and patient-to-staff ratios for Acadia's hospitals and treatment centers.  ¶¶52-53.  It is the widespread and chronic violations of these objective requirements that rendered Defendants' "staffing" statements false and misleading.  ¶¶50-60, 148, 185-186.  Defendants' staffing-level statements are not puffery, and Defendants do not credibly argue otherwise.

Defendants' "quality care" statements are similarly capable of objective measurement.  *See* ¶217 (Turner: "[T]here are some [quality] measurements.  CMS requires – I think there's about a 7 core measure that get reported. . . .  And so we've been reporting now for over 2 years those stats.").  Indeed, a separate October 2018 analysis of CMS reports found that the quality of care at Acadia's hospitals was objectively worse than its closest competitor, UHS, with Acadia facilities receiving double the number of violations per inspection involving patient safety or care deficiencies, and four times the number of violations for staffing problems.  ¶187.

Even if the "quality care" statements could be considered "superficially broad statements of corporate self-praise," they still "must be evaluated in context to determine if they convey more than just a generalized optimism."  *CCA*, 2017 WL 6442145, at *14; *City of Monroe*, 399 F.3d at 671-72.  Here, Defendants' "quality care" statements were uttered in concert with Defendants' assurances – often in response to direct questions from analysts – that the Company's aggressive acquisition and bed-growth strategy would not compromise patient care or safety.  Indeed, the misrepresentations here are strikingly similar to those upheld against Defendants in a previous securities fraud litigation involving their previous company, PSI, where the court held that statements regarding the "'highest

quality care'" were, in context, actionable and "subject to objective verification given the scope and extent of [the problems at] PSI facilities, the core measures of PSI's performance for its accreditation, and the remedial costs for PSI's non-compliance." *Psychiatric Sols.*, 2011 WL 1335803, at *51. And while the "question of what constitutes an adequate level of quality for clients in any particular field is difficult to resolve without evidence from knowledgeable experts," what Plaintiffs have alleged here is "as much as any plaintiff could be expected to plead to establish an allegation of quality deficiencies at the complaint stage." *CCA*, 2017 WL 6442145, at *14.[4]

"***Disclosure***." A truth-on-the-market argument is "intensely fact-specific" and inappropriate to resolve at this stage. *Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at *10 (M.D. Tenn. Apr. 19, 2018). Even on the merits, Defendants' argument fails because the "disclosures" they identify, MTD at 13-15, failed to disclose Acadia's pervasive and unlawful understaffing and patient care issues.

First, Defendants point to the total employee figures Acadia disclosed during the Class Period, but those figures say nothing about the number of nurses, psychiatrists or medical technicians at each facility, the number of patients at each facility, staff-to-patient ratios or any other metric necessary to determine whether Acadia's facilities were appropriately staffed.[5] Nor can that information be found in the Salaries, Wages & Benefits ("SWB") expense line that Defendants highlight.[6]

---

[4]  Defendants' authorities are inapposite because they involved optimistic statements that either were "too untethered to anything measurable," *City of Monroe*, 399 F.3d at 671, or did nothing more than "vaguely predict positive future results." *Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc*., 583 F.3d 935, 943-44 (6th Cir. 2009).

[5]  Nor would it be possible to arrive at this information from the reported total employee number, as Defendants repeatedly stated that much of the necessary facility staff "are licensed medical professionals ***who are generally not employed by us*** and work in our facilities as independent contractors or medical staff members." *See* MTD, Ex. 6 (2013 10-K) at 12, Ex. 3 (2014 10-K) at 19, Ex. 2 (2015 10-K) at 18, Ex. 7 (2016 10-K) at 18, Ex. 8 (2017 10-K) at 18.

[6]  Acadia grew from 78 behavioral healthcare facilities with over 5,800 beds at the end of 2014, MTD, Ex. 3 (2014 10-K) at 43, to 583 behavioral healthcare facilities with approximately 18,100

Second, Jacobs' statement that the Company will likely have "some incidents" does not come anywhere close to revealing the systemic staffing and patient issues alleged.[7] And the "Risk Factors" Defendants cite, MTD at 14, merely warned of the potentiality of patient incidents – they did not disclose the widespread past and ongoing patient incidents. *Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820, at *16 (M.D. Tenn. Apr. 26, 2011) ("'[G]eneral cautionary language does not render omission of specific adverse historical facts immaterial . . . .'"); *Quorum Health*, 2018 WL 2933406, at *7 ("'[T]o caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'").

### 2. Defendants' Statements of Compliance with Applicable Standards at U.S. Facilities Were Materially Misleading

Defendants represented that the Company was "in substantial compliance with all applicable laws and regulations" at the same time state and federal inspections routinely found that Acadia facilities failed to meet lawfully required staffing levels and patient safety standards. ¶150. Defendants argue that because they prefaced these statements with the words "we believe," they constitute nonactionable opinions. MTD at 15-16. But as they concede, statements of opinion are actionable where: (a) the speaker does not "actually hold[] the stated belief"; (b) the opinion contains a materially false "embedded statement[] of fact"; or (c) the omitted information shows that the speaker "lacked the basis for making those statements that a reasonable investor would expect." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, 135 S. Ct. 1318, 1326-27, 1333 (2015). Indeed, as courts have recognized:

---

beds by the end of 2018. MTD, Ex. 1 (2018 10-K) at 46. It is no surprise that the total number of employees and SWB expense grew over the course of the Class Period.

[7] The statement Defendants highlight, MTD at 14, is nearly identical to a statement Jacobs made in 2008 in connection with similar allegations in *Psychiatric Sols.*: "'[JACOBS:] Unfortunately, we take care of very difficult patients. I want them all not to have incidents, but some incidents will occur, and we do our level best to go back and put the resources back to correct it.'" 2011 WL 1335803, at *13. That statement did not disclose the fraud in that case, nor did it here.

> *Omnicare* . . . stand[s] for the proposition that a legal compliance statement may be deemed misleading if, although sincerely held, it is formed on the basis of an omitted fact, not disclosed by the speaker, that would likely conflict with a reasonable investor's own understanding of the facts conveyed by that statement.

*In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 729 (S.D.N.Y. 2015); *Quorum Health*, 2018 WL 2933406, at *5 ("In *Omnicare*, the Court explained that a reasonable investor expects not just that the company believes the opinion, but that 'it fairly aligns with the information in the company's possession at the time.'").

Here, Defendants concede the Complaint alleges "Acadia had 'knowledge' of instances in which individual Acadia facilities had been found to be in violation of applicable laws and regulations." MTD at 15. Moreover, these violations did not just occur at "some facilities"; they were chronic and pervasive throughout the ***majority*** of Acadia's acute inpatient facilities.[8] *See* ¶¶185-186. These violations indisputably conflict with what reasonable investors expected based on Defendants' "substantial compliance" statements – rendering those statements actionable.[9] *See BioScrip*, 95 F. Supp. 3d at 726-29 (statement that "'the Company believes it is in substantial compliance with all laws, rules and regulations that affects its business and operations,'" was actionable); *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 Civ. 2106(ER), 2017 WL 1169629, at *10-*11 (S.D.N.Y. Mar. 28, 2017) (same).

Next, Defendants argue that the widespread regulatory violations were not material "to Acadia as a whole." MTD at 16. Materiality, however, is a fact-based inquiry rarely appropriate for resolution at the pleading stage. *City of Monroe*, 399 F.3d at 681. Nor is materiality dependent on a showing of a negative effect on revenue, as Defendants erroneously suggest. *See Matrixx Initiatives*

---

[8]    The Company's acute inpatient hospitals accounted for 40%-43% of Acadia's U.S. revenue throughout the Class Period.  ¶186 n.7.

[9]    The "regulatory compliance" statements appeared in SEC filings, and "[i]nvestors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life." *Omnicare*, 135 S. Ct. at 1330.

*v. Siracusano*, 563 U.S. 27, 44 (2011) (rejecting bright-line rule for materiality, which requires a "contextual inquiry"). Rather, an omitted fact is material if "'there is a substantial likelihood that a reasonable [investor] would consider it important.'" *Omnicare*, 135 S. Ct. at 1333. Defendants cannot establish that the widespread legal violations alleged were "'so obviously unimportant'" to a reasonable investor – as they must to prevail on materiality at this stage. *City of Monroe*, 399 F.3d at 681.

### 3. Defendants' Statements Regarding the Financial Performance of Acadia's U.K. Facilities Were Materially Misleading

Beginning in February 2017, Defendants misrepresented the then-current financial state and expected performance of Acadia's newly acquired U.K. Facilities. ¶¶159-177. On February 23, 2017, Defendants issued financial guidance for FY17, ¶159, stating that the ***4.2%*** U.K. organic growth rate seen in the previous quarter was unduly low due to "disruption throughout the fourth quarter resulting from the focus, time and effort required to complete the divestiture in late November and to begin the integration of Priory's operations into Acadia." ¶101; *see also* ¶¶91-93. Defendants stated that "people should expect the UK to improve rateably each quarter throughout 2017" and that the Company would overcome the weakened patient census and increased labor costs. ¶¶163-164. At a March 2017 investor conference shortly thereafter, Defendants again stated that the expectation for U.K. organic growth "should be centered around ***5%***." ¶165.

On April 25, 2017, however, Acadia reported a 1Q17 U.K. organic growth rate of only ***2.6%***. ¶103. Nevertheless, Defendants reaffirmed their previously announced FY17 financial guidance, assuring investors that they were still "comfortable with [their] total year guidance" and "that over the course of the year . . . we should see the growth pickup in the U.K." ¶171.[10] The following month, at

---

[10] While Defendants would ultimately blame their missed earnings on increased staffing costs for nurses in the U.K., *see* ¶180, in April 2017 Defendants expressly disclaimed that any of the weaker

a May 2017 investor conference, Defendants again stated they were seeing "incremental progress in terms of [their] expectations" in the U.K. ¶172.

On July 27, 2017, Defendants reported a U.K. 2Q17 organic growth rate of *4.0%*, ¶105 – still below the 5% benchmark set by management and 4.2% 4Q16 rate that management vowed to beat. While Defendants narrowed their financial guidance for FY17, they denied that there was "anything to read into" the revision other than a "tighten[ing] . . . up" of the initial guidance and stated that they remained confident that Acadia was "going to get incremental improvements through the U.K. over the balance of the year." ¶¶173-176.

These assurances were false. In October 2017, Acadia reported it had missed its 3Q17 earnings targets, with a U.K. organic growth of only *3.8%*, and reduced its FY17 guidance for the remainder of the year. ¶¶8, 108, 180-181. Defendants do not dispute the objective falsity of these financial statements and projections – nor could they. Instead, they contend that all of the statements related to the Company's U.K. Facilities are shielded by the PSLRA's statutory safe harbor for forward-looking statements. *See* MTD at 6-11; MTD, Ex. 4.[11]

First, many of the "U.K. Facilities" statements are statements of present and historical fact. *See, e.g.*, ¶163 (claiming that the difficulties from the Priory divestiture transaction are "[n]ow behind us" (historical) and that "now we are, the UK is focused, integrating and getting back on track" (present)); ¶164 (blaming increased labor costs on "distraction" caused by integrating the newly acquired U.K. Facilities (present)); ¶171 (claiming it was "[n]ot so much the nurses" that affected 1Q17 performance (historical)). Such statements are not subject to safe-harbor protection. *See*

---

U.K. growth was attributable to nursing labor, ¶171, despite the fact that Defendants had admittedly been "focused on nurses" in the U.K. for the past year. ¶166.

[11]   In addition to the "U.K. Facilities" statements, Defendants identify a single set of "quality care" statements from the Company's April 8, 2016 and April 13, 2017 Proxy Statements, ¶121, that they also claim are forward looking and subject to the PSLRA's safe harbor. *See* MTD at 8; MTD, Ex. 4. But those statements are admittedly about "the Company's business strategy," ¶121 – *i.e.*, statements of present and historical facts that are not subject to the safe harbor.

*Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018).

Similarly, Defendants' assurances throughout 2017 that the Company was on track to meet its FY17 financial guidance, ¶¶168, 170-171, 173-175, were not forward looking but, rather, conveyed information about then-existing conditions. *See IBEW Local 98 Pension Fund v. Best Buy Co.*, 958 F. Supp. 2d 1065, 1076 (D. Minn. 2013) ("[S]tatements claiming that [defendant] was 'on track to meet or exceed our annual guidance' and that 'earnings are essentially in line with our original expectations for the year' are not forward-looking and are, therefore, actionable as a statement of present condition."); *In re MGM Mirage Sec. Litig.*, No. 2:09-cv-01558-GMN-VCF, 2013 WL 5435832, at *7 (D. Nev. Sept. 26, 2013) (statements that project was "on track" not protected by the safe harbor).

Lastly, even for financial guidance statements that qualify as "forward looking," the safe harbor applies only if those statements are accompanied by "'meaningful cautionary statements'" that "'convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements.'" *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 911-12 (M.D. Tenn. 2019). Here, Defendants' purported cautionary language was not "meaningful." Rather, the risk factors merely address in general terms "competition for staffing," "[f]luctuations in . . . operating results," and "structural shifts in the [U.K.]." *See* MTD at 9-10. Nor is any of the cautionary language in Acadia's press releases, *see* MTD at 10-11, tethered to the factors that ultimately caused the revenue miss and lowered guidance – *i.e.*, weakened patient admissions and increased agency labor costs. *See* ¶180.

Such generalized and non-specific warnings are insufficient to invoke safe-harbor (or bespeaks-caution) protection, where the important facts giving rise to the risks have not been disclosed. *See, e.g.*, *Helwig*, 251 F.3d at 559-60 ("blanket statements" that "offered investors no guidance about the consequences of health care reform upon the company's business . . . were not meaningful and were hardly even cautionary"). Moreover, risk disclosures are "meaningless" where,

- 14 -

as here, they "portend[] the future, but d[o] not alert investors about the conditions that then exist[]." *Winslow*, 2011 WL 7090820, at *16. Because Defendants' "risk disclosures" were either not meaningful or warned of general risks that had already materialized, the safe harbor does not apply.[12]

### C. Plaintiffs Plead a Strong Inference of Scienter

Scienter may be alleged two ways: "'[1] knowing and deliberate intent to manipulate, deceive, or defraud, and [2] recklessness.'" *Frank v. Dana Corp.*, 646 F.3d 954, 958-59 (6th Cir. 2011). Recklessness is "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.'" *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 549-50 (6th Cir. 1999).

When analyzing allegations of scienter, courts consider the totality of circumstances, *Tellabs*, 551 U.S. at 321-22; treating each allegation separately "risks losing the forest for the trees." *Frank*, 646 F.3d at 961. A complaint will survive "if a reasonable person would deem the inference of scienter cogent and **at least as** compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Where two equally compelling inferences can be drawn, a motion to dismiss must be denied. *Id*.

#### 1. Defendants' Intimate Involvement in the Fraud Establishes Their Contemporaneous Knowledge of Acadia's Widespread Quality of Care Problems

Defendants' own statements detailing their intimate monitoring of quality control metrics, together with the number and nature of patient incidents, establishes that Defendants had direct, personal knowledge of, or were reckless in not knowing about, the perpetual understaffing at Acadia's facilities, the resulting state of mayhem and harm to patients, and other conditions that were concealed from investors. ¶¶50-85; *see Kyrstek v. Ruby Tuesday, Inc.*, No. 3:14-cv-01119, 2016 WL

---

[12] At best, Defendants' safe-harbor arguments raise issues of fact that cannot be determined at this stage. *See In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 690 (M.D. Tenn. 2000) (whether forward-looking statements were accompanied by "sufficiently meaningful" cautionary language under the bespeaks-caution doctrine "presents questions of fact that are inappropriate for determination on this Motion to Dismiss").

1274447, at \*9 (M.D. Tenn. Mar. 31, 2016) (finding scienter sufficiently pled where "[d]efendants' pre-class statements allegedly confirm that the Company was monitoring Lime Fresh's performance").

Jacobs stated that he regularly reviewed the Company's census and that he and the Company have "a pretty good handle on how the census is trending on a daily basis." ¶¶211-212. Jacobs even represented that Defendants "*look at the census every day*." ¶213. Further, Turner assured investors that the Company scrutinized patient trends and open beds to determine the correct staffing levels: "So again, we look at the history, we look at the trends going forward . . . everybody in the Company knows when these next 20 beds are coming on in a certain market, so it's not a surprise when those beds come online that we are expecting to have more labor needs there." ¶214. Defendants' "tout[ing]" of their "careful monitoring of the very areas in which [they] committed" the fraud provides strong evidence that Defendants knew or were reckless in not knowing that their statements were misleading. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004).

The overwhelming nature and number of patient assaults and deaths across Acadia's facilities further demonstrates that Plaintiffs have pled a compelling and cogent inference of scienter. *See* ¶¶61-84. The sheer magnitude of the patient care issues infecting virtually all of Acadia's acute inpatient facilities, in combination with Defendants' close monitoring of the very metrics that revealed those issues and Defendants' similar misconduct at their previous company, PSI, adds to the inference of scienter. *See, e.g.*, *In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at \*10 (N.D. Ill. Nov. 4, 1998) ("'Other circumstances suggesting fraudulent intent' can include the presence of 'red flags' or warning signs that the financial reports are fraudulent, as well as the magnitude of the fraud alleged."); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 578 (S.D.N.Y. 2012) ("[F]ailing to detect a fraud of large magnitude provides some circumstantial evidence of scienter, just as failing to detect a large boulder in front of your face qualifies as

circumstantial evidence of blindness."); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) ("[T]he magnitude of the alleged fraud provides some additional circumstantial evidence of scienter.").  Defendants' opposing inference – that they had no idea about pervasive care issues – is implausible.

### 2. The Fraud Concerned Acadia's Core Operations

Defendants' "access to information central to the Company's business operations creates a strong inference of scienter because Plaintiffs allege that Defendants made false statements about significant portions of the Company's operations."  *Willis v. Big Lots, Inc.*, No. 2:12-cv-604, 2016 WL 8199124, at *32 (S.D. Ohio Jan. 21, 2016).  It is implausible that Defendants were unaware of the systemic quality of care and staffing issues that, by their own admission, were critical to both Acadia's U.K. and U.S. businesses, and that they monitored daily.  ¶¶6-7, 136, 210-218.  Acadia "cannot, in one breath, claim that it placed a high priority on [patient] safety and then, in the next breath, plausibly suggest that perhaps its most important decision makers were simply unaware of the mountain of evidence made available to them on that very topic."  *CCA*, 2017 WL 6442145, at *21.  Indeed, by the start of 2017, Acadia maintained more than half of its inpatient behavioral healthcare facilities and beds in the U.K.  ¶93.  The significance of the Company's U.K. Facilities also supports the inference that Defendants closely monitored its U.K. Facilities.  *CCA*, 2017 WL 6442145, at *21 (finding that the BOP, which provided between 11% and 13% of the company's annual revenue, to be "central" to CoreCivic's operations).

### 3. Suspicious Insider Trading Further Demonstrates a Strong Inference of Scienter

The existence of "insider trading at a suspicious time *or* in an unusual amount" adds to the inference of scienter.  *Helwig*, 251 F.3d at 552.  Here, the Complaint pleads both.  The Individual Defendants and Acadia insider Reeve Waud (collectively, the "Selling Insiders"), engaged in outsized

stock sales at suspicious times, which permitted them to pocket more than ***$600 million*** while the stock price was near its Class Period high as a result of the alleged misrepresentations and omissions.

Jacobs sold 797,967 Acadia shares, or ***60.17%*** of his total holdings, for proceeds exceeding ***$45 million*** during the Class Period. ¶196. Prior to the Class Period, however, Jacobs sold only 323,893 shares, or 23.24% of his total holdings, for proceeds of approximately $7.2 million. *Id.*[13] In other words, Jacobs pocketed insider proceeds of more than ***six times*** the proceeds he received prior to the Class Period. *Id.* Moreover, Jacobs' insider trades were suspicious in timing, including a large sale – $7.4 million – on August 14, 2015, when Acadia's stock price traded near its Class Period high as a result of the alleged fraud. ¶197. Jacobs' other Class Period insider trades, including his largest sale – a $25.3 million sale on August 22, 2017 – occurred shortly before the first alleged corrective disclosure, which caused Acadia's stock price to decline precipitously. *Id.*

Turner sold 294,545 Acadia shares, or ***73.32%*** of his total holdings, for proceeds of nearly ***$16 million*** during the Class Period. ¶199. Prior to the Class Period, however, Turner sold only 99,833 shares, or 26.59% of his holdings, for proceeds of $2.36 million. *Id.* Thus, Turner pocketed insider proceeds of almost ***seven times*** the proceeds he received prior to the Class Period. *Id.* Like Jacobs, Turner suspiciously sold a substantial portion of his shares in August 2015, when Acadia's stock price was near its Class Period high due to inflation caused by the alleged fraud. ¶200. Also like Jacobs, Turner effected his largest Class Period sale – $10.5 million – on August 22, 2017, just weeks before Acadia's first partial disclosure. *Id.*

Duckworth sold 64,203 Acadia shares, or ***59.89%*** of his total holdings, for proceeds exceeding ***$4.4 million*** during the Class Period. ¶202. Prior to the Class Period, however, Duckworth sold just 11,540 shares, or 25.46% of his total holdings, for proceeds of approximately

---

[13] Because Acadia shares did not begin trading until November 1, 2011, the pre-Class Period comparison time frame is the 30-month period between November 1, 2011 and the beginning of the Class Period – April 29, 2014. ¶196 n.8.

$478,000.  *Id.*  That is, Duckworth pocketed insider proceeds of more than ***nine times*** the proceeds he received prior to the Class Period.  *Id.*  Moreover, Duckworth made his largest Class Period trade – $2.6 million, or 60% of his Class Period sales – in August 2015, at the same time Jacobs and Turner executed large trades to take advantage of the near-Class Period high stock price.  ¶203.

Reeve Waud, the Founder and Managing Partner of Waud Capital Partners (collectively, "Waud"), sold 10,438,846 Acadia shares, or ***92.9%*** of his total holdings, for proceeds of approximately ***$560 million*** during the Class Period.  ¶207.  Prior to the Class Period, however, Waud sold only 3,262,873 shares, or 18.3% of his total holdings, for proceeds of approximately $70 million. *Id.*  Waud pocketed insider proceeds ***eight times*** larger than the proceeds he received prior to the Class Period.  *Id.*  Waud's insider trades were also suspicious in timing.  Indeed, Waud's largest Class Period sale – more than $193 million – occurred on August 14, 2015 when the stock traded near its Class Period high.  ¶208.[14]

***All*** of the Selling Insiders sold substantially more stock during the Class Period than before, and ***all*** of those sales were suspiciously timed.  In an effort to mute the stark differences between the pre-Class Period and Class Period sales, Defendants present their Class Period sales in manufactured "two-year tranches," MTD at 18-19, because the pre-Class Period comparison duration is 30 months (November 1, 2011, when Acadia shares began trading, to April 29, 2014, the first day of the Class

---

[14]  Defendants argue that because Waud is not a defendant, his sales are irrelevant.  *See* MTD at 20 n.13.  Waud founded Acadia, served on Acadia's Board since 2005 and currently serves as Acadia's Chairman.  ¶205.  As a member of its Board, Waud was privy throughout the Class Period to confidential, proprietary and inside information concerning Acadia, its finances, operations, financial condition, and present and future business prospects.  ¶206.  As a result, Waud's insider sales are relevant to scienter.  *See Weiner*, 365 F. Supp. 3d at 906-07 (finding insider sales by a non-defendant insider and two named defendants indicative of scienter).  Defendants' only case supporting their argument that non-defendant sales are irrelevant – *Campbell v. Lexmark Int'l Inc.*, 234 F. Supp. 2d 680, 685 (E.D. Ky. 2002), was considered by Judge Crenshaw in *Weiner*, who rejected the argument.  *See Weiner v. Tivity Health, Inc.*, No. 3:17-cv-01469, 2018 WL 3969388, Memorandum of Law in Support of Defendants' Motion to Dismiss First Amended Complaint (M.D. Tenn. Aug. 3, 2018) (ECF No. 39) (citing *Campbell*).

Period), whereas the Class Period is 54 months (April 29, 2014 to November 15, 2018).  As an initial

matter, Plaintiffs compared Defendants' Class Period sales against all available sales that pre-dated

the Class Period.  More importantly, even Defendants' "tranches" do not help them.  Indeed, ***all*** of the

Selling Insiders sold significantly more stock on a monthly average basis during the 54-month Class

Period than in the 30-month pre-Class Period, as demonstrated below:

| Defendant | Pre-Class Period Ratio | Class Period Ratio | % Increase During Class Period |
|---|---|---|---|
| Jacobs | 323,893 shares/30 months = 10,796.4 shares/month | 797,967 shares/54 months = 14,777.2 shares/month | 37% |
| Turner | 99,833 shares/30 months = 3,327.8 shares/month | 294,545 shares/54 months = 5,454.5 shares/month | 64% |
| Duckworth | 11,540/30 months = 384.7 shares/months | 64,203 shares/54 months = 1,189 shares/month | 309% |
| Waud | 3,262,873/30 months = 108,762.4 shares/month | 10,438,846 shares/54 months = 193,312 shares/month | 78% |

Defendants' cases are inapposite.  In *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 185

(4th Cir. 2007), unlike here, the defendants sold the majority of their shares when the stock price was

near its class period low.  And the plaintiffs there did not provide defendants' pre-class period stock

sales to "permit comparison with their trades within the class period."  *Id.*  Plaintiffs in *In re Dell Inc.

Sec. Litig.*, 591 F. Supp. 2d 877, 897 (W.D. Tex. 2008), similarly failed to provide "any context" to

the sales; as a result, it was not "clear if [the] magnitude of trading [was] out of the ordinary."  *Id*.

Moreover, many of the stock sales in *Dell* "occurred at a price substantially lower than the 'peak.'"

*Id.*  Finally, Defendants cite *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353 (5th Cir.

2004), to argue that sales that occur in connection with a stock offering cannot be suspicious.  MTD

at 19.  That is not what *Southland* holds.  Rather, the court found the trading allegations did not

evidence scienter because plaintiffs did not allege "that the sales were suspicious in timing or

amount"; not all defendants were alleged to have sold; the defendants who did sell sold relatively

small percentages of their total holdings; the prices at which defendants sold were relatively low; and

the stock price continued to increase after the alleged sales, suggesting that the sales were "not unusually prescient." 365 F.3d at 368-69. *None* of these facts are present here. Similarly, although certain of the insider trades in *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004), occurred in connection with a public offering, the court found the sales were not suspicious because the sales did not occur shortly before the corrective disclosure and occurred when the stock was trading at "well below the peak price of the stock." *Id.* at 1374.

### 4. Acadia's Compensation System Incentivized Personal Gain over Patient Care

Defendants' bonuses were tied to Acadia's adjusted EPS, adjusted EBITDA and revenue, but were not tied to any metric that measured quality of care. ¶222. Facility executives were compensated mainly through bonuses, which were dependent on the facility meeting the budget set by the Company. ¶221. As a result, facility CEOs were incentivized to cut costs, including firing staff, in order to make budget. *Id.* Additionally, Acadia maintained a compensation system whereby Treatment Placement Specialists' ("TPS") commissions were dependent on the facility in which they chose to place a patient. ¶¶4, 220. TPS representatives were thus incentivized to, and did, place patients in facilities that resulted in higher commissions, rather than referring patients to the most appropriate facility for their needs. *Id.* From the top down, Defendants created compensation structures that focused solely on personal gain, not patient care. ¶¶4, 48-49, 64, 71, 219-222. In combination with Defendants' illicit insider trading, their incentive compensation structure contributed to massive "personal financial gain" that "weigh[s] heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325.

In response, Defendants resort to attacking Plaintiffs' use of confidential witnesses. But in the Sixth Circuit, such testimony is common, *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 960-63 (S.D. Ohio 2009) (accepting the unnamed confidential witnesses' statements "in full

- 21 -

and without discount"), and "'there is no requirement that [CWs] be named.'" *Id.* at 960. A complaint need only provide "descriptions of each of those individuals' jobs to ascertain whether any would have been in a position to have gained first hand knowledge of the facts attributed to him or her." *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 993 (S.D. Ohio 2008). The allegations here meet this standard. ¶¶219-222.

### 5. The Suspicious Terminations of Jacobs and Turner Further Buttress a Finding of Scienter

The ouster of Jacobs and Turner lends further support to an already strong inference of scienter. Jacobs was ousted by Acadia's Board on a *Sunday* without any advance notice. ¶223. Just a few months later, Turner was forced from his position as President, and his departure was not disclosed to investors for almost a week. ¶¶223, 225. Both terminations occurred just a few months after the publication of the *Seeking Alpha* article. ¶¶185, 190, 223, 225. The abrupt terminations of two of Acadia's key founding executives serves as further indicia of scienter. *Big Lots*, 2016 WL 8199124, at *34 (finding resignation of an executive on the same day the company announced it had not met earnings was evidence of scienter).[15]

Defendants attempt to downplay these suspicious terminations as "innocuous executive changes." MTD at 23. But Defendants' implausible competing explanations ignore that Jacobs and Turner were seasoned veterans of the behavioral healthcare industry, having previously run PSI, a company engaged in the same misconduct – cutting staff to the bone, resulting in shocking incidents of patient harm and death. ¶¶34-36, 60-85, 94-98. The more plausible inference is that Turner and Jacobs were terminated because of their involvement in the quality of care, staffing, and regulatory issues that rendered the Class Period statements materially false and misleading. *See In re Am. Serv.*

---

[15] Contrary to Defendants' citation to Third and Ninth Circuit cases, courts in the Sixth Circuit often turn to suspicious resignations to support a finding of scienter. *See, e.g.*, *Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*, 964 F. Supp. 2d 875, 889 (N.D. Ohio 2013); *Albert Fadem Tr. v. Am. Elec. Power Co., Inc.*, 334 F. Supp. 2d 985, 1014 (S.D. Ohio 2004).

4842-4551-1325.v1

*Grp., Inc.*, No. 3:06-0323, 2009 WL 1348163, at *58 (M.D. Tenn. Mar. 31, 2009) (finding, *inter alia*, that the firing of executives constitutes evidence of scienter, as "'[s]uch house-cleaning and reforms do not follow innocent mistakes'").

### 6.    Defendants Personally Lobbied Against a Proposal that Would Have Provided Greater Transparency

Acadia's Board, which included Jacobs, lobbied shareholders to reject a proposal requiring the preparation of a sustainability report that would have included greater transparency into patient and worker safety – the precise subject of the alleged fraud. ¶¶227-229. Defendants assert that the recommendation against the report was a matter of opinion and that no inference of scienter can be drawn because self-selected highlights of a separate patient survey were eventually reported on Acadia's website. MTD at 23-25. These arguments miss the point. The point is that during the Class Period, while understaffing and patient harm was rampant, Defendants took active steps to suppress and petitioned shareholders to reject completion of a report that would have investigated these very issues. ¶¶227-229. Under these circumstances, "[t]he inference of intent is further supported by the allegations that [Defendants] affirmatively attempted to obstruct the investigation and that [they] participated in the effort" to lobby against the sustainability report. *Katz*, 542 F. Supp. 2d at 274. This allegation in conjunction with Defendants' knowledge of the fraud and massive stock sales further supports a finding of scienter.

### 7.    Defendants Instituted a Policy Preventing Facilities from Reporting Adverse Patient Incidents to Authorities

Further evidencing Defendants' scienter, Defendants instituted and maintained corporate policies and practices designed to conceal the true conditions at Acadia facilities from investors and the public. Indeed, as corroborated by former employees, Acadia maintained policies that prohibited facilities from immediately calling the police and demanded "in-house" investigations of adverse patient incidents prior to notifying the authorities. *See* ¶¶48, 64. These policies were designed to

conceal and minimize the investigation and reporting of adverse patient events, and were borrowed directly from Jacobs' and Turner's playbook at PSI. *See Psychiatric Sols.*, 2011 WL 1335803, at *9 (detailing instance where "a hospital employee refused to turn a video of the [patient] incident over [to] the police, telling officers she needed permission of PSI's risk management specialist before she could do so"); *see also Garden City Emps.' Ret. Sys. v. Psychiatric Sols.*, No. 3:09-cv-00882 (M.D. Tenn. May 17, 2004) (ECF No. 289-1, Ex. 15) (PSI "Internal Communications Policy" requiring facilities to "immediately" notify Jacobs and other corporate executives – not the proper authorities – upon learning of an adverse patient incident or regulatory agency visit). And to further conceal evidence of their knowledge and misconduct, Defendants instituted a document destruction policy that automatically deleted Acadia employee e-mails after only 30 days. ¶49.

### 8. A Holistic View of Plaintiffs' Allegations Supports a Strong Inference of Scienter that Is at Least as Compelling as Any Opposing Inference

The Complaint provides numerous detailed allegations that cumulatively support a strong inference of scienter, including allegations describing: (i) Defendants' contemporaneous knowledge of the fraud contradicting their Class Period statements; (ii) Defendants' intimate monitoring of quality control metrics; (iii) the pervasive nature of patient abuse and death at Acadia facilities; (iv) the millions of dollars Defendants earned as a result of massive and suspicious stock sales and other incentive compensation; (v) the abrupt and suspicious departure of two of Acadia's senior executives; and (vi) the active concealment of patient harm. ¶¶2-11, 194-226. When considering these allegations holistically, the inference of scienter is sufficiently strong and at least as compelling as any opposing inference. *Frank*, 646 F.3d at 961; *Tellabs*, 551 U.S. at 322-23.

### D. Plaintiffs Adequately Allege Liability Under §20(a)

Defendants seek dismissal of Plaintiffs' §20(a) claims solely on the purported failure to allege a primary violation of the securities laws. *See* MTD at 25. Because Plaintiffs have alleged primary

- 24 -

violations under §10(b), Plaintiffs' control person claims should be sustained.  *See, e.g.*, *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 945 (M.D. Tenn. 1999).

## IV.   THE COURT SHOULD STRIKE DEFENDANTS' REFERENCE TO EXTRANEOUS INFORMATION

The extraneous material cited in Defendants' Motion, MTD at 1, 19, 24, is not subject to judicial notice and not "integral to statements within the complaint."  *In re Cardinal Health Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 712 (S.D. Ohio 2006); *see also Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88-89 (6th Cir. 1997).  Thus, the Court should strike these extraneous documents.  Fed. R. Civ. P. 12(f)(1).  But even if the Court finds judicial notice appropriate, "[i]t would be improper for the Court to rely upon these documents to determine disputed factual issues," *In re UnumProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 875-76 (E.D. Tenn. 2005), and it would be equally inappropriate to use any of the documents for the truth of any statements contained therein – despite Defendants' repeated attempts to do so.  *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 592 (N.D. Ohio 2004).

## V.   CONCLUSION

Defendants' Motion to Dismiss should be denied in its entirety.[16]

DATED:  July 30, 2019

Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP
JERRY E. MARTIN, #20193
CHRISTOPHER M. WOOD, #032977


s/ CHRISTOPHER M. WOOD
CHRISTOPHER M. WOOD

---

[16]   If the Complaint is found lacking in any respect, Plaintiffs respectfully request the opportunity to move for leave to amend.  *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002).

4842-4551-1325.v1

414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
jmartin@rgrdlaw.com
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS
DARRYL J. ALVARADO
J. MARCO JANOSKI GRAY
TING H. LIU
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dalvarado@rgrdlaw.com
jgray@rgrdlaw.com
tliu@rgrdlaw.com

Lead Counsel for Plaintiffs

4842-4551-1325.v1

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on July 30, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ CHRISTOPHER M. WOOD
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)
E-mail: cwood@rgrdlaw.com

# Mailing Information for a Case 3:18-cv-00988 St. Clair County Employees' Retirement System v. Acadia Healthcare Company, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **AMALGAMATED BANK, TRUSTEE**
  PKNASHLAW@AOL.COM

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com

- **BOSTON RETIREMENT SYSTEM**
  PKNASHLAW@AOL.COM

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Lisa R. Bugni**
  lbugni@kslaw.com

- **Thomas H. Burt**
  burt@whafh.com

- **Regina M. Calcaterra**
  calcaterra@whafh.com

- **Jessica Perry Corley**
  jpcorley@kslaw.com

- **Patrick Donovan**
  donovan@whafh.com

- **Matthew M. Guiney**
  guiney@whafh.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,eseaborn@barrettjohnston.com,nchanin@barrettjohnston.com,jmartin@rgrdlaw.com,ggilbert@barrettjohnston.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,dgibby@rwjplc.com

- **Thomas C. Michaud**
  tmichaud@vmtlaw.com

- **Danielle S. Myers**
  danim@rgrdlaw.com

- **PLYMOUTH COUNTY RETIREMENT ASSOC**
  PKNASHLAW@AOL.COM

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **David C. Walton**
  davew@csgrr.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,9101599420@filings.docketbird.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com,ehyatt@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)