UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,           Plaintiff,<br><br>vs.<br><br>ACADIA HEALTHCARE COMPANY, INC., et al.,<br><br>          Defendants. | Civil Action No. 3:18-cv-00988<br><br><u>CLASS ACTION</u><br><br>District Judge William L. Campbell, Jr.<br>Magistrate Judge Alistair E. Newbern |

**JOINT DISCOVERY DISPUTE STATEMENT**

**TABLE OF CONTENTS**

**Page**

I.  PLAINTIFFS' STATEMENT OF THE DISPUTE ............................................................1

    A.  Defendants Should Provide Hit Reports to Assess Potential Facility-Level Custodians' Possession of Class Period Documents ................................................2

    B.  Defendants Should Collect and Produce Documents from Several Discrete Sources at Priory Group in the United Kingdom......................................................5

    C.  Defendants Should Produce All Documents Housed in RiskQual for Levels 1 and 2 Patient Incidents, and Should Produce a RiskQual Report of All Levels 3 and 4 Patient Incidents ...................................................................9

II.  DEFENDANTS' STATEMENT OF THE DISPUTE ........................................................11

    A.  Plaintiffs' Requested Facility-Level Custodian Search Hit Report Is Unnecessary And Disproportionate To The Needs Of The Case. .........................13

    B.  Plaintiffs' Request For Five New Priory Custodians Is Unreasonable.................16

    C.  Plaintiffs' Request for RiskQual/HAS Documents Should Be Denied. ...............19

4864-3978-1895.v1

Pursuant to Section VII of the Case Management Order (ECF No. 66) and Local Rule 37.01(b), Plaintiffs[1] and Defendants[2] submit this Joint Discovery Dispute Statement ("Statement") regarding Plaintiffs' request to compel the production of: (a) hit reports for potential division-level and facility-level custodians; (b) documents from select sources at the Priory Group ("Priory"); and (c) documents and incident reports from Acadia's centralized RiskQual system. The parties certify that counsel for all parties conducted several telephonic meetings and a videoconference meeting regarding the subjects of this Statement, and made a good faith effort to resolve each discovery dispute presented herein.

## I.     PLAINTIFFS' STATEMENT OF THE DISPUTE

Plaintiffs respectfully request that the Court order Defendants to produce three categories of documents that have been in dispute for months. *First*, in order for Plaintiffs to knowledgeably identify relevant and proportional custodians for documents generated at certain Acadia facilities, Defendants should be required to provide Plaintiffs with hit reports for 52 potential facility-level custodians that identify the volume of responsive documents throughout each month of the Class Period. *Second*, Defendants should be required to collect and produce documents from several discrete custodial and non-custodial sources at Priory – *i.e.*, the U.K.-based behavioral health company that Acadia acquired in 2016, but later sold in December 2020 while the motion to dismiss was pending in this action. *Finally*, Defendants should be required to produce documents related to patient incidents from Acadia's RiskQual incident reporting system. For all of the reasons set forth below, the Court should order Defendants to produce these hit reports and documents to Plaintiffs promptly or, alternatively, permit Plaintiffs to file a Rule 37 motion to compel on these issues.

---

[1]   "Plaintiffs" are Chicago & Vicinity Laborers' District Council Pension Fund and New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund.

[2]   "Defendants" are Acadia Healthcare Company, Inc. ("Acadia" or the "Company"), Joey A. Jacobs ("Jacobs"), Brent Turner, and David Duckworth.

4864-3978-1895.v1

**A.    Defendants Should Provide Hit Reports to Assess Potential Facility-Level Custodians' Possession of Class Period Documents**

The Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 39) (the "Complaint") specifically alleges that Defendants engaged in a scheme to mislead the market that, *inter alia*: (1) Acadia "*facilities* provided high-quality care"; (2) "Acadia adequately staffed its *facilities*"; and (3) "Acadia's *facilities* were in compliance with relevant regulatory requirements." Complaint, ¶3.[3]   The Complaint also alleges that the true state of affairs at Acadia was revealed to the market in October and November 2018, when Aurelius Value and *Seeking Alpha* published materials detailing widespread understaffing and adverse patient events at "*dozens of Acadia facilities*." *Id.*, ¶¶9-11.  The Court upheld all of these facility-related allegations.  *See* ECF No. 54 at 10 (finding the alleged statements were misleading "because Acadia did not provide high quality care services and achieved growth by *inadequately staffing facilities* and slashing costs, which led to *widespread violence, sexual assault, and counter-therapeutic policies and practices in its facilities*."); *see also id.* at 13 ("[T]he Court finds that a reasonable juror could conclude that Defendants' statements regarding staffing levels and the quality of care at Acadia *facilities* were material misrepresentations.").  For this reason, Plaintiffs' first set of document requests, dated February 25, 2021, contained a number of requests (*i.e.*, Request Nos. 2, 4-6, 8-11, 14-15, 28-31, 35, 42-43 and 48-50) that target, *inter alia*, facility-level documents, reports, and metrics that are housed in Acadia's individual facilities.

Defendants, however, have resisted conducting facility-level searches at every turn of the parties' negotiations.  Defendants initially stated in their March 2021 responses and objections that they would only produce documents from "Acadia corporate headquarters" and that they would

---

[3]    All emphasis is added and internal citations are omitted unless otherwise noted.  Additionally, all stand-alone ¶ and ¶¶ references hereafter are to the Complaint.

"confer with Lead Plaintiffs in good faith on the scope of any further collection from one or more Acadia Facilities in the event that such collection proves necessary." After months of correspondence, Defendants agreed in June 2021 to produce several discrete categories of documents *concerning* specific facilities from centralized sources at Acadia's corporate headquarters[4] – but otherwise refused to conduct a search of any of the individual Acadia facilities (or facility-level custodians).

In an effort to reach a compromise on this issue, in July 2021 Plaintiffs proposed that Defendants conduct a search of custodial and non-custodial sources at five specific facilities referenced in the Complaint – *i.e.*, Harbor Oaks Hospital, Longleaf Hospital, Cedar Crest Hospital and Residential Treatment Center, Timberline Knolls, and Park Royal Hospital.[5] All five of these facilities are cited in the Complaint for adverse patient incidents and understaffing issues that are directly relevant to Plaintiffs' claims. *See, e.g.*, ¶¶51, 55, 58-59, 63-64, 66-67, 74, 78, 84.[6] After

---

[4] Specifically, with respect to 74 facilities listed on Aurelius Value's October 2018 website, Defendants agreed to produce the following documents from Acadia corporate: (i) monthly financial statements; (ii) level 1 and level 2 patient incident reports from the RiskQual reporting system; and (iii) CMS reports and facility surveys.

[5] This was a compromise offer from Plaintiffs' initial proposal that Defendants search all 74 facilities listed on Aurelius Value website for responsive documents.

[6] Defendants "incorrectly state that in order to successfully compel discovery, Plaintiffs must . . . 'point[] . . . to any substantive deficiencies in Defendants' productions,'" when "[i]nstead, the movant's burden is to establish that the discovery sought is relevant to any Party's claim or defense." *See In re Envision Healthcare Corp. Secs. Litig.*, No. 3:17-cv-01112, 2020 U.S. Dist. LEXIS 213302, *14 (M.D. Tenn. Nov. 16, 2020). Defendants also erroneously "argue that none of these [facility-level employees] 'are alleged to have had any role in the alleged misstatements,'" but "it is not necessary for Plaintiffs to allege those types of involvement in order to establish that they may have relevant ESI." *See id.* at *12; *see also In re Toyota Motor Corp. Sec. Litig.*, No. CV 10-922 DSF (AJWx), 2012 U.S. Dist. LEXIS 124438, at *45, *53 (C.D. Cal. Mar. 12, 2012) (holding that "the Actionable Statements do not bound the limits of relevant or potentially relevant information," and that "discovery should not be limited to the knowledge (or lack thereof) of the speakers of the . . . Actionable Statements").

4864-3978-1895.v1

several additional rounds of correspondence and meet-and-confer efforts, organizational charts for these five facilities were ultimately produced to Plaintiffs on October 1, 2021.

Despite this, Defendants maintained that they wanted to take a "phased approach and limit the collection and production of documents to a proportional number of custodians at the Timberline Knolls and Longleaf facilities and to those proportional non-custodial sources at these two facilities." But this was an empty offer. Only five individuals from the Timberline Knolls and Longleaf facilities have been placed on litigation hold that would exempt them from Acadia's 30-day email deletion policy – and none of those individuals appear on the organizational charts that Defendants produced for those facilities.

After cross-referencing the organizational charts against a list of individuals placed on litigation hold, Plaintiffs identified 87 individuals of interest to Defendants that either: (a) worked at one of the five aforementioned facilities; or (b) served as a Division President. Defendants were able to locate mailboxes for *52* of those 87 individuals – but only in connection with responding to this joint discovery dispute did they finally identify which specific individuals have available data. In order for Plaintiffs to intelligently assess which of these individuals are more likely to possess relevant documents throughout the course of the Class Period,[7] Plaintiffs requested that Defendants produce hit reports to determine the volume of documents from each of these potential custodians throughout each month of the relevant time period that hit on previously agreed-upon search terms.

Defendants have refused to produce such hit reports (absent an agreement from Plaintiffs to pay costs) – thereby placing the parties' negotiations on facility-level searches at impasse.

---

[7] Due to Acadia's 30-day email deletion policy, Plaintiffs cannot determine which of these 52 individuals are the most appropriate document custodians until we receive further information on the volume and time span of each individual's email data that hit on targeted search terms. For instance, a document custodian who was placed on litigation hold (and thus, has responsive documents) dating back to the start of the Class Period is much more valuable than an custodian who was placed on litigation hold at the very end of the Class Period.

Defendants claim, and have provided a declaration from their ESI vendor attesting, that it would cost approximately $84,000 "just to process the email data to make it available for searching not including the fees and expenses Acadia would incur to run the search terms and generate hit reports." However, using the same data size assumptions provided by Defendants (*i.e.*, 1,296.44 GB of email) one of Plaintiffs' ESI vendors provided an estimated cost of $26,500 to conduct all of the work needed to generate hit reports. *See* Ex. A, Declaration of Kristopher Taylor. Thus, the cost estimates provided by Defendants appear to be vastly inflated and, in any event, the actual cost of providing these hit reports is a necessary expense that Defendants must incur for the parties to determine the scope a reasonable facility-level search. *See Rucker v. Lindamood*, No. 1:16-cv-00090, 2018 U.S. Dist. LEXIS 51980, at *23 (M.D. Tenn. Mar. 28, 2018) (Newbern, J.) ("[P]arties generally bear the costs of their own discovery.").

Defendants should be ordered to produce hit reports for the 52 potential facility-level custodians that show the volume of custodial documents, broken out by each month of the relevant time period, that hit on the search terms agreed upon for the document custodians at Acadia corporate.

### B. Defendants Should Collect and Produce Documents from Several Discrete Sources at Priory Group in the United Kingdom

As discussed in the parties' July 16, 2021 Joint Discovery Dispute Statement (ECF No. 86), from the outset of this case the parties have been in disagreement as to the production of documents from Priory. Priory is a behavioral health company based in the United Kingdom that Acadia acquired during the Class Period, in 2016. ¶91. At that time, Priory was ***the largest*** independent provider of behavioral healthcare services in the U.K. – and following the acquisition Acadia maintained more inpatient behavioral healthcare facilities and beds in the U.K. than in the United

- 5 -

4864-3978-1895.v1

States.  ¶¶91, 93.  Thus, by the start of 2017, Acadia's overall economic performance was heavily dependent on the performance of Priory and its U.K. facilities.  ¶93.

A significant portion of this case – in fact, the only portion of the case that Defendants agree should be certified for class treatment (ECF No. 81 at 26) – involves earnings expectations and performance for Acadia's U.K. facilities (*i.e.*, Priory) through the first three fiscal quarters of 2017. *See* Complaint, §V.B.  Thus, documents housed at Priory are undoubtedly relevant to this case. Nevertheless, to date, Defendants have produced only 2,400 documents from the custodial email files of Trevor Torrington (Priory's former CEO) and David Hall (Priory's General Counsel). Notably, the custodial emails of Nigel Myers – Priory's former CFO (and thus, the individual likely to have documents most relevant to the financial performance of Priory) – have supposedly been "inadvertently" deleted.[8]

Plaintiffs repeatedly sought additional documents from Priory, only for Defendants to initially claim that they could not obtain such documents because Acadia sold Priory in December 2020 – and thus, Acadia no longer had possession, custody, or control of such documents.  *See* ECF No. 86 at 6 (Defendants arguing to the Court that "[i]f Plaintiffs want information from Priory, they can follow the Hague Convention process that exists for doing so").  In the course of these discussions, Defendants also confirmed that they did not even attempt to collect any documents from Priory in the entire 26 months from the filing of the initial complaint (October 2018) to the sale of Priory (December 2020).  That is, Defendants sold off a foreign business division directly at issue in this litigation without collecting any documents, and then took the position that they had no obligation to produce those documents.  This is wholly improper, as the PSLRA specifically required Defendants to preserve all documents during the stay of discovery "*as if they were the subject of a*

_____

[8]   These three individuals – Trevor Torrington, David Hall, and Nigel Myers – are the only individuals at Priory for whom Acadia issued a litigation hold.

4864-3978-1895.v1

*continuing request for production of documents*." 15 U.S.C. §78u–4(b)(3)(C)(i); *see also Nacco Materials Handling Grp., Inc. v. Lilly Co.*, 278 F.R.D. 395, 404 (W.D. Tenn. 2011) (sanctioning defendant and holding that defendant "breached its duty to preserve relevant evidence" where it failed to "timely and effectively collect ESI").

On July 30, 2021, the Court held a telephonic conference to discuss the parties' previous Joint Discovery Dispute Statement on this very issue. *See* ECF No. 90. At the conference, the Court stated that it would permit Plaintiffs to file a motion to compel, but strongly suggested that the parties continue to meet and confer on this issue to crystallize what particular sources at Priory should be searched. After several rounds of correspondence and meet-and-confer efforts, Defendants indicated that they were "willing to discuss the collection and production of documents from certain additional custodians and noncustodial sources at Priory that are likely to have relevant information subject to burden and proportionality concerns." Following a review of Priory organizational charts (produced to Plaintiffs on October 1, 2021) and confirmation from Defendants on available mailboxes, Plaintiffs have identified the following discrete sources of documents at Priory that should be searched:

- the custodial files of Sarah Smith (Group Financial Accountant), Matt Ward (Group Financial Accountant), David Watts (Director of Safety), Vicky Morrell (Director of Finance – Priory Healthcare), and John Dalton (Finance Director – Priory Adult Care), using proposed search terms aimed at targeting documents concerning the financial performance and quality of care/patient incidents at Priory;

- the non-custodial shared drives of Priory's Finance and Compliance departments, using proposed search terms aimed at targeting documents concerning the financial performance and quality of care/patient incidents at Priory;

- the custodial files of Tina Walton (Chief Information Officer),[9] using previously agreed-upon search terms aimed at targeting documents concerning Priory's document retention policies and the deletion of Nigel Myers' email; and

- Priory's formal document retention policies (both predating and postdating Priory's June 2018 implementation of a 60-day email deletion policy).

Documents from these sources are unquestionably relevant to the U.K.-related claims in this case. Two of the six custodians (Sarah Smith and Matt Ward) were Group Financial Accountants that worked under former CFO (and deleted email custodian) Nigel Myers in the finance department, and two others (Vicky Morrell and John Dalton) were Directors of Finance for the Priory Healthcare and Priory Adult Care divisions. These four custodians are extremely likely to possess relevant documents reflecting factors, analyses, and discussions related to Priory's financial performance. The fifth custodian (David Watts) was a Director of Safety at Priory, and the Complaint specifically alleges that in early 2017, "at the same time that the Company was becoming ever-more dependent on the performance of its U.K. facilities, those same Priory facilities were receiving ever-increasing scrutiny from U.K.-based media on their poor safety and quality of care." *See* ¶¶94-98. The sixth and final custodian (Tina Walton) is likely to possess documents concerning Priory's document deletion policies and the deletion of Nigel Myers' emails – *i.e.*, two topics for which Defendants agreed to designate a Rule 30(b)(6) witness, but for which the designee had no knowledge, was inadequately prepared for, and offered no useful testimony.[10]

In their last correspondence on this issue (dated November 23, 2021), Defendants no longer put forth the argument that Priory documents were outside their possession, custody and control – and instead argued that it would be "burdensome and disproportionate" for Acadia to "set up and

---

[9]   In their last correspondence on this issue (dated December 9, 2021), Plaintiffs inadvertently identified Priory's Chief Information Officer as Sylvia Tang, instead of Tina Walton.

[10]   Notably, documents show that Tina Walton and Trevor Torrington were involved in discussions in the Spring of 2018 to change Priory's email retention policy to automatically delete emails after 60 days – only days after Acadia was sued for misstatements concerning its U.K. performance.

conduct a minimization review in the UK to comply with the UK's data protection laws."  But Defendants' claim of burden cannot possibly be credited when they have submitted no information regarding the volume of documents at issue.[11]  Indeed, Defendants had previously represented to Plaintiffs and the Court that "[p]ursuant to Acadia's retention policy, documents from the U.K. for the relevant time period are not likely to have existed by the time this action was filed."  ECF No. 86 at 5.  If that is truly the case, then Plaintiffs' request would should impose no burden at all.

Defendants should be ordered to promptly collect, run searches, and produce responsive documents from the aforementioned sources at Priory.

**C.** **Defendants Should Produce All Documents Housed in RiskQual for Levels 1 and 2 Patient Incidents, and Should Produce a RiskQual Report of All Levels 3 and 4 Patient Incidents**

Acadia maintains an internal data management system for patient incidents and related claims called HAS, or RiskQual.  Patient incidents in RiskQual are ranked by four levels of severity: Level 1 – Tragic; Level 2 – Serious; Level 3 – Non-Serious; and Level 4 – Inconsequential.[12]  As part of the parties' negotiations, Defendants agreed to produce Level 1 and Level 2 patient incident reports from the RiskQual reporting system for the 74 facilities that were identified by Aurelius Value in October 2018.  To that end, early in discovery Defendants produced a spreadsheet that provided, *inter alia*, a brief summary of each Level 1 and Level 2 incident at these facilities. Similarly, after initially refusing to produce such documents, in September 2021 Defendants

---

[11]  Defendants' proposal to search Acadia's U.S. email system for email sent, received, copied or blind copied by the U.K. custodians would entirely omit communications between individuals at Priory and non-custodial documents.  Nor is there any indication that individuals at Acadia's U.S. operations (whose emails were subject to a 30-day email deletion policy) regularly communicated with the proposed U.K. custodians.

[12]  Level 1 "Tragic" incidents are those which are considered tragic in nature.  Level 2 "Serious" incidents are those where a major injury occurs requiring outside medical intervention.  Level 3 "Non-Serious" incidents are those where a minor injury occurs in which treatment is limited to first aid.  Level 4 "Inconsequential" incidents are those that results in no injury.

4864-3978-1895.v1

ultimately "agree[d] to produce . . . level 3 and 4 patient incident reports for the[] 74 Acadia facilities" as well.

When questioned on the spreadsheet report of Level 1 and Level 2 patient incidents, one of Acadia's Rule 30(b)(6) designees testified that: (a) the RiskQual system maintains a variety of different data elements that could be added to the report; (b) the spreadsheet report only included the field that the designee chose to include; (c) the designee would be able to provide a document showing all of the different fields that are available in RiskQual; and (d) for Level 1 and Level 2 incidents, RiskQual links an incident report and investigation report to each incident in the system.

As a result of this testimony, Plaintiffs repeatedly requested that Defendants produce "'(1) a list of all of the data element fields for HAS [(*i.e.*, RiskQual)]. . . ; and (2) all investigation documents stored or linked in HAS.'" Plaintiffs sought this information to understand whether the spreadsheet report produced by Defendants is an accurate and complete representation of information relating to each patient incident, and to ensure that all responsive Level 1 and Level 2 incident and investigation reports are ultimately produced. Defendants, in response, have stated that the spreadsheet report they produced "provided Plaintiffs with the incident information requested," and otherwise "refuse[d] to provide additional information." As evidence of tragic and serious adverse patient incidents at Acadia's facilities, the RiskQual/HAS reports (and the documents stored or linked therein) are clearly relevant to the allegations in this case. Nor is there any burden associated with providing Plaintiffs with the information necessary to understand the completeness of the spreadsheet report. Similarly, any burden associated with collecting documents stored or linked in RiskQual/HAS would be minimal, as they would be centrally housed within that system.

Separately, Defendants recently informed Plaintiffs on December 7, 2021 that they intend to renege on their prior agreement to produce Level 3 and Level 4 incident reports – claiming that it

- 10 -

would be unduly burdensome to redact each incident report for Protected Health Information ("PHI"). But documents like these are already being marked "Confidential" and are protected pursuant to the terms of the Stipulated Protective Order (ECF No. 76), and nothing in the Stipulated Protective Order *requires* Defendants to redact PHI. That is, Defendants are constructing their own burden here, and then using that burden as the basis for withholding responsive documents. At minimum, Defendants should be ordered to produce a spreadsheet report that provides a summary of all Level 3 and Level 4 incidents – like Defendants did for the Level 1 and Level 2 incidents.

Defendants should be ordered to produce: (a) a document listing all of the available data element fields in RiskQual/HAS; (b) all documents (including, but not limited to, incident reports and investigation reports) housed or linked in RiskQual/HAS for Level 1 and Level 2 incidents; and (c) a spreadsheet report summarizing all Level 3 and Level 4 incidents.

## II.    DEFENDANTS' STATEMENT OF THE DISPUTE

With barely a month remaining to reach substantial completion of document production, Plaintiffs now ask the Court to compel extensive new discovery from Defendants, including search hit reports for 52 facility-level Acadia custodians, production of documents from 5 new custodians from Priory, Acadia's former subsidiary in the UK, and production of new documents and incident reports from Acadia's RiskQual patient incident system. As explained below, Plaintiffs have failed to show any need for this discovery that would justify the great burden and expense it would entail. For this reason, Defendants respectfully submit that the Court should deny Plaintiffs' requests.

As an initial matter, to evaluate the reasonableness and proportionality of Plaintiffs' current demands, it is important to understand the significant cost Defendants have already incurred to collect and produce documents in response to Plaintiffs' Requests for Production. To date, Defendants have already reviewed, or are in the process of reviewing, approximately 470,000 documents in response to Plaintiffs' requests. This includes reviewing the email of 41 custodians

- 11 -

using Plaintiffs' proposed search terms and an expansive time frame extending for more than five years. This also includes documents Defendants have collected from **hundreds** of additional sources (a list of which has been provided to Plaintiffs), including a variety of Acadia shared drives. This review has provided (and will provide) Plaintiffs an extensive amount of information responsive to their requests that will more than cover any needed document discovery on the issues in this case. The review has also come at great expense to Acadia. As is detailed in the attached Declaration of John R. Tucker, Acadia has already incurred over $1.8 million in fees and is estimated to incur over $2.65 million in fees and expenses to collect, process, host, search, review, produce, and log documents from the 41 custodians the parties have already agreed upon. *See* Ex. B, Tucker Dec. ¶¶ 4, 7.[13] The average cost per custodian is approximately $64,634. Acadia is also estimated to incur $590,000 in expenses to complete discovery of various non-custodial sources. So far, Acadia has collected and processed more than a terabyte of data from these 41 custodians' mailboxes and other sources. Yet, despite this massive undertaking, and without even knowing the full scope of information Plaintiffs are already set to receive from this review, Plaintiffs continue to demand more—more custodians, more sources, and more documents.

The requests by Plaintiffs here are yet another example of their incessant demand for more discovery without limit. One common theme with each of Plaintiffs' requests is that they have failed to show any deficiency in Defendants' current review and production of documents. Instead of pointing to any deficiency in Defendants' productions or providing any indication that the current review would be inadequate to provide the information they have requested, Plaintiffs simply demand *more*. At this stage of discovery, however, Plaintiffs have the burden of proving a specific,

---

[13]  Even a cursory review of Plaintiffs' declaration easily demonstrates that the Tucker Declaration provides vastly more detail explaining the costs, burdens, and mechanics of the document production by Defendants in this case.

material deficiency in Defendants' production of documents in order to justify additional discovery. *See* Fed. R. Civ. P. 26(b)(1); *see also Helena Agri-Enterprises, LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 273 (6th Cir. 2021) (upholding denial of motion to compel where "additional discovery would not outweigh the proportionality concerns implicated by the delay and cost generated by continued discovery"); *The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1, 118 (2018). Plaintiffs have failed to meet that burden, and their requests should be rejected for that reason alone. At a minimum, Plaintiffs should wait until they receive and review all of the productions from the set of approximately 470,000 documents Defendants are already reviewing before attempting to claim that additional discovery is needed.

Although Defendants submit that Plaintiffs' requests should be rejected for this reason alone, Plaintiffs fail to justify that their requests are warranted for the additional reasons discussed below.

## A. Plaintiffs' Requested Facility-Level Custodian Search Hit Report Is Unnecessary And Disproportionate To The Needs Of The Case.

Plaintiffs first ask the Court to order Defendants to go beyond collection of information from Acadia's corporate headquarters and produce search hit reports for 52 custodians at Acadia's individual facilities.[14] Specifically, Plaintiffs request that such a report "show the volume of custodial documents, broken out by each month of the relevant time period, that hit on the search terms agreed upon for the document custodians at Acadia corporate." To put this request into the proper perspective, Plaintiffs are asking that Defendants produce such a hit report for 52 new

---

[14] In their correspondence with Defendants, Plaintiffs initially requested the addition of 87 facility-level custodians. Acadia has been able to locate mailboxes for 52 of the current and former employees that Plaintiffs had requested. From this, Plaintiffs now request a search hit report for these 52 custodians.

- 13 -

employees *in addition* to the 41 corporate-level custodians whose email Defendants are already reviewing at an expected cost of $2.65 million.  Plaintiffs do not justify this request.

Indeed, Plaintiffs have not shown a need for *any* discovery at all from these additional custodians.  In the Complaint, Plaintiffs challenge corporate-level statements issued from Acadia's corporate headquarters or made by Acadia's corporate executives.  Thus, discovery in this case should be focused on the statements made by Acadia and its top-level executives, and what those executives knew at the time those statements were made.  Defendants have already committed to providing that relevant discovery by, among other things, searching the custodial data for relevant Acadia executives and collecting a variety of information concerning the issues in this case that was available to such executives, such as patient incident information from corporate headquarters.  Plaintiffs fail to explain why it is necessary to also obtain discovery from facility-level employees, particularly in light of the fact that any relevant information that trickled up to the company executives and corporate headquarters would already be encompassed in what Defendants have collected and are reviewing.  Although information regarding Acadia's facilities may be tangentially related to the challenged statements, the focus of this case is on the conduct and knowledge of Acadia and its executives.  Any minimal relevance of this facility-level discovery is vastly outweighed by the immense cost of collecting, searching, reviewing, and producing such documents.

Plaintiffs also fail to highlight any specific, material deficiencies in the current production that would necessitate discovery of documents from these facility-level custodians. *Enslin v. Coca-Cola Co.*, No. 2:14-CV-06476, 2016 WL 7042206, at *3 (E.D. Pa. June 8, 2016) (rejecting request for additional custodians where plaintiff had not "pointed to any evidence to suggest that a search of either of their ESI would produce responsive information that has not already been captured" and did not "offer any suggestion of what responsive information a search of their ESI would uncover, or

- 14 -

how that information would relate to any of the claims in this action"). Even assuming certain facility-level information is relevant, Plaintiffs have not explained how the current search and review of 41 corporate-level custodians (and relevant shared drives) is insufficient to capture such relevant information. Documents held at Acadia's corporate level still contain information regarding operations at Acadia's facilities, and this information held at the corporate level is more directly probative of the issues in this case. Without showing a need for any documents from these custodians, there is no reason to run a search hit report in the first place.

And, merely conducting such a search term report would prove to be extremely expensive for Acadia. It would cost approximately $84,000 just to process the email data to make it available for searching, not including the fees and expenses Acadia would incur to run the search terms and generate hit reports. Tucker Dec. ¶ 12; *see also* Ex. C, Truong Dec. Plaintiffs contend that such a search term report would cost $26,500. Although Defendants disagree, even this amount, while smaller than Defendants' estimate of $84,000, is still a significant cost for which Plaintiffs have not demonstrated an adequate need. Moreover, the Tucker Declaration details the discovery process that Defendants have undertaken in this case to date, and uses this process to estimate the cost of running such a search term report. It is not for Plaintiffs to dictate how Defendants collect, process, search, review, and produce their own information. *The Sedona Principles*, 19 Sedona Conf. J. at 118.

As the Tucker Declaration also explains, such a search hit report is not necessary since the parties can use already-available information regarding the volume of data associated with these custodians to engage in nearly the same analysis. Tucker Dec. ¶ 9. Thus, running such a report would come at a great cost with minimal, to no, added benefit.[15]

---

[15] Defendants have offered to run the requested search hit report if Plaintiffs pay for the cost of producing such a report. Plaintiffs rejected this offer.

4864-3978-1895.v1

In addition, during the last meet and confer conference, Acadia offered to provide Plaintiffs with the names of the 52 facility-level employees for which it was able to locate mailboxes. Acadia also offered to provide other information regarding volume and dates for the mailboxes of each of the 52 employees as stored in Acadia's email system. Acadia has since provided that information, which details the volume of documents available for each of the 52 facility-level employees, broken down by year, for a total volume of approximately 4.4 million documents. Plaintiffs summarily rejected these offers and insisted that they had to have hit reports and thus would go to Court to force them to be produced. But even setting aside the significant cost of producing such a hit report, and that it is unnecessary given that the parties can estimate the volume at issue from what Defendants have already provided to Plaintiffs, Plaintiffs' request goes far beyond the ordinary process for identifying and selecting custodians. Their request puts the cart before the horse in terms of identifying custodians. Typically, identification of custodians comes first and search terms are run on the narrowed set of custodians, not the other way around, which is vastly more expensive and would lead to the unnecessary processing of data.

**B.     Plaintiffs' Request For Five New Priory Custodians Is Unreasonable.**

Similarly, the Court should deny Plaintiffs' request to compel production of documents from five custodians of Priory, Acadia's former subsidiary in the UK. The addition of these five new custodians would be unduly burdensome and disproportionate to the needs of the case when put in the proper context of the 41 custodians (and other information) already agreed upon by the parties and collected by Defendants.

First, Plaintiffs' request is not likely to result in the production of relevant documents for many of the same reasons discussed above. The statements Plaintiffs challenge relating to Acadia's operations in the UK include Acadia's Fiscal Year 2017 *company-wide* financial guidance, certain earnings releases by Acadia, certain of Acadia's filings with the SEC, and certain statements made

4864-3978-1895.v1

by Acadia's executives during investor conference calls. *See* Consolidated Complaint ¶¶ 159-77. All of these challenged statements were issued by Acadia's corporate headquarters in the United States and concerned the financial performance of Acadia's UK operations in 2017 only in the context of Acadia's company-wide earnings guidance. The relevant documents concerning these challenged statements would already be encompassed in the documents Defendants have collected and are in the process of reviewing and producing. Plaintiffs do not explain what types of documents held solely by Priory (and never exchanged with Acadia) would be relevant to company-wide earnings guidance and financial results. Plaintiffs' request also ignores that the current production universe of approximately 470,000 documents already contains numerous documents captured by substantive search terms regarding the challenged UK statements. Thus, as with the facility-level documents, Plaintiffs fail to point to a specific deficiency in the current production with regard to the UK statements that would justify their demand for production of more information from Priory.[16]

Defendants have already produced, among other things, monthly financial and operating metrics for the UK, the UK's forecasted operating results, the UK's narrative to explain those results, Acadia's due diligence on the acquisition of the UK facilities, and the due diligence done on a potential acquisition of Acadia, including the UK operations, for the entire requested time period. Plaintiffs have not—and cannot—point to exactly what discovery they need from these five Priory custodians beyond this wide variety of documents that Defendants have already produced. Absent such a showing, Plaintiffs' request should be denied.

Second, the limited value of such discovery is vastly outweighed by its burden. The review and production of such documents would be extremely burdensome and disproportionate to the

---

[16] Plaintiffs' request also ignores the fact that they have already received documents from Priory's CEO and General Counsel during the relevant time period.

4864-3978-1895.v1

needs of the case, particularly given that it would implicate UK data protection laws. In order to comply with these legal requirements, Defendants would need to set up and conduct a minimization review in the UK. The minimization review would involve setting up a database in the UK, applying search terms to the data in the UK, and then having attorneys in the UK review the documents that hit on the search terms to identify likely relevant documents. As the UK attorneys review for relevance and privilege, they would also need to determine whether the relevant documents contain personal privacy information. The attorneys would then redact the personal privacy information contained in the likely relevant documents before the documents could be transferred out of the UK to the United States.

Third, contrary to Plaintiffs' suggestion, Acadia has never abandoned its contention that the Priory documents Plaintiffs seek are outside of Defendants' possession, custody, or control, such that Defendants cannot be ordered to produce them. Acadia sold Priory and no longer has control of that company. Although Defendants have offered on multiple occasions to work with Priory to obtain information Plaintiffs seek if such is necessary and proportionate to the needs of this case, Defendants simply cannot produce the documents that Plaintiffs seek without Priory's cooperation. As Defendants noted previously, Plaintiffs do not have to work through Defendants for this process—if they want documents directly from Priory, they can follow the process that already exists for obtaining that information from Priory itself. And although Plaintiffs attempt to suggest that Defendants did something improper by selling Priory after this litigation was filed, there is no merit to that contention. Neither the PSLRA, nor the rules in this Court, required Defendants to collect (as opposed to preserve) documents at that stage. *See* 15 U.S.C. § 78u–4(b)(3)(C)(i) (imposing a duty to preserve documents during the pendency of the stay of discovery); M.D. Tenn. Administrative Order 174-1(4)-(5) (providing that a party has "an obligation to take reasonable and proportional steps to

4864-3978-1895.v1

preserve discoverable ESI in the party's possession, custody or control" but "need not collect ESI before they have conferred regarding the form of production at the Rule 26(f) conference").

Finally, Defendants, to no avail, have made a reasonable offer of compromise as to this Priory dispute. Rather than try to collect documents from Priory (and thereby implicate the expensive process to comply with UK data protection laws), Defendants offered to search Acadia's entire email system to identify emails sent, received, copied, or blind copied by these 5 Priory custodians, and then apply the substantive search terms to the documents, review the documents, and produce or log responsive documents. This compromise would avoid the unnecessary burden and expense of performing a minimization review in the UK, and at the same time likely capture any of these custodians' relevant communications given that relevant documents concerning the challenged UK statements would be those reflecting on what Defendants knew about the UK operations during the relevant time period. Plaintiffs rejected this compromise.

### C. Plaintiffs' Request for RiskQual/HAS Documents Should Be Denied.

The Court should also reject Plaintiffs' requests for the Court to compel the production of certain documents relating to Acadia's internal patient incident system, RiskQual. Plaintiffs ask that Defendants produce additional discovery regarding Level 1 and Level 2 incidents beyond what it has already produced, and request that Defendants search and produce documents regarding Level 3 and Level 4 incidents. Both requests lack merit.

First, as to Plaintiffs' request regarding Level 1 and Level 2 incidents, Defendants have already agreed to provide this information and indicated that they would do so during the parties' last meet and confer on this issue. Specifically, Defendants stated that they would work to produce a document showing the requested fields used by the Company in RiskQual, as well as any linked investigative reports. Defendants are in the process of collecting that information, as they indicated they would, and thus there is no reason to raise this issue with the Court.

- 19 -

Second, Plaintiffs fail to show how documents concerning Level 3 and Level 4 incidents, categorized as "Non-Serious" and "Inconsequential," would be relevant to their claims. Plaintiffs' allegations in their Complaint discuss serious patient incidents, such as suicides and sexual assaults, which they say undermine the challenged statements concerning Acadia's commitment to providing quality care to its patients. *See, e.g.*, Consolidated Complaint ¶¶ 10, 60. But Level 3 and Level 4 incidents are not the type addressed in the Complaint, nor would they be reflective of whether the challenged statements were or were not accurate given the wide range of issues that fall within a Level 3 or Level 4 incident. Plaintiffs do not explain how documents concerning "Non-Serious" and "Inconsequential" patient incidents would be relevant to their allegations in this case.

Furthermore, these patient incident documents raise serious privacy concerns. These documents do not include merely ordinary personally identifiable information, but instead contain extremely sensitive information regarding patients' mental health. Production of the requested documents would require privacy redactions to protect this very sensitive personal health information. It would cost approximately $650,000 to redact that information. Given the low likelihood that such discovery is likely to lead to relevant documents, and the significant cost associated with redacting this private health information, such discovery is not warranted. Defendants offered to conduct this review and produce the information if Plaintiffs paid for the cost of these redactions, but Plaintiffs refused that offer.

DATED: December 27, 2021          ROBBINS GELLER RUDMAN & DOWD LLP
                                  JERRY E. MARTIN, #20193
                                  CHRISTOPHER M. WOOD, #032977


                                  s/ Christopher M. Wood
                                  CHRISTOPHER M. WOOD

4864-3978-1895.v1

414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
jmartin@rgrdlaw.com
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS
DARRYL J. ALVARADO
J. MARCO JANOSKI GRAY
TING H. LIU
T. ALEX B. FOLKERTH
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dalvarado@rgrdlaw.com
jgray@rgrdlaw.com
tliu@rgrdlaw.com
afolkerth@rgrdlaw.com

Lead Counsel for Plaintiffs

DOWD, BLOCH, BENNETT, CERVONE,
   AUERBACH & YOKICH
JUSTIN J. LANNOYE
8 South Michigan Avenue, 19th Floor
Chicago, IL 60603
Telephone:  312/372-1361
312/372-6599 (fax)
jlannoye@laboradvocates.com

Counsel for Chicago & Vicinity Laborers'
District Council Pension Fund

- 21 -

PITTA LLP
MICHAEL BAUMAN
120 Broadway, 28th Floor
New York, NY 10271
Telephone: 212/652-3890
212/652-3891 (fax)
mbauman@pittalaw.com

Counsel for New York Hotel Trades Council &
Hotel Association of New York City, Inc. Pension
Fund

DATED: December 27, 2021

KING & SPALDING LLP
JESSICA P. CORLEY (admitted *pro hac vice*)
LISA R. BUGNI (admitted *pro hac vice*)
BRANDON R. KEEL (admitted *pro hac vice*)
RONNI D. SOLOMON (admitted *pro hac vice*)

s/ Lisa R. Bugni
LISA R. BUGNI

1180 Peachtree Street NE
Atlanta, GA 30309
Telephone: 404/572-4600
jpcorley@kslaw.com
lbugni@kslaw.com
bkeel@kslaw.com
rsolomon@kslaw.com

RILEY WARNOCK & JACOBSON, PLC
STEVEN A. RILEY (BRP #006258)
MILTON S. McGEE, III (BPR #024150
ELIZABETH O. GONSER (BRP #026329)
1906 West End Avenue
Nashville, TN 37203
Telephone: 615/320-3700
sriley@rwjplc.com
tmcgeeWrwjplc.com
egonser@rwjplc.COM

Counsel for Defendants

- 22 -

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 27, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

E-mail: cwood@rgrdlaw.com

**Mailing Information for a Case 3:18-cv-00988 St. Clair County Employees' Retirement System v. Acadia Healthcare Company, Inc. et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **AMALGAMATED BANK, TRUSTEE**
  PKNASHLAW@AOL.COM

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **BOSTON RETIREMENT SYSTEM**
  PKNASHLAW@AOL.COM

- **Michael Bauman**
  mbauman@pittalaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Lisa R. Bugni**
  lbugni@kslaw.com

- **Thomas H. Burt**
  burt@whafh.com

- **Regina M. Calcaterra**
  calcaterra@whafh.com

- **Jessica Perry Corley**
  jpcorley@kslaw.com

- **Patrick Donovan**
  donovan@whafh.com

- **Timothy Alexander Benwa Folkerth**
  afolkerth@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Elizabeth O. Gonser**
  egonser@rwjplc.com,nnguyen@rwjplc.com

- **J. Marco Janoski Gray**
  mjanoski@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew M. Guiney**
  guiney@whafh.com

- **Brandon R. Keel**
  bkeel@kslaw.com

- **Justin J. Lannoye**
  jlannoye@laboradvocates.com

- **Ting H. Liu**
  tliu@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,jkarsten@barrettjohnston.com,ealexander@barrettjohnston.com,jmartin@rgrdlaw.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,EWard@kslaw.com,dgibby@rwjplc.com

- **Thomas C. Michaud**
  tmichaud@vmtlaw.com

- **Danielle S. Myers**
  danim@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **PLYMOUTH COUNTY RETIREMENT ASSOC**
  PKNASHLAW@AOL.COM

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Ronni D. Solomon**
  rsolomon@kslaw.com

- **David C. Walton**
  davew@csgrr.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,agonzales@ecf.courtdrive.com,CWood@ecf.courtdrive.com,agonzales@rgrdlaw.coom,e_file_sd@rgrdlaw.com,mkuwashima@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)