UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br> vs.<br><br>ACADIA HEALTHCARE COMPANY, INC., et al.,<br><br>      Defendants. | Civil Action No. 3:18-cv-00988<br><br><u>CLASS ACTION</u><br><br>District Judge William L. Campbell, Jr.<br>Magistrate Judge Alistair E. Newbern<br><br>MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' UPDATED MOTION FOR CLASS CERTIFICATION |

- 1 -

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................................................1

II.   STATEMENT OF FACTS ...........................................................................................2

    A.    Summary of the Allegations ...........................................................................2

    B.    The Proposed Class Representatives ...............................................................5

III.   ARGUMENT ................................................................................................................6

    A.    The Proposed Class Satisfies the Requirements of Rule 23(a)................................6

        1.    The Class Is Sufficiently Numerous ...................................................7

        2.    Questions of Law and Fact Are Common to the Class..............................8

        3.    The Proposed Class Representatives' Claims Are Typical.........................9

        4.    The Proposed Class Representatives Will Adequately and Fairly
             Protect the Interests of the Class.....................................................10

    B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3).........................12

        1.    Common Factual and Legal Questions Predominate................................12

             a.    Plaintiffs Are Entitled to a Presumption of Reliance
                 Pursuant to *Basic*.............................................................13

                    (1)    The *Cammer* Factors..........................................15

                    (2)    The *Krogman* Factors ........................................17

              b.    Plaintiffs Are Entitled to a Presumption of Reliance
                 Pursuant to *Affiliated Ute* ................................................18

        2.    A Class Action Is Superior to Other Available Methods for the Fair
             and Efficient Adjudication of This Action..............................................19

IV.   CONCLUSION.............................................................................................................20

# TABLE OF AUTHORITIES

**CASES**

*Affiliated Ute Citizens of Utah v. U.S.*,
406 U.S. 128 (1972)...............................................................................................2, 18, 19

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)...........................................................................................................6, 12

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)...................................................................................................12, 13, 19

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)..............................................................................................2, 6, 13, 14

*Bovee v. Coopers & Lybrand*,
216 F.R.D. 596 (S.D. Ohio 2003) ....................................................................................8

*Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*,
843 F.3d 1119 (6th Cir. 2016) .........................................................................................12

*Burges v. BancorpSouth, Inc.*,
2017 WL 2772122 (M.D. Tenn. June 26, 2017)........................................................ *passim*

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ...................................................................14, 15, 16, 17

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) .......................................................................................15

*Castillo v. Envoy Corp.*,
206 F.R.D. 464 (M.D. Tenn. 2002) ...............................................................................1, 6

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
270 F.R.D. 247 (D.S.C. 2010) .........................................................................................15

*Freeman v. Laventhol & Horwath*,
915 F.2d 193 (6th Cir. 1990) ......................................................................................14, 16

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
2010 WL 1790763 (M.D. Tenn. Apr. 30, 2010)...........................................................11

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
2012 WL 1071281 (M.D. Tenn. Mar. 29, 2012) ..............................................6, 17, 18, 19

4860-4435-3292.v1

*Grae v. Corr. Corp. of Am.*,
    330 F.R.D. 481 (M.D. Tenn. 2019) ...................................................................6, 7

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).................................................................13, 14, 17, 19

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) .........................................................................................6

*In re Accredo Health, Inc. Sec. Litig.*,
    2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006)............................................14, 15

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ....................................................................16

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir. 1996) ..........................................................................10

*In re Direct Gen. Corp.*,
    2006 WL 2265472 (M.D. Tenn. Aug. 8, 2006) ..............................................10

*In re DVI Inc. Sec. Litig.*,
    249 F.R.D. 196 (E.D. Pa. 2008),
    *aff'd*, 639 F.3d 623 (3d Cir. 2011) ................................................................15

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ................................................9

*Kasper v. AAC Holdings, Inc.*,
    2017 WL 3008510 (M.D. Tenn. July 14, 2017) ..............................................6

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .........................................................14, 17, 18

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970)...........................................................................................6

*Plumbers & Pipefitters Nat'l Pension Fund v. Burns*,
    967 F. Supp. 2d 1143 (N.D. Ohio 2013).......................................................15, 17

*Powers v. Hamilton Cnty. Pub. Def. Comm'n*,
    501 F.3d 592 (6th Cir. 2007) ..........................................................................12

4860-4435-3292.v1

*Ross v. Abercrombie & Fitch Co.*,
    257 F.R.D. 435 (S.D. Ohio 2009) ........................................................................8, 9

*Schuh v. HCA Holdings, Inc.*,
    2014 WL 4716231 (M.D. Tenn. Sept. 22, 2014) ....................................................8

*Stein v. U.S. Xpress Enters.*,
    2021 WL 1410035 (E.D. Tenn. Feb. 12, 2021) .............................................6, 9, 11

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ..............................................................................................18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ................................................................................................6

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    325 F.R.D. 280 (D. Minn. 2018) ...........................................................................18

*Weiner v. Tivity Health, Inc.*,
    334 F.R.D. 123 (M.D. Tenn. 2020) .........................................................................6

*Willis v. Big Lots, Inc.*,
    2017 WL 1074048 (S.D. Ohio Mar. 17, 2017) ......................................................17

*Willis v. Big Lots, Inc.*,
    242 F. Supp. 3d 634 (S.D. Ohio 2017) ..................................................................16

*Yost v. First Horizon Nat'l Corp.*,
    2011 WL 2182262 (W.D. Tenn. June 3, 2011) .......................................................9

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ................................................................................10

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b)..................................................................................................2, 9, 13
    §78t(a)............................................................................................2, 8, 9, 13

17 C.F.R.
    §240.10b-5 .......................................................................................2, 13, 14

Federal Rules of Civil Procedure

Rule 23(a)................................................................................................................1, 6

Rule 23(a)(1)................................................................................................................7

Rule 23(a)(2)................................................................................................................8

Rule 23(a)(4)..............................................................................................................10

Rule 23(b)(3)............................................................................................... *passim*

Rule 26......................................................................................................................11

4860-4435-3292.v1

Lead Plaintiffs Chicago & Vicinity Laborers' District Council Pension Fund[1] ("Chicago Laborers") and New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund ("New York Hotels" and, collectively with Chicago Laborers, "Plaintiffs") submit this Memorandum of Law in Support of Lead Plaintiffs' Updated Motion for Class Certification and respectfully request that the Court: (1) certify this case as a class action; (2) appoint Plaintiffs as Class Representatives; and (3) appoint Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.[2]

## I.     INTRODUCTION

Pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following Class:

> All persons who purchased or otherwise acquired the common stock of Acadia Healthcare Company, Inc. ("Acadia" or the "Company") between April 30, 2014 and November 15, 2018, inclusive (the "Class Period"). Excluded from the Class are Acadia, Joey A. Jacobs, Brent Turner, David Duckworth (collectively, "Defendants") and members of their immediate families, any entity of which a Defendant has a controlling interest, and the legal representatives, heirs, predecessors, successors or assigns of any such excluded party.

Courts have consistently recognized that "class actions are the most favorable means of adjudicating federal securities fraud claims." *Castillo v. Envoy Corp.*, 206 F.R.D. 464, 474 (M.D. Tenn. 2002).[3]  This case is no different, as thousands of Acadia investors (including the proposed

---

[1]     As of March 9, 2020, Chicago Laborers' Pension Fund is known as Chicago & Vicinity Laborers' District Council Pension Fund.

[2]     On December 17, 2021, in response to the parties' Joint Motion to Amend Case Management Order (ECF No. 97), the Court terminated Plaintiffs' Motion for Class Certification, (ECF No. 70) and ordered Plaintiffs to file an updated Motion for Class Certification on or before February 1, 2022.  ECF No. 98.

[3]     All internal citations are omitted and emphasis added unless otherwise indicated.

4860-4435-3292.v1

Class Representatives) were damaged by Defendants' conduct in the same manner and Plaintiffs satisfy the requirements of Rule 23(a) and (b)(3).

First, the four requisite elements of Rule 23(a) are readily established here:

- (1) Numerosity: Thousands of investors acquired the millions of nationally traded shares of Acadia stock during the Class Period.

- (2) Commonality and (3) Typicality: Defendants engaged in the same scheme, issued the same false and misleading statements and omitted the same material facts when communicating to all investors.

- (4) Adequacy: The proposed Class Representatives have participated in the litigation and are committed to prosecuting this action on behalf of the Class through experienced and competent counsel.

Second, this action meets the predominance and superiority requirements of Rule 23(b)(3). Predominance, as with commonality, is met because the core elements of Plaintiffs' §§10(b) and 20(a) claims are susceptible to common proof. Similarly, reliance can be presumed on a class-wide basis under the "fraud-on-the-market" presumption articulated by the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), as Acadia's securities traded in an efficient market throughout the Class Period. Reliance can also presumed on a class-wide basis under the test set forth in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972). Lastly, a class action promotes judicial economy and is undoubtedly the superior method of resolving the claims of the thousands of geographically dispersed investors that were similarly harmed by Defendants' fraudulent conduct.

For these reasons and the reasons further explained below, Lead Plaintiffs' Motion for Class Certification should be granted.

## II. STATEMENT OF FACTS

### A. Summary of the Allegations

This is a federal securities action alleging that Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and U.S.

Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5, by engaging in a scheme to mislead the public about: (i) the quality of care and the adequacy of staffing at Acadia's facilities; (ii) Acadia's substantial compliance with all applicable laws and regulations; and (iii) Acadia's operations, earnings guidance and expected revenue growth in its U.K. facilities. *See generally* ECF No. 39 (the "Complaint"); ECF No. 54 (order denying Defendants' motion to dismiss).

Acadia's business model and ability to generate revenue is heavily dependent on its ability to fill beds at its inpatient and outpatient residential treatment facilities. ¶41.[4] Accordingly, to convince the public that its facilities situated across the nation were the preeminent centers to seek treatment, Acadia consistently and repeatedly represented to the public and investors that it provided "high-quality patient care." ¶¶43-45, 111-157. In reality, and in stark contrast to Defendants' public statements, Acadia's tactics of acquiring facilities and then systemically cutting staff was generating alarming incidents of abuse, neglect and, on several occasions, death. ¶¶47-85. Specifically, staff cuts left fewer employees available to monitor patients and permitted unsupervised patients to act out on suicidal tendencies, facilitated patients to elope from Acadia's facilities and allowed patients and staff to physically and/or sexually abuse other patients. *Id.*[5]

Defendants also sought to falsely reassure investors that Acadia was "in substantial compliance with all applicable laws and regulations and [was] not aware of any material pending or threatened investigations involving allegations of wrongdoing." ¶¶46, 149-157. In fact, Acadia

---

[4]     All standalone "¶" or "¶¶" references are to the Complaint. All exhibits referenced herein are attached to the Declaration of Christopher M. Wood in Support of Lead Plaintiffs' Motion for Class Certification, filed concurrently herewith.

[5]     Aware of these pervasive issues, Acadia sought to destroy evidence of its misconduct through draconian document destruction policies, such as an automatic e-mail deletion policy of 30 days. ¶49.

4860-4435-3292.v1

facilities were staffed below levels necessary to assure proper treatment of patients in a safe and secure environment or to monitor patients at risk of harming themselves or others. ¶¶50-85. As revealed by an October 2018 analysis, federal CMS[6] inspection reports from 2013 to 2018 for 31 of the 40 acute inpatient U.S. hospitals listed on Acadia's website found staffing deficiencies at 28 of the 31 hospitals. *See* ¶¶149-157, 185-186.

During the Class Period, Defendants also falsely assured investors that the Company's acquisition of the U.K.'s largest behavioral health company, the Priory Group ("Priory"), would drive record profits and earnings in fiscal year 2017. ¶¶6, 91-93, 99. On February 23, 2017, Acadia issued a press release that included the Company's financial guidance for 2017 "in a range of $2.85 billion to $2.9 billion." ¶¶100-101, 159. In reality, however, Acadia was not on track to meet its U.K. financial targets because of weakened patient admissions and increased labor costs. ¶¶158-178, 180-183. Indeed, Defendants knew about rising agency staffing costs throughout 2017 and monitored their patient admission trends on a daily basis. ¶¶86-93. Additionally, Defendants had no reasonable basis to believe, and did not actually believe, in the census figures underpinning their projections as Priory was the subject of multiple negative media reports in 2017. ¶¶94-98.

Defendants' fraud was revealed through a series of partial disclosures. On October 24, 2017, Acadia issued a release entitled, "Acadia Healthcare Reports Third Quarter Financial Results" stating that Acadia badly missed its Q3 2017 revenue and earnings targets and was substantially reducing its guidance for the remainder of the year. ¶¶8, 180-181. On this news, the price of Acadia's securities plummeted from a close of $44.12 per share on October 24, 2017 to an intraday low of $30.91 per share on October 25, 2017, a decline of 30%. *Id.* On October 11, 2018, Aurelius Value published a report and released a video documenting systematic instances of patient abuse and

---

[6] "CMS" refers to the U.S. Department of Health and Human Services' Centers for Medicare & Medicaid Services.

4860-4435-3292.v1

neglect at dozens of Acadia facilities caused primarily by understaffing.  ¶¶9, 185-189.  On this news, the price of Acadia securities declined from a close of $36.55 per share on October 10, 2018 to an intraday low of $32.37 per share on October 12, 2018, a decline of more than 11%.  *Id.*  The true state of Acadia's business and operations was further disclosed on November 16, 2018, when *Seeking Alpha* published an article entitled, "Acadia Healthcare: Very Scary Findings from A 14-Month Investigation."  ¶¶11, 190-192.  The article described Acadia's rapid growth but attributed Acadia's recent revenue and margin increases to cost cutting and "reducing the quality of care."  *Id.* On this news, the price of Acadia securities declined from a close of $37.86 per share on November 15, 2018 to an intraday low of $28.02 per share on November 16, 2018, a decline of 26%.  *Id.*  As a result of these partial disclosures, Plaintiffs and other class members who purchased Acadia common stock at artificially inflated prices suffered significant damages as the truth about, and impact associated with, Defendants' misstatements and scheme to defraud was revealed to the market.  This action seeks to recover for these losses.

### B.     The Proposed Class Representatives

On January 9, 2019, Chicago Laborers and New York Hotels were appointed as Lead Plaintiffs.  ECF No. 35.  Both proposed Class Representatives are defined benefit pension plans that provide retirement income benefits to their participants and collectively purchased or otherwise acquired more than 50,000 shares of Acadia common stock during the Class Period and suffered nearly $900,000 in losses.  ECF Nos. 26-2, 26-3, 26-4.

The proposed Class Representatives have expended significant time and effort prosecuting this action on behalf of the proposed Class – actively participating in discovery and monitoring and reviewing the work of Lead Counsel Robbins Geller.  *See* Ex. A, Declaration of Catherine Wenskus in Support of Lead Plaintiffs' Motion for Class Certification ("Chicago Laborers Decl."); Ex. B, Declaration of John Heim in Support of Lead Plaintiffs' Motion for Class Certification ("New York

- 5 -

Hotels Decl.").  Court-appointed Lead Counsel Robbins Geller, in turn, has conducted an extensive investigation into Defendants' alleged misconduct, drafted a comprehensive consolidated complaint, successfully opposed Defendants' motion to dismiss and is diligently pursuing the discovery necessary to prove the Class' claims.  *See, e.g.*, Complaint; ECF No. 47.

## III.  ARGUMENT

Class actions are widely considered to be the most favorable means of adjudicating federal securities fraud claims.  *See Castillo*, 206  F.R.D. at 474; *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313-14, 320 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions . . . .").  Indeed, the Supreme Court[7] and courts within the Sixth Circuit[8] overwhelmingly find that, in securities fraud actions, class treatment is an appropriate way to vindicate investors' rights.

For the reasons discussed below, the requirements of Rule 23(a) and Rule 23(b) are readily met in this case; thus, the Court should certify the Class.

### A.  The Proposed Class Satisfies the Requirements of Rule 23(a)

Rule 23(a) establishes four requisite elements for class certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

---

[7]    *E.g.*, *Basic*, 485 U.S. at 229-30, 249-50; *Tellabs*, 551 U.S. at 313-14, 320; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 380 n.10 (1983); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 396 (1970).

[8]    *E.g.*, *Stein v. U.S. Xpress Enters.*, 2021 WL 1410035 (E.D. Tenn. Feb. 12, 2021); *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481 (M.D. Tenn. 2019); *Kasper v. AAC Holdings, Inc.*, 2017 WL 3008510, at *5 (M.D. Tenn. July 14, 2017); *Burges v. BancorpSouth, Inc.*, 2017 WL 2772122, at *11 (M.D. Tenn. June 26, 2017); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2012 WL 1071281 (M.D. Tenn. Mar. 29, 2012).

4860-4435-3292.v1

*Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 128 (M.D. Tenn. 2020) (citing Fed. R. Civ. P. 23(a)).

Here, the proposed Class meets each of these requirements.

### 1.     The Class Is Sufficiently Numerous

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Rather than a "strict numerical test, 'substantial' numbers usually satisfy the numerosity requirement." *Burges, Inc.*, 2017 WL 2772122, at *2; *see also Corr. Corp. of Am.*, 330 F.R.D. at 501 ("'[T]he exact number of class members need not be pleaded or proved' for a class to be certified, as long as the class representatives can show that joinder would be impracticable."). Indeed, "[n]umerosity is generally assumed to have been met in class action suits involving nationally traded securities." *Burges*, 2017 WL 2772122, at *2.

Throughout the Class Period, Acadia stock traded on the National Association of Securities Dealers Automated Quotations ("Nasdaq") – one of the largest stock exchanges in the world. *See* Ex. C, Expert Report of W. Scott Dalrymple, CFA ("Dalrymple Rpt."), ¶¶14, 29. Evidencing numerosity, the average weekly trading volume of Acadia stock was approximately 4.8 million shares, or 5.9% of the shares outstanding. *Id.*, ¶35. Similarly, Acadia investors bought tens of millions of shares of Acadia common stock during the Class Period as part of several public offerings: (1) 8.8 million shares in a June 17, 2014 secondary offering; (2) 5.1 million shares in a May 11, 2015 secondary offering; (3) 11.5 million shares in a January 12, 2016 secondary offering; and (4) 2.8 million shares in an August 16, 2017 secondary offering. Exs. D-E. Lastly, at least 200 major institutions owned Acadia stock during the Class Period, further demonstrating the numerosity of the proposed Class. Dalrymple Rpt., ¶47 n.58. These institutional investors, such as asset management and brokerage firms, often hold shares on behalf of numerous undisclosed beneficial holders (*i.e.*, individual investors).

- 7 -

Based on this volume of trading and the number of institutional shareholders, it is reasonable to conclude that many thousands of individuals owned Acadia stock during the Class Period. In short, because "[t]his case involves the sale of millions of stock, and Plaintiff estimates that the number of purchasers is likely to be 'in the thousands' and that those purchasers reside in many states," numerosity is satisfied. *Schuh v. HCA Holdings, Inc.*, 2014 WL 4716231, at *13 (M.D. Tenn. Sept. 22, 2014).

### 2. Questions of Law and Fact Are Common to the Class

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The claims of the potential class members need not be factually identical," though "[t]he mere fact that questions peculiar to individual class members could remain does not necessarily defeat a finding of commonality." *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 442 (S.D. Ohio 2009). Instead, commonality exists if there is at least "one question common to the class." *Id*.

Plaintiffs' claims readily meet this standard as the allegations in the Complaint raise numerous questions common to the Class. These include, *inter alia*, including whether: (1) Defendants were engaged in a scheme to defraud and/or made materially false or misleading statements or omissions to investors regarding the quality of care, staffing levels and regulatory compliance of Acadia's U.S. facilities, ¶¶111-157; (2) Defendants were engaged in a scheme to defraud and/or made materially false or misleading statements or omissions to investors regarding the performance of Acadia's U.K. operations, ¶¶158-178; (3) Defendants acted with scienter, ¶¶194-229; (4) Defendants' misrepresentations caused the putative Class to suffer damages, ¶¶179-193; and (5) Defendants were "control persons" within the meaning of §20(a) of the Exchange Act, ¶¶251-255. Because all Class members' claims depend on the answers to these common questions, commonality is established. *See Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 609 (S.D. Ohio

- 8 -

2003) (explaining that questions bearing upon misrepresentations and materiality are among """the paradigmatic common question[s] of law in a securities fraud class action"""").

### 3. The Proposed Class Representatives' Claims Are Typical

"A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and if its claims are based on the same legal theory." *Burges*, 2017 WL 2772122, at *4. "[A] plaintiff's burden to establish typicality is not onerous." *Yost v. First Horizon Nat'l Corp.*, 2011 WL 2182262, at *8 (W.D. Tenn. June 3, 2011).

Plaintiffs' claims are typical of the proposed Class as they arise out of the same course of conduct – specifically, that Defendants artificially inflated Acadia's share prices by engaging in a scheme to defraud and misrepresenting the true state of its U.S. and U.K. facilities. ¶¶3, 12. As courts consistently recognize, trivial "[f]actual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009); *Ross*, 257 F.R.D. at 456 ("'[i]ndividual differences regarding the purchasing and selling of stock during the proposed class period [do] not destroy the typicality requirement'"). All of Plaintiffs' claims – *i.e.*, the alleged violations of §§10(b) and 20(a) of the Exchange Act – will be proven by the same evidence on a class-wide basis. *See U.S. Xpress*, 2021 WL 1410035, at *6 (proposed class representatives' claims were typical and "driven by the same factual underpinnings as the Securities Act claims of the proposed class because they derive from the same alleged misrepresentations and/or omissions").

Plaintiffs and the putative Class suffered losses from the same course of conduct and share identical interests in holding Defendants accountable and maximizing the Class' recovery. The claims are therefore typical.

4860-4435-3292.v1

4. **The Proposed Class Representatives Will Adequately and Fairly Protect the Interests of the Class**

The adequacy requirement of Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To establish adequacy: (i) "'the representative must have common interests with unnamed members of the class'"; and (ii) "'it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (citing *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996)). The first adequacy factor overlaps with the commonality and typicality elements discussed above and seeks to ensure that the class representatives have interests aligned with, rather than antagonistic to, the interests of the unnamed class members. *See In re Direct Gen. Corp.*, 2006 WL 2265472, at *4 (M.D. Tenn. Aug. 8, 2006). The second adequacy factor requires that the representatives have sufficient financial and personal involvement to encourage them to prosecute the action vigorously and adequate legal representation to meet the demands of maintaining the action. *Id.* Plaintiffs clearly satisfy both prongs of Rule 23(a)(4)'s adequacy test.

Plaintiffs' interests are neither antagonistic to nor in conflict with the interests of the other Class members. To the contrary, Plaintiffs acquired Acadia common stock during the Class Period and sustained damages as a result of the same alleged material misrepresentations and omissions as other class members. *See* Chicago Laborers Decl., ¶5; New York Hotels Decl., ¶5. Indeed, Chicago Laborers and New York Hotels purchased or acquired more than 26,000 and 28,000 shares of Acadia, respectively, collectively suffering more than $800,000 in losses. *Id.*

In addition to their financial stakes, Plaintiffs have demonstrated a willingness and ability to take an active role in the litigation to protect the interests of class members. Chicago Laborers Decl., ¶¶6-8; New York Hotels Decl., ¶¶6-8. They have, among other things, filed a consolidated

- 10 -

complaint with a comprehensive set of claims, defended those claims through motion-to-dismiss briefing and are in the process of proving those claims in discovery. Chicago Laborers Decl., ¶7; New York Hotels Decl., ¶7. Plaintiffs have also diligently complied with their own discovery obligations by filing Rule 26 Initial Disclosures and responding to Defendants' interrogatories and document requests. *Id.* Further, as set forth in their respective declarations, Plaintiffs: (i) understand the requirements and responsibilities of serving as a class representative; (ii) have reviewed key pleadings in this action; (iii) intend to continue to monitor and review the progress of this litigation; and (iv) intend to work with counsel to maximize the recovery to the Class. Chicago Laborers Decl., ¶¶6-8; New York Hotels Decl., ¶¶6-8.

Plaintiffs have also demonstrated their adequacy by retaining attorneys with considerable experience in securities class actions. *See U.S. Xpress*, 2021 WL 1410035, at *8 ("[I]n determining whether the plaintiffs have established adequate representation, the Court considers whether the proposed class counsel are 'qualified, experienced and generally able to conduct the litigation.'"). Robbins Geller, a 200-attorney firm with an office in this District, regularly represents investors in nationwide securities litigation, including within the Sixth Circuit and this District. *See* Ex. F. District courts throughout the country, including the judges of this Court, have noted Robbins Geller's reputation for excellence. *See, e.g.*, ECF No. 35 at 12 ("[T]his Court has previously found Robbins Geller to be 'well qualified' for the task of representing a class in a securities action."); *Burges*, 2017 WL 2772122, at *4; *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2010 WL 1790763, at *4 (M.D. Tenn. Apr. 30, 2010). The Robbins Geller attorneys involved in this case are responsible for obtaining each of the three largest securities fraud class action recoveries ever obtained in this District. *See, e.g.*, Transcript of Proceedings (ECF No. 567) at 12-13, *Schuh v. HCA Holdings, Inc.*, (M.D. Tenn. Apr. 11, 2016) (in granting final approval to a $215 million recovery,

- 11 -

the largest securities class action recovery ever in Tennessee, recognizing that Robbins Geller and its local counsel "were gladiators" and expressing the court's "appreciat[ion for] the work that you all have done on this"). Additionally, Robbins Geller has obtained the largest securities fraud class action recovery in this Circuit, as well as in the Fifth, Seventh, Eighth, Tenth and Eleventh Circuits. In short, Robbins Geller is qualified, experienced and able to prosecute this action.

## B. The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

This action also satisfies Rule 23(b)(3)'s requirements that: (1) common questions of law or fact predominate over individual questions; and (2) a class action is superior to alternative methods of resolving the dispute. *See Amchem*, 521 U.S. at 615.

### 1. Common Factual and Legal Questions Predominate

"Predominance is a test readily met in certain cases alleging . . . securities" law claims and exists where the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Id*. at 623, 625. Plaintiffs meet the predominance requirement by establishing that ***at least one*** factual or legal question "is at the heart of the litigation." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007). Importantly, Plaintiffs "'need not prove that each element of a claim can be established by class wide proof: "What the rule does require is that common questions *predominate* over any questions affecting only individual [class] members."'" *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016) (emphasis in original). Nor does "Rule 23(b)(3) require[] a showing that *questions* common to the class . . . will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) (emphasis in original).

As discussed above, the Class' claims are all premised on the same factual circumstances: Defendants' course of conduct that concealed from investors the true state of affairs regarding: (1) the quality of care, staffing levels and regulatory compliance of Acadia's U.S. facilities; and (2) the

- 12 -

financial performance of Acadia's U.K. facilities. Plaintiffs allege this conduct caused Acadia's stock price to be artificially inflated during the Class Period, and that Plaintiffs and the Class were harmed when the price of Acadia's stock declined, when the true state of affairs was publicly disclosed.

Thus, the Class' claims will be proven through evidence common to the entire Class. With respect to the Class' §10(b) and Rule 10b-5 claims, the Supreme Court has held that questions of whether a defendant knowingly and/or recklessly made public material misstatements and/or omissions (*i.e.*, the scienter, falsity and materiality elements) and whether the revelation(s) of the alleged fraud proximately caused that company's stock price to decline (*i.e.*, loss causation) are all common questions. *Amgen*, 568 U.S. at 467-70, 474-76. Moreover, as described in the Dalrymple Rpt., damages in this case are capable of being measured on a class-wide basis, consistent with Plaintiffs' theory of the case. Dalrymple Rpt., ¶¶90-97.

These questions of Defendants' class-wide liability predominate over any individualized issues and are fundamental to all class members' claims.

> **a.** **Plaintiffs Are Entitled to a Presumption of Reliance Pursuant to *Basic***

Predominance is established with respect to reliance for the §10(b) claim as Plaintiffs are entitled to rely on the fraud-on-the-market presumption articulated by the Supreme Court in *Basic*, 485 U.S. at 241; *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263-64, 268-69 (2014) ("*Halliburton II*"); and *Amgen*, 568 U.S. at 460-62. The fraud on-the-market theory "holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations'" and that whenever an "investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations . . . may be presumed for

- 13 -

purposes of a Rule 10b-5 action.'" *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246-47).

To invoke the fraud-on-the-market presumption, a plaintiff must demonstrate: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.*, 573 U.S. at 268. "[W]ith the exception of materiality" – which is a question of fact reserved for the jury – the elements of publicity, market efficiency and market timing "must be satisfied before class certification." *Id.* at 276. Here, there is no dispute that the alleged misrepresentations in this case were publicly issued (*see* ¶¶112-128, 131-147, 150-156, 159-177) or that Plaintiffs traded in Acadia stock between the misrepresentations and the ultimate revelation of the truth (*see* ECF No. 26-2 (New York Hotels' Certification and Chicago Laborers' Certification)). As described in the Dalrymple Rpt., Acadia traded in an efficient market. Dalrymple Rpt., §VI.

Indeed, the market for Acadia stock was open, active and efficient throughout the Class Period. Courts in this Circuit and others rely principally on the five *Cammer* factors, described below, when assessing market efficiency. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990). Courts have also considered the *Krogman* factors, which look to: (1) the company's market capitalization; (2) the stock's bid-ask spread; and (3) the stock's float. *Krogman v. Sterritt*, 202 F.R.D. 467, 474, 478 (N.D. Tex. 2001); *Freeman*, 915 F.2d at 199. No single factor is determinative; nor are the factors to be applied as a "checklist." *Burges*, 2017 WL 2772122, at *8 n.10; *In re Accredo Health, Inc. Sec. Litig.*, 2006 WL 1716910, at *10 (W.D. Tenn. Apr. 19, 2006). As set forth below, these factors

- 14 -

establish that Acadia traded in an efficient market during the Class Period; thus, Plaintiffs are entitled to rely on the fraud-on-the-market presumption.

### (1) The *Cammer* Factors

**Acadia Had a High Average Trading Volume**.  An average weekly trading volume in excess of 2% is widely recognized as a sign of an efficient market.[9]  On average during the Class Period, approximately 4.8 million Acadia shares changed hands each week.  Dalrymple Rpt., ¶35.  This translated to an average weekly trading volume of 5.9% of shares outstanding (*id*.), supporting a strong presumption of an efficient market.

**A Substantial Number of Securities Analysts Followed the Company**.  Analysts facilitate the flow and digestion of information in the market.  *Id*., ¶36.  In this case, at least 13 analyst firms followed Acadia during each month of the Class Period (with an average of 15.5 analysts per month during the Class Period), who collectively published more than 600 reports covering Acadia.  *Id*., ¶¶37-38.  This widespread analyst coverage of Acadia supports a finding of efficiency.  *See, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209-10 (E.D. Pa. 2008) (three analysts sufficient under this factor), *aff'd*, 639 F.3d 623 (3d Cir. 2011); *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 256 (D.S.C. 2010) (six analysts sufficient); *Burns*, 967 F. Supp. 2d at 1162 (15 analysts sufficient).  Moreover, over 200 media articles about Acadia were published during the Class Period, adding to the rich flow of publicly available information.  Dalrymple Rpt., ¶39.  This media coverage of Acadia further supports a finding of market efficiency.  *See Carpenters Pension*

---

[9]     *See, e.g.*, *Cammer*, 711 F. Supp. at 1286 ("Such interest . . . implies . . . investors are executing trades on the basis of newly available . . . information."); *Accredo*, 2006 WL 1716910, at *7 n.3 ("'substantial presumption of an efficient market if the securities' average weekly trading volume is 1% or more of the total outstanding shares and an even greater presumption of market efficiency if the percentage is 2%'"); *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1161 (N.D. Ohio 2013) (average weekly trading volume above 2% benchmark "warrant[s] a 'strong' presumption . . . [of] an efficient market") (citing *Cammer*, 711 F. Supp. at 1285).

- 15 -

*Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (fact that "information concerning Barclays was widely disseminated throughout the Class Period through Bloomberg and other news services" supported a finding of market efficiency).[10]

**Acadia Was Listed on the Nasdaq, and There Were Market Makers for Acadia Stock**. Acadia's listing on the Nasdaq throughout the Class Period provides further evidence that it traded in an efficient market. *Freeman*, 915 F.2d at 199 ("[S]ecurities traded in national secondary markets such as the New York Stock Exchange . . . are well suited for application of the fraud on the market theory."). Acadia's listing on the Nasdaq, which "'achieves market depth averaging 14 market makers per stock,'" demonstrates that the Company had access to a highly developed network of brokers and market makers. Dalrymple Rpt., ¶43; *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 654 (S.D. Ohio 2017) ("Transactions on the NYSE . . . go through a designated market maker . . . which has been found to satisfy this factor."). Moreover, at least 15 market makers – financial intermediaries who trade in a company's stock, allowing investors to trade in a timely fashion and with reasonable transaction costs – made a market for Acadia stock over the course of the Class Period. Dalrymple Rpt., ¶44. Acadia's listing on the Nasdaq and the broad array of market makers further supports a finding that the market for Acadia was efficient.

**Acadia Was Eligible to File, and Did File, Form S-3 Registration Statements**. Courts also consider eligibility to file a Form S-3 registration statement in assessing market efficiency. *Cammer*, 771 F. Supp. at 1284 (Form S-3 registration is "'predicated on the Commission's belief that the market operates efficiently for these companies'"). A company must meet certain float and other requirements to be eligible for S-3 registration. Dalrymple Rpt., ¶¶48-49. Here, Acadia was

---

[10] Moreover, at least 200 major institutions owned Acadia stock during the Class Period. Dalrymple Rpt., ¶47 n.58. Acadia's considerable ownership by large institutions further supports a finding of market efficiency. *See In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008).

eligible for S-3 registration and, in fact, filed three Form S-3 registration statements during the Class Period (*id.*, ¶51), supporting a finding that Acadia stock traded in an efficient market.

**Acadia's Stock Price Reacted to New, Company-Specific Information**.   The fifth *Cammer* factor focuses on whether Acadia stock responded to new, Company-specific information. *Cammer*, 711 F. Supp. at 1287.   To test the responsiveness of Acadia's stock price to new information, Plaintiffs' expert performed an event study – analyzing Acadia stock price movements on days that the Company announced financial results or guidance and comparing those events to all other days in the Class Period.  Dalrymple Rpt., ¶¶55-71.  An event study is "'a generally accepted technique for measuring how a security's price reacts to new, unexpected information about the issuing company.'"  *Willis v. Big Lots, Inc.*, 2017 WL 1074048, at *4 n.4 (S.D. Ohio Mar. 17, 2017) (quoting *Burns*, 967 F. Supp. 2d at 1151); *see also Halliburton II*, 573 U.S. at 280 (event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events").  As explained in the Dalrymple Rpt., the event study identified a cause-and-effect relationship between the release of new, Acadia-specific information and the movement in Acadia's stock price.  Dalrymple Rpt., ¶¶55-71.

### (2)   The *Krogman* Factors

**Acadia Had an Extremely Large Market Capitalization**.  Courts have considered a large market capitalization to be indicative of market efficiency on the premise that investors have a greater incentive to invest in more highly capitalized corporations. *Krogman*, 202 F.R.D. at 478; *Psychiatric Sols.*, 2012 WL 1071281, at *32 (capitalization between $600 million and $1.2 billion favored a determination of market efficiency).  Here, Acadia's market capitalization exceeded $2.1 billion on every trading day of the Class Period – further indicating that it traded in an efficient market.  Dalrymple Rpt., ¶74.

- 17 -

**Acadia Stock Had a Narrow Bid-Ask Spread**. A narrow bid-ask spread – *i.e.*, a small difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares – indicates a more efficient market. *See Krogman*, 202 F.R.D. at 478. Acadia's common stock had a very narrow bid-ask spread, averaging 0.04% during the Class Period. Dalrymple Rpt., ¶79. This supports the finding that Acadia traded in an efficient market. *Psychiatric Sols.*, 2012 WL 1071281, at \*32 (average bid-ask spread of $0.04 indicated an efficient market).

**Acadia Had a Large Public Float**. Courts also consider public float – *i.e.*, the percentage of shares held by the public, rather than insiders and affiliated entities – in assessing market efficiency. *Krogman*, 202 F.R.D. at 478. Acadia's public float was considerable, ranging between 61.2% and 97.8% of all shares outstanding throughout the Class Period. Dalrymple Rpt., ¶75. This large public float provides further evidence that Acadia traded in an efficient market.

   **b.**  **Plaintiffs Are Entitled to a Presumption of Reliance Pursuant to *Affiliated Ute***

With respect to reliance, predominance is also met because Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Plaintiffs' claims are based, in part, on Defendants' scheme to artificially inflate the value of Acadia securities and material omissions; *Affiliated Ute* applies to such scheme claims, as well as claims "involving primarily a failure to disclose." *Id*. at 153; *see, e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 288-90 (D. Minn. 2018) (certifying class and holding that plaintiffs could invoke the *Affiliated Ute* presumption for their scheme liability claims). In such cases, "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153-54. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable

- 18 -

investor might have considered them important in the making of [their] decision." *Id.* Moreover, because materiality itself is a common question, Plaintiffs need not prove materiality at the class certification stage. *Amgen*, 568 U.S. at 467 ("[B]ecause '[t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor,' materiality can be proved through evidence common to the class."); *Halliburton II*, 573 U.S. at 281-83 (same).

Here, Plaintiffs alleged that Defendants engaged in a scheme to defraud investors by, *inter alia*, the understaffing and widespread adverse patient issues at Acadia facilities. Accordingly, *Affiliated Ute*'s presumption of reliance also applies. *Burges*, 2017 WL 2772122, at *10.

### 2. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

Courts have uniformly recognized that a class action is superior to other available methods for the fair and efficient resolution of securities class actions. Under Rule 23(b)(3), consideration of the following factors determines whether the "superiority" requirement is met: (1) the class members' interests in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Here, each factor weighs strongly in favor of class certification.

Most class members' interests in individually prosecuting separate actions is minimal as the trouble and expense of doing so would be prohibitive when weighed against the potential recoveries. Additionally, the maintenance of a class action in this District ensures an efficient expenditure of resources and consistent rulings on the Class' claims. *See Psychiatric Sols.*, 2012 WL 1071281, at *39 ("[C]ertification of this action as a class action is a vastly superior method of adjudication

- 19 -

because the common issues will only have to be heard and decided once, thereby promoting judicial efficiency."). This District is a desirable forum for this class action: individual class members are most likely located in geographically dispersed areas, Acadia is headquartered in this District and many of the acts and practices complained of occurred in substantial part in this District. Plaintiffs do not foresee any management difficulties that preclude this action from proceeding as a class action. Consistent with the requirements of Rule 23(b)(3), certification of this action as a class action would not only be superior to other available methods, but appears to be the sole method for fairly and efficiently litigating the class members' claims.

## IV.   CONCLUSION

For the foregoing reasons, Lead Plaintiffs' Motion for Class Certification should be granted.

DATED: February 1, 2022

ROBBINS GELLER RUDMAN
  & DOWD LLP
JERRY E. MARTIN, #20193
CHRISTOPHER M. WOOD, #032977


                          s/ Christopher M. Wood
                   CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
jmartin@rgrdlaw.com
cwood@rgrdlaw.com

- 20 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DARRYL J. ALVARADO
J. MARCO JANOSKI GRAY
TING H. LIU
T. ALEX B. FOLKERTH
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dalvarado@rgrdlaw.com
mjanoski@rgrdlaw.com
tliu@rgrdlaw.com
afolkerth@rgrdlaw.com

Lead Counsel for Plaintiffs

DOWD, BLOCH, BENNETT, CERVONE,
  AUERBACH & YOKICH
JUSTIN J. LANNOYE
8 South Michigan Avenue, 19th Floor
Chicago, IL 60603
Telephone:  312/372-1361
312/372-6599 (fax)
jlannoye@laboradvocates.com

Counsel for Chicago & Vicinity Laborers'
District Council Pension Fund

PITTA LLP
MICHAEL BAUMAN
120 Broadway, 28th Floor
New York, NY  10271
Telephone: 212/652-3890
212/652-3891 (fax)
mbauman@pittalaw.com

Counsel for New York Hotel Trades Council &
Hotel Association of New York City, Inc. Pension
Fund

- 21 -

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on February 1, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

E-mail: cwood@rgrdlaw.com

- 1 -

**Mailing Information for a Case 3:18-cv-00988 St. Clair County Employees' Retirement System v. Acadia Healthcare Company, Inc. et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **AMALGAMATED BANK, TRUSTEE**
  PKNASHLAW@AOL.COM

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **BOSTON RETIREMENT SYSTEM**
  PKNASHLAW@AOL.COM

- **Michael Bauman**
  mbauman@pittalaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Lisa R. Bugni**
  lbugni@kslaw.com

- **Thomas H. Burt**
  burt@whafh.com

- **Regina M. Calcaterra**
  calcaterra@whafh.com

- **Jessica Perry Corley**
  jpcorley@kslaw.com

- **Patrick Donovan**
  donovan@whafh.com

- **Timothy Alexander Benwa Folkerth**
  afolkerth@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Elizabeth O. Gonser**
  egonser@rwjplc.com,nnguyen@rwjplc.com

- **J. Marco Janoski Gray**
  mjanoski@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew M. Guiney**
  guiney@whafh.com

- **Brandon R. Keel**
  bkeel@kslaw.com

- **Justin J. Lannoye**
  jlannoye@laboradvocates.com

- **Ting H. Liu**
  tliu@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,jkarsten@barrettjohnston.com,ealexander@barrettjohnston.com,jmartin@rgrdlaw.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,EWard@kslaw.com,dgibby@rwjplc.com

- **Thomas C. Michaud**
  tmichaud@vmtlaw.com

- **Danielle S. Myers**
  danim@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **PLYMOUTH COUNTY RETIREMENT ASSOC**
  PKNASHLAW@AOL.COM

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Ronni D. Solomon**
  rsolomon@kslaw.com

- **David C. Walton**
  davew@csgrr.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,agonzales@ecf.courtdrive.com,CWood@ecf.courtdrive.com,agonzales@rgrdlaw.coom,e_file_sd@rgrdlaw.com,mkuwashima@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)