# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) CIVIL ACTION NO.: 3:18-cv-00988 |
| | ) |
| | ) |
| | ) Judge William L. Campbell, Jr. |
| Plaintiff, | ) Magistrate Judge Alistair Newbern |
| | ) |
| v. | ) |
| | ) |
| ACADIA HEALTHCARE COMPANY, INC., | ) |
| *et al.*, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## MOTION FOR CLASS CERTIFICATION

Dated: March 1, 2022

Steven A. Riley (BPR # 006258)
Milton S. McGee, III (BPR # 024150)
Elizabeth O. Gonser (BPR # 026329)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
(615) 320-3700
sriley@rwjplc.com
tmcgee@rwjplc.com
egonser@rwjplc.com

Jessica P. Corley (*pro hac vice*)
Lisa R. Bugni (*pro hac vice*)
Brandon R. Keel (*pro hac vice*)
Ronni D. Solomon (*pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street N.E.
Atlanta, GA 30309
(404) 572-4600
jpcorley@kslaw.com
lbugni@kslaw.com
bkeel@kslaw.com
rsolomon@kslaw.com

*Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

I.     THE *BASIC* PRESUMPTION DOES NOT APPLY TO PLAINTIFFS' US-BASED CLAIMS. ................................................................................................................. 7

     A.     The October 11, 2018 *Aurelius Value* Report Had No Price Impact. .................... 8

               1.     There Was No Statistically Significant Price Reaction To The *Aurelius Value* Report. ........................................................................................... 9

               2.     Other Evidence Demonstrates That The *Aurelius Value* Report Had No Price Impact. ................................................................................................. 13

     B.     The November 16, 2018 *Seeking Alpha* Article Had No Price Impact. .............. 16

               1.     Intraday Trading Prices Demonstrate That The *Seeking Alpha* Article Had No Price Impact. ..................................................................................... 16

               2.     Other Evidence Demonstrates That The *Seeking Alpha* Article Had No Price Impact. ............................................................................................... 17

II.     THE *AFFILIATED UTE* PRESUMPTION DOES NOT APPLY TO PLAINTIFFS' US-BASED CLAIMS. ......................................................................................................... 20

III.     PLAINTIFFS FAIL TO SATISFY RULE 23(B)(3)'S PREDOMINANCE REQUIREMENT FOR THEIR ALLEGED "SCHEME" CLAIM. ................................ 22

CONCLUSION ................................................................................................................. 29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advance Auto Parts, Inc., Sec. Litig.*,
No. CV 18-212-RGA, 2020 WL 6544637 (D. Del. Nov. 6, 2020)..........................................8

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)...................................................................................... *passim*

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) ...............................................................................9, 19

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)...............................................................................................1

*Anschutz Corp. v. Merrill Lynch & Co. Inc.*,
785 F. Supp. 2d 799 (N.D. Cal. 2011) ..................................................................25

*In re Apple Inc. Sec. Litig.*,
No. 4:19-CV-2033-YGR, 2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ................................13

*Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
879 F.3d 474 (2d Cir. 2018)........................................................................................9

*In re BancorpSouth, Inc.*,
No. 16-0505, 2016 WL 5714755 (6th Cir. Sept. 6, 2016) ........................................6

*In re BancorpSouth, Inc.*,
No. 17-0508, 2017 WL 4125647 (6th Cir. Sept. 18, 2017)..........................8, 11, 12

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................... *passim*

*Binder v. Gillespie*,
184 F.3d 1059 (9th Cir. 1999) ...............................................................................21

*In re BP p.l.c. Sec. Litig.*,
No. 4:10-md-2185, 2013 WL 6388408 (N.D. Tex. Dec. 6, 2013) ...................................28, 29

*Brokop v. Farmland Partners Inc.*,
No. 18-CV-02104-DME-NYW, 2021 WL 4913970 (D. Colo. Sept. 30, 2021)...........13

*Burges v. Bancorpsouth, Inc.*,
No. 3:14-CV-1564, 2017 WL 2772122 (M.D. Tenn. June 26, 2017) ...................................21

*Cavalier Carpets, Inc. v. Caylor*,
   746 F.2d 749 (11th Cir. 1984) ............................................................20

*Clayton, Jr. v. Heartland Resources, Inc.*,
   Case No. 1:08-CV-94-JHM, 2010 WL 4778787 (W.D. Ky. Nov. 16, 2010).........................22

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)....................................................................4, 28, 29

*Cosby v. KPMG, LLP*,
   No. 3:16-CV-121-TAV-DCP, 2021 WL 1828114 (E.D. Tenn. May 7, 2021).......................21

*Cox v. Collins*,
   7 F.3d 394 (4th Cir. 1993) .............................................................3, 21

*Desai v. Deutsche Bank Sec. Ltd.*,
   573 F.3d 931 (9th Cir. 2009) ......................................................23, 24, 25

*In re DVI Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Pa. 2008)............................................................24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   309 F.R.D. 251 (N.D. Tex. 2015) ....................................................9, 11, 13

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011).....................................................................19

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
   301 F.R.D. 116 (S.D.N.Y. 2014).........................................................28

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
   No. 10 CIV. 3461 (PAC), 2021 WL 5826285 (S.D.N.Y. Dec. 8, 2021) ......................15

*Geoffrey A. Orley Revocable Tr. U/A/D 1/26/2000 v. Genovese*,
   No. 18 CIV. 8460 (ER), 2020 WL 611506 (S.D.N.Y. Feb. 7, 2020) ......................26

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
   141 S. Ct. 1951 (2021)........................................................... *passim*

*Gordon v. Elite Consulting Grp. L.L.C.*,
   No. 09–CV–10772, 2009 WL 4042911 (E.D. Mich. Nov. 19, 2009)......................26

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)............................................................. *passim*

*Hawaii Ironworkers Annuity Tr. Fund v. Cole*,
   296 F.R.D. 549 (N.D. Ohio 2013) ........................................................24

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
   818 F.3d 775 (8th Cir. 2016) ...................................................................................11, 13

*In re Interbank Funding Corp. Sec. Litig.*,
   629 F.3d 213 (D.C. Cir. 2010) .................................................................................21, 22

*In re Intuitive Surgical Sec. Litig.*,
   No. 5:13-cv-01920-EJD, 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) .....................9, 11, 13

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)........................................................................................... *passim*

*Johnston v. HBO Film Mgmt., Inc.*,
   265 F.3d 178 (3d Cir. 2001).........................................................................................22

*Joseph v. Wiles*,
   223 F.3d 1155 (10th Cir. 2000), *abrogated on other grounds by California
   Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017)...........................20, 21, 22, 25

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)..........................................................................................23

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
   No. CV 16-112 (MN), 2020 WL 5026553 (D. Del. Aug. 25, 2020) ................................21, 22

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019).............................................................................................26, 27

*In re Mattel, Inc. Sec. Litig.*,
   No. 2:19-CV-10860-MCS-PLA, 2021 WL 4704578 (C.D. Cal. Oct. 6, 2021).....................13

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016)..............................................................................23

*In re Moody's Corp. Sec. Litig.*,
   274 F.R.D. 480 (S.D.N.Y. 2011) ...............................................................................11, 13

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008).............................................................................................19

*Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
   332 F.R.D. 556 (M.D. Tenn. 2019), *order clarified*, 334 F.R.D. 118 (M.D.
   Tenn. 2019), *and leave to appeal denied sub nom. In re Cmty. Health Sys.,
   Inc.*, No. 19-0509, 2019 WL 5549319 (6th Cir. Oct. 23, 2019) .........................................21

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   No. 4:08CV0160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ......................................11

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
    679 F.3d 972 (8th Cir. 2012) ...............................................................23

*Puddu v. 6D Glob. Tech., Inc.*,
    No. 15-cv-8061 (AJN), 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021)...............................3, 27

*Rikos v. Procter & Gamble Co.*,
    799 F.3d 497 (6th Cir. 2015) .................................................................6

*Schwartzman v. Morningstar, Inc.*,
    No. CIV.A. 12-1647, 2014 WL 3843875 (E.D. Pa. Aug. 5, 2014) ......................................21

*SEC v. Kameli*,
    No. 17 C 4686, 2020 WL 2542154 (N.D. Ill. May 19, 2020) ...............................27

*SEC v. Rio Tinto PLC*,
    No. 17CIV7994 (AT) (DCF), 2021 WL 818745 (S.D.N.Y. Mar. 3, 2021)...........................27

*In re Silver Wheaton Corp. Sec. Litig.*,
    No. 2:15-CV-05146-CAS(JEMx), 2017 WL 2039171 (C.D. Cal. May 11,
    2017) ...............................................................................22

*Stoneridge v. Scientific-Atlanta*,
    552 U.S. 148 (2008).....................................................................24, 25, 26

*In re Teva Sec. Litig.*,
    No. 3:17-CV-558 (SRU), 2021 WL 1197805 (D. Conn. Mar. 30, 2021)...............................27

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    325 F.R.D. 280 (D. Minn. 2018)................................................................25

*Wal–Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)........................................................................6, 7

*Willis v. Big Lots, Inc.*,
    242 F. Supp. 3d 634 (S.D. Ohio 2017) .................................................................8

*Wilson v. Comtech Telecomms Corp.*,
    648 F.2d 88 (2d Cir. 1981)......................................................................20

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ..............................................................6

**Other Authorities**

17 C.F.R. § 240.10b-5................................................................ *passim*

Federal Rule of Civil Procedure 23 ................................................ *passim*

Katia Porzecanski and Tom Schoenberg, *Vast DOJ Probe Looks at Almost 30 Short-Selling Firms and Allies* (Feb. 4, 2022, 11:34 AM), https://news.bloomberglaw.com/securities-law/vast-doj-probe-looks-at-almost-30-short-selling-firms-and-allies....................................................................8

Case 3:18-cv-00988   Document 120   Filed 03/01/22   Page 7 of 39 PageID #: 3580

## INTRODUCTION

Plaintiffs[1] should have adhered to the class period alleged in the initial complaint of February 23, 2017 through October 24, 2017 (the "UK Class Period").[2] The initial complaint and the associated class period relate solely to allegations regarding the operations of Acadia Healthcare Company, Inc. ("Acadia") in the United Kingdom. Defendants[3] do not oppose certifying a class of purchasers who acquired Acadia stock during the UK Class Period.

Through the amended complaint, however, Plaintiffs seek a vastly expanded class period of April 30, 2014 through November 15, 2018 (the "US Class Period"). Plaintiffs do so by adding purported misstatements regarding Acadia's operations in the United States.[4] But the US-based allegations cannot be certified to proceed as a class because Plaintiffs cannot prove the requisite element of reliance on a class-wide basis for the US Class Period.

It is axiomatic that Plaintiffs must prove as an essential element of their securities fraud claims that they relied on the allegedly false or misleading statements when purchasing Acadia stock. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 462-63 (2013). For purchasers of stock during the US Class Period to be certified as a class, Plaintiffs must therefore establish that reliance can be proven on a class-wide basis. *See id.* If Plaintiffs fail to meet that burden, certification must be denied because the inquiry into whether any investor relied on the alleged misrepresentations is inherently individualized and "would overwhelm questions common

---

[1] "Plaintiffs" refers to New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and Chicago & Vicinity Laborers' District Counsel Pension Fund.

[2] *See* ECF 1. In the amended complaint, the UK allegations are at Section V(B). *See* ECF 39 ¶¶ 158-178.

[3] "Defendants" refers to Acadia, Joey Jacobs (Acadia's former CEO), Brent Turner (Acadia's former President), and David Duckworth (Acadia's CFO).

[4] The US allegations are in the amended complaint at Section V(A). *See* ECF 39 ¶¶ 111-157.

1

to the class," thus defeating predominance under Rule 23(b)(3) and making certification of the class improper. *Id.*

Here, Plaintiffs seek to prove reliance on a class-wide basis for the US Class Period by invoking two separate presumptions: the fraud-on-the-market presumption recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the rarely invoked presumption for omission-based claims recognized in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Neither presumption, however, applies to the US Class Period.

**The *Basic* Presumption**. The *Basic* presumption rests on the theory that "the price of stock traded in an efficient market reflects all public, material information—including material misstatements," and thus that "anyone who buys or sells the stock at the market price may be considered to have relied on those misstatements" when doing so. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263 (2014) ("*Halliburton II*"). But the *Basic* presumption does not always apply, even for stock traded in an efficient market.

One fundamental premise of *Basic*'s theory is that the alleged misrepresentations influenced the market price of the security at issue—*i.e.*, that the alleged misrepresentations had "price impact." *Id.* at 278. If the misrepresentations did not have price impact, then an investor cannot be said to have "indirectly relied on [those] misrepresentation[s] through his reliance on the integrity of the market price." *Id.* (quotation omitted). Accordingly, Defendants can rebut the *Basic* presumption by presenting evidence that the "alleged misrepresentation[s] did not actually affect the market price." *Id.* at 284.

In this case, purchasers of Acadia stock during the US Class Period cannot be certified as a class because the alleged misstatements and omissions regarding Acadia's US operations did not have price impact. Plaintiffs contend that the "truth" of those US-based misstatements was

revealed through two corrective disclosures: (i) the October 11, 2018 report published online by *Aurelius Value*, and (ii) the November 16, 2018 article published online by *Seeking Alpha*. *See* ECF 39 ¶¶ 185-190; *see also id.* ¶¶ 129, 148, 157. But the evidence conclusively proves that when this so-called truth was revealed, it did not impact Acadia's stock price. *See* Ex. 1, Allen Rpt. ¶¶ 28-56. As a result, the *Basic* presumption cannot apply for the alleged misrepresentations concerning Acadia's US operations.

**The *Affiliated Ute* Presumption.** The *Affiliated Ute* presumption of reliance likewise cannot be used to establish class-wide reliance during the US Class Period. That presumption applies only in cases involving "primarily a failure to disclose." *See* 406 U.S. at 153. But where the complaint challenges affirmative misrepresentations, as Plaintiffs clearly do here, the *Affiliated Ute* presumption does not apply. *See Cox v. Collins*, 7 F.3d 394, 395–96 (4th Cir. 1993) ("The *Affiliated Ute* presumption of reliance is not warranted in a Rule 10b–5 case when the plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure as in *Affiliated Ute*.").

**"Scheme" Claim.** Plaintiffs also fail to satisfy Rule 23(b)(3)'s predominance requirement for their claim that "defendants engaged in a scheme to defraud" in violation of subsections (a) and (c) of Rule 10b-5, 17 C.F.R. § 240.10b-5 (*see* ECF 39 ¶¶ 3, 244). Scheme claims under subsections (a) or (c) cannot consist merely of the same alleged misstatements that form the basis of Plaintiffs' claim under subsection (b), which prohibits the "making" of any untrue statement of material fact. *See* 17 C.F.R. § 240.10b-5(b). Rather, "[a] claim brought under subsection [(a) or] (c) would have to establish different elements than one brought under subsection (b), including, notably, the existence of an alleged scheme to defraud." *Puddu v. 6D Glob. Tech., Inc.*, No. 15-cv-8061 (AJN), 2021 WL 1198566, *11 (S.D.N.Y. Mar. 30, 2021). Here, however, Plaintiffs have

never identified what conduct comprised this alleged scheme. If the scheme consists of nothing more than the alleged misstatements, as one of the proposed class representatives testified, the scheme claim completely overlaps with the US-based misrepresentation claims and cannot be certified because Plaintiffs cannot prove class-wide reliance for the reasons discussed above. And to the extent that the alleged scheme consists of something other than the alleged misstatements, Plaintiffs cannot obtain certification for that claim because (i) the *Basic* presumption does not apply where, as here, Plaintiffs do not allege that the scheme itself was ever publicly revealed, (ii) the *Affiliated Ute* presumption does not apply to such claims, and (iii) given that Plaintiffs do not contend that the scheme was publicly revealed, they have failed to present any viable model for determining damages for this theory on a class-wide basis, as required under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

For these and the other reasons discussed below, Defendants request that the Court limit the certified class to the UK allegations and the UK Class Period.

## BACKGROUND

Acadia is a provider of behavioral healthcare services that is headquartered in Franklin, Tennessee. *See* Ex. 2, Acadia FY 2018 Form 10-K, at 1, 5. Through hundreds of facilities located throughout the US and the UK during the putative class period, Acadia provides treatment to patients of all ages and a wide range of conditions, including to those suffering from the most severe behavioral issues who "are either a threat to themselves or to others." *Id.* at 5. Acadia also operates specialty treatment centers, which primarily provide services "to patients who abuse addictive substances such as alcohol, illicit drugs or opiates," and also "treat other addictions and behavioral disorders such as chronic pain, sexual compulsivity, compulsive gambling, mood disorders, emotional trauma and abuse." *Id.* at 6-7.

4

In the amended complaint, Plaintiffs allege that Defendants violated the federal securities laws by issuing false and misleading statements that fall into two distinct buckets. *See* ECF 39 at 32, 59. First, Plaintiffs challenge a series of alleged misstatements concerning Acadia's US operations. *Id.* at § V(A). Plaintiffs allege that Defendants issued false and misleading US-based statements concerning (i) Acadia's commitment to providing quality care, (ii) the adequacy of staffing levels at Acadia facilities, and (iii) management's belief that Acadia was in compliance with regulatory requirements. *Id.* ¶¶ 111-156. Plaintiffs contend that the truth of these alleged misstatements was publicly revealed through two separate corrective disclosures: (i) the October 11, 2018 *Aurelius Value* report that allegedly "document[ed] systematic instances of patient abuse and neglect at dozens of Acadia facilities, caused primarily by understaffing," *id.* ¶ 9, and (ii) the November 16, 2018 *Seeking Alpha* article that "attributed Acadia's recent revenue and margin increases to cost-cutting and 'reducing the quality of care,'" as well as "highlighted severe problems at seven of Acadia's facilities," *id.* ¶ 11; *see also id.* ¶¶ 129, 148, 157 (alleging that the challenged US-based statements concerning quality of care, staffing levels, and regulatory compliance were false or misleading based on information revealed in the *Aurelius Value* and *Seeking Alpha* articles); *id.* ¶¶ 185-190 (alleging that the truth of those alleged misstatements was revealed in these articles).

Second, Plaintiffs challenge statements concerning financial guidance as to Acadia's operations in the UK. *See id.* § V(B), ¶¶ 3-4, 21-39. These allegations are distinct from the challenged statements concerning Acadia's US operations. Indeed, unlike the US-based statements, Plaintiffs allege that the truth of these UK-based statements was revealed on October 24, 2017, when Acadia issued its third quarter earnings release, in which it reported earnings below expectations, explained that the UK results were negatively impacted by a lower census (*i.e.*,

patient admissions) and higher operating costs, and lowered its financial guidance. *Id.* ¶¶ 4-5, 41-43.

Based on these allegations, Plaintiffs seek certification of a class of all persons or entities that purchased Acadia common stock during the US Class Period. *Id.* ¶ 1. But, as discussed below, that class cannot be certified under Rule 23. Instead, the Court should grant class certification solely as to Plaintiffs' claims regarding Acadia's UK operations during the UK Class Period.

## LEGAL STANDARD

The Supreme Court has made clear that class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). "[T]o justify a departure from that rule" and obtain class certification, Plaintiffs bear the burden of satisfying all the requirements of Rule 23(a) and at least one requirement of Rule 23(b). *Id.* And they cannot do so with mere allegations or conclusory assertions. *Id.* at 350. Plaintiffs must, instead, "prove the Rule 23 certification requirements" are met with evidence. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012).

The Court must hold Plaintiffs to that burden. It may grant class certification only if it finds, after conducting a "rigorous analysis" of the evidence submitted, that the Rule 23 requirements are satisfied. *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 504 (6th Cir. 2015). "A district judge may not duck hard questions by observing that each side has some support . . . . Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives." *In re BancorpSouth, Inc.*, No. 16-0505, 2016 WL 5714755, at *1 (6th Cir. Sept. 6, 2016) (quotation marks omitted). And where, as here, both parties submit competing expert reports, the Court must carefully weigh the persuasiveness of that expert

6

testimony and resolve conflicts between the experts when deciding whether to certify a class. *See Wal-Mart Stores, Inc.*, 564 U.S. at 353-56.[5]

## ARGUMENT

A rigorous analysis of the evidence in this case, including evaluating the report of Defendants' expert, Lucy P. Allen, compels the conclusion that the US Class Period cannot be certified under Rule 23(b)(3), which requires Plaintiffs to prove "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).[6] Because reliance is an essential element of Plaintiffs' securities fraud claims, and the inquiry into reliance is inherently individualized, *Halliburton II*, 573 U.S. at 262-63, Plaintiffs must establish that a presumption of reliance applies to obtain class certification. Simply put, "without [a] presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action." *Id.* at 281. Here, neither presumption Plaintiffs attempt to invoke applies to their US-based claims and, as a result, those claims cannot be certified under Rule 23(b)(3). The same is true for Plaintiffs' purported "scheme" claim, for which Plaintiffs cannot show predominance of common issues.

## I. THE *BASIC* PRESUMPTION DOES NOT APPLY TO PLAINTIFFS' US-BASED CLAIMS.

Seeking to avoid the individualized inquiry of reliance, Plaintiffs rely primarily on *Basic*'s fraud-on-the-market theory. *See* ECF 113 at 13-18. *Basic* allows for a presumption that "anyone who buys or sells the stock at the market price" did so in reliance on the alleged misrepresentations, which in theory would be reflected in the price of a stock traded in an efficient market. *Halliburton*

---

[5] Consistent with Rule 23's standards, Defendants are filing simultaneously with this opposition a motion requesting the Court to conduct an evidentiary hearing to address the parties' competing evidence, including the competing expert testimony, on class certification issues.

[6] Rule 23(b)(3) is the exclusive basis under which Plaintiffs seek certification. *See* ECF 113 at 12.

*II*, 573 U.S. at 263. Plaintiffs must present evidence that Acadia stock traded in an efficient market to invoke this presumption. *Id.* Defendants may then rebut this presumption by showing that the alleged misrepresentations did not actually impact the stock price. *Id.* at 278-89.[7]

As courts have recognized, "[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed." *In re Advance Auto Parts, Inc., Sec. Litig.*, No. CV 18-212-RGA, 2020 WL 6544637, at *4 (D. Del. Nov. 6, 2020). Accordingly, Defendants may demonstrate a lack of price impact, and thereby rebut the *Basic* presumption, by showing that Acadia's stock price was not affected when the "truth" of the alleged misrepresentations was publicly revealed. *See Willis v. Big Lots, Inc*., 242 F. Supp. 3d 634, 659 (S.D. Ohio 2017).[8] Defendants have done so here with respect to the US-based statements.

### A.    The October 11, 2018 *Aurelius Value* Report Had No Price Impact.

As noted above, Plaintiffs allege that the truth of the US-based statements was first revealed on October 11, 2018, when a short seller, *Aurelius Value* (which is now reportedly being investigated by the DOJ for possible market manipulation),[9] "published a report and released a

---

[7] The Supreme Court has clarified that a defendant bears the burden of persuasion on this issue, a previously open question in the Sixth Circuit. *See Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.,* 141 S. Ct. 1951, 1962-63 (2021). But, as the Supreme Court acknowledged, allocation of that burden is "unlikely to make much difference on the ground" in cases where, as here, the parties submit competing expert evidence on price impact. *Id.* at 1963. And, in any event, Defendants have satisfied that burden here.

[8] This is typically referred to as "back-end" price impact. *See In re BancorpSouth, Inc.*, No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017). A lack of price impact also may be demonstrated by showing that the stock price was not affected when the alleged misrepresentations were first issued—*i.e.*, lack of "front-end" price impact. Here, the lack of back-end price impact is determinative, but there is no evidence of front-end price impact either. *See* Allen Rpt. ¶ 20. The lack of *any* price impact distinguishes this case from the results reached in *Advance Auto Parts* and *Willis*, where the courts granted class certification but only because, unlike Defendants here, the defendants failed to demonstrate a lack of back-end price impact. *See Advance Auto Parts*, 2020 WL 6544637, at *4; *Willis*, 242 F. Supp. 3d at 658-59.

[9] Katia Porzecanski and Tom Schoenberg, *Vast DOJ Probe Looks at Almost 30 Short-Selling Firms and Allies* (Feb. 4, 2022, 11:34 AM), https://news.bloomberglaw.com/securities-law/vast-doj-probe-looks-at-almost-30-short-selling-firms-and-allies.

video documenting systematic instances of patient abuse and neglect at dozens of Acadia facilities, caused primarily by understaffing." *See* ECF 39 ¶¶ 3, 185, 189. But despite what Plaintiffs suggest, the *Aurelius Value* report did not impact Acadia's stock price.

        1.     *There Was No Statistically Significant Price Reaction To The Aurelius Value Report.*

A common and scientifically accepted method for determining whether particular information impacted a stock price is through an event study. *See* Allen Rpt. ¶ 26; *see also Halliburton II*, 573 U.S. at 280 (noting that parties commonly submit event studies to determine whether information had a price impact); *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (7th Cir. 2020) ("[E]vent studies have come to be treated as the sine qua non for proving or disproving price impact and loss causation."). Because stock prices move all the time for any number of reasons, or no reason at all, an event study seeks to isolate the impact of particular information on a company's stock price by, among things, adjusting for price movements resulting from market or industry fluctuations in general, as opposed to the particular information in question. *Id.* An event study also incorporates the concept of statistical significance to determine the likelihood that particular information impacted the stock price. *Id.* ¶¶ 26-27. If the price movement following the release of the information in question falls below the accepted threshold for statistical significance, then it cannot be said that any movement in the company's stock price that day was due to the release of that information. *Id.*[10]

---

[10] *See also Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 481 n.5 (2d Cir. 2018) (explaining that "[i]f the isolated stock price movement [in an event study] falls outside the range of typical random stock price fluctuations, it is statistically significant" and "[i]f the stock price movement is indistinguishable from random price fluctuations, it cannot be attributed to company-specific information announced on the event date"); *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 270 (N.D. Tex. 2015) (stating that price movement below a 95% confidence level is not statistically significant and does not show price impact); *In re Intuitive Surgical Sec. Litig.*, No. 5:13-cv-01920-EJD, 2016 WL 7425926, at *15 (N.D. Cal. Dec. 22, 2016) (same).

Defendants' expert, Ms. Allen, followed that accepted methodology and conducted an event study to evaluate whether the October 11, 2018 *Aurelius Value* report impacted Acadia's stock price. Allen Rpt. ¶¶ 28-34. As Ms. Allen explains in her report, this event study conclusively shows that, "[c]ontrary to Plaintiffs' theory, there was no statistically significant reaction in Acadia's stock price on October 11, 2018 following the release of the *Aurelius Value* report." *Id.* ¶ 29. Rather, as the chart below demonstrates, any movement in Acadia's stock price on October 11, 2018 was within the normal range of expected daily price variations and cannot be attributed to the information in the *Aurelius Value* report—"[i]n other words," the "movement of the price on this date is just the usual 'noise'":



*Id.* ¶¶ 29-30.

The event study conducted by Plaintiffs' expert, Scott Dalrymple, showed the same. Although Mr. Dalrymple concedes that he did "not express an opinion" or "perform any analysis" as to whether the alleged misrepresentations and omissions in this case had a price impact, *see* Ex. 3, Dalrymple Dep. at 187:8-23, he did conduct his own event study to show that Acadia's stock

traded in an efficient market. *See* ECF 114-3 at 13-17. Like Ms. Allen's study, the event study Mr. Dalrymple conducted shows that the October 11, 2018 *Aurelius Value* report had no statistically significant impact on Acadia's stock price. *See* Allen Rpt. ¶ 29.

That effectively ends the inquiry as to the *Aurelius Value* report. Where the information that the plaintiff claims revealed the truth of the alleged misstatements had no statistically significant impact on the company's stock price, the *Basic* presumption does not apply. *See, e.g.*, *Halliburton*, 309 F.R.D. at 270, 271, 274, 276 (holding that the defendant showed lack of price impact from alleged corrective disclosures and consequently rebutted the *Basic* presumption as to misstatements purportedly revealed on those dates); *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) (finding that defendants sufficiently showed lack of price impact where price movement resulted from the release of information that was not connected to the alleged fraudulent misstatements); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (refusing to certify class due to lack of statistically significant price impact from alleged corrective disclosures); *In re Intuitive Surgical Secs. Litig.*, 2016 WL 7425926, at *15 (finding a lack of price impact with regard to the release of the company's disappointing financial results because neither party's expert "found a statistically significant price impact at the 95% confidence level for this date"); *see also Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840, at *13 (N.D. Ohio Aug. 14, 2018) ("Expert testimony on back-end price impact is also admissible and directly relevant at the class certification stage."); *BancorpSouth,* 2017 WL 4125647, at *1 (noting that lack of price impact can be demonstrated at the time of alleged correction).[11]

---

[11] In *Bancorp*, the Sixth Circuit refused to grant the defendants' Rule 23(f) petition, noting that the defendants solely attempted to demonstrate a lack of "front-end" price impact at the time the

Plaintiffs know full well that there was no price impact from the October 11, 2018 *Aurelius Value* report. So, in their amended complaint, they try to obscure that issue by alleging that Acadia's stock price declined the day after that report was issued, on October 12, 2018. ECF 39 ¶¶ 10, 189. This attempt to evade the lack of price impact fails for at least two reasons.

*First*, if the market for Acadia's stock was efficient, as Plaintiffs must show to invoke the *Basic* presumption, any reaction from the *Aurelius Value* report would have occurred the day it was issued. *See* Allen Report ¶ 31. "[G]iven that there was no statistically significant price reaction on October 11 according to Plaintiffs' own event study, there is no basis to conclude that in an efficient market Acadia's price would start reacting to the *Aurelius Value* Report on October 12, almost a full trading day after the report was released." *Id.* Thus, Plaintiffs' theory that the reaction occurred a day later would require finding that Acadia's stock did *not* trade in an efficient market, because, as Plaintiffs' expert acknowledges, in an efficient market, Acadia's stock price would immediately reflect newly available "value-relevant information." *See* Dalrymple Rpt. ¶¶ 37-40; *see also* Allen Rpt. ¶ 31 ("[T]he *majority* of the stock market response is [ ] completed within 5 to 10 minutes.").

*Second*, Plaintiffs' attempt to rely on the stock movement on October 12th fails because, as Ms. Allen explains, "even if there was some basis to conclude that the reaction started on October 12 . . . the reaction would have continued the next trading day, October 15, when Acadia's stock price bounced back by almost 8% despite no new company-specific news." Allen Rpt. ¶ 32. And the cumulative price reaction from October 11, 2018 to October 16, 2018, remains statistically *in*significant. *Id.*

---

alleged misrepresentations were made. *See Bancorp*, 2017 WL 4125647, at *1. Here, however, Defendants' expert shows both a lack of front-end *and* back-end price impact.

Either way, the *Basic* presumption does not apply to the US-based misrepresentations that Plaintiffs claim were revealed on October 11, 2018. *See Best Buy*, 818 F.3d at 782; *Halliburton II*, 573 U.S. at 283-84; *In re Moody's Corp. Sec. Litig.*, 274 at 493; *Halliburton*, 309 F.R.D. at 270, 271, 274, 276; *In re Intuitive Surgical Secs. Litig.*, 2016 WL 7425926, at *15.[12]

> 2.    *Other Evidence Demonstrates That The Aurelius Value Report Had No Price Impact.*

As the Supreme Court recently held, "[i]n assessing price impact at class certification, courts should be open to all probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *See Goldman Sachs Grp.*, 141 S. Ct. at 1959 (internal quotations omitted). Although the Court need go no further than the event study demonstrating lack of price impact from the *Aurelius Value* report, several other pieces of evidence confirm the findings from the event study.

*First*, Ms. Allen analyzed the intraday trading prices of Acadia's stock, which "provide further evidence demonstrating that there was no market reaction to the release of the *Aurelius Value* Report." Allen Rpt. ¶ 30. Specifically, the intraday trading prices show that less than one hour after the report was issued, Acadia's stock price rose to trade even higher than it did before the report was released. *Id.*

---

[12] Those courts that have rejected defendants' arguments of lack of price impact have done so under circumstances not present here—*e.g.*, where the defendant did not demonstrate a lack of back-end price impact or failed to offer an event study to support their arguments. *See, e.g., In re Mattel, Inc. Sec. Litig.*, No. 2:19-CV-10860-MCS-PLA, 2021 WL 4704578, at *6 (C.D. Cal. Oct. 6, 2021) (defendants failed to dispute the existence of back-end price impact and focused solely on whether corrective disclosures "fully" mirrored the alleged misrepresentations); *In re Apple Inc. Sec. Litig.*, No. 4:19-CV-2033-YGR, 2022 WL 354785, at *8 (N.D. Cal. Feb. 4, 2022) (similar); *Brokop v. Farmland Partners Inc.*, No. 18-CV-02104-DME-NYW, 2021 WL 4913970, at *7 (D. Colo. Sept. 30, 2021) (defendants failed to show lack of back-end price impact where event study demonstrated a statistically significant price movement and defendants' expert failed to offer analysis tying this movement to other causes).

13

*Second*, commentary from the market analysts is also "consistent with the lack of a price reaction to the to the *Aurelius Value* report." *Id.* ¶ 33. As Ms. Allen explains:

> Thirteen of the 15 [] analysts covering Acadia at the time did not even issue reports following the *Aurelius Value* report. The two analysts that issued reports acknowledge that the *Aurelius Value* report portrayed the Company in a negative light, but did not indicate that the report revealed anything new about Acadia's quality of care. . . . [And a] week after the *Aurelius Value* report was released, several analysts referenced the *Aurelius Value* report in reports focused on earnings previews and/or rumors of a potential buyout. None of the analysts indicated that they had learned anything new about Acadia's quality of care [] but instead reminded investors that Acadia "generally treats a troubled patient population."

*Id.* ¶¶ 33-34. This evidence further underscores the lack of a price impact.

*Third*, the generic nature of the alleged US-based misstatements likewise supports a finding of no price impact, consistent with the Supreme Court's instruction in *Goldman Sachs Group*. Similar to the statements at issue here, the plaintiffs in that case challenged generic statements such as "[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest," "[o]ur clients' interests always come first," and "[i]ntegrity and honesty are at the heart of our business." *Goldman Sachs Grp.*, 141 S. Ct. at 1959. The Supreme Court held that the generic nature of a misrepresentation is "often" important evidence of the lack of price impact, as "a more-general statement will affect a security's price less than a more-specific statement on the same question." *Id.* at 1960 (internal quotations omitted).

The same principle counsels in favor of finding a lack of price impact from the alleged US-based misstatements here. Like the statements highlighted by the Supreme Court in *Goldman Sachs Group*, Plaintiffs' US-based claims challenge numerous generic statements that could be expected from any executive, at any company, including statements such as "[w]e strive to improve the operating results of our facilities by providing high quality services"; "we're meeting the needs and providing good quality care"; "Thank you all very, very much and always keep quality, doing the right thing, that is absolutely the first priority of this company is doing that";

and "[m]anagement believes we are in substantial compliance with all applicable laws and regulations." ECF 39 ¶¶ 112, 116, 125, 150.[13]

As the Supreme Court explained, by applying a "good dose" of "common sense," such general statements are unlikely to have impacted the price of Acadia's stock. *See Goldman Sachs Grp.*, 141 S. Ct. at 1960; *see also* Allen Rpt. ¶ 20.[14] In fact, consistent with the recognition in *Goldman Sachs Group*, the investment advisor that acquired Acadia stock on behalf of one of the proposed class representatives testified that these generic statements concerning quality of care, staffing levels, or regulatory compliance at Acadia were ***not*** part of the reasons why the advisor invested in Acadia in the first place. *See* Ex. 7, Buu-Hoan Dep. at 42:19-43:9 (acknowledging that Rice Hall James's investment thesis for the Acadia investment never mentioned "quality of care," "staffing levels," or "substantial compliance with state and federal regulatory requirements").[15]

*Finally*, further consistent with the notion that the US-based statements had no impact on Acadia's stock price, Ms. Allen studied numerous other news stories regarding Acadia's quality of care, staffing levels, or regulatory compliance that are similar to the disclosures Plaintiffs contend revealed the truth of the US-based statements. Allen Rpt. ¶¶ 48-53. That study, again, showed that none of those other reports of similar information had any statistically significant impact on Acadia's stock price. *Id.* ¶ 49.

---

[13] *See also* Allen Rpt., Appendix C (describing the actual language of challenged misstatements).

[14] Although, the district court in *Goldman*, on remand, ultimately concluded that this "mismatch" was insufficient to establish a lack of price impact, it did so because when "[a]pplying this sliding-scale test, . . . the alleged misstatements [were] not so exceedingly more generic than the corrective disclosures that they vanquish the otherwise strong inference of price impact embedded in the evidentiary record." *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 CIV. 3461 (PAC), 2021 WL 5826285, at *14 (S.D.N.Y. Dec. 8, 2021). Unlike in that case, there is no evidence of price impact here.

[15] Rice Hall James was the investment advisor that acquired Acadia stock for proposed class representative New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and had complete discretion in making those investment decisions.

No matter where the Court looks, the evidence leads to the same conclusion: there was no price impact from the October 11, 2018 *Aurelius Value* report.

**B.    The November 16, 2018 *Seeking Alpha* Article Had No Price Impact.**

The same is true of Plaintiffs' second alleged corrective disclosure for the US-based statements: the November 16, 2018 *Seeking Alpha* article. Although there was a decline in Acadia's stock price that day, the evidence shows that "the price decline on November 16 was *not* due to the information allegedly disclosed in the *Seeking Alpha* article but rather due to negative news about the potential sale of Acadia." Allen Rpt. ¶ 36. Indeed, both the author of the *Seeking Alpha* article himself and one of Plaintiffs' own investment advisors acknowledged that the November 16 price decline was caused by negative news about the potential sale of Acadia.

>    *1.    Intraday Trading Prices Demonstrate That The Seeking Alpha Article Had No Price Impact.*

An analysis of intraday trading prices makes clear that the *Seeking Alpha* article had no price impact. There were two news events about Acadia on November 16, 2018: the *Seeking Alpha* article and a CNBC report regarding Acadia that disclosed negative news unrelated to the alleged fraud—specifically, that talks had stalled in an ongoing negotiation for a potential sale of Acadia. *Id.* The *Seeking Alpha* article was published before market hours on November 16th. *Id.* ¶ 37. Upon market opening, Acadia's stock price slightly declined from the prior day closing price (by a mere 1.16%) in the first thirteen minutes on low trading volume, which was entirely consistent with an overall decline of the NASDAQ market index (a decline of 1.06%) in those same thirteen minutes. *Id.* Nearly an hour after the *Seeking Alpha* article, "CNBC's David Faber reported . . . that the process for the potential sale of Acadia had 'stalled.'" *Id.* ¶ 38. "Bloomberg news followed immediately with a one-sentence story at 9:45 AM: 'Acadia Healthcare Sales Process Said to Have Stalled: CNBC's Faber.'" *Id.* Immediately following those reports, "Acadia's stock price began to

16

decline on very high trading volume, triggering a trading halt two minutes later at 9:47 AM." *Id.*

After trading resumed, Acadia's stock continued to decline, forcing a second trading halt later that

day. *Id.* This is all demonstrated in the chart below:



*See id.* ¶ 39.

As Plaintiffs' expert concedes, intraday trading may be used to determine price impact, *see*

Dalrymple Dep. at 26:18-29:16, and an evaluation of that trading on November 16th establishes

that any decline in Acadia's stock price that day was not due to the *Seeking Alpha* article. *See* Allen

Rpt. ¶¶ 35-39.

       2.     *Other Evidence Demonstrates That The Seeking Alpha Article Had No Price Impact.*

Although the intraday trading prices are conclusive on this issue, other evidence leads to

the same result.

*First*, the author of the *Seeking Alpha* article wrote a subsequent piece on November 20,

2018, conceding that the cause of the stock price movement on November 16th was the CNBC

report and not his *Seeking Alpha* article. *Id.* ¶ 43.

*Second*, the investment advisor that purchased Acadia stock for one of the proposed class representatives came to the same conclusion—sending an email attributing Acadia's stock price decline on November 16th to "a press report saying PE buyout talks ha[d] stalled" and never mentioning the *Seeking Alpha* article that allegedly revealed Defendants' fraud. *See* Ex. 4, RHJA0000073; *see also* Ex. 7, Buu-Hoan Dep. at 56:3-15 (testifying about this email and acknowledging that the Rice Hall James representative was saying that "the reason . . . Acadia's stock [wa]s decreasing on November 16, 2018" was "that there were private equity buyout rumors that were again rumored to have stalled, leading investors to sell").

*Third*, analyst reports are consistent with a lack of price impact. "Contrary to Plaintiffs' theory, analysts attributed the decline in Acadia's stock price on November 16, 2018 to the negative news about Acadia's sale process and not to the *Seeking Alpha* article." Allen Rpt. ¶ 40. In fact, "[a]ll four analysts" that issued reports covering the news on November 16th "attributed Acadia's stock price decline on that day to the negative news about Acadia's sales process ***and none of the analysts even mentioned the Seeking Alpha article***." *Id.* (emphasis added). Plaintiffs' expert again concedes that "analysts discuss new 'value-relevant information' if that information has a 'significant' impact on the share price," and here the information leading to the decline was the stalled sale process, which is unrelated to the alleged fraud. *Id.* ¶ 42 (quoting Dalrymple Dep. at 98:13-22).

*Finally*, just as with the *Aurelius Value* report, the generic nature of the challenged statements concerning Acadia's US operations that were allegedly revealed on this date further favors finding a lack of price impact for these alleged misstatements. *See Goldman Sachs Grp.*, 141 S. Ct. at 1960-61.

18

Plaintiffs will no doubt assert in their reply brief that the Court cannot decide the issue regarding *Seeking Alpha* because it is one of loss causation, and not price impact, and loss causation cannot be decided at the class certification stage. That might be correct if the parties were arguing over which piece of information in the same press release caused the price decline. But that is not the case where, as here, there were entirely separate reports about the company issued at different times on the day in question.

Price impact—*i.e.*, the consideration of "whether the alleged misrepresentations affected the market price," *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 814 (2011) (citations omitted)—is distinct from loss causation. *Id.* And as the Supreme Court made clear again in *Goldman Sachs Group*, evidence showing a lack of price impact must be considered at the class certification stage because it goes to the very core of the *Basic* presumption, and it cannot be ignored merely because it may also overlap with the merits question of loss causation to some degree. *See Goldman Sachs Grp.*, 141 S. Ct. at 1961 ("[A] court cannot conclude that Rule 23's requirements are satisfied without considering all evidence relevant to price impact."); *see also Halliburton II*, 573 U.S. at 283-84 (same); *Allstate*, 966 F.3d at 600 ("[T]o decide class certification using the *Basic* presumption, a court must consider the same [loss causation and materiality] evidence if the defense offers it to show the absence of transaction causation, also known as price impact," even if it requires "split[ting] some very fine hairs."); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2008) (noting that the court may not, at the class-certification stage, "put blinders on as to an issue simply because it implicates the merits of the case").

Here, Defendants have shown a lack of price impact from the two disclosures that Plaintiffs allege revealed the truth of the challenged statements concerning Acadia's US operations and, as

a result, have "sever[ed] the link between the alleged misrepresentation[s]" and the stock price, meaning that *Basic* does not apply to these claims. *See Basic*, 485 U.S. at 248. Accordingly, any certified class in this case would have to be limited to the UK allegations and the UK Class Period.

## II. THE *AFFILIATED UTE* PRESUMPTION DOES NOT APPLY TO PLAINTIFFS' US-BASED CLAIMS.

Likely aware of the lack of price impact for the US-based claims, Plaintiffs briefly attempt to invoke the *Affiliated Ute* presumption of reliance. *See* ECF 113 at 18-19. In just two short paragraphs, Plaintiffs argue that their "claims are based, in part" on "material omissions" and that *Affiliated Ute* applies to such claims. *Id.* Plaintiffs' minimal effort is telling—*Affiliated Ute* plainly does not apply to this case.[16]

As courts have consistently acknowledged, the *Affiliated Ute* presumption is limited to those cases based primarily on alleged omissions where the defendants, like those in *Affiliated Ute*, "stood mute, giving plaintiffs nothing upon which to rely." *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 755 (11th Cir. 1984). A presumption is necessary in such cases because when "no positive statements exist[] reliance as a practical matter is impossible to prove." *Wilson v. Comtech Telecomms Corp.*, 648 F.2d 88, 93 (2d Cir. 1981); *see also Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000) ("[T]he *Affiliated Ute* presumption of reliance exists in the first place to aid plaintiffs when reliance on a negative would be practically impossible to prove."), *abrogated on other grounds by California Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017).

This case is not based solely, or even primarily, on alleged omissions. To the contrary, the amended complaint alleges that Defendants issued approximately 100 statements during the putative class period that were false or misleading. *See* ECF 39 ¶¶ 111-177. And the alleged

---

[16] For the same reasons discussed herein, this presumption also would not apply to Plaintiffs' UK-based claims. But because Defendants do not oppose certification as to those claims, they limit the discussion above to the US-based claims.

omissions Plaintiffs identify in the amended complaint are only included as reasons why the challenged affirmative statements were supposedly false or misleading. *See id.* ¶¶ 129, 148, 157, 178. The *Affiliated Ute* presumption, created for omission-based claims where it would be practically impossible to prove reliance, does not apply where, as here, Plaintiffs challenge affirmative misrepresentations. *See Cox*, 7 F.3d at 395–96 (*Affiliated Ute* presumption does not apply where the "plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure as in *Affiliated Ute*"); *Joseph*, 223 F.3d at 1162 (refusing to apply *Affiliated Ute* where plaintiff alleged misrepresentations and omissions); *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215 (D.C. Cir. 2010) (same); *Schwartzman v. Morningstar, Inc.*, No. CIV.A. 12-1647, 2014 WL 3843875, at *22 (E.D. Pa. Aug. 5, 2014) (same); *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) ("*Affiliated Ute* presumption should not be applied to cases that allege both misstatements and omissions unless the case can be characterized as one that primarily alleges omissions."); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, No. CV 16-112 (MN), 2020 WL 5026553, at *5 (D. Del. Aug. 25, 2020) (refusing to apply *Affiliated Ute* where plaintiffs alleged omissions solely "to explain why the affirmative misstatements satisfy the falsity element").[17]

---

[17] The case law Plaintiffs' counsel has relied upon for the *Affiliated Ute* presumption elsewhere, and may cite again in reply here, is inapposite because it involves claims that were based primarily on omissions and/or where the alleged omissions were not merely the reasons why the challenged affirmative statements were allegedly misleading, as is the case here. *See, e.g., Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2021 WL 1828114, at *7 (E.D. Tenn. May 7, 2021) (alleged omissions were more than "direct corollaries to affirmative misstatements"); *see also Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 332 F.R.D. 556, 576 (M.D. Tenn. 2019), *order clarified*, 334 F.R.D. 118 (M.D. Tenn. 2019), *and leave to appeal denied sub nom. In re Cmty. Health Sys., Inc.*, No. 19-0509, 2019 WL 5549319 (6th Cir. Oct. 23, 2019) (omissions were "fairly deemed to be 'primarily' what underlies this securities fraud action"); *Burges v. Bancorpsouth, Inc*., No. 3:14-CV-1564, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017) (focusing on failure to disclose banking regulation violations).

Courts repeatedly reject efforts like Plaintiffs to invoke the *Affiliated Ute* presumption by re-characterizing their claims as omission-based, which could be done in every case and would undermine the reliance requirement if permitted. *See, e.g.*, *Joseph*, 223 F.3d at 1162 ("We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely."); *In re Silver Wheaton Corp. Sec. Litig.*, No. 2:15-CV-05146-CAS(JEMx), 2017 WL 2039171, at *12 (C.D. Cal. May 11, 2017) ("The CAC is replete with alleged misrepresentations akin to those in *Interbank*. That plaintiffs may now portray the foregoing misrepresentations as omissions is of no moment. Any false statement might also be portrayed as a failure to disclose the truth, but that does not render it an omission in the sense that the term is used in *Affiliated Ute* and its progeny.").[18] The Court should likewise reject that attempt in this case.

## III. PLAINTIFFS FAIL TO SATISFY RULE 23(B)(3)'S PREDOMINANCE REQUIREMENT FOR THEIR ALLEGED "SCHEME" CLAIM.

The Court should also refuse to certify a class with regard to Plaintiffs' claim that Defendants engaged in a "scheme" to defraud in violation of subsections (a) and (c) of Rule 10b-5 because Plaintiffs fail to satisfy the predominance requirement as to that claim.[19]

---

[18] *Accord Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 193 (3d Cir. 2001) (refusing to apply *Affiliated Ute* where "the omission alleged would have no impact absent the misrepresentation, or in other words, a misrepresentation is necessary to create the specific expectation that the omission does not negate"); *Lord Abbett*, 2020 WL 5026553, at *5 ("The allegations explaining why Defendants' statements were false do not turn Plaintiffs' misrepresentation claims into claims based on omissions" because "any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself,' and . . . the mere fact of this concealment cannot, and should not, transform a misrepresentation into an omission."); *Clayton, Jr. v. Heartland Resources, Inc.*, Case No. 1:08-CV-94-JHM, 2010 WL 4778787, *5 (W.D. Ky. Nov. 16, 2010) ("Because the allegations should be characterized primarily as misrepresentations, the Plaintiffs are not entitled to a presumption of reliance.").

[19] These subsections of Rule 10b-5 prohibit employing "any device, scheme, or artifice to defraud," 17 C.F.R. § 240.10b-5(a), and engaging "in any act, practice, or course of business which operates

As a threshold matter, the scheme claim entirely (and improperly) overlaps with the alleged misrepresentations and, thus, it fails on predominance for the reasons discussed above. *See supra* §§ I, II. Scheme claims under subsections (a) and (c) cannot be based merely on the same alleged misstatements that form the basis of an alleged violation of subsection (b), which specifically applies to claims for alleged false or misleading statements. *See Lentell v. Merrill Lynch & Co*., 396 F.3d 161, 177 (2d Cir. 2005) ("[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b–5(a) and (c)[.]"); *Pub. Pension Fund Grp. v. KV Pharm. Co*., 679 F.3d 972, 987 (8th Cir. 2012) (same); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 586 (S.D.N.Y. 2016) (same); *see also Desai v. Deutsche Bank Sec. Ltd*., 573 F.3d 931, 940 (9th Cir. 2009) ("We must recognize, however, that manipulative conduct has always been distinct from actionable omissions."). Thus, to allege a claim for scheme liability under subsections (a) or (c) of Rule 10b-5, a plaintiff must demonstrate that the "scheme" consists of something more than the alleged misstatements or omissions. *See id.* Specifically, a plaintiff alleging a scheme claim must identify what specific "deceptive acts," other than the challenged misstatements themselves, were performed. *See Menaldi*, 164 F. Supp. 3d at 586.

Here, although the amended complaint generically alleges that Defendants "engaged in a scheme to defraud the market," *see* ECF 39 ¶ 27, Plaintiffs never allege a single act comprising the purported scheme. Thus, Plaintiffs appear to repackage their misstatement claims as scheme claims. Indeed, one of the proposed class representatives admitted that the alleged "scheme" consists of nothing more than the alleged misstatements. *See* Ex. 5, Wenskus Dep. at 157:11-

---

or would operate as a fraud or deceit," 17 C.F.R. § 240.10b-5(c), "in connection with the purchase or sale of any security."

161:18. If that is the case, then the inability to certify a class for the challenged US-based misstatements would likewise doom Plaintiffs' effort to certify a class consisting of a scheme of those misstatements.

To the extent that this alleged scheme consists of something more than the challenged statements, as it must be to be viable, certification is inappropriate for three reasons.

*First*, the *Basic* presumption of reliance does not apply to Plaintiffs' scheme claim because they do not allege that the scheme itself was ever publicly revealed. As the Supreme Court made clear in *Stoneridge v. Scientific-Atlanta*, 552 U.S. 148 (2008), a plaintiff cannot invoke *Basic's* fraud-on-the-market presumption for an alleged scheme where that scheme was never "communicated to the public," and, consequently, "[n]o member of the investing public had knowledge, either actual or presumed, of [defendants'] deceptive acts during the relevant times." *Id*. at 159. Following *Stoneridge*, courts have regularly refused to apply the *Basic* presumption of reliance to scheme claims where the plaintiff did not allege that the scheme itself was publicly revealed. *See, e.g.*, *Hawaii Ironworkers Annuity Tr. Fund v. Cole*, 296 F.R.D. 549, 556 (N.D. Ohio 2013) (refusing to invoke the *Basic* presumption as to scheme claims because the deceptive conduct was never "communicated to the public"); *Desai*, 573 F.3d at 940 (refusing to certify a class as to scheme claims and rejecting plaintiffs' theory that they relied on the "integrity" of the market); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 218 (E.D. Pa. 2008) (declining to apply *Basic* because "none of this alleged conduct was public[ly] disclosed such that it affected the market for DVI's securities"). For the same reason, the *Basic* presumption does not apply to Plaintiffs' scheme claim in this case.

*Second*, Plaintiffs also cannot invoke the *Affiliated Ute* presumption of reliance as to their scheme claim. As mentioned above, that presumption is limited to omission-based claims where

it is practically necessary because there is no challenged statement upon which to rely. *See supra* § II. The presumption does not apply to cases like this one, where Plaintiffs challenge numerous affirmative statements and generically allege a "scheme" to defraud related to those same affirmative statements. *See Joseph*, 223 F.3d at 1163 (refusing to apply *Affiliated Ute* to alleged scheme where the plaintiff "struggle[ed] valiantly to bring the alleged conduct within the definition of 'omission'" and in reality challenged "the affirmative misrepresentations allegedly made by defendant"); *Desai*, 573 F.3d at 941 (rejecting *Affiliated Ute* presumption for scheme claims and agreeing with the approach that "carefully maintained the well-established distinction, for purposes of the *Affiliated Ute* presumption, between omission claims, on the one hand, and misrepresentation and manipulation claims, on the other"); *Anschutz Corp. v. Merrill Lynch & Co. Inc.*, 785 F. Supp. 2d 799, 818 (N.D. Cal. 2011) (same where "all [challenged] conduct was part of the same alleged scheme to manipulate the market" and was not limited to omissions).[20]

Plaintiffs know that they cannot demonstrate reliance on their alleged scheme with common evidence. That is why when responding to Defendants' interrogatory asking for their alleged basis of reliance for this theory, Plaintiffs asserted that "reliance is not an element of scheme liability." *See* Ex. 6, Ps.' ROG Resp. at 9. That is clearly wrong and contrary to binding Supreme Court precedent. *See Stoneridge*, 552 U.S. at 159 (finding that "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action,"

---

[20] The authority Plaintiffs cite, *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc*., 325 F.R.D. 280, 288-90 (D. Minn. 2018), does not counsel otherwise. There, the court, disregarding the Supreme Court's clear guidance as to the breadth of *Affiliated Ute*, concluded that this presumption could apply to the plaintiffs' scheme claims since "practicality" should be kept in mind. *Id.* at 288. As discussed above, however, there is no "practicality" problem that would support invoking the *Affiliated Ute* presumption in this case. Rather, this case is based on alleged misrepresentations and a supposed scheme relating to the same misstatements, where courts have made clear *Affiliated Ute* does not apply.

regardless of whether the deceptive act is a deceptive statement or some deceptive conduct); *see also Gordon v. Elite Consulting Grp. L.L.C.*, No. 09–CV–10772, 2009 WL 4042911, at *6 (E.D. Mich. Nov. 19, 2009) (scheme liability still requires proof "of reliance and causation resulting from such conduct"). Reliance is, of course, a required element of any private Section 10(b) claim, scheme or not. *See id.* And without a presumption of reliance, which Plaintiffs do not have here, they cannot satisfy the predominance requirement for their scheme claim because individualized issues of reliance will predominate.

Based on a reply brief their counsel submitted in another securities matter, Plaintiffs may argue that the Supreme Court's decision in *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), supports their theory of scheme liability and establishes that an actionable scheme may be premised on alleged false or misleading statements. But *Lorenzo* provides Plaintiffs no relief here.

As an initial matter, *Lorenzo* did not address the applicability of any presumption of reliance or the type of evidence necessary to prove the element of reliance for a scheme claim on a class-wide basis. *Lorenzo* was not a class action at all. It was an enforcement action brought by the SEC, and the Supreme Court made sure to note a key distinction that "the [SEC], unlike private parties, need not show reliance in its enforcement actions." 139 S. Ct. at 1104.

Moreover, contrary to what Plaintiffs will likely argue, *Lorenzo* did not hold that scheme claims under subsections (a) or (c) of Rule 10b-5 may be premised on the very same conduct that forms the basis of the plaintiff's subsection (b) claim. The question in *Lorenzo* was whether an individual who did not "make" a challenged statement within the meaning of *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), and thus could not be liable under subsection (b), could still potentially be liable under subsections (a) and (c) for disseminating false or misleading statements to potential investors with the intent to defraud. *Id.*; *see also Geoffrey A.*

*Orley Revocable Tr. U/A/D 1/26/2000 v. Genovese*, No. 18 CIV. 8460 (ER), 2020 WL 611506, at

*8 (S.D.N.Y. Feb. 7, 2020) (referring to the "additional liability *Lorenzo* may have carved out of

*Janus*"). The defendant in *Lorenzo* was an investment banker who sent e-mails to investors on

behalf of his boss that he allegedly knew to contain false information. *Lorenzo*, 139 S. Ct. at 1099.

The court held that the defendant could be held liable under subsections (a) or (c) for

"disseminat[ing] false statements with intent to defraud," even though he was not the "maker" of

such statements for purposes of subsection (b). *Lorenzo*, 139 S. Ct. 1104.

Courts interpreting *Lorenzo* have correctly recognized that the case did not abrogate the

long-recognized principle that some alleged wrongful conduct, beyond the challenged statements

themselves, is necessary to support a scheme claim. *See SEC v. Rio Tinto PLC*, No. 17CIV7994

(AT) (DCF), 2021 WL 818745, at *2-3 (S.D.N.Y. Mar. 3, 2021) (concluding that *Lorenzo* did not

hold that "misstatements alone are sufficient to trigger scheme liability"); *In re Teva Sec. Litig*.,

No. 3:17-CV-558 (SRU), 2021 WL 1197805, at *6 (D. Conn. Mar. 30, 2021) ("Although

[*Lorenzo*] contained some language regarding the interrelatedness of the three subsections of Rule

10b-5, *Lorenzo* did not address whether a Defendant could be held primarily liable under all three

subsections of Rule 10b-5 for a series of misstatements and omissions that are, admittedly, partly

actionable under Rule 10b-5(b).").[21] Indeed, even the case law Plaintiffs have relied upon

elsewhere recognizes that a scheme claim requires more than alleged misstatements. *See Puddu*,

2021 WL 1198566, *11 ("A claim brought under subsection [(a) or] (c) would have to establish

---

[21] Although one district court from outside the Sixth Circuit concluded that "*Lorenzo* effectively
abrogated the line of cases on which defendants rely and permits liability under Rule 10b-5(a) and
(c) for both making and disseminating misleading statements—despite some resulting redundancy
with Rule 10b-5(b)," *SEC v. Kameli*, No. 17 C 4686, 2020 WL 2542154, at *14 (N.D. Ill. May 19,
2020), it did so only in dicta. The court noted that this issue was effectively irrelevant to the opinion
because the SEC in that case "allege[d] conduct other than misrepresentations in support of its
Rule 10b-5(a) and (c) claims." *Id.* at *15.

different elements than one brought under subsection (b), including, notably, the existence of an alleged scheme to defraud.").

Here, there is no such allegation of wrongful conduct separate from the allegation that Defendants made false or misleading statements in violation of Rule 10b-5. The amended complaint contains four generic references to a "scheme" but never explains what that scheme consisted of, other than the allegedly false or misleading statements that supposedly inflated Acadia's stock price. *See* ECF 39 ¶¶ 27, 179, 193. This claim thus entirely overlaps with Plaintiffs' subsection (b) claim for alleged misstatements and cannot be certified under Rule 23 for the same reasons discussed above.

*Finally*, Plaintiffs' alleged scheme claim raises another, independent reason for denying class certification for that claim under *Comcast*, 569 U.S. at 35. In *Comcast*, the Supreme Court held that, to satisfy Rule 23(b)(3)'s predominance requirement, the plaintiff must present a model demonstrating that damages can be measured on a class-wide basis with evidence common to the class and consistent with plaintiff's theory of liability. *See id.* The plaintiff cannot merely rely on "assurances" that it intends to create such a model in the future—it must actually present that model at the class certification stage. *Id.* at 37; *see also Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) ("[W]ithout assurance beyond [an expert's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis."); *accord In re BP p.l.c. Sec. Litig.*, No. 4:10-md-2185, 2013 WL 6388408, at *17 (N.D. Tex. Dec. 6, 2013).

Plaintiffs rely exclusively on their expert, Mr. Dalrymple, to offer a damages model in this case. In approximately one page of his report, Mr. Dalrymple proposes that he can calculate class-wide damages based upon abnormal returns following the alleged curative events. *See* Dalrymple

Rpt. ¶¶ 92-95. In other words, Mr. Dalrymple proposes to determine the amount of artificial inflation in the price of Acadia's stock by using the drop in Acadia's stock price that allegedly followed when the truth of the misstatements was publicly revealed (*i.e.*, when the misstatements were "cured"). *See id.* Even if the Court were to accept that generic description to qualify as a damages model under *Comcast*, it cannot support certification of Plaintiffs' scheme claim because if that alleged scheme consists of something other than the alleged misstatements (as it must to be viable), Plaintiffs do not allege that the truth of that scheme was ever publicly revealed. Without a "curative" disclosure for the alleged scheme to calculate damages, Mr. Dalrymple's proposed model does not apply. And Mr. Dalrymple made clear that he has not proposed any methodology to isolate damages for the alleged scheme theory of liability. *See* Ex. 3, Dalrymple Dep. at 187:4-7 ("I have not attempted to analyze or isolate the impact of the alleged scheme or the misrepresentations and omissions. I have not bifurcated my analysis in that way."). Plaintiffs thus fail to present a viable damages model for their scheme claim for the same reason acknowledged in *Comcast*. For this additional, independent deficiency, the Court should refuse to grant class certification for Plaintiffs' purported "scheme" liability claim.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court limit the certified class in this case to the UK allegations and the UK Class Period.

Dated: March 1, 2022

*/s/ Steven A. Riley*
Steven A. Riley (BPR # 006258)
Milton S. McGee, III (BPR # 024150)
Elizabeth O. Gonser (BPR # 026329)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
(615) 320-3700
sriley@rwjplc.com
tmcgee@rwjplc.com
egonser@rwjplc.com

29

Jessica P. Corley (*pro hac vice*)
Lisa R. Bugni (*pro hac vice*)
Brandon R. Keel (*pro hac vice*)
Ronni D. Solomon (*pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street N.E.
Atlanta, GA 30309
(404) 572-4600
jpcorley@kslaw.com
lbugni@kslaw.com
bkeel@kslaw.com
rsolomon@kslaw.com

*Counsel for Defendants*

30

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of March, 2022, I electronically filed the following document and accompanying exhibits with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Christopher M. Wood
ROBBINS GELLER RUDMAN &
DOWD LLP
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2203
cwood@rgrdlaw.com

Danielle S. Myers
David C. Walton
Darryl J. Alvarado
J. Marco Janoski Gray
Ting H. Liu
Timothy Alexander Benwa Folkerth
ROBBINS GELLER RUDMAN &
DOWD LLP
655 W Broadway
Suite 1900
San Diego, CA 92101
(619) 231-1058
danim@rgrdlaw.com
davew@csgrr.com
dalvarado@rgrdlaw.com
mjanoski@rgrdlaw.com
tliu@rgrdlaw.com
afolkerth@rgrdlaw.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN & GARRISON, LLC
Bank of America Plaza
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2202
Fax: (615) 252-3798
jmartin@barrettjohnston.com

Michael Bauman
PITTA LLP
120 Broadway, 28th Floor
New York, NY 10271
(212) 652-3890
Fax: (212) 652-3891
mbauman@pittalaw.com

Justin J. Lannoye
DOWD, BLOCH, BENNETT, CERVONE, AUERBACH & YOKICH LLP
8 South Michigan Avenue, 19th Floor
Chicago, IL 60603
(312) 372-1361
Fax: (312) 372-6599
jlannoye@laboradvocates.com

Thomas C. Michaud
VANOVERBEKE, MICHAUD & TIMMONY, P.C.
79 Alfred Street
Detroit, MI 48201
(313) 578-1200
tmichaud@vmtlaw.com

Matthew M. Guiney
Patrick Donovan
Regina M. Calcaterra
Thomas H. Burt
WOLF, HALDENSTEIN, ADLER, FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
(212) 545-4600
guiney@whafh.com
donovan@whafh.com
calcaterra@whafh.com
burt@whafh.com

Paul Kent Bramlett
BRAMLETT LAW OFFICES
P O Box 150734
Nashville, TN 37215
(615) 248-2828
pknashlaw@aol.com

*/s/ Steven A. Riley*

32