# Exhibit 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ST. CLAIR COUNTY EMPLOYEES'
RETIREMENT SYSTEM, Individually and on
Behalf of All Others Similarly Situated,

    Plaintiff,

vs.

ACADIA HEALTHCARE COMPANY, INC., et al.,

    Defendants.

No. 3:18-cv-00988

# REBUTTAL REPORT

# OF

# LUCY P. ALLEN

**April 22, 2022**

**TABLE OF CONTENTS**

I. Scope of Assignment ...........................................................................................................1

II. Qualifications and Remuneration ........................................................................................1

III. Materials Considered ...........................................................................................................1

IV. The Dalrymple Rebuttal Report provides further evidence that Acadia's alleged misrepresentations regarding U.S. operations did not have price impact............................2

    A. The Dalrymple Rebuttal Report identifies another earlier short seller report that contains the same type of information Plaintiffs deem corrective of the alleged fraud – Acadia's stock price did not react to this short seller report (or the two other reports that Plaintiffs claim were corrective of the alleged fraud), which further demonstrates that the alleged misrepresentations did not have price impact ....2

    B. According to Mr. Dalrymple's own analysis and economic theory, the allegedly concealed information was not relevant to Acadia's value and thus there is no price impact from the alleged misrepresentations .........................................................5

    C. The Dalrymple Rebuttal Report's arguments that there is no evidence that the *Aurelius Value* report did not have price impact are incorrect and contrary to his own event study analysis and his proposed common damages methodology ...............6

    D. The Dalrymple Rebuttal Report's arguments that there is no evidence that the *Seeking Alpha* article did not have price impact are incorrect and undermined by his own market efficiency analysis and academic literature..........................................9

    E. According to the internal documents considered by Mr. Dalrymple, both potential private equity acquirers were aware of the allegedly corrective information and still valued Acadia's stock substantially above the market price .................................11

## I. SCOPE OF ASSIGNMENT

1. I have been asked by counsel for Defendants to review and comment on the Rebuttal Report of W. Scott Dalrymple, dated April 1, 2022 ("Dalrymple Rebuttal Report")

2. I have previously submitted an expert report in this matter, dated February 28, 2022 ("Allen Report").

## II. QUALIFICATIONS AND REMUNERATION

3. My qualifications and remuneration were set forth in the Allen Report.

## III. MATERIALS CONSIDERED

4. In preparing this report, I considered the materials previously considered in the Allen Report. In addition, I considered the following additional materials:

a) Dalrymple Rebuttal Report, including materials relied upon;

b) Academic literature on economics and statistics; and

c) News stories on Acadia.

## IV. THE DALRYMPLE REBUTTAL REPORT PROVIDES FURTHER EVIDENCE THAT ACADIA'S ALLEGED MISREPRESENTATIONS REGARDING U.S. OPERATIONS DID NOT HAVE PRICE IMPACT

### A. The Dalrymple Rebuttal Report identifies another earlier short seller report that contains the same type of information Plaintiffs deem corrective of the alleged fraud – Acadia's stock price did not react to this short seller report (or the two other reports that Plaintiffs claim were corrective of the alleged fraud), which further demonstrates that the alleged misrepresentations did not have price impact

5. The Dalrymple Rebuttal Report states that a short seller report published by *Off Wall Street Consulting Group* ("*Off Wall Street*") on September 12, 2018 is further "evidence that investors were concerned about the value impact of Acadia's alleged misconduct."[1] However, rather than supporting Plaintiffs' theory of the alleged fraud, the fact that Acadia's stock price did not react to the *Off Wall Street* short seller report only further demonstrates that the alleged misrepresentations regarding Acadia's U.S. operations did not have price impact.

6. Mr. Dalrymple asserts that the "linkage" between Acadia's alleged understaffing and patient incidents that was revealed in the *Aurelius Value* and *Seeking Alpha* reports was the crux of the corrective information that "affected investors' assessment of Acadia's value[.]"[2] In particular, the Dalrymple Rebuttal Report states that the corrective information in the alleged corrective disclosures was not just that there was a collection of "isolated [patient incidents] unrelated to Acadia's operational issues[,]" but also the attribution and "linkage" of these incidents to "Acadia's understaffing and other cost-cutting measures."[3] The *Off Wall Street* report, which was published a month before the *Aurelius Value* report and two months before the *Seeking Alpha* report, explicitly makes this "linkage" by stating that the "incidents at ACHC facilities suggest ACHC may be cutting staffing to dangerous levels." In particular, this earlier short seller report stated:

> **Recent incidents at ACHC facilities suggest ACHC may be cutting staffing to dangerous levels.**

---

[1] Dalrymple Rebuttal Report, ¶19.

[2] Dalrymple Rebuttal Report, ¶57.

[3] Dalrymple Rebuttal Report, ¶57.

> **Unfortunately for ACHC's patients, the company may already be working with reduced staffing levels due to shortages and/or to save costs.** We have identified reported safety incidents at five ACHC facilities in five different states just since the beginning of 2018. We provide links to media reports of these incidents below. In Ohio, the situation was bad enough that OhioHealth, OSU, Netcare and Mount Carmel (an ACHC JV partner) halted referrals to ACHC's Ohio Hospital for Psychiatry in May 2018.[4]

The very information that Plaintiffs claim is corrective of the alleged fraud was released to the market prior to either of the alleged corrective disclosures and there was no statistically significant price reaction in Acadia's stock, providing further evidence that the alleged misrepresentations did not have price impact.

7. According to both the Dalrymple event study and the alternative event study I conducted in the Allen Report, there was no statistically significant price reaction in Acadia's stock after the publication of the *Off Wall Street* report. According to Mr. Dalrymple's event study, Acadia's stock price reaction on September 13, 2018, after controlling for market and industry movements, is within the range of normal expected daily variation in the stock price and cannot be distinguished from zero.[5] In other words, according to Mr. Dalrymple's own event study there was no price reaction to the *Off Wall Street* report that contains the very information Mr. Dalrymple deems corrective of the alleged fraud, as the movement of the price on this date is just the usual "noise."[6] The table below shows the results of Mr. Dalrymple's event study after the publication of the *Off Wall Street* report.

---

[4] *Off Wall Street Consulting Group*, September 12, 2018, p. 13 (JEFF00000191) (emphasis added).

[5] In addition, my team and I reviewed news on Acadia released on September 12-13, 2018 and found that there was no other news announced on that date that could have offset any negative reaction in Acadia's stock price. Note that the *Off Wall Street* report appears to have been published after market hours on September 12 since the report lists Acadia's closing price on September 12 on the first page.

[6] Dalrymple Deposition at 137:19-23 and 169:5-11.

**Price Reaction Following the Off Wall Street Report**
According to Dalrymple Event Study

| Date | Previous Day Acadia Price | Acadia Price | Acadia Return | Market Index Return | Industry Index Return | Acadia Predicted Return | Price Reaction | Statistically Significant?[1] |
|---|---|---|---|---|---|---|---|---|
| 9/13/18 | $36.72 | $36.28 | -1.2% | 0.2% | 1.0% | 0.8% | -2.0% | No |

**Notes and Sources:**
Data from the Dalrymple Report. Returns are log returns.

[1] Significance is based on the price reaction's t-statistic, calculated as the price reaction divided by the standard error of the regression over the sample period. "Yes" indicates significance at the 5% level.

I also tested Acadia's stock price reaction following the *Off Wall Street* report using the alternative event study described in Section VI of the Allen Report. Again, as shown in the table below, there was no statistically significant price reaction in Acadia's stock after the publication of the *Off Wall Street* report.

**Price Reaction Following the Off Wall Street Report**
According to Alternative Event Study

| Date | Previous Day Acadia Price | Acadia Price | Acadia Return | Market Index Return | Industry Index Return | Acadia Predicted Return | Price Reaction | Statistically Significant?[1] |
|---|---|---|---|---|---|---|---|---|
| 9/13/18 | $36.72 | $36.28 | -1.2% | 0.7% | 0.5% | 0.4% | -1.6% | No |

**Notes and Sources:**
Data from Bloomberg, L.P. Returns are log returns.

[1] Significance is based on the price reaction's t-statistic, calculated as the price reaction divided by the standard error of the regression over the sample period. "Yes" indicates significance at the 5% level.

8. Moreover, there were no analyst reports issued after the *Off Wall Street* report was published. According to Mr. Dalrymple's testimony, analysts discuss new "value-relevant information" if that information has a "significant" impact on the share price.[7] Thus, according to Mr. Dalrymple's testimony, the information in the *Off Wall Street* report was not "value-relevant information."

9. Plaintiffs and Mr. Dalrymple have now identified three instances when information Plaintiffs and Mr. Dalrymple deem "value-relevant" and corrective of the alleged

---

[7] Dalrymple Deposition at 98:13-22.

fraud concerning Acadia's U.S. operations was released to the market: the *Off Wall Street* report, the *Aurelius Value* report, and the *Seeking Alpha* article. Acadia's stock price did not react to any of these alleged corrective disclosures, demonstrating that the alleged misrepresentations regarding Acadia's U.S. operations did not have price impact.

> **B. According to Mr. Dalrymple's own analysis and economic theory, the allegedly concealed information was not relevant to Acadia's value and thus there is no price impact from the alleged misrepresentations**

10. According to the Dalrymple Rebuttal Report, "for information to have price impact, […] the question is whether the allegedly concealed information was **relevant** to Acadia's value."[8] As shown in the Allen Report, when the allegedly concealed information was disclosed to the market, Acadia's stock price did not react, demonstrating that the allegedly concealed information was not relevant to Acadia's value and thus that there is no price impact from the alleged misrepresentations regarding Acadia's U.S. operations.

11. Moreover, the same analyst quotes that the Dalrymple Rebuttal Report cites to argue "that issues of adequate staffing, regulatory compliance, and quality of care were important factors in determining the value of the company"[9] were repeated before and after both the alleged misrepresentations and alleged corrective disclosures, thus showing that the allegedly concealed information did not change analysts' opinions regarding Acadia's value. In particular, the language concerning quality, staffing and compliance that the Dalrymple Rebuttal Report cites in reports from Craig Hallum, Bank of America, JPMorgan, and Wells Fargo appears in reports before and after both the alleged misrepresentations and alleged corrective disclosures.[10] For example, in reports on January 17, 2014, January 5, 2016, and November 6, 2018, Craig Hallum analysts stated:

---

[8] Dalrymple Rebuttal Report, ¶16 (emphasis added).

[9] Dalrymple Rebuttal Report, ¶17.

[10] Note there is one analyst, Jefferies, that does not repeat the same language that Mr. Dalrymple cites. However, the Jefferies report explicitly states that "questions about business practices […] including understaffing and overbilling" are not Acadia-specific but of the "mental health industry as a whole," and that media coverage regarding these concerns was focused on Acadia's competitors. See Jefferies, February 28, 2018. Jefferies maintained its buy rating and price target on Acadia, indicating that Jefferies' bottom-line valuation of the stock was not affected by these "questions" regarding business practices in the mental health industry. See Jefferies, May 1, 2018 ("BUY Price target $44.00 (from $42.00)") and Jefferies, February 21, 2018 ("BUY Price target $42.00"). Moreover, Jefferies did not mention issues of quality, staffing and compliance at Acadia's US facilities (or even mention any of the short seller reports) after the alleged corrective disclosures.

5

> Like most healthcare services companies that derive a large amount of revenues from the government, there is a high level of operational scrutiny. It is important for the management of Acadia to adequately staff their facilities, bill for patient services correctly, maintain good recordkeeping, and operate their facilities for the benefit of their patients.

In reports on February 20, 2014, July 29, 2016, and March 1, 2019, Bank of America analysts stated:

> Risks to our PO are government reimbursement pressures driven by state (Medicaid) or federal (Medicare) budgetary issues, as well as potential quality of care issues.

In reports on April 29, 2016 and March 4, 2019, JPMorgan analysts stated:[11]

> Downside risks to our price target include 1) valuation currently above historical averages, 2) overall pace of acquisition activity, 3) Priory & CRC integration risks given sizes of deals, 4) behavioral care is highly scrutinized by media and regulators, 5) increased government revenue concentration, and 6) relatively higher leverage and below-average earnings quality.

In reports on February 21, 2018, and December 17, 2018, Wells Fargo analysts stated:[12]

> Risks include occupancy rates, same facility growth, labor costs, acquisition integration, government regulation, managed care, local market competition, and interest rates. In addition, ACHC has risk from its highly levered balance sheet, its U.K. business could worsen, and the behavioral business carries reputational risk from media and others.

### C. The Dalrymple Rebuttal Report's arguments that there is no evidence that the *Aurelius Value* report did not have price impact are incorrect and contrary to his own event study analysis and his proposed common damages methodology

12. According to Mr. Darlymple's own event study there was *no* statistically significant price decline after the *Aurelius Value* report was published. However, Mr. Dalrymple argues in his rebuttal report that an event study with a non-statistically significant price reaction is not evidence of a lack of price impact. Mr. Dalrymple's argument is incorrect and contradicts

---

[11] Note that JPMorgan did not initiate coverage on Acadia until September 2015. See JPMorgan, September 16, 2015.

[12] Note that Wells Fargo resumed coverage on Acadia with a new covering analyst in January 2018. See Wells Fargo, January 29, 2018 and Wells Fargo, April 27, 2017.

his own methodology for testing for market efficiency and his own proposed methodology for measuring damages on a class-wide basis.

13. First, the fact that there is no statistically significant price decline after the *Aurelius Value* report *is* direct evidence that the alleged misrepresentations did not have price impact. For example, according to the Reference Manual on Scientific Evidence "when studies have a good chance of detecting a meaningful association, **failure to obtain significance can be persuasive evidence that there is nothing much to be found**."[13] A practical example is in FDA drug trials, where if a statistical test that a drug is more effective than a placebo fails (*i.e.*, there is no statistically significant difference in efficacy between the drug and a placebo), then the drug is rejected—the lack of statistical significance provides evidence that the drug is not better than a placebo.[14]

14. Second, Plaintiffs claim that they do not need to prove individualized reliance on the alleged misrepresentations since Acadia's stock traded in an efficient market that reflected all publicly available information, including the alleged misrepresentations, and thus there is a link between Acadia' stock price and the alleged misrepresentations.[15] Plaintiffs rely on Mr. Dalrymple's event study to "test the responsiveness of Acadia's stock price to new information" and show that Acadia traded in an efficient market and that there is a link between the stock price and the alleged misrepresentations.[16] However, Mr. Dalrymple's own event study shows that there is no observable reaction to the correction of the alleged misrepresentations (*i.e.*, no statistically significant reaction to the *Aurelius Value* report),[17] and thus, the very analysis that Plaintiffs have used to show there is a link between the stock price and "value-relevant" information shows there is no link between the alleged misrepresentations or their corrections and Acadia' stock price.

---

[13] Reference Manual on Scientific Evidence, p. 254 (emphasis added).

[14] See, for example, Kennedy-Shaffer, Lee, "When the Alpha is the Omega: P-Values, 'Substantial Evidence,' and the 0.05 Standard at FDA," Food Drug Law Journal, 72(4): 2017, pp. 595-635, which describes the history of the use of statistics by the FDA in the decision-making process for new drugs.

[15] Memorandum of Law in Support of Lead Plaintiffs' Motion for Class Certification, May 3, 2021, pp. 13-15.

[16] Memorandum of Law in Support of Lead Plaintiffs' Motion for Class Certification, May 3, 2021, p. 17.

[17] Note that according to Plaintiffs, the alleged misrepresentations either "maintained" the alleged inflation in the stock price or were misleading by omission, and thus according to Plaintiffs' theory a statistically significant price increase would not be expected at the time the alleged misrepresentations were made. Mr. Dalrymple agrees with this characterization of Plaintiffs' theory. (Dalrymple Rebuttal Report, ¶15.)

15. Third, Mr. Dalrymple argues that damages can be measured on a class-wide basis by using an event study to analyze the price reaction to a curative event to see what the impact would have been when the misrepresentations were made.[18] This is exactly what I did in the Allen Report. I used Mr. Dalrymple's own event study to measure the reaction to an alleged curative event to see what the impact would have been when the alleged misrepresentations were made and found that there was none.[19] In other words, using Mr. Dalrymple's own proposed damages methodology shows that the release of the very information that is purportedly curative of the alleged misrepresentations did not cause any statistically significant reaction in Acadia's stock price, affirmatively demonstrating that the alleged misrepresentations did not have price impact.

16. Moreover, if Mr. Dalrymple's argument is that a price reaction to a curative event that is not statistically significant is not evidence of a lack of price impact, then his proposed damages methodology would not be able to measure damages on a class-wide basis since there would be no way to statistically distinguish the alleged price reaction to the *Aurelius Value* report (*i.e.*, the alleged curative event) from noise or unrelated news.

17. In the Allen Report, I noted that the analyst commentary following the release of the *Aurelius Value* report is consistent with the lack of a price reaction to the *Aurelius Value* report.[20] 13 out of 15 (or 87%) of the analysts covering Acadia at the time did not even issue reports following the *Aurelius Value* report. Mr. Dalrymple claims that the reason most of the analysts did not publish reports following the publication of the *Aurelius Value* report is merely because analysts sometimes "refrain from commenting immediately after the revelation of new information."[21] Mr. Dalrymple's claim is not supported by any academic cite or evidence and is directly contradicted by the findings in his first report. In particular, in his first report, Mr. Dalrymple found that there were "over 600 individual analyst reports discussing Acadia during the Class Period" and that analysts "quickly digested new information and disseminated their reactions to Acadia investors."[22] It is unclear how Mr. Dalrymple's claim that analysts

---

[18] Dalrymple Report, ¶¶90-97.

[19] Allen Report, ¶29.

[20] Allen Report, ¶33.

[21] Dalrymple Rebuttal Report, ¶29.

[22] Dalrymple Report, ¶¶38 and 40.

8

sometimes "refrain from commenting immediately after the revelation of new information" can be squared with his finding that analysts "quickly digested new information and disseminated their reactions to Acadia investors."[23]

### D. The Dalrymple Rebuttal Report's arguments that there is no evidence that the *Seeking Alpha* article did not have price impact are incorrect and undermined by his own market efficiency analysis and academic literature

18. In the Allen Report, I found that the intraday price movements and trading volume of Acadia's stock show that the price decline on November 16 was not due to the information allegedly disclosed in the *Seeking Alpha* article, but rather due to negative news about the potential sale of Acadia. According to the Dalrymple Rebuttal Report, these findings are "unsupportable" because the Allen Report only cites one study that is 40 years old and focuses on price reactions after earnings or dividend announcements when "the *Seeking Alpha* article was neither an earnings nor a dividend announcement."[24]

19. Contrary to the Dalrymple Rebuttal Report's criticism, the Allen Report's assertion that, in an efficient market, securities prices react very quickly to new information, including information other than earnings and dividend announcements, is well-founded and supported by finance textbooks and academic literature. Basic finance theory dictates that in competitive and/or efficient markets, including, for example, the markets in which many Nasdaq and NYSE-listed stocks trade, market forces and the competition between buyers and sellers cause available information to be incorporated rapidly into the stock price.[25] Investors compete to discover information before the rest of the market and then to trade on that information (*i.e.*,

---

[23] Note that the Dalrymple Rebuttal Report confusingly and disingenuously claims that the Allen Report ignored that Acadia's stock, even though it did not react on day 1 after the *Aurelius Value* report, had a statistically significant reaction if you combine the reactions of day 1 and day 2. (Dalrymple Rebuttal Report, ¶28.) As described in Section IV.D below, securities prices react very quickly to new information. Acadia's stock did not react on day 1 after the *Aurelius Value* report, and there is no basis to conclude that, in an efficient market, Acadia's price would start reacting on day 2. This is consistent with my testimony that the standard approach with event studies is to continue the reaction in consecutive statistically significant one-day price movements until new information is released **only if there is a statistically significant reaction on the first day**. (Allen Deposition, 67:22-68:14, emphasis added) Moreover, Mr. Dalrymple himself uses one-day price reactions when he tests "the responsiveness of Acadia's stock price to new information." (Dalrymple Report, ¶¶65-68.)

[24] Dalrymple Rebuttal Report, ¶38.

[25] See, for example, Richard A. Brealey, Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 10th ed., 2011), p. 330.

9

buy or sell the stock) to make money. As investors trade the stock, the value of the information gets incorporated into the stock price.[26] For example, if there is information in the market indicating that a stock is underpriced, investors will attempt to profit by buying the stock and bidding up its price until the price reaches an appropriate level and the mispricing is corrected (thus eliminating the profit opportunity). Investors, therefore, have an incentive to review public information such as company filings, news stories and analyst reports as they are released to identify new information that has not yet been incorporated into the stock price.

20. Numerous empirical studies have confirmed the theory that new information is incorporated rapidly into the stock price. For example, a study in the *Journal of Financial Economics* analyzing stock price responses to analyst recommendations on CNBC TV found that prices respond within seconds and are fully incorporated within one minute:

> "The Morning Call and Midday Call segments on CNBC TV[…]report analysts' views above individual stocks and are broadcast when the market is open. We find that prices respond to reports within seconds of initial mention, with positive reports fully incorporated within one minute."[27]

Similarly, another study in the *Journal of Financial and Quantitative Analysis* analyzing stock price reactions to analyst recommendations found that information released before market open is reflected at market open and that on average it takes 5 to 15 minutes for prices to fully impound the information:

> "We examine stock price behavior in response to initial coverage, buy recommendations that are pre-released to important clients before the stock market opens, and find a strong positive valuation effect at the open. On average, it takes five minutes of trading for NYSE/AMEX stocks and 15 minutes for NASDAQ stocks to reflect the private information contained in these analyst recommendations."[28]

---

[26] See, for example, Richard A. Brealey, Stewart C. Myers and Franklin Allen, Principles of Corporate Finance (McGraw-Hill: New York, NY, 10th ed., 2011), p. 330. See, also, Zvi Bodie, Alex Kane, and Alan J. Marcus, Investments (McGraw-Hill: New York, NY, 10th ed., 2014), pp. 350-353 ("[I]t is virtually certain that there are many investigators hot on the trail of most leads that seem likely to improve investment performance. Competition among these many well-backed, highly paid, aggressive analysts ensures that, as a general rule, stock prices ought to reflect available information regarding their proper levels.").

[27] Busse, Jeffrey A. and T. Clifton Green, "Market efficiency in real time," *Journal of Financial Economics*, 65: 2002, p. 415.

[28] Kim, Sok Tae, Ji-Chai Lin, and Myron B. Slovin, "Market Structure, Informed Trading, and Analysts' Recommendations," *Journal of Financial and Quantitative Analysis*, 32(4): 1997, pp. 507-508.

21.     The Dalrymple Rebuttal Report conjectures that "like the Aurelius Value report, the Seeking Alpha article revealed complex information that could take time to digest"— in particular, information that linked staffing and quality of care issues at Acadia's facilities to management's cost cutting.[29] However, this was the same "complex information" that was revealed by the *Aurelius Value* report and the *Off Wall Street* report, several weeks before the *Seeking Alpha* article. The fact that there was no price reaction to these earlier reports is consistent with the lack of reaction to the *Seeking Alpha* article and the lack of price impact of the alleged misrepresentations.

### E.  According to the internal documents considered by Mr. Dalrymple, both potential private equity acquirers were aware of the allegedly corrective information and still valued Acadia's stock substantially above the market price

22.     According to the Dalrymple Rebuttal Report, the internal documents produced by the private equity firms that were considering acquiring Acadia (Potential Buyer A and Potential Buyer B) and the investment bank advising Acadia in the deal (Jefferies) suggest that the "issues raised in the *Aurelius Value* report and *Seeking Alpha* article were key factors" in the potential acquirers' decisions to "abandon their plans to acquire Acadia."[30] Note, as an initial matter, it is my understanding that Plaintiffs have not claimed that the CNBC report discussing the prospects of the sale of Acadia on November 16, 2018 was a corrective disclosure, and the Complaint does not discuss how the CNBC report could have revealed Acadia's alleged fraud to the market. The CNBC report and the market commentary on the CNBC report did not contain any discussion of issues relating to understaffing, quality of care, or regulatory compliance at Acadia. Nevertheless, the documents that Mr. Dalrymple cites undermine Plaintiffs' theory of the alleged fraud.

23.     The Dalrymple Rebuttal Report cites a handful of quotes from a few select documents that appear to have been cherry-picked from a much broader production of thousands of documents. According to his own list of materials considered, Mr. Dalrymple only considered a very small subset of documents, mostly emails without any supporting context, from the

---

[29] Dalrymple Rebuttal Report, ¶39.

[30] Dalrymple Rebuttal Report, ¶44.

overall production of thousands of documents by Potential Buyer A, Potential Buyer B, and Jefferies.

24. The Dalrymple Rebuttal Report does not explain how this small subset of documents (mostly emails) was selected for review by Mr. Dalrymple. Mr. Dalrymple's method of linking portions of individual emails to later documents without a review of intervening documents or understanding of the context is an unreliable method for drawing the type of conclusions asserted in the Dalrymple Rebuttal Report. Note that the limited internal documents Mr. Dalrymple cites do not appear to support his conclusion that the proposed acquisition fell through because of issues associated with the alleged misrepresentations.[31]

25. There is, however, clear economic evidence in the internal documents cited in the Dalrymple Rebuttal Report that indicates that both potential acquirers were aware of the allegedly corrective information and still valued Acadia's stock substantially *above* the market price. For example, Potential Buyer A, in its formal proposal to acquire Acadia, a document that Mr. Dalrymple cites, offered to pay more than a 10% premium over the market price to acquire Acadia, despite the fact that Potential Buyer A and its equity partners were aware of the allegations in the short seller reports.[32] Potential Buyer B also valued Acadia at a price more than 10% above the market price at the time. In its memo assessing the potential acquisition of Acadia, another document that Mr. Dalrymple cites, Potential Buyer B valued Acadia at a price more than 10% above the market price, even though Potential Buyer B was aware of the Aurelius Value report.[33] Potential Buyer A and Potential Buyer B's valuations of Acadia's stock show that, contrary to Plaintiffs' theory, sophisticated market participants aware of the alleged corrective information valued Acadia above the market price.

---

[31] In particular, the Jefferies presentation from after the end of the alleged class period indicates that the Potential Buyer A deal was abandoned because the Potential Buyer A's primary partner in the proposed acquisition was "distracted" by its own acquisition of another unrelated healthcare company that the primary partner ultimately acquired. (ACADIA00043505 and JEFF00048594.) Additionally, the October 23, 2018 email from Potential Buyer B indicates that the Potential Buyer B's "pause" on the Acadia acquisition was related to concerns about Acadia's UK business, rather than quality of care, understaffing, or regulatory compliance issues in the U.S. operations. ([Potential Buyer B]_00003205.)

[32] ACADIA00327535.

[33] [Potential Buyer B]_00005659.

26. In sum, the Dalrymple Rebuttal Report does not change any of the conclusions in the Allen Report and in fact introduces new evidence that further supports my finding that the alleged misrepresentations regarding Acadia's U.S. operations did not have price impact.

_____
Lucy P. Allen