UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ACADIA HEALTHCARE COMPANY, INC., et al.,<br><br>Defendants. | Case No. 3:18-cv-00988<br><br>Judge William L. Campbell, Jr.<br>Magistrate Judge Alistair E. Newbern |

## MEMORANDUM ORDER

Lead Plaintiffs Chicago & Vicinity Laborers' District Council Pension Fund and New York Hotel Trades Council & Hotel Association of New York City, Inc., Pension Fund filed a motion to compel discovery production (Doc. No. 106). Defendants Acadia Healthcare Company, Inc., Joey A. Jacobs, Brent Turner, and David Duckworth have responded in opposition (Doc. No. 115), and Plaintiffs have replied (Doc. No. 118). Plaintiffs' motion will be granted as set out in the following Order.

Plaintiffs have also filed a motion for issuance of letters rogatory to depose witnesses located in the United Kingdom (Doc. No. 127). Defendants have opposed that motion (Doc. No. 128), and Plaintiffs have replied (Doc. No. 137). Because that motion and Defendants' response includes arguments that are resolved, in part, by this Order, Plaintiffs' motion (Doc. No. 127) will be denied without prejudice to refiling as necessary.

## I. Background

This action brought under the Securities Exchange Act of 1934 seeks compensation from Defendants Acadia Healthcare Company, Inc., Joey A. Jacobs, Brent Turner, and David Duckworth (collectively, Defendants) for a class of plaintiffs who purchased Acadia securities between April 30, 2014, and November 15, 2018. (Doc. No. 39.) Acadia Healthcare Company provides for-profit healthcare services by operating "inpatient psychiatric facilities, residential treatment centers, group homes, substance abuse facilities, and facilities providing outpatient behavioral healthcare services in the United States, the United Kingdom ("U.K.") and Puerto Rico." (*Id.* at ¶ 2.) Plaintiffs filed this action on October 1, 2018, alleging claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S. C. §§ 78j(b), 78t(a), and Securities and Exchange Commission Rule 10b–5, 17 CFR § 240.10b–5. Plaintiffs allege that, during the class period, Defendants

> engaged in a scheme to defraud and made numerous materially false and misleading statements and omissions to investors regarding Acadia's business and operations, including by falsely stating that: (i) offering quality care was of fundamental importance to Acadia's business model, and that its facilities provided high-quality care that would drive Acadia's success; (ii) Acadia adequately staffed its facilities to ensure its ability to provide appropriate care to patients; (iii) Acadia's facilities were in compliance with relevant regulatory requirements; and (iv) Acadia's U.K. operations would achieve substantial revenue and earnings growth in the face of nursing shortages and negative media reports about the Company's operations.

(*Id.* at ¶ 3.)

Plaintiffs allege that these misleading statements about Acadia's operations artificially inflated the price of its securities, allowing the individual defendants to realize "hundreds of millions of dollars in insider trading proceeds by dumping the majority of their Acadia shares." (*Id.* at ¶ 7.)

Plaintiffs' claims were summarized by Judge Campbell in ruling on Defendants' motion to dismiss as follows:

Plaintiffs allege that Defendants falsely represented that Acadia provided high-quality services, adequately staffed its facilities, and complied with applicable laws and regulations. It was quality care, Defendants repeatedly emphasized, that drove new patients to Acadia facilities, created the demand necessary to grow its existing facilities, and was key to improving the performance and operations at the facilities Acadia acquired to fuel its growth. In reality, Acadia achieved growth by inadequately staffing facilities and cutting costs to extract higher profits at the expense of patient care and safety, and ran facilities rife with violence, sexual assault, and counter-therapeutic policies and practices.

Additionally, Plaintiffs allege Defendants falsely represented that Acadia's $2.2 billion acquisition of The Priory Group, the U.K.'s largest chain of behavioral health centers, would contribute to positive financial growth. Defendants repeatedly assured investors throughout 2017 that Acadia was on track to meet its financial targets and that the Company would experience margin improvement in the U.K. when, in fact, Acadia was not on track to meet[] its U.K. financial targets because of weakened patient census and increased labor costs that Defendants concealed.

Defendants' fraud was revealed through a series of partial disclosures. The first occurred on October 24, 2017, when Acadia revealed that deteriorating performance in the U.K. had caused the Company to miss its 3Q17 revenue and earnings targets and substantially reduce its guidance for the remainder of the year, causing Acadia's stock price to drop 30%. The second occurred on October 11, 20o18, when Aurelius Value published a report and released a video documenting systemic patient abuse and neglect at dozens of Acadia facilities caused primarily by understaffing. The report included an analysis of Centers of Medicare and Medicaid Services inspection reports from 2013 to 2018 for 31 of the 40 acute inpatient U.S. Hospitals listed on Acadia's website. The analysis found that federal inspectors uncovered staffing deficiencies at over 90% of these 31 Acadia hospitals, including repeated violations for insufficient nurses or qualified practitioners on hand. Of these 28 hospitals with staffing deficiencies, 89% of those facilities were also cited by inspectors for patient care and safety deficiencies. Following this news, Acadia's stock price declined by more than 11%.

Finally, on November 16, 2018, *Seeking Alpha* published an article entitled, "Acadia Healthcare: Very Scary Findings From A 14-Month Investigation," which revealed that the Company's rapid growth, as well as its revenue and margin increases, were attributed to cost-cutting and "reducing the quality of care." The article highlighted severe problems at seven of Acadia's facilities (facilities that were also featured in the October 2018 Aurelius Value report) and reported that, "due to the number of suicides at some of their facilities, Acadia's ability to accept certain patients has been restricted by state-level governments." On this news, Acadia's stock price declined by 26%.

(Doc. No. 54 (internal citations omitted).)

Plaintiffs also allege that "Acadia has sought to destroy evidence of its misconduct through draconian document destruction policies. Several former Acadia employees reported that during the Class period, the Company instituted a policy whereby employee e-mails were automatically deleted after 30 days unless employees took affirmative steps to preserve them." (Doc. No. 39, ¶ 49.)

The parties entered into a joint stipulation to stay all discovery pending resolution of Defendants' then-anticipated motion to dismiss on November 5, 2018. (Doc. No. 22.) After the motion to dismiss was denied (Doc. No. 55), the parties requested and the Court held an initial case management conference. The initial case management order was entered and discovery commenced on March 2, 2021. (Doc. No. 66.) Since then, the parties have engaged in extensive discovery negotiations and held multiple discovery dispute resolution conferences with the Court. The motion to compel addressed by this Order presents issues that the parties were not able to resolve by those means.

## II.       Legal Standard

"[T]he scope of discovery is within the sound discretion of the trial court[.]" *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008) (first alteration in original) (quoting *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981)). Generally, Federal Rule of Civil Procedure 26 allows discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). Relevant evidence in this context is that which "'has any tendency to make a fact more or less probable than it would be without the evidence,' if 'the fact is of consequence in determining the action.'" *Grae v. Corr. Corp. of Am.*, 326 F.R.D. 482, 485 (M.D. Tenn. 2018) (quoting Fed. R. Evid. 401).

The party moving to compel discovery bears the initial burden of proving the relevance of the information sought. *See Gruenbaum v. Werner Enters., Inc.*, 270 F.R.D. 298, 302 (S.D. Ohio

2010); *see also* Fed. R. Civ P. 26(b)(1) advisory committee's note to 2015 amendment ("A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them."). A motion to compel discovery may be filed in several circumstances, including when "a party fails to answer an interrogatory submitted under Rule 33[,]" or "produce documents ... as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iii)–(iv). "[A]n evasive or incomplete disclosure, answer, or response" is considered "a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). "The court will only grant [a motion to compel], however, if the movant actually has a right to the discovery requested." *Grae*, 326 F.R.D. at 485.

## III.    Analysis

Plaintiffs' motion to compel identifies eleven requests for production that address Acadia's relationship to Priory, Acadia's U.K. operations, and the retention of documents related to this action by Acadia and Priory:

> **Request No. 1**: Defendants' document retention policies and documents concerning the preservation, search for, collection, maintenance, destruction or alteration of documents and ESI concerning Acadia and the Individual defendants:
>
> **Request No. 8**: All documents and communications concerning Acadia's proposed, draft or final business plans, strategic plans or budgets for Acadia and any Acadia facility, including any quarterly or annual budget or financial plan;
>
> **Request No. 32**: All documents and communications concerning the effect(s) of the Priory Group and PiC acquisitions on Acadia's revenue, profit and growth, including any potential or actual stock market reaction(s) to the acquisitions;
>
> **Request No. 34**: All documents and communications concerning the Company's operations and financial performance in the U.K., including: (a) any internal projections, forecasts, budgets, reports, monitoring or strategies regarding revenue and adjusted EBITDA results and growth in the U.K.; (b) any comparison between the economic performance of Acadia's U.S. and U.K. Acadia Facilities; (c) all periodic evaluations of the Company's financial performance in the U.K.; (d) anticipated, potential or actual profit, revenue and adjusted EBITDA results and growth from the acquisitions of PiC and the Priory Group; and (e) anticipated,

potential or actual facility revenue, adjusted EBITDA and adjusted earnings per diluted share for fiscal years 2016-2018;

**Request No. 36**: All documents and communications concerning Acadia's Q4 2016 earnings results and FY 2017 guidance announced on February 23, 2017, including the statement that Defendants believed the U.K. results were out of the ordinary due to "disruption throughout the fourth quarter resulting from the focus, time and effort required to complete the divestiture in late November and to begin the integration of Priory's operations into Acadia";

**Request No. 37**: All documents and communications concerning Acadia's Q2 2017 earnings results announced on July 27, 2017, including the disclosure that same facility revenue growth for its U.K. Acadia Facilities was 4.0% and the narrowing of the Company's previously-established financial guidance for FY 2017;

**Request No. 39**: All documents and communications concerning Acadia's Q3 2017 earnings results announced on October 24, 2017, including the disclosure that same facility revenue growth for its U.K. Acadia Facilities had slowed to 3.8% and the lowering of the Company's previously-narrowed financial guidance for FY 2017;

**Request No. 40**: All documents and communications concerning: (a) the March 14, 2017 Care Quality Commission report on the Priory Group Hospital Roehampton; and (b) all Care Quality Commission reports on Acadia's U.K. Acadia Facilities; and

**Request No. 55**: All documents and communications concerning the deletion of the Acadia Microsoft Exchange mailbox for Nigel Myers.

(Doc. No. 107.)

Defendants have produced discovery responsive to Plaintiffs' requests for production collected from Acadia custodians located in the United States. Plaintiffs now move to compel Defendants to collect and produce discovery responsive to these requests from the following sources located in the U.K.: (1) the custodial files of Priory Group Financial Accountants Matt Ward and Sarah Smith, Priory Director of Finance Vicky Morell, Priory Director of Adult Care John Dalton, and Priory Director of Risk & Safety David Watts (collectively, the Priory Custodians); (2) the non-custodial shared drives of Priory's Finance and Compliance departments; and (3) the custodial files of Priory's Chief Information Officer Tina Walton. (*Id.*) Plaintiffs state

6

that their need for production from the U.K. sources is occasioned by four events: "(1) Acadia's implementation of a 60-day deletion policy at Priory in the spring of 2018 (*i.e.*, **after** the alleged misconduct); (2) Acadia's decision to place only three Priory custodians on litigation hold; (3) the deletion of the mailbox of Nigel Myers (Priory's CFO during the relevant time period), with no explanation; and (4) Acadia's refusal to conduct any additional searches of Priory sources." (Doc. No. 107.) Plaintiffs state that the "first shareholder lawsuit alleging Acadia had misled investors with respect to its Priory U.K. operations was filed on March 14, 2018," *see Jackson Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, Case No. 3:18-cv-00286 (M.D. Tenn), and voluntarily dismissed on March 26, 2018. (Doc. No. 107.) Plaintiffs cite email correspondence among Priory employees including Priory CEO Trevor Torrington and Walton from March 30, 2018, discussing implementation of an email deletion policy at Priory. In May 2018, Torrington announced that a sixty-day automatic deletion policy would take effect the next month. When this action was filed on October 1, 2018, Defendants placed three Priory employees—Torrington, Priory CFO Nigel Myers, and Priory General Counsel Dave Hall—on a litigation hold. (*Id.*) Plaintiffs state that "the custodial emails of Nigel Myers . . . were subsequently deleted after the litigation hold was put in place" and that "Acadia has been unable to explain how this deletion occurred." (*Id.*)

By agreement of the parties, Defendants produced a Rule 30(b)(6) witness, Brandon Leatha, to testify on two topics:

> **Topic No. 24**: (a) The deletion of Nigel Myers' mailbox; (b) the decision not to collect any documents from Priory Group prior to its sale; and (c) the decision not to reserve any right to request or collect documents in the January 7, 2021 Share Purchase Agreement that finalized the sale of Priory Group; and

> **Topic No. 25**: The origin, basis and nature of Acadia's document destruction policies, including: (a) the Company's policy whereby employee emails are automatically deleted after 30 days; and (b) Priory's document deletion policies.

> (Doc. Nos. 107, 111-11–111-13.)

That deposition took place on December 3, 2021. Plaintiffs state that Leatha "had no knowledge, was inadequately prepared, and offered no useful testimony on these topics as they related to Priory." (Doc. No. 107.) Excerpts from Leatha's deposition testimony reflect his statements that he did not have any knowledge regarding the deletion of Myers's email account, Priory's email retention policies, or why Defendants did not collect documents from Priory before its sale.

The parties have engaged in extensive negotiations regarding the production of discovery from U.K. sources that are reflected in correspondence filed with Plaintiffs' motion. Plaintiffs state—and Defendants do not dispute—that, over the course of these discussions, Defendants represented that they were "in contact with Priory's counsel and expected to collect the email files of Trevor Torrington and Dave Hall" and that discovery from Torrington and Hall's email files has been produced. Defendants also stated that they were "willing to discuss the collection and production of documents from certain additional custodians and noncustodial sources at Priory that are likely to have relevant information subject to burden and proportionality concerns."

After continued back and forth regarding what custodial sources remained available at Priory, Plaintiffs identified the six custodians and two noncustodial shared drives that are the subject of this motion. Plaintiffs propose that thirteen search terms be run on the Priory Custodians' email accounts and the noncustodial shared drives for a time period of January 1, 2016, through February 27, 2018. The parties have agreed on two search terms to be run on seven domestic Acadia custodians regarding implementation of a litigation hold, email retention, and the deletion of Joey Jacobs and Nigel Myers's email accounts. Plaintiffs propose that Defendants conduct the same search on Walton's email.

## A.      Federal Rule of Civil Procedure 37(e)

Although the parties do not address it in their filings, consideration of Federal Rule of Civil Procedure 37(e) is necessary to resolving Plaintiffs' motion to compel. Rule 37(e) addresses the failure to preserve electronically stored information and "authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Those measures extend from steps "no greater than necessary to cure" any identified prejudice, to an adverse jury instruction, to dismissal of the case. Fed. R. Civ. P. 37(e). No sanction under Rule 37(e) is requested by Plaintiffs or justified by the record now before the Court. What is relevant to Plaintiffs' motion is the finding Rule 37(e) requires a court to make before determining if any curative measures are necessary: that "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it and it cannot be restored or replaced through additional discovery[.]" Fed. R. Civ. P. 37(e). This initial inquiry recognizes that "electronically stored information often exists in multiple locations, [and] loss from one source may often be harmless when substitute information can be found elsewhere." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. If ESI can be replaced or restored—regardless of whether its loss was intentional or inadvertent—no further remedial measures are warranted. *Id.*

Defendants do not dispute that Myers's email account should have been preserved in anticipation of this litigation—he was one of three custodians (with Torrington and Hall) whose accounts were placed on a litigation hold—or that his email account was deleted while the hold was in place. Nor do Defendants dispute that Priory implemented a sixty-day email deletion policy in June 2018, four months before this lawsuit was filed. These events may constitute the kind of "routine alteration and deletion of information that attends ordinary use" recognized by Rule 37(e)

9

as occasioning, in the first instance, more discovery to replace what was lost.[1] Fed. R. Civ. P. 37(e) advisory committee's note to 2006 amendment. They may warrant taking the additional measures that Rule 37(e) provides. That determination cannot be made on this record. However, the Court's assessment of whether the discovery Plaintiffs seek through their motion to compel is relevant and proportional includes consideration of Rule 37(e)'s framework, including that its first step in addressing the loss of ESI is additional discovery to replace it.

### B. Relevance

First, the Court must determine whether Plaintiffs have established that the discovery they request addresses "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). *see Reitz v. City of Mt. Juliet*, 680 F. Supp. 2d 888, 891 (M.D. Tenn. 2010). Plaintiffs summarize their theory of why the Priory Custodians and Walton are likely to have relevant discovery as follows:

> Two of the six custodians were Group Financial Accountants who worked under former Chief Financial Officer ("CFO") Nigel Myers—whose emails were deleted prior to production in this case—in the Finance Department, and two others were Directors of Finance for the Priory Healthcare and Priory Adult Care divisions. Based on their positions at Priory and on documents produced to date, all of these individuals were involved in, *inter alia*, tracking monthly patient volumes and staffing costs, working on financial audits, and drafting and reconciling the financial forecasts and budgets for Priory. The fifth custodian was a Director of Risk & Safety, and internal policies show he was one of the primary individuals tasked with reviewing and investigating serious patient incidents at Priory. The sixth custodian, Priory's Chief Information Officer [Tina Walton], is in possession of documents concerning Priory's document deletion policies and the deletion of Nigel Myers' emails—*i.e.*, two topics for which Defendants agreed to designate a Rule 30(b)(6) witness, but for which the designee had no knowledge, was inadequately prepared, and offered no useful testimony.

(Doc. No. 107.)

---

[1] Plaintiffs have not argued for or otherwise supported a finding that Defendants acted with an intent to deprive them of relevant discovery in this motion.

In opposition to Plaintiffs' motion, Defendants argue that the discovery Plaintiffs seek is not relevant because it "will not establish the actual knowledge of the Individual Defendants, nor . . . show the scienter of Acadia because, under the PSLRA safe harbor, only the scienter of executives may be attributable to Acadia." (Doc. No. 115.)

First, Defendants did not object to the relevance of any of these requests with specificity in their responses. Rather, Defendants' responses uniformly begin with a statement that each request is "overbroad, unduly burdensome, disproportionate to the needs of the case, and seeking information that has no bearing on the claims or defenses at issue in the Action." Such "[b]oilerplate objections are legally meaningless and amount to a waiver of an objection." *Siser N. Am., Inc. v. Herika G. Inc.*, 325 F.R.D. 200, 209–10 (E.D. Mich. 2018); *see also* Fed. R. Civ. P. 34(b)(2)(B) (requiring that a response to a request for production "state with specificity the grounds for objecting to the request"). Because Defendants did not make the relevance objections they now raise in their responses to Plaintiffs requests, the Court may consider them waived. *See, e.g.*, *Smash Tech., LLC v. Smash Sols., LLC*, 335 F.R.D. 438, 446 (D. Utah 2020) (finding that "the objecting party must explain how each objection applies to each specific discovery request" and that objections not meeting this standard "fail[] to comply with Rules 33 and 34 and [are] therefore waived"); *Liguria Foods, Inc. v. Griffith Lab'ys, Inc.*, 320 F.R.D. 168, 186 (N.D. Iowa 2017) (finding "a 'lack of relevance' objection, without explanation, is contrary to the rules") (quoting *Sentis Grp., Inc. v. Shell Oil Co.*, 763 F.3d 919, 925 (8th Cir. 2014)). Because Plaintiffs have not argued for waiver, however, the Court will consider relevance on the merits.

Defendants' relevance argument is centered on an assertion "that all of the challenged statements concerning Acadia's performance in the UK are forward looking under the PSLRA's safe harbor." (Doc. No. 115.) The PSLRA's safe harbor provision excludes from liability forward-

looking statements that are (1) identified as such and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; (2) immaterial; (3) if made by a natural person, not shown to be made with that person's "actual knowledge . . . that the statement was false or misleading"; or (4) if made by a business entity, not shown to be "made by or with the approval of an executive officer of that entity" and "made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1). In their motion to dismiss, Defendants argued principally that all of the challenged statements were accompanied by cautionary statements sufficient to trigger the safe harbor provision. (Doc. No. 41.) In ruling on Defendants' motion, the Court found that the challenged statements did "fall squarely within the PSLRA's definition of forward-looking statements."[2] (Doc. No. 54.) It also found that "the meaningfulness of the cautionary statements in Acadia's Form 10-K cannot be determined without a determination of the facts[,]" including "whether Acadia's U.K. Facilities were already facing increased labor costs and declines in patient volume at the time the respective challenged forward-looking statements were made." (Doc. No. 54.) Having made this finding, the Court declined to dismiss this action on the basis that the safe harbor provision shielded Defendants from liability. (*Id.*)

In opposing Plaintiffs' motion to compel, Defendants shift their focus to the safe harbor provision's scienter requirement of "actual knowledge." (Doc. No. 115.) Specifically, Defendants argue that, when it is a business entity making the statements in question, "liability can only attach

---

[2]     Plaintiffs argue in their reply that "not all of the U.K.-related statements are forward-looking" and cite statements identified in Paragraphs 163, 168, 170–171, and 173–175. (Doc. No. 118.) The Court identified the statements made in each of these paragraphs as "squarely" forward-looking. (Doc. No. 54.)

where the plaintiff shows that an 'executive officer of that entity' who made or approved the statement did so with 'actual knowledge by that officer that the statement was false or misleading.'" (Doc. No. 115 (quoting 15 U.S.C. § 78u-5(c)(1)(B)(ii)).) They argue that the requested discovery cannot show actual knowledge because "the executive officers that made or approved the challenged statements at issue are Defendants Jacobs, Turner, or Duckworth," each of whom "has confirmed, under oath, that they did not rely on any of these Priory sources for the challenged statements at issue[.]" (Doc. No. 115.) In support, Defendants offer declarations from Jacobs, Turner, and Duckworth in which each states that, "in approving Acadia's press releases and public filings and making the statements [identified in the Amended Complaint] [he] did not communicate with Matthew Ward, Sarah Smith, Vicky Morrell, John Dalton, David Watts, or Tina Walton, and [ ] did not access Priory Group's Finance or Compliance department computer drives in the United Kingdom. Rather, the information on which [he] relied for the statements . . . was located at Acadia's U.S. corporate headquarters."[3] (Doc. Nos. 115-2, 115-3, 115-4.)

But, as Plaintiffs point out, Defendants' theory of relevance unduly restricts the means by which a party may prove actual knowledge. As the Supreme Court recently held in the context of ERISA actions, actual knowledge can be proved by "any of the 'usual ways,'" including "through 'inference from circumstantial evidence.'" *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *see also In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 210 (1st Cir. 2005) (finding circumstantial evidence "sufficient . . . when taken together with the entire mix of alleged facts, to support a strong inference of at least recklessness with respect to the falsity, if not actual knowledge of the falsity" of statements made

---

[3]     Turner's declaration excludes the language regarding "approving Acadia's press releases and public filings." (Doc. No. 115-3.)

in a securities action); *S.E.C. v. Lybrand*, 200 F.Supp.2d 384, 400 (S.D.N.Y. 2002) (finding "ample circumstantial evidence that could give rise to an inference of [defendants'] actual knowledge"). Evidence used to prove actual knowledge may include "electronic records showing that a [party] viewed" relevant information, "evidence suggesting that [a party] took action in response to [that] information[,]" and "evidence of 'willful blindness'" *Intel Corp.*, 140 S.Ct. at 779 (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)).

The Court finds that Plaintiffs' Requests for Production 8, 32, 33, 34, 36, 37, 38, 39, and 40—all of which address Acadia's acquisition of Priory, operation of the U.K. facilities, and the effect of the U.K. facilities' performance on Acadia's earnings—seek discovery that is relevant to proving, at a minimum through circumstantial evidence, Defendants' actual knowledge that the forward-looking statements were false.[4]

Requests for Production 1 and 55 and the proposed search of Walton's email address the discovery of evidence related to the deletion of Myers's email account and the implementation of a sixty-day email deletion policy at Priory shortly before this action was filed. Defendants' primary argument against the relevance of this discovery is that "if Priory documents are not relevant to the challenged statements at issue, then neither are documents concerning Priory's preservation of those documents." (Doc. No. 115.) That argument is rendered moot by the Court's finding that the substantive discovery Plaintiffs seek is relevant.

Defendants argue that the sixty-day deletion policy was put into effect "at a time when no lawsuit was pending against [Priory], and thus when it had no duty to preserve such documents" and, therefore, "is not spoliation." (Doc. No. 115.) "As a general matter, it is beyond question that

---

[4]    Requests for Production 1 and 55 seek documents relevant to Plaintiffs' spoliation allegations and will be addressed separately.

a party to civil litigation has a duty to preserve relevant information, including ESI, when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'" *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (quoting *Fujitsu Ltd. V. Fed. Express Crop.*, 247 F.3d 423, 436 (2d Cir. 2001)). "It is the responsibility of the parties to ensure that relevant ESI is preserved, and when that duty is breached, a district court may exercise its authority to impose appropriate discovery sanctions." *Id.* Because the "[d]estruction of potentially relevant evidence obviously occurs along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality," determining how to address lost ESI is a case-specific and fact-intensive inquiry. *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009). THus

Plaintiffs have shown that Priory instituted the sixty-day deletion policy three months after their first action against these defendants was voluntarily dismissed and six months before this action was filed. They have also shown that Myers's email account was deleted while on a litigation hold. These acts may well be wholly innocent—the kind of "routine alteration and deletion of information that attends ordinary use" that Rule 37(e) contemplates and, as Defendants assert, not spoliation. Fed. R. Civ. P. 37(e) advisory committee's note to 2006 amendment. They may warrant the stronger remedies that Rule 37(e) provides. "Further discovery will help all parties" make that determination. *Konica Minolta Bus. Sols., U.S.A. Inc v. Lowery Corp.*, No. 15-CV-11254, 2016 WL 4537847, at *6 (E.D. Mich. Aug. 31, 2016) (finding such discovery "especially needed to illuminate . . . whether reasonable steps were taken to preserve [ESI] and whether it can be restored or replaced through additional discovery"). And Defendants have already attempted to provide it by offering a Rule 30(b)(6) witness to testify about them. The transcript of that deposition, however, shows that the witness was not able to testify as to how

Myers's email was deleted, Priory's email deletion policies before it was acquired by Acadia, why the sixty-day policy was instituted in June 2018, why discovery was not collected from Priory before its sale, or who would have been responsible for collecting that discovery. The discovery Plaintiffs seek through the proposed search of Walton's email is relevant to those topics and is a reasonable next step to obtaining it.

### C.      Possession, Custody, or Control

Defendants argue that Plaintiffs' motion must be denied because the discovery they seek is not in Defendants' "possession, custody, or control" for purposes of Federal Rule of Civil Procedure 34. (Doc. No. 115.) The parties agree that Defendants do not have actual possession of the requested discovery, which is housed with Priory in the U.K. The question is thus whether Defendants have sufficient control of the discovery to be required to produce it.

Defendants argue that they cannot be required to produce ESI in Priory's possession under Rule 34 because they do not have the "legal right to obtain" that discovery. (Doc. No. 115.) The Sixth Circuit has held that "documents are deemed to be within the 'possession, custody, or control' for purposes of Rule 34 if the party has *actual* possession, custody or control, or has the legal right to obtain the documents on demand." *In re Bankers Tr. Co.*, 61 F.3d 465, 469 (6th Cir. 1995) (emphasis original). Some courts within the Sixth Circuit have construed the "legal right" standard narrowly. *See, e.g.*, *J.S.T. Corp. v. Robert Bosch LLC*, No. 15-13842, 2019 WL 2354631, at *6 (E.D. Mich. June 3, 2019), *report and recommendation adopted,* No. 15-13842, 2019 WL 2343705 (E.D. Mich. June 3, 2019) (finding that courts in the Sixth Circuit "have adopted the Legal Right Standard and the Legal Right Plus Notification Standard but not the Practical Ability Standard" as defined by The Sedona Conference); *Pasley v. Caruso*, No. 10-CV-11805, 2013 WL 2149136, at *5 (E.D. Mich. May 16, 2013) (finding that, "[w]hile Plaintiff's argument [in support of the practical ability standard] is logically sound, the Sixth Circuit has not adopted this

16

'expansive notion of control'") (quoting *Flagg v. City of Detroit*, 252 F.R.D. 346, 353 n.16 (E.D. Mich. 2008); *Flagg*, 252 F.R.D. at 353 & n.16 (finding that "[t]he Sixth Circuit and other courts have held that documents are deemed to be within the 'control' of a party if it 'has the legal right to obtain the documents on demand'" and that "[s]ome courts have adopted a more expansive notion of 'control,' finding that it extends to circumstances where a party has the 'practical ability to obtain the documents from a nonparty to the action'") (quoting *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 146 (S.D.N.Y. 1997)).

Other courts within the Sixth Circuit have found that "control" includes the practical ability to produce documents from a third party. *See, e.g.*, *Union Com. Servs. Ltd. v. FCA Int'l Operations LLC*, No. 16-CV-10925, 2018 WL 558760, at *2 (E.D. Mich. Jan. 25, 2018) ("Moreover, discovery material is within a party's control when the party has the practical ability to obtain the documents, particularly when the opposing party does not have the same practical ability to do so.'" (internal citations omitted)); *Robison v. Coey*, No. 2:15-CV-944, 2016 WL 3350471, at *2 (S.D. Ohio June 16, 2016) ("[C]ourts have frequently held that the Defendants . . . have the practical ability to obtain such documents and therefore must do so in response to a Rule 34 request[.]"); *Libertarian Party of Ohio v. Husted*, No. 2:13-CV-953, 2014 WL 3928293, at *1 (S.D. Ohio Aug. 12, 2014) ("Control is defined as the legal right or ability to obtain the documents from another source upon demand. . . Neither physical possession nor legal ownership of the documents is required; [c]ourts have also interpreted Rule 34 to require production if the party has the practical ability to obtain the documents from another, irrespective of his legal entitlement."); *Sagraves v. Lab One, Inc.*, No. C2:04-CV-683, 2004 WL 7340443, at *4 (S.D. Ohio Sept. 30, 2004), *objections overruled sub nom. Sagraves v. LabOne, Inc.*, No. 2:04CV683, 2005 WL 8168483 (S.D. Ohio Sept. 29, 2005), *aff'd sub nom. Sagraves v. Lab One, Inc.*, 316 F. App'x 366

(6th Cir. 2008) ("Control has been defined broadly: it . . . includes the legal right, authority, or practical ability to obtain the materials sought upon demand." (internal quotation omitted) (emphasis added)). Still other courts appear to use the standards interchangeably.[5] *Whiting v. Trew*, No. 3:20-CV-54-TRM-DCP, 2020 WL 6468131, at *2 (E.D. Tenn. Nov. 3, 2020) (finding that plaintiff "had the practical ability and/or legal right to obtain" the subject discovery).

The state of the law is best summarized by Wright & Miller: "The concept of 'control' is very important in applying [Rule 34], but the application of this concept is often highly fact-specific." 8B Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2210 (3d ed.); *see also Libertarian Party of Ohio*, 2014 WL 3928293, at *2 ("There may be instances where some factual development is needed to demonstrate that, even apart from legal ownership or a legal right to demand documents, a party has the practical ability to obtain them.") "Particular concerns can arise when a corporate party is related to another corporation, and this nonparty

---

[5]    Several courts across other circuits have also adopted the practical ability standard, including courts in the Second, Fourth, Eighth, Eleventh, and D.C. Circuits. *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007) ("[I]ndeed, documents have been considered to be under a party's control (for discovery purposes) when that party has the right, authority, or practical ability to obtain the materials sought on demand." (internal citations omitted)); *Searock v. Stripling*, 736 F. 2d 650, 653 (11th Cir. 1984) (defining "control" as the legal right, authority, or ability to obtain documents on demand); *Benisek v. Lamone*, 320 F.R.D. 32, 34 (D. Md. 2017) "[C]ourts have sometimes interpreted Rule 34 to require production if the party has the practical ability to obtain the documents from another, irrespective of his legal entitlement[.]" (internal citations omitted); *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 636 (D. Minn. 2000) "[D]ocuments are considered to be under a party's control when that party has the right, authority, or practical ability, to obtain the documents from a non-party to the action." (internal citations omitted); *Costa v. Kerzner Int'l Resorts, Inc.*, 277 F.R.D. 468, 471 (S.D. Fla. 2011) ("[I]f a party has access and the practical ability to possess documents not available to the party seeking them, production may be required."); *Bush v. Ruth's Chris Steak House, Inc.*, 286 F.R.D. 1, 5 (D.D.C. 2012) ("Control does not require that the party have legal ownership or actual physical possession . . . , but rather the right, authority or practical ability to obtain the documents from a non-party to the action."). The preceding is not intended to be a comprehensive survey of all circuits—nor even within a single circuit—but rather merely to show the general inclination among courts to broadly interpret the meaning of control within Rule 34.

18

corporation actually possesses the materials in question." Wright & Miller, *supra*, § 2210. In this circumstance, "[r]ather than adopting an overarching rule . . . courts have tended to focus on the facts shown in a particular case." *Id.*

Here, Defendants point to the Share Purchase Agreement documenting Acadia's January 7, 2021 sale of Priory and assert that the "contract governing Acadia's sale of Priory granted Acadia no such right [to command the release of discovery]." (Doc. No. 19.) But Defendants identify no portion of the purchase agreement that denies Acadia the ability to obtain documents from Priory.[6] Further, "[a] party that lacks a contractual right to obtain a third-party's documents . . . may nonetheless be found to have control over the third-party's documents based on a demonstrated ability to access those documents in the ordinary course of business." *Coventry Cap. US LLC v. EEA Life Settlements Inc.*, 334 F.R.D. 68, 73 (S.D.N.Y. 2020) (citing *Camden Iron and Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 441–42 (D.N.J. 1991)). Control has also been found where a subsidiary corporation "was an agent of the parent in the transaction giving rise to the suit" in question. *Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131, 140 (3d Cir. 1988). Finally, "[w]here the relationship [between corporate entities is] such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use

---

[6]    The Court also notes that Acadia's sale of Priory was executed on January 7, 2021, more than two years after this action was filed and less than two weeks before the denial of Defendants' motion to dismiss (Doc. No. 54). The PSLRA requires that, while the required stay of discovery during the pendency of any motion to dismiss is in place, "any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(b)(3)(C)(i). At least one court has found that this provision provides assurance that relevant discovery will not be lost due to corporate reorganization and divestiture. *See In re Sunrise Senior Living, Inc.*, 584 F. Supp. 2d 14, 18 (D.D.C. 2008).

in the litigation, the courts will not permit the agent-subsidiary to deny control for purposes of discovery by an opposing party." *Id.*

Plaintiffs argue that Defendants' control over the requested discovery has been demonstrated by their collection and production of Torrington and Hall's email and their representations during discovery negotiations that they were "willing to discuss the collection and production of documents from certain additional custodians and noncustodial sources at Priory that are likely to have relevant information subject to burden and proportionality concerns" and that they had "advised Priory about Plaintiffs' requests and Priory ha[d] provided the information" about the availability of identified custodians. (Doc. Nos. 111-23, 111-25.) The representations Defendants have made in discovery negotiations and their past production from Torrington and Hale's email accounts indicate that they are readily able to obtain documents from Priory. Indeed, the only hesitance Defendants voiced before opposing this motion was based on a weighing of U.K. production against anticipated additional requests for production from U.S. custodians.[7] The factual circumstances of this case thus weigh in favor of a finding that Defendants have control over the requested Priory discovery for purposes of Rule 34.

## D. Proportionality

Defendants' argue that they should not be required to search for relevant discovery from these custodians because the burden of doing so far outweighs the benefit of any resulting

---

[7]      Defendants argue that Plaintiffs should seek this discovery directly from Priory via the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the Hague Convention). The Supreme Court rejected such a "rule of law that would require first resort to Convention procedures whenever discovery is sought from a foreign litigant" and where the Federal Rules of Civil Procedure provide adequate means for discovery. *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 542–43 (1987). Because the Court finds that Defendants have control over the Priory discovery for purposes of Rule 34, use of the Hague Convention is not required in this case.

production. Defendants objected grounds of overbreadth, burden, and proportionality to Plaintiffs' definitions of "PiC"[8] and "Priory Group"[9] as they are employed in the Requests. Specifically, Defendants objected to these definitions to the extent that their application would "require Defendants to collect and produce documents that are located outside of the United States and that would be subject to restrictions on the disclosure of such information, including under foreign data privacy laws." Defendants also objected to Requests for Production Nos. 34, 36, 37, 39, and 40 "to the extent that [they] seek[] production of documents from Acadia's former operations in the United Kingdom that are outside of Acadia's possession, custody, or control and that would be subject to foreign restrictions on the disclosure of such information, including foreign data privacy laws." In response to the motion to compel, Defendants argue that Plaintiffs cannot show that the benefit of the requested discovery outweighs the burden of its production in light of the "cross-border nature of the requests" and "in light of the substantial amount of information concerning Priory that has already been produced." (Doc. No. 115.)

Rule 26 requires generally that discovery be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery

---

[8]     Plaintiffs define "PiC" as "Partnerships in Care, an independent provider of inpatient behavioral healthcare services in the United Kingdom and any of its direct or indirect subsidiaries, divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, accountants and advisors, and all other persons acting or purporting to act on its behalf."

[9]     Plaintiffs define "Priory Group" as "the largest independent provider of psychiatric services in the United Kingdom that was acquired by Acadia in 2016 for $2.3 billion and any of its direct or indirect subsidiaries, divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, accountants and advisors, and all other persons acting or purporting to act on its behalf."

outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "[T]he party resisting discovery bears the burden of demonstrating why the request is unduly burdensome or otherwise not discoverable under the Federal Rules." *Anderson v. Dillard's, Inc.*, 251 F.R.D. 307, 310 (W.D. Tenn. 2008). Regarding ESI, Rule 26 provides that "[a] party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B). When ESI is the subject of a motion to compel, "the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost." *Id.*

Defendants argue that Plaintiffs "do not explain how the added discovery they seek is necessary in light of what is already in their possession." (Doc. No. 115.) Of course, once Plaintiffs have established relevance, it is Defendants' burden to show that the discovery Plaintiffs seek is not proportional to the needs of the case. *Anderson*, 251 F.R.D. at 310. The Court, however, on motion or on its own, "must limit the . . . extent of discovery . . . if it determines that the discovery sought is unreasonably cumulative or duplicative, or can be obtained form some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C). And, as the Sixth Circuit has described, "the parties and courts share the 'collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes.'" *Helena Agri-Enterprises, LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 273 (6th Cir. 2021) (quoting Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment).

Defendants offer the declaration of John R. Tucker, their counsel's Director of E-Discovery Operations, to support their claim that the production of the requested discovery is unduly burdensome. Tucker states that Defendants have already produced "120,510 documents totaling 929,607 pages" in the course of discovery, at a cost of more than $3.8 million in legal fees. (Doc.

No. 115-1.) Tucker states that the noncustodial Priory network drives contain 2.6 terabytes of data and that the cost of preparing that data to be searched; conducting a preliminary review of the responsive documents to redact personal information in compliance with U.K. privacy laws, conducting a secondary review for responsiveness and privilege, and a third review by senior attorneys for quality control and quality assurance checks; and preparation of a privilege log would exceed $1 million. Tucker estimates that the cost of conducting the same tasks to review and produce Walton's email would be nearly half-a-million dollars. Tucker does not address the cost associated with searching the Priory Custodians' email accounts, and Defendants state that they "do not believe [the Priory Custodians] are likely to have a significant amount of documents for the time period in question given Priory's regular email retention policy." (Doc. No. 115.) These are sums that would cause sticker shock in a run-of-the-mill civil action. But this is an expansive action addressing cross-border conduct and hundreds of millions of dollars of profit, and the cost of discovery must be considered in that context. (Doc. No. 39.)

Defendants' argument that the requested production would be unduly cumulative of prior discovery has more traction. Defendants state that they have already produced "the information necessary to evaluate [Plaintiffs'] allegations" that Acadia's "weakened patient admissions [a/k/a 'census'] and increased labor costs in its U.K. operations did not support its publicly touted financial guidance." (Doc. No. 115 (quoting Doc. No. 39, ¶ 158).) Defendants state that they have produced:

> The monthly operational reports the UK submitted to Acadia; detailed monthly financials from the UK operations; the UK's forecasted operating results; the UK's narrative to explain those results; the 2017 budgets and operating metrics for the UK operations; Acadia's board materials, which contain additional information concerning the financial and operational performance Acadia's operations in the UK; and a host of other information reflecting such financial and operational performance, including the due diligence materials for Acadia's sale of Priory. This information includes tracking the census and operating costs for Acadia's UK

operations—the two factors that Plaintiffs identify as undermining Acadia's ability to meet its FY 2017 financial guidance. Defendants have also produced the relevant information concerning Acadia's 2017 financial guidance, including information reflecting the basis of that guidance.

(Doc. No. 115.)

While Defendants identify this production as providing "the information necessary" for Plaintiffs to evaluate their claims, "a party should not be limited by its opponent's theory of the case in determining what is discoverable." *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1192 (10th Cir. 2009) (citing 8 Wright, Miller, & Marcus, Fed. Prac. & Proc. § 2011 (3d ed.). The Court has already determined that Plaintiffs seek relevant discovery. Plaintiffs seek that discovery from these sources to capture ESI that was lost in the deletion of Myers's email account and Priory's institution of a sixty-day deletion policy and is not available through the other sources from which production has already been made, particularly ESI reflecting communications within Priory. Plaintiffs' requests and their execution through the proposed searches should be narrowly directed to those targets.

Plaintiffs state that they identified and selected the Priory Custodians because they are the most likely to yield that narrow set of production. Ward and Smith, Group Financial Accountants, reported directly to Myers, working with him on audits concerning Acadia's 2016 acquisition of Priory; Priory's accounting policies, financial statements, and outside audits; and portions of Acadia's financial statements filed with the SEC regarding Acadia's U.K. business. (*Id.*) Morrell and Dalton—Directors of Finance of the Priory Healthcare and Priory Adult Care divisions, respectively—worked with Myers to monitor and report Priory's average daily census figures. (*Id.*) Watts reported to Hall, whose email has been searched and produced, and documents in his custody are less likely to replace what was lost in the deletion of Myers's email. However, Watts's role reviewing and advising Priory as to the response to all serious incidents at its facilities makes

24

him an appropriate custodian of ESI relevant to proving Defendants' actual knowledge. Walton was as Priory's IT Security Policy signatory, had general responsibility over Priory Group's technical security, and was directly involved in adopting the sixty-day deletion policy. Finally, the shared drives are also likely to yield relevant information not available elsewhere because these are the repositories where, per Priory policy, important ESI was to be preserved after the sixty-day deletion policy went into effect. These sources are appropriate targets for Plaintiffs discovery requests.

However, having reviewed the proposed search terms to be applied to the Priory Custodians and the shared noncustodial drives, the Court finds that they can and should be narrowed to avoid cumulative production. Given the additional costs Defendants cite of reviewing the production to comply with the U.K.'s data protection laws, the search terms should be specifically tailored to avoid production of ESI that already been identified and produced from U.S. custodians. Plaintiffs concede that they can further narrow their search terms to avoid unnecessary cost. (Doc. No. 118.) The Court will therefore require Plaintiffs to propose search terms for the Priory Custodians and the shared noncustodial drives that (1) target ESI that will replace what was lost in the deletion of Myers's email account and the institution of the sixty-day email deletion policy and (2) that is not available from and has not already been produced in searches of U.S. custodians.

## IV.     Conclusion

For these reasons, Plaintiffs' motion to compel discovery (Doc. No. 106) is GRANTED. Plaintiffs are ORDERED to provide Defendants' revised search terms narrowing the proposed search of the Priory Custodians' email and the noncustodial shared drives as set out in this Order by no later than September 15, 2022. The Court will set additional deadlines regarding the production required by this Order separately.

Plaintiffs' motion for issuance of letters rogatory (Doc. No. 127) is DENIED WITHOUT PREJUDICE to refiling as necessary in light of the provisions of this Order.

It is so ORDERED.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge