IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similar, ) ) ) ) Plaintiff, ) ) v. ) ) ACADIA HEALTHCARE COMPANY, ) INC., et al., ) ) Defendants. ) | NO. 3:18-cv-00988 JUDGE CAMPBELL MAGISTRATE JUDGE NEWBERN |

## MEMORANDUM AND ORDER

Pending before the Court are Plaintiffs' and Defendants' respective motions for summary judgment (Doc. Nos. 313, 347), which are fully briefed. (Doc. Nos. 335, 393, 338, 395). For the reasons stated herein, Plaintiffs' motion (Doc. No. 313) is **GRANTED** and Defendants' motion (Doc. No. 347) is **DENIED**.[1]

Defendant Acadia Healthcare Company, Inc. is a for-profit healthcare company that operates inpatient psychiatric facilities, residential treatment centers, and other facilities providing outpatient behavioral healthcare services in the United States, the United Kingdom ("U.K.") and Puerto Rico. Lead Plaintiffs, New York Hotel Trades Council and Hotel Association of New York

---

[1] For ease of references the statements of material facts and responses thereto are cited as follows:

- Plaintiffs' Statement of Undisputed Material Facts (Doc. No. 315) together with Defendants' response (Doc. No. 336) is cited as "Pl. SOF ¶__."

- Defendants' Statement of Additional Material Facts (Doc. No. 336) together with Plaintiffs' response (Doc. No. 342) is cited as "Def. SOF ¶ __."

- Defendants' Statement of Undisputed Material Facts (Doc. No. 351) together with Plaintiffs' response (Doc. No. 390) is cited as "Acadia SOF ¶ __."

City, Inc. Pension Fund and the Chicago Laborers' Pension Fund, brought this securities fraud class action on behalf of themselves and other purchasers of Acadia Healthcare Company, Inc. securities between April 30, 2014 and November 15, 2018, against the company and three of its officers (collectively "Acadia") for alleged violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission Rule 10b–5 (Count I) and of Section 20(a) of the Exchange Act (Count II). (Am. Complaint, Doc. No. 39).

Plaintiffs claim Acadia engaged in a scheme to defraud investors and made false and misleading statements and omissions regarding patient care, staffing levels, and regulatory compliance at its U.S. facilities and misled investors about the financial performance of its U.K. facilities. Plaintiffs claim Defendants' fraud was revealed through a series of corrective disclosures. It is undisputed that Acadia's stock price dropped after each such disclosure.

## I. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id*.

2

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party, and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id*. The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## II. ANALYSIS

Through their pending motions, the parties seek summary judgment as to Plaintiffs' claims brought under Section 10(b) of the Exchange Act and Rule 10b–5, which "prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("*Halliburton II*").[2] To recover damages for violations of Section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *In Re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 601–02 (6th Cir. 2025).

The Court will take up the parties' respective motions in turn.

---

2   If Plaintiffs' claims brought under Section 10(b) and Rule 10b–5 fail, then their claims brought under Section 20(a) also fail. *See City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 816 (6th Cir. 2022) ("Section 20(a) provides liability for every person who directly or indirectly, controls any person liable' for violation of the securities law.").

## A. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for partial summary judgment solely on the issue of reliance, the fourth essential element of their claims brought under Section 10(b) and Rule 10b-5. "Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988). And "there is more than one way to demonstrate the causal connection." (*Id.*) (citation modified). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—e.g., purchasing common stock—based on that specific misrepresentation." *Halliburton II*, 573 U.S. at 267 (citation omitted).

Alternatively, in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), the Supreme Court "dispensed with a requirement of positive proof of reliance, where a duty to disclose material information had been breached, concluding that the necessary nexus between the plaintiffs' injury and the defendant's wrongful conduct had been established." *Basic*, 485 U.S. at 243 (citing *Affiliated Ute*, 406 U.S. at 153-54 (the "*Affiliated Ute* presumption")); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 447 n.9 (1976) ("…we held [in *Affiliated Ute*] that when a Rule 10b-5 violation involves a failure to disclose, 'positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.' The conclusion embodied in the quoted language was simply that positive proof of reliance is unnecessary when materiality is established…"); *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008) ("if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance.").

4

Additionally, "under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement." *Stoneridge*, 552 U.S. at 159 (citing *Basic*, 485 U.S. at 247 (the "*Basic* presumption")). The *Basic* presumption of reliance is "rebuttable rather than conclusive." *Halliburton II*, 573 U.S. 258, 268 (2014). "*Basic* assumes that buyers and sellers of stock in an efficient market rely on the market as an intermediary for setting the stock's price in light of all publicly available material information; accordingly, when one buys or sells the stock at the market price, one has, in effect, relied on all publicly available information, regardless of whether the buyer and/or seller was aware of that information personally." *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 493 (M.D. Tenn. 2019); *Halliburton II*, 573 U.S. at 268 ("…whenever the investor buys or sells stock at the market price, his reliance on any public material misrepresentations ... may be presumed for purposes of a Rule 10b–5 action.") (citation modified). "Fraud committed by artificially affecting a stock's price through public information, as contemplated by *Basic*, is known as 'fraud-on-the-market.'" *Grae*, 330 F.R.D. at 493.

Plaintiffs argue partial summary judgment is appropriate as to the element of reliance because there is no genuine issue of material fact as to: (1) any prerequisite required to invoke the *Basic* and *Affiliated Ute* presumptions, aside from materiality; and (2) Defendants' inability to rebut the presumptions. Defendants agree that there are no genuine disputes of material fact, aside from materiality, as to Plaintiffs' invocation of the *Basic* and *Affiliated Ute* presumptions of reliance. (*See* Doc. No. 335 at 9 (citing Pl. SOF ¶¶ 1-2, 4-34, 36-47)).[3] However, Defendants

---

[3] As noted above, the *Affiliated Ute* presumption applies (such that positive proof of reliance is not a prerequisite to recovery) when a Rule 10b-5 violation involves a failure to disclose (*i.e.*, "where there is an omission of a material fact by one with a duty to disclose"). *See supra*. There is no dispute that this case

5

Case 3:18-cv-00988    Document 436    Filed 10/16/25    Page 5 of 16 PageID #: 17681

oppose Plaintiffs' motion as to their ability to rebut the *Basic* presumption. (*See id*. ("Defendants do, however, dispute that Plaintiffs can rely on the *Basic* presumption because the alleged misrepresentations did not impact Acadia's stock price and thus the presumption does not apply.")). As Defendants' alleged Section 10(b) and Rule 10b-5 violations in the present case involve omissions/failures to disclose and Defendants do not identify any evidence to rebut the *Affiliated Ute* presumption, Plaintiffs are **GRANTED** summary judgment on the element of reliance under the *Affiliated Ute* presumption as to themselves and the class as to any omissions that Plaintiffs show to be material at trial.

Accordingly, the Court turns to Defendants' arguments as to the *Basic* presumption.

### 1. Rebutting the *Basic* Presumption of Reliance

"Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S., at 248. The Supreme Court has expressly recognized two ways in which a defendant may rebut the *Basic* presumption: (1) "show that the alleged misrepresentation did not, for whatever reason, actually affect the market price;" or (2) show that "a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud[.]" *Halliburton II*, 573 U.S. at 269.

Defendants oppose Plaintiffs' motion for partial summary judgment on the element of reliance under the *Basic* presumption with a single argument: they have evidence that rebuts the *Basic* presumption. Specifically, Defendants submit they have evidence "showing that the alleged

---

concerns alleged Rule 10b-5 violations involving omissions/failures to disclose. "To invoke the *Basic* presumption, a plaintiff must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021) (citing *Halliburton II*, 573 U.S. at 268).

6

misrepresentation had no impact on Acadia's stock price and that at least one of the Plaintiffs would have bought Acadia stock irrespective of the alleged fraud." (Doc. No. 335 at 2).

### a. Evidence of lack of price impact

"Defendants may rebut the presumption of reliance if they 'show that the misrepresentation in fact did not lead to a distortion of price.'" *Goldman Sachs*, 594 U.S. at 125 (quoting *Basic*, 485 U.S. at 248). Defendants contend they can make such a showing through their rebuttal expert witness, Lilly Allen, who will testify to "the lack of a statistically significant decline in Acadia's stock price in reaction to the alleged corrective disclosures." (Doc. No. 335 at 11). However, as Defendants concede, numerous courts have recognized that the absence of a statistically significant price adjustment does not show the stock price was unaffected by the misrepresentation. *See, e.g., Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019); *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019) ("A non-statistically significant decline simply does not 'sever the link' between the alleged misrepresentations and corrective disclosures."); *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 444 (D. Ariz. 2019) ("The *lack* of statistically significant proof that a statement affected the stock price is not statistically significant proof of the opposite, i.e., that it did not actually affect the stock price.") (emphasis in original); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018) (holding that non-statistically significant stock price decline following corrective disclosure "does not prove the *absence* of price impact") (emphasis in original). Thus, Allen's testimony and opinions as to the lack of a statistically significant decline – as opposed to **no** decline – in Acadia's stock price in reaction to the claimed corrective disclosures fail to rebut the *Basic* presumption or create a genuine issue of material fact as to Defendants' ability to do so.

Defendants also note that the generic nature of an alleged misrepresentation can be evidence of a lack of price impact "when there is a mismatch between the contents of the misrepresentation and the corrective disclosure[.]" *Goldman Sachs*, 594 U.S. at 123. While Defendants state such a mismatch is present here, they fail to support that contention with any substantive analysis. (*See* Doc. No. 335 at 12). Defendants' bald contention as to the generic nature of the alleged misstatements is insufficient to rebut the *Basic* presumption or create a genuine issue of material fact as to their ability to do so.

> b. Evidence that a plaintiff would have bought or sold Acadia stock even if they had been aware that the stock's price was tainted by fraud

Alternatively, Defendants claim they can rebut the *Basic* presumption with evidence showing that an outside investment advisor for one of Lead Plaintiffs, the Chicago Laborers' Pension Fund, was aware of certain risks before purchasing Acadia stock during the class period, did not think Acadia was engaged in fraud after review of the alleged corrective disclosures, and did not sell Acadia stock in the face of its financial guidance. (Doc. No. 335 at 13-16). However, Defendants offer no explanation as to how the foregoing shows or supports an inference that the investment advisor would have bought or sold Acadia stock *even if it had been aware that the stock's price was tainted by fraud*. Nor can the Court think of any reason.

Moreover, as Plaintiffs note in their reply, the investment advisor at issue testified that it: (1) would not have invested the Chicago Laborers' into Acadia's common stock if it had known that the share price of Acadia was artificially inflated by fraud; and (2) had no way to know whether Acadia's statements were true or false when made because it did not have access to internal Acadia documents or material nonpublic information about Acadia. (*See* Doc. No. 338 at 3-4 (citing Def. SOF ¶ 74)). As the undisputed evidence in the record establishes that the investment advisor for Chicago Laborers would not have bought or sold Acadia stock even if it had been aware that the

8

stock's price was tainted by fraud, Defendants have failed to identify evidence they could present at trial showing that "a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud[.]" *Halliburton II*, 573 U.S. at 269.

In sum, the Court finds Defendants have failed to create a genuine issue of material fact as their inability to rebut the *Basic* presumption of reliance. Accordingly, Plaintiffs are **GRANTED** summary judgment on the element of reliance under *Basic* presumption as to themselves and the class as to any misstatements that Plaintiffs show to be material at trial.

The Court's foregoing rulings in Plaintiffs' favor on their motion for partial summary judgment means for purposes of trial that: (1) the jury will not be instructed on the element of reliance; and (2) Plaintiffs need not put on proof positive of reliance, as to themselves or the class, on any misstatements or omissions that they show to be material.

B. **Defendants' motion for summary judgment**

Defendants move for summary judgment on the grounds that: (1) the Private Securities Litigation Reform Act ("PSLRA") safe harbor bars Plaintiffs' claims based on projected earnings at Acadia's U.K. facilities in 2017; and (2) Plaintiffs lack evidence of loss causation. Plaintiffs oppose Defendants' motion, arguing they have shown material facts in genuine dispute that require this case proceed to trial.

1. **PSLRA Safe Harbor**

"The PSLRA contains a safe-harbor provision for a forward-looking statement whereby a defendant is liable for such statements only if they were material; if the defendant had actual knowledge that the statements were false or misleading; and if the defendant did not identify the statements as forward-looking or insulate them with meaningful cautionary language." *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 910 (M.D. Tenn. 2019) (citations and internal quotations

omitted). "[F]or 'forward-looking statements' that are accompanied by meaningful cautionary language, the ... the safe harbor provided for in the PSLRA makes the state of mind irrelevant." *Id*. (quoting *Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) (citing 15 U.S.C. § 78u–5(c)(1)(A)). "A company that chooses to speak, therefore, is protected against failed projections provided it identifies 'important factors that could cause actual results to differ materially from those in the forward-looking statements.'" *Id*. at 911 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 551 (6th Cir. 2001) (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). The Court previously held that the challenged statements for Plaintiffs' U.K.-based claim "fall squarely within the PSLRA's definition of forward-looking statements." (*See* Memorandum, Doc. No. 54 at 7).[4] Plaintiffs' may overcome the safe-harbor protection by proving that the statements lacked meaningful cautionary language and that the defendants had actual knowledge that the statements were false or misleading when made. *Helwig*, 251 F.3d at 547-48.

Defendants assert that the cautionary language was "undoubtedly 'meaningful'" because it disclosed the exact risk that occurred in this situation – failure to meet earnings projections because of "patient admission trends" and "labor costs and labor management costs in the U.K." (Doc. No. 349 at 6-7 (citing Am. Compl., Doc. No. 39 at ¶ 178)). Defendants contend the cautionary language warned of exactly the risks and uncertainty's Plaintiff allege led to lower than projected earnings: "fluctuations in patient volume, increased labor costs, labor shortages, and the impact of Brexit." Defendants argue this cautionary language is more than sufficient to invoke the safe harbor (*Id*. at 7). Defendants argue that because there is meaningful cautionary language, the Court need not and

---

[4] Generally, the challenged statements are related to earnings guidance, plans and objectives of management for future operations, and statements of future economic performance or are statements of assumptions underlying or relating to plans for future operations or future projections. (*See* Am. Complaint, Doc. No. 39 at ¶¶ 121, 159-60, 162-65, 167-77).

should not consider whether Defendants knew that the statements were false or misleading. (Doc. No. 349 at 7 (citing *Miller*, 346 F.3d at 672)).

Plaintiffs dispute that the cautionary language was meaningful in light of historical facts because the risks identified as possibilities had, in fact, already materialized. (Doc. No. 393 at 6). Plaintiffs point to evidence showing that when Acadia warned of "the impact of competition for staffing on [its] labor costs and profitability" and that "no volume commitments are given," Acadia's U.K. operation was already experiencing increased agency costs and lowered patient volume and, in fact, failed to meet targets in every month of the 2017 fiscal year. (*See* Pl. Exs. 32-41 (showing monthly costs higher than budget and average daily census lower than budget)).

Plaintiffs point to this Court's reasoning when addressing the motion to dismiss: "[i]f a company were to warn of the potential deterioration of one line of business, when in fact it was established that that line of business had already deteriorated, then ... its cautionary language would be inadequate to meet the safe harbor standard. By analogy, the safe harbor would not protect from liability a person 'who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'" (*See* Doc. No. 54 at 8 (citing *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 911 (M.D. Tenn. 2019) (quoting *In re Harmon Int'l Indus. Inc. Sec. Litig.*, 791 F.3d 90, 102-03 (D.C. Cir. 2015)). The same reasoning applies equally at the summary judgment stage, albeit under a different standard. Disclosure of a risk that "might" occur when that risk has already materialized is misleading and does not constitute meaningful cautionary language. As relevant here, if staffing costs were consistently above budget and occupancy rates were consistently below budget, as the evidence Plaintiffs have identified indicates, language cautioning of the risk of these occurrences would not be meaningful and Defendants would not be entitled to the safe harbor.

11

Defendants argue two Sixth Circuit decisions require different result. (Doc. No. 349 at 8 (citing *Bondali v. YUM! Brands, Inc.*, 620 Fed. App'x 483, 491 (6th Cir. 2015)); Doc. No. 395 at 1-2 (citing *Kolominsky v. Root*, 100 F.4th 675, 689 (6th Cir. 2024))). Neither of these cases is directly applicable here. *Bondali* did not concern application of the safe harbor – *i.e.*, whether a forward-looking statement was accompanied by meaningful cautionary language. *See* 620 Fed. App'x at 491. Instead, the *Bondali* court held (in an unpublished decision) that cautionary statements themselves are not actionable "to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results." *Id*. Whether the cautionary statements identified by Defendants are themselves a material misstatement is not at issue here. The Court has no difficulty reconciling the idea that a statement describing future risks that have already materialized is not meaningful cautionary language for purposes of the PSLRA safe harbor and is also not independently actionable as a fraudulent misrepresentation. As *Bondali* concerned only the second proposition, it has little application here.

*Kolominsky*, which addresses the "Bespeaks Caution doctrine" rather than the PSLRA safe harbor and also involves a claim based on allegedly fraudulent risk disclosure statements, is similarly unpersuasive. *See* 100 F.4th 675. As in *Bondali*, the court considered whether a stated risk factor was itself materially false or misleading. *Id*. at 687. The court held that statement which was both forward looking and labeled as a "risk factor" was not itself materially misleading. As in *Bondali*, a determination of whether a statement constitutes meaningful cautionary language for purposes of the PSLRA safe harbor is not the same as whether that same statement is itself a fraudulent misrepresentation. Accordingly, Defendants have failed to show they are entitled to the safe harbor as a matter of law based on the inclusion of meaningful cautionary language.

12

The Court next turns to whether defendants had actual knowledge that the statements were false or misleading when made. *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 547-48 (6th Cir. 2001). Actual knowledge is a higher standard than recklessness; "to have 'actual knowledge' of a piece of information, one must in fact be aware of it." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184 (2020) (defining "actual knowledge" in the context of ERISA based on the plain meaning of the phrase). Actual knowledge can be proved through "any of the 'usual ways,'" including "through inference from circumstantial evidence" and "willful blindness." *Id*. at 189.

Defendants argue there is no evidence that they had actual knowledge that any of the forward-looking statements were materially false or misleading when made. (Doc. No. 349 at 9). Defendants point to evidence that Acadia's public guidance was more conservative (*i.e.*, projected lower earnings) than its internal budget. Defendants also note that executive bonuses were tied to meeting budget earning, so the executives had no incentive to approve a budget they did not believe would be met. (*Id*.). Defendants point out that even Plaintiffs' expert, Michael J. Willis, does not say Defendants had actual knowledge that the budget projections were false – instead, he labels them "overly aggressive, unreasonable, and inconsistent with historical trends" and that it was "highly unlikely" that Acadia would meet the projections. (Doc. No. 349 at 10 (citing Acadia SOF ¶ 52)). In fact, Willis testified that he does not offer an opinion about whether Defendants knew the statements were false. (Acadia SOF ¶ 55 (citing Willis Dep., at 195)).

Defendants acknowledge that Plaintiffs' expert, Daniel Taylor, opines that Defendants engaged in "unusual" trading in Acadia stock during the class period. Defendants argue, however, that "unusual" trading does not show that any Defendant had actual knowledge that the challenged forward-looking statements were false when made. (Doc. No. 349 at 11). Defendants argue that,

13

standing alone, suspicious trading does not even give rise to a "strong inference of scienter," let alone prove actual knowledge.

In response, Plaintiffs point to circumstantial evidence from which an inference of actual knowledge could be drawn. This includes evidence that Defendants made unreasonable performance expectations, assumed improvements in Priory's budgeted occupancy rates and staffing costs that deviated from historical trends, ignored monthly results and forecasts that showed the fiscal year 2017 guidance was not feasible, directed Priory to make accounting adjustments to improve interim results and delay the revision of guidance regarding profit, secretly explored options to divest the U.K. operations, sold millions of dollars in Acadia stock only months before lowering projected earnings guidance, and implemented a 60-day email deletion policy shortly after getting sued about alleged misrepresentations regarding the fiscal year 2017 guidance. (Pl. Mem., Doc. No. 393 at 8-9 (citing Exs. 6-11, 13-15, 17-19, 20-23, 32-42, 46-59, 60-71)).

This evidence is sufficient to raise a genuine dispute of fact concerning whether the earnings guidance was knowingly false. Accordingly, summary judgment is inappropriate.

### 2. Element Six – Loss Causation

Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff. *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384-85 (6th Cir. 2016) ("a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor") (emphasis in original). Defendants attempt to show Plaintiffs lack evidence of loss causation by attacking the opinions of Plaintiffs' expert witness, Scott Dalrymple, and by arguing the corrective disclosures did not reveal

14

new information and/or were not followed by statistically significant price declines. (Doc. No. 349 at 16-25).

The Court has already ruled that Dalrymple's opinions about loss causation and damages will be admissible at trial and explained why the absence of a statistically significant price decline following a corrective disclosure is not evidence of an absence of price impact. (*See* Doc. No. 426; *supra* III.A.1.a.).[5] Thus, the Court turns to Defendants' argument that two of the claimed corrective disclosures – a report published by *Aurelius Value* on October 11, 2018 and an article published by *Seeking Alpha* on November 16, 2018 – "fail[] to support Plaintiffs' theory of causation" because neither contained information "that the market would not have already processed and reacted to." (Doc. No. 349 at 18-21). Defendants' foregoing argument is premised on their view that publicly available information will be reflected in market price "within minutes." (*See id*. ("in an efficient market, Acadia's stock price would immediately reflect newly available value-relevant information.")). However, as Defendants are aware, the Supreme Court has specifically not adopted "any particular theory of how quickly and completely publicly available information is reflected in market price." *Halliburton II*, 573 U.S. at 271–72 (quoting *Basic*, 485 U.S. at 248 n.28). Defendants' argument is also unpersuasive because it is premised on a view of the facts in the light most favorable to themselves. As Defendants have failed to show the absence of material disputes of fact or that Plaintiffs lack evidence of loss causation, they are not entitled to summary judgment in their favor on this basis.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **DENIED** and Plaintiffs' motion for partial summary judgment is **GRANTED** on the element of reliance under

---

[5] Accordingly, the Court does not reach Defendants' argument that expert testimony is required to establish loss causation in the present matter.

the *Affiliated Ute* and *Basic* presumptions as to themselves and the class as to any omissions or misstatements that Plaintiffs show to be material at trial.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE